**Nos. 25-2497(L), 26-1002**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

E.K., *by and through parent and next friend Lindsey Keeley*, *et al.*,
Plaintiffs-Appellees/
Cross-Appellants,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*,
Defendants-Appellants/
Cross-Appellees.

On Appeal from the United States District Court
for the Eastern District of Virginia

## JOINT APPENDIX

MATTHEW CALLAHAN
EDEN HEILMAN
*ACLU of Virginia Foundation*
*P.O. Box 26464*
*Richmond, VA 23261*
*(804) 644-8080*

EMERSON J. SYKES
*ACLU Foundation*
*125 Broad Street, 18th Floor*
*New York, NY 10004*

COREY M. SHAPIRO
WILLIAM E. SHARP
*ACLU of Kentucky Foundation*
*325 W. Main Street, Suite 2210*
*Louisville, KY 40202*

*Counsel for Plaintiffs-*
*Appellees/Cross-Appellants*

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*

*Counsel for Defendants-*
*Appellants/Cross-Appellees*

# TABLE OF CONTENTS

Docket Sheet ................................................................................ JA1

Memorandum Opinion Regarding Motion for Preliminary Injunction,
    Dkt. 58 (Oct. 20, 2025) ........................................................JA13

Order Granting Preliminary Injunction,
    Dkt. 59 (Oct. 20, 2025) ........................................................JA57

Complaint,
    Dkt. 1 (Apr. 15, 2025) ..........................................................JA59

Exhbit 1 to Complaint, Executive Order 14168 (Jan. 20, 2025),
    Dkt. 1-1 (Apr. 15, 2025) .......................................................JA86

Exhbit 2 to Complaint, Executive Order 14185 (Jan. 27, 2025),
    Dkt. 1-2 (Apr. 15, 2025) .......................................................JA91

Exhbit 3 to Complaint, Executive Order 14190 (Jan. 29, 2025),
    Dkt. 1-3 (Apr. 15, 2025) .......................................................JA95

Exhbit 6 to Complaint, Letter from Beth Shiavino-Navaez, Director,
    DoDEA to DoDEA Sponsors, Parents, and Guardians (Feb. 10,
    2025),
    Dkt. 1-6 (Apr. 15, 2025) ......................................................JA101

Exhbit 11 to Complaint, Memorandum from Lori Pickel, Acting Chief
    Academic Officer, DoDEA to DoDEA Directors for Student
    Excellence, et al. (Feb. 5, 2025),
    Dkt. 1-6 (Apr. 15, 2025) ......................................................JA103

Notice of Motion for a Preliminary Injunction,
    Dkt. 9 (May 7, 2025) ...........................................................JA106

Exhibit 11 in Support of Motion for Preliminary Injunction,
    Memorandum from Charles Kelker, Chief of Staff, DoDEA, to
    DoDEA Europe Administrators and School-Level Employees (Feb.
    7, 2025),
    Dkt. 10-13 (May 7, 2025) .....................................................JA110

Exhibit 15 in Support of Motion for Preliminary Injunction, Letter
from Michelle Howard-Brahaney, Director for Student Excellence,
DoDEA to Parents and Students (Mar. 7, 2025),
Dkt. 10-17 (May 7, 2025) ......................................................................JA113

Exhibit 16 in Support of Motion for Preliminary Injunction, Press
Release, DoD, Identity Months Dead at DoD (Jan. 31, 2025),
Dkt. 10-18 (May 7, 2025) ......................................................................JA116

Exhibit 17 in Support of Motion for Preliminary Injunction,
Memorandum from Taylor York, Civil Rights Analyst and Program
Manager, DoDEA, to Jay M. Burcham, Chief of Staff, DoDEA (Feb.
24, 2025),
Dkt. 10-19 (May 7, 2025) ......................................................................JA118

Exhibit 18 in Support of Motion for Preliminary Injunction,
Memorandum from Pete Hegseth, Secretary of Defense to Senior
Pentagon Leadership, et al. (Jan. 29, 2025),
Dkt. 10-20 (May 7, 2025) ......................................................................JA122

Declaration of Lindsey Keeley in Support of Motion for Preliminary
Injunction (May 4, 2025),
Dkt. 10-23 (May 7, 2025) ......................................................................JA125

Declaration of Jessica Henninger in Support of Motion for Preliminary
Injunction (May 1, 2025),
Dkt. 10-24 (May 7, 2025) ......................................................................JA165

Declaration of Jessica Henninger in Support of Motion for Preliminary
Injunction (May 6, 2025),
Dkt. 10-25 (May 7, 2025) ......................................................................JA171

Declaration of Anna Kenkel in Support of Motion for Preliminary
Injunction (May 6, 2025),
Dkt. 10-26 (May 7, 2025) ......................................................................JA178

Declaration of Natalie Tolley in Support of Motion for Preliminary
Injunction (May 5, 2025),
Dkt. 10-27 (May 7, 2025) ......................................................................JA194

ii

Exhibit 2 in Opposition to Motion for Preliminary Injunction,
Declaration of Timothy D. Dill (May 22, 2025),
Dkt. 29-2 (May 23, 2025) ..................................................................JA201

Exhibit 3 in Opposition to Motion for Preliminary Injunction,
Declaration of Beth Schiavino-Narvaez (May 23, 2025),
Dkt. 29-2 (May 23, 2025) ..................................................................JA206

Exhibit 4 in Opposition to Motion for Preliminary Injunction,
Declaration of Jayme Linton (May 23, 2025),
Dkt. 29-2 (May 23, 2025) ..................................................................JA212

Memorandum Order Denying Motion for Reconsideration,
Dkt. 54 (July 11, 2025) ......................................................................JA222

Notice of Appeal,
Dkt. 60 (Dec. 23, 2025) .....................................................................JA247

Notice of Cross-Appeal,
Dkt. 63 (Dec. 23, 2025) .....................................................................JA251

Plaintiffs' Notice to Court Regarding Enrollment Status,
Dkt. 64 (Dec. 23, 2025) .....................................................................JA252

Attachment A to Plaintiffs' Notice to Court Regarding Enrollment
Status, Supplemental Declaration of Jessica Henninger (Dec. 19,
2025)
Dkt. 64-1 (Dec. 23, 2025) ..................................................................JA256

Attachment B to Plaintiffs' Notice to Court Regarding Enrollment
Status, Declaration of Megan Jebeles (Oct. 27, 2025)
Dkt. 64-2 (Dec. 23, 2025) ..................................................................JA261

Attachment C to Plaintiffs' Notice to Court Regarding Enrollment
Status, Second Declaration of Lindsey Keeley (Dec. 21, 2025)
Dkt. 64-3 (Dec. 23, 2025) ..................................................................JA266

Attachment D to Plaintiffs' Notice to Court Regarding Enrollment
Status, Second Declaration of Anna Kenkel (Dec. 22, 2025)
Dkt. 64-4 (Dec. 23, 2025) ..................................................................JA270

Second Declaration of Natalie Tolley (Feb. 25, 2026),
Dkt. 68 (Feb. 25, 2026) ..................................................................JA273

Supplemental Declaration of Jessica Henninger in Support of Motion
to Modify the Preliminary Injunction (Feb. 27, 2026),
Dkt. 72 (Mar. 18, 2026)...............................................................JA276

iv

APPEAL

## U.S. District Court
## Eastern District of Virginia − (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:25−cv−00637−PTG−IDD

E.K. et al v. Department of Defense Education Activity et al
Assigned to: District Judge Patricia Tolliver Giles
Referred to: Magistrate Judge Ivan D. Davis
Case in other court:  Fourth Circuit, 25−02497
                    Fourth Circuit, 26−01002
Cause: 28:1331 Fed Question−Violation of Constitutional Rights

Date Filed: 04/15/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**E.K.**
*by and through parent and next friend*
*Lindsey Keeley*

represented by   **Corey M. Shapiro**
ACLU of Kentucky Foundation (NA/KY)
325 W. Main St
Suite 2210
Louisville, KY 40202
502−581−9746
Email: corey@aclu−ky.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
ACLU of Virginia
P.O. Box 26464
Richmond, VA 23261
804−523−2152
Email: eheilman@acluva.org
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
American Civil Liberties Union
Foundation (NY−NA)
125 Broad St
18th Floor
New York, NY 10004
**NA**
212−549−2500
Email: esykes@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
ACLU of Kentucky Foundation (NA/KY)
325 W. Main St
Suite 2210
Louisville, KY 40202
502−581−9746
Email: wsharp@aclu−ky.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
American Civil Liberties Union
Foundation of Virginia
701 E. Franklin St.
Ste. 1412
Richmond, VA 23219
804−986−9450
Fax: 804−649−2733
Email: mcallahan@acluva.org
*ATTORNEY TO BE NOTICED*

JA1

**Plaintiff**

**S.K.**
*by and through parent and next friend*
*Lindsey Keeley*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**O.H.**
*by and through parent and next friend*
*Jessica Henninger*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**S.H.**
*by and through parent and next friend*
*Jessica Henninger*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA2

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**H.H.**
*by and through parent and next friend*
*Jessica Henninger*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**E.G.**
*by and through parent and next friend*
*Megan Jebeles*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**E.Y.**
*by and through parent and next friend*
*Anna Young*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA3

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**C.Y.**
*by and through parent and next friend*
*Anna Young*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**L.K.**
*by and through parent and next friend*
*Anna Kenkel*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**

**JA4**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**L.K.**
*by and through parent and next friend
Anna Kenkel*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**L.K.**
*by and through parent and next friend
Anna Kenkel*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M.T.**
*by and through parent and next friend
Natalie Tolley*

represented by **Corey M. Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eden Brooke Heilman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)

**JA5**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Sharp**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Department of Defense Education Activity** | represented by | **Matthew J. Mezger**<br>DOJ−USAO<br>United States Attorney's Office<br>Eastern District of Virginia<br>2100 Jamieson Avenue<br>Alexandria, VA 22314<br>703−299−3700<br>Email: matthew.mezger@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Meghan Elizabeth Loftus**<br>United States Attorney's Office<br>(Alexandria)<br>2100 Jamieson Avenue<br>Alexandria, VA 22314<br>703−299−3757<br>Email: meghan.loftus@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Beth Schiavino−Narvaez**<br>*in her official capacity as Director of the Department of Defense Education Activity* | represented by | **Matthew J. Mezger**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Meghan Elizabeth Loftus**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Peter B. Hegseth**<br>*in his official capacity as Secretary of Defense* | represented by | **Matthew J. Mezger**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Meghan Elizabeth Loftus**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **Federal Education Association** | represented by | **Jacob Karabell**<br>Bredhoff & Kaiser, PLLC<br>805 Fifteenth St, NW, 10th Fl<br>Suite 1000<br>Washington, DC 20005 |

**JA6**

202−842−2600
Fax: 202−842−1888
Email: jkarabell@bredhoff.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**National Education Association**          represented by    **Jacob Karabell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/15/2025 | 1 | Complaint ( Filing fee $ 405, receipt number AVAEDC−10124205.), filed by O.H., C.Y., S.H., E.G., L.K., M.T., H.H., E.K., E.Y., S.K.. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9, # 10 Exhibit Exhibit 10, # 11 Exhibit Exhibit 11, # 12 Exhibit Exhibit 12, # 13 Exhibit Exhibit 13, # 14 Exhibit Exhibit 14, # 15 Exhibit Index of Exhibits, # 16 Civil Cover Sheet)(Callahan, Matthew) (Entered: 04/15/2025) |
| 04/15/2025 | | Initial Case Assignment to District Judge Patricia Tolliver Giles and Magistrate Judge Ivan D. Davis. (jlan) (Entered: 04/15/2025) |
| 04/15/2025 | 2 | Proposed Summons *as to Department of Defense Education Activity* by C.Y., E.G., E.K., E.Y., H.H., L.K., M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 04/15/2025) |
| 04/15/2025 | 3 | Proposed Summons *as to Beth Schiavano−Narvaez* by C.Y., E.G., E.K., E.Y., H.H., L.K., M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 04/15/2025) |
| 04/15/2025 | 4 | Proposed Summons *as to Peter Brian Hegseth* by C.Y., E.G., E.K., E.Y., H.H., L.K., M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 04/15/2025) |
| 04/16/2025 | | Notice of Correction in re Complaint and Summons. The filing user has been notified to file proposed summons for the Attorney General and US Attorney for the EDVA. (dvanm) (Entered: 04/16/2025) |
| 04/16/2025 | 5 | Proposed Summons *as to Attorney General* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 04/16/2025) |
| 04/16/2025 | 6 | Proposed Summons *as to U.S. Attorney* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 04/16/2025) |
| 04/18/2025 | 7 | Summons Issued as to Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavano−Narvaez, U.S. Attorney and U.S. Attorney General. NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed as to USA or Summons Returned Unexecuted as to USA. (Attachments: # 1 Notice)(dvanm) (Entered: 04/18/2025) |
| 05/06/2025 | 8 | SUMMONS Returned Executed by O.H., C.Y., S.H., E.G., L.K.(by and through parent and next friend Anna Kenkel), M.T., H.H., E.K., E.Y., S.K.. All Defendants. (Attachments: # 1 Affidavit, # 2 Receipt)(Callahan, Matthew) (Entered: 05/06/2025) |
| 05/07/2025 | 9 | MOTION for Preliminary Injunction by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Callahan, Matthew) (Entered: 05/07/2025) |

**JA7**

| 05/07/2025 | 10 | Memorandum in Support re 9 MOTION for Preliminary Injunction filed by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Attachments: # 1 Index of Exhibits, # 2 Attorney Declaration of Matthew Callahan, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Keeley Declaration with Exhibits A−E, # 24 Henninger Declaration, # 25 Young Declaration, # 26 Kenkel Declaration with Exhibits A and B, # 27 Tolley Declaration with Exhibit A)(Callahan, Matthew) (Entered: 05/07/2025) |
| 05/07/2025 | 11 | Notice of Hearing Date *on May 29, 2025 at 10:00 a.m.* re 9 MOTION for Preliminary Injunction (Callahan, Matthew) (Entered: 05/07/2025) |
| 05/07/2025 | 12 | Motion to appear Pro Hac Vice by Emerson Sykes and Certification of Local Counsel Matthew Callahan Filing fee $ 75, receipt number AVAEDC−10166769. by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Callahan, Matthew) (Entered: 05/07/2025) |
| 05/07/2025 | 13 | Motion to appear Pro Hac Vice by Corey Shapiro and Certification of Local Counsel Matthew Callahan Filing fee $ 75, receipt number AVAEDC−10166792. by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Callahan, Matthew) (Entered: 05/07/2025) |
| 05/07/2025 | 14 | Motion to appear Pro Hac Vice by William Sharp and Certification of Local Counsel Matthew Callahan Filing fee $ 75, receipt number AVAEDC−10166795. by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Callahan, Matthew) (Entered: 05/07/2025) |
| 05/08/2025 |  | Set Deadline as to 9 MOTION for Preliminary Injunction. Motion Hearing set for 5/29/2025 at 10:00 AM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles. (triv) (Entered: 05/08/2025) |
| 05/08/2025 | 15 | ORDER that the hearing on Pltfs' 9 MOTION for Preliminary Injunction currently scheduled for 05/29/2025, at 10:00 a.m. is **RESET** to 06/03/2025, at 10:00 a.m.; the Clerk shall **TERMINATE** the hearing currently scheduled for 05/29/2025, at 10:00 a.m. Signed by District Judge Patricia Tolliver Giles on 05/08/25. (pmil, ) (Main Document 15 replaced on 5/9/2025) (pmil, ). Modified on 5/9/2025 to attach correct Order (pmil, ). (Entered: 05/08/2025) |
| 05/08/2025 |  | Reset Deadline as to 9 MOTION for Preliminary Injunction. Motion Hearing set for 6/3/2025 at 10:00 AM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles. (pmil, ) (Entered: 05/08/2025) |
| 05/09/2025 | 16 | ORDER granting 12 Motion for Pro hac vice. Appointed Emerson J. Sykes for C.Y.,Emerson J. Sykes for E.G.,Emerson J. Sykes for E.K.,Emerson J. Sykes for E.Y.,Emerson J. Sykes for H.H.,Emerson J. Sykes for L.K.,Emerson J. Sykes for L.K.,Emerson J. Sykes for L.K.,Emerson J. Sykes for M.T.,Emerson J. Sykes for O.H.,Emerson J. Sykes for S.H.,Emerson J. Sykes for S.K. Signed by District Judge Patricia Tolliver Giles on 5/9/2025. (kgall) (Entered: 05/09/2025) |
| 05/09/2025 | 17 | ORDER granting 13 Motion for Pro hac vice. Appointed Corey M. Shapiro for C.Y.,Corey M. Shapiro for E.G.,Corey M. Shapiro for E.K.,Corey M. Shapiro for E.Y.,Corey M. Shapiro for H.H.,Corey M. Shapiro for L.K.,Corey M. Shapiro for L.K.,Corey M. Shapiro for L.K.,Corey M. Shapiro for M.T.,Corey M. Shapiro for O.H.,Corey M. Shapiro for S.H.,Corey M. Shapiro for S.K. Signed by District Judge Patricia Tolliver Giles on 5/9/2025. (kgall) (Entered: 05/09/2025) |
| 05/09/2025 | 18 | ORDER granting 14 Motion for Pro hac vice. Appointed William E. Sharp for C.Y.,William E. Sharp for E.G.,William E. Sharp for E.K.,William E. Sharp for E.Y.,William E. Sharp for H.H.,William E. Sharp for L.K.,William E. Sharp for L.K.,William E. Sharp for L.K.,William E. Sharp for M.T.,William E. Sharp for O.H.,William E. Sharp for S.H.,William E. Sharp for S.K. Signed by District Judge Patricia Tolliver Giles on 5/9/2025. (kgall) (Entered: 05/09/2025) |
| 05/15/2025 | 19 | Document removed as improperly filed. Modified on 5/16/2025 (dvanm). (Entered: 05/15/2025) |

**JA8**

| 05/15/2025 | 20 | Document removed as improperly filed. Modified on 5/16/2025 (dvanm). (Entered: 05/15/2025) |
|---|---|---|
| 05/19/2025 | 21 | NOTICE of Appearance by Matthew J. Mezger on behalf of Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez (Mezger, Matthew) (Entered: 05/19/2025) |
| 05/19/2025 | 22 | MOTION for Extension of Time to File Response/Reply as to 9 MOTION for Preliminary Injunction *(Unopposed)* by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Attachments: # 1 Proposed Order)(Mezger, Matthew) (Entered: 05/19/2025) |
| 05/19/2025 | 23 | Waiver of re 22 MOTION for Extension of Time to File Response/Reply as to 9 MOTION for Preliminary Injunction *(Unopposed) (Hearing)* by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez (Mezger, Matthew) (Entered: 05/19/2025) |
| 05/19/2025 | 24 | ORDERED that Defendants' motion 22 is GRANTED; and it is further ORDERED that Defendants shall file any memorandum of law in opposition to Plaintiffs' Motion for a Preliminary injunction on or before May 23, 2025 no later than noon. Signed by District Judge Patricia Tolliver Giles on 05/19/2025. (dvanm) (Entered: 05/19/2025) |
| 05/19/2025 | 25 | MOTION for Leave to File Amicus Brief by Federal Education Association, National Education Association. (Attachments: # 1 Proposed Amicus Brief)(dvanm) (Attachment 1 replaced with correct document on 5/21/2025) (dvanm). (Entered: 05/21/2025) |
| 05/19/2025 | 26 | NOTICE of Appearance by Jacob Karabell on behalf of Federal Education Association, National Education Association. (dvanm) (Entered: 05/21/2025) |
| 05/19/2025 | 27 | Financial Interest Disclosure Statement (Local Rule 7.1) by Federal Education Association, National Education Association. (dvanm) (Entered: 05/21/2025) |
| 05/23/2025 | 28 | NOTICE of Appearance by Meghan Elizabeth Loftus on behalf of Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez (Loftus, Meghan) (Entered: 05/23/2025) |
| 05/23/2025 | 29 | Memorandum in Opposition re 9 MOTION for Preliminary Injunction filed by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Attachments: # 1 Exhibit DEX 1, # 2 Exhibit DEX 2, # 3 Exhibit DEX 3, # 4 Exhibit DEX 4)(Loftus, Meghan) (Entered: 05/23/2025) |
| 05/23/2025 | 30 | MOTION for Extension of Time to File Response/Reply as to 29 Memorandum in Opposition, *(unopposed)* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Attachments: # 1 Proposed Order)(Callahan, Matthew) (Entered: 05/23/2025) |
| 05/23/2025 | 31 | Waiver of re 30 MOTION for Extension of Time to File Response/Reply as to 29 Memorandum in Opposition, *(unopposed) hearing* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 05/23/2025) |
| 05/23/2025 | 32 | MOTION re Set Motion and R&R Deadlines/Hearings *Providing Telephonic or Other Remote Access (Unopposed)* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Attachments: # 1 Proposed Order)(Callahan, Matthew) (Entered: 05/23/2025) |
| 05/23/2025 | 33 | Waiver of re 32 MOTION re Set Motion and R&R Deadlines/Hearings *Providing Telephonic or Other Remote Access (Unopposed) hearing* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 05/23/2025) |
| 05/27/2025 | 34 | ORDERED that the Motion is GRANTED; and it is further ORDERED that FEA and NEA's Amici Brief filed on May 19, 2025 is deemed FILED in re 25 Motion for Leave to File Amicus Brief. Signed by District Judge Patricia Tolliver Giles on 5/27/2025. (swil) (Entered: 05/28/2025) |
| 05/27/2025 | 35 | ORDERED that Plaintiffs' motion is GRANTED; and it is further ORDERED that Plaintiffs shall file any memorandum of law in reply to Defendants' Response in |

**JA9**

| | | |
|---|---|---|
| | | Opposition to Plaintiffs' Motion for a Preliminary Injunction on or before May 30, 2025. by 12:00 p.m. in re 30 Motion for Extension of Time to File Response/Reply. Signed by District Judge Patricia Tolliver Giles on 5/27/2025. (swil) (Entered: 05/28/2025) |
| 05/30/2025 | 36 | REPLY to Response to Motion re 9 MOTION for Preliminary Injunction filed by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Callahan, Matthew) (Entered: 05/30/2025) |
| 06/03/2025 | 37 | Minute Entry for proceedings held before District Judge Patricia Tolliver Giles: Motion Hearing held on 6/3/2025. Appearances of Counsel for Plaintiffs and Counsel for Defendants. RE: 9 MOTION for Preliminary Injunction filed by H.H., E.Y., L.K., S.H., O.H., C.Y., E.K., E.G., S.K., M.T. − MATTER ARGUED − TAKEN UNDER ADVISEMENT − ORDER TO FOLLOW. The Court DIRECTS Defts to file all information/lists as to material removed within 7 days. Court Reporter: S. Wallace(pmil, ) (Entered: 06/03/2025) |
| 06/06/2025 | 38 | MOTION for Extension *of Time* by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Attachments: # 1 Proposed Order)(Loftus, Meghan) (Entered: 06/06/2025) |
| 06/06/2025 | 39 | NOTICE by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez re 38 MOTION for Extension *of Time (Waiver of Hearing)* (Loftus, Meghan) (Entered: 06/06/2025) |
| 06/09/2025 | 40 | ORDERED that Defendants' motion 38 is GRANTED: and it is further ORDERED that Defendants' deadline with respect to the filing of the list of books is extended to June 16, 2025. Signed by District Judge Patricia Tolliver Giles on 06/09/2025. (dvanm) (Entered: 06/09/2025) |
| 06/11/2025 | 41 | MOTION for Reconsideration *of Court's June 3, 2025 Order* by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Attachments: # 1 Proposed Order)(Loftus, Meghan) (Entered: 06/11/2025) |
| 06/11/2025 | 42 | Memorandum in Support re 41 MOTION for Reconsideration *of Court's June 3, 2025 Order* filed by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Attachments: # 1 Exhibit Second Dill Declaration)(Loftus, Meghan) (Entered: 06/11/2025) |
| 06/11/2025 | 43 | NOTICE by Beth Schiavino−Narvaez re 41 MOTION for Reconsideration *of Court's June 3, 2025 Order (Waiver of Hearing)* (Loftus, Meghan) (Entered: 06/11/2025) |
| 06/13/2025 | 44 | Memorandum in Opposition re 41 MOTION for Reconsideration *of Court's June 3, 2025 Order* filed by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Callahan, Matthew) Modified to correct filer names on 6/13/2025 (dvanm). (Entered: 06/13/2025) |
| 06/16/2025 | 45 | ORDER that Defts produce the list of books pending review by the Department of Defense ex parte for the Court's in camera review by 06/16/2025 at 5:00 p.m. Signed by District Judge Patricia Tolliver Giles on 06/16/25. (pmil, ) (Entered: 06/16/2025) |
| 06/16/2025 | 46 | NOTICE by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez re 45 Order (Loftus, Meghan) (Entered: 06/16/2025) |
| 06/20/2025 | 47 | TRANSCRIPT of proceedings held on 6−3−25, before Judge Patricia Tolliver Giles, Court Reporter/Transcriber Scott Wallace, Telephone number 202 277−3739. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/21/2025. Redacted Transcript Deadline set for 8/20/2025. Release of Transcript Restriction set for 9/18/2025.(wallace, scott) (Entered: 06/20/2025)** |

| 06/27/2025 | 48 | MOTION to Dismiss by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Mezger, Matthew) (Entered: 06/27/2025) |
|---|---|---|
| 06/27/2025 | 49 | Memorandum in Support re 48 MOTION to Dismiss filed by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Mezger, Matthew) (Entered: 06/27/2025) |
| 06/27/2025 | 50 | Notice of Hearing Date re 48 MOTION to Dismiss , 49 Memorandum in Support (Mezger, Matthew) (Entered: 06/27/2025) |
| 06/27/2025 | | Set Deadline as to 48 MOTION to Dismiss. Motion Hearing set for 7/24/2025 at 10:00 AM in Alexandria Courtroom 801 before District Judge Patricia Tolliver Giles. (triv) (Entered: 06/27/2025) |
| 06/30/2025 | 51 | Consent MOTION for Extension of Time to File Response/Reply as to 48 MOTION to Dismiss by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Attachments: # 1 Proposed Order)(Callahan, Matthew) (Entered: 06/30/2025) |
| 06/30/2025 | 52 | Waiver of re 51 Consent MOTION for Extension of Time to File Response/Reply as to 48 MOTION to Dismiss *hearing date* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 06/30/2025) |
| 07/02/2025 | 53 | ORDERED that Plaintiffs' motion is GRANTED; and it is further ORDERED that Plaintiffs shall file any memorandum of law in response to Defendants' Motion to Dismiss on or before July 16, 2025 in re 51 Motion for Extension of Time to File Response/Reply. Signed by District Judge Patricia Tolliver Giles on 7/2/2025. (swil) (Entered: 07/02/2025) |
| 07/11/2025 | 54 | MEMORANDUM ORDER Denying Defendants' Motion for Reconsideration (Dkt. 41); and it is further ORDERED that the list of books (as submitted to the Court) is deemed filed on the public docket and included as Attachment A to this Memorandum Order. Signed by District Judge Patricia Tolliver Giles on 07/11/2025. (see order for details)(dvanm) (Entered: 07/11/2025) |
| 07/16/2025 | 55 | Memorandum in Opposition re 48 MOTION to Dismiss filed by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Heilman, Eden) (Entered: 07/16/2025) |
| 07/17/2025 | 56 | ORDER that the hearing on the 48 MOTION to Dismiss on for 07/24/2025 is **TERMINATED** (see Order for details). Signed by District Judge Patricia Tolliver Giles on 07/17/25. (pmil, ) (Entered: 07/17/2025) |
| 07/22/2025 | 57 | RESPONSE in Support re 48 MOTION to Dismiss filed by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Loftus, Meghan) (Entered: 07/22/2025) |
| 10/20/2025 | 58 | MEMORANDUM OPINION in re Motion for Preliminary Injunction (see Order for details). Signed by District Judge Patricia Tolliver Giles on 10/20/2025. (swil) (Entered: 10/20/2025) |
| 10/20/2025 | 59 | ORDERED that Plaintiffs' Motion for Preliminary Injunction (Dkt. 9) is GRANTED in part and DENIED in part; it is further ORDERED that the injunction applies to Plaintiffs' five DoDEA schools: Crossroads Elementary School, Barsanti Elementary School, Aviano Middle−High School, Stollars Elementary School, and Egdren Middle High School; it is further ORDERED that Defendants DoDEA, Dr. Beth Schiavano−Narvaez, and Secretary of Defense Peter Brian Hegseth, along with their agents, are enjoined from further removals of educational books and curricular content in implementation of Executive Order Nos. 14168, 14185, and 14190 and any related memoranda, directives, and guidance at Plaintiffs' DoDEA schools; and it is further ORDERED that Defendants and their agents immediately restore the library books and curricular materials that have been removed since January 19, 2025 in implementation of the EOs to their preexisting shelves, classrooms, and units at Plaintiffs' five schools. Signed by District Judge Patricia Tolliver Giles on 10/20/2025. (swil) (Entered: 10/20/2025) |

**JA11**

| | | |
|---|---|---|
| 12/18/2025 | 60 | NOTICE OF APPEAL as to 58 Memorandum Opinion, 59 Order on Motion for Preliminary Injunction,,,, by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Mezger, Matthew) (Entered: 12/18/2025) |
| 12/18/2025 | 61 | Transmission of Notice of Appeal to US Court of Appeals re 60 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm) (Entered: 12/18/2025) |
| 12/22/2025 | 62 | USCA Case Number 25−2497, case manager R. Phillips 4th Circuit for 60 Notice of Appeal filed by Peter B. Hegseth, Beth Schiavino−Narvaez, Department of Defense Education Activity. (swil) (Entered: 12/23/2025) |
| 12/23/2025 | 63 | NOTICE OF CROSS APPEAL as to 59 Order on Motion for Preliminary Injunction,,,, by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. Filing fee $ 605, receipt number AVAEDC−10668262. (Callahan, Matthew) (Entered: 12/23/2025) |
| 12/23/2025 | 64 | NOTICE by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K. *of Change in Enrollment Status of Certain Plaintiffs* (Attachments: # 1 Declaration of J. Henninger, # 2 Declaration of M. Jebeles, # 3 Declaration of L. Keeley, # 4 Declaration of A. Kenkel)(Callahan, Matthew) (Entered: 12/23/2025) |
| 12/30/2025 | 65 | Transmission of Notice of Cross Appeal to US Court of Appeals re 63 Notice of Cross Appeal, (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm) (Entered: 12/30/2025) |
| 01/02/2026 | 66 | USCA Case Number 26−1002 Fourth Circuit, Case Manager R. Phillips for 63 NOTICE OF CROSS APPEAL as to 59 Order on Motion for Preliminary Injunction,,,, by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K..(Sbro, ). (Entered: 01/02/2026) |
| 01/02/2026 | 67 | ORDER of USCA as to 60 Notice of Appeal filed by Peter B. Hegseth, Beth Schiavino−Narvaez, Department of Defense Education Activity, 63 Notice of Cross Appeal, filed by H.H., E.Y., L.K., S.H., O.H., C.Y., E.K., E.G., S.K., M.T.. The court consolidates Case No. 25−2497 and Case No. 26−1002 as cross−appeals. The appellant in Case No. 25−2497 shall be considered the appellant for purposes of the consolidated appeals and shall proceed first at briefing and at oral argument. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case. (Sbro, ) (Entered: 01/02/2026) |
| 02/25/2026 | 68 | NOTICE by M.T. *of Use of School Library* (Callahan, Matthew) (Entered: 02/25/2026) |
| 03/12/2026 | 69 | MOTION to Modify the Preliminary Injunction by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Attachments: # 1 Proposed Order)(Callahan, Matthew) (Entered: 03/12/2026) |
| 03/12/2026 | 70 | Memorandum in Support re 69 MOTION for Preliminary Injunction *Modification* filed by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Callahan, Matthew) (Entered: 03/12/2026) |
| 03/12/2026 | 71 | Waiver of re 69 MOTION for Preliminary Injunction *Modification Hearing* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K. (Callahan, Matthew) (Entered: 03/12/2026) |
| 03/18/2026 | 72 | Declaration re 69 MOTION for Preliminary Injunction *Modification of J. Henninger* by C.Y., E.G., E.K., E.Y., H.H., L.K.(by and through parent and next friend Anna Kenkel), M.T., O.H., S.H., S.K.. (Callahan, Matthew) (Entered: 03/18/2026) |
| 03/20/2026 | 73 | MEMORANDUM ORDER denying defendant's Motion to Dismiss (Dkt. 48). (see order for details) Signed by District Judge Patricia Tolliver Giles on 3/20/2026. (dvanm) (Entered: 03/20/2026) |
| 03/20/2026 | 74 | Consent MOTION for an Enlargement of Time as to 69 MOTION to Modify the Preliminary Injunction by Department of Defense Education Activity, Peter B. Hegseth, Beth Schiavino−Narvaez. (Attachments: # 1 Proposed Order)(Mezger, Matthew) (Entered: 03/20/2026) |

**JA12**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| E.K. and S.K., *minors, by and through their parent and next friend Lindsey Keeley, et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:25-cv-637 (PTG/IDD) |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

### MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs E.K. and S.K., *et al.*'s Motion for Preliminary Injunction. Dkt. 9. In this suit, twelve students of military families at five Department of Defense Education Activity ("DoDEA") schools bring First Amendment claims against Defendants DoDEA, Director of DoDEA Dr. Beth Schiavano-Narvaez, and Secretary of Defense Peter Brian Hegseth (collectively, "Defendants"). Dkt. 1 ("Compl.") ¶¶ 4, 10-15, 17-18. The Complaint alleges that Defendants violated Plaintiffs' First Amendment rights by removing library books at DoDEA schools and making changes to curricular material in implementation of various Presidential Executive Orders. *Id.* ¶¶ 51, 83-101. Plaintiffs seek a preliminary injunction from this Court ordering DoDEA to "cease its classifications and removals of educational books and curricular content" and "restore the status quo to how it existed" prior to the Executive Orders. Dkt. 10 at 25-26. For the reasons that follow, the Court grants in part and denies in part Plaintiffs' preliminary injunction.

**JA13**

**Background**

The following facts are taken from the parties' pleadings and attached exhibits and declarations as well as admissions made during oral argument. Plaintiffs in this suit include the following students of DoDEA schools who bring suit through their respective parents and next friends: E.K. (first grade) and S.K. (fourth grade) from Crossroads Elementary School in Quantico, Virginia; O.H. (fourth grade), S.H. (kindergarten), H.H. (pre-kindergarten), and E.G. (fourth grade) from Barsanti Elementary School in Fort Campbell, Kentucky; C.Y. (eleventh grade), E.Y. (ninth grade), and M.T. (eleventh grade) from Aviano Middle-High School in Aviano, Italy; L.K. 1 (fourth grade) and L.K. 2 (sixth grade) from Stollars Elementary on the Misawa Air Base in Japan; and L.K. 3 (eighth grade) from Egdren Middle High School on the Misawa Air Base (collectively, "Plaintiffs"). Compl. ¶¶ 4, 10-15. Defendant DoDEA is an entity within the Department of Defense ("DoD") "responsible for, *inter alia*, planning, directing, coordinating, and managing federally-funded pre-kindergarten to twelfth grade ('Pre-K-12') schools" for dependents of military personal and DoD civilian employees. *Id.* ¶ 16. DoDEA provides education to "approximately 67,000 children in 161 accredited schools . . . rank[ing] DoDEA among the nation's 60 largest school districts by enrollment." Dkt. 10 at 2 (citing Dkt. 10-2, Callahan Decl., Ex. 1). Defendant Dr. Beth Schiavino-Narvaez is the Director of DoDEA and exercises oversight over all DoDEA schools, "including those attended by Plaintiffs." Compl. ¶ 17. Defendant Secretary Hegseth maintains "control over and administration of DoDEA." *Id.* ¶ 18.

In January 2025, during the first few weeks of his second term, President Donald Trump issued three Executive Orders ("EOs") removing and prohibiting statements promoting gender ideology, "divisive concepts" around "race or sex stereotyping," and "indoctrination . . . based on gender ideology and discriminatory equity ideology." *Id.* ¶¶ 25-28. EO 14168, issued on January

2

**JA14**

20, 2025, directs federal agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that **promote or otherwise inculcate gender ideology**, and . . . cease issuing such statements, policies, regulations, forms, communications or other messages." Dkt. 1-1 (emphasis added) (Exec. Order No. 14,168, 90 Fed. Reg. 8615, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Jan. 20, 2025)). EO 14168 defines "gender ideology" as an "internally inconsistent" concept, including "the idea that there is a vast spectrum of genders that are disconnected from one's sex[,]" and the "false claim that males can identify as and thus become women and vice versa." 90 Fed. Reg. 8615 § 2(f).

The second EO, EO 14185, issued on January 27, 2025, bars DoD from:

> promoting, advancing, or otherwise inculcating the following **un-American, divisive, discriminatory, radical, extremist, and irrational theories:** (i) "divisive concepts," as defined in section 3(c) of this order, and "race or sex stereotyping," or "race or sex scapegoating" as both terms are defined in section 2 of Executive Order 13950, as amended; (ii) that America's founding documents are racist or sexist; and (iii) "gender ideology," as defined in section 3(b) of this order.

Dkt. 1-2 (emphasis added) (Exec. Order No. 14,185, 90 Fed. Reg. 8763, Restoring America's Fighting Force (Jan. 27, 2025)).[1]

---

[1] The definition of "divisive concepts" stems from EO 13950, issued on September 22, 2020, and includes the following ideas:

> (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a

Finally, EO 14190, issued on January 29, 2025, directs agencies to provide, within 90 days, "an Ending Indoctrination Strategy to the President . . . containing recommendations and a plan for: (i) **eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination** in K-12 schools, including based on gender ideology and discriminatory equity ideology . . . ." Dkt. 1-3 (emphasis added) (Exec. Order No. 14,190, 90 Fed. Reg. 8853, Ending Radical Indoctrination in K-12 Schooling (Jan. 29, 2025)). EO 14190 defines "discriminatory equity ideology" as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations."[2] 90 Fed. Reg. 8853 § 2(b).

---

hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "divisive concepts" also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

Exec. Order No. 13950, 85 Fed. Reg. 60683, 60685 § 2(a) (Sept. 22, 2020)).

[2] EO 14190 defines the list of concepts barred under "discriminatory equity ideology" as including the following:

(i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin; (ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin; (iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin; (v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part; (vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion; (vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to

4

**JA16**

## A. Book Removals

In early February 2025, following the issuance of the EOs, DoDEA circulated a memorandum to "educators, administrators, and staff requiring schools to review their libraries and remove . . . 'books potentially related to gender ideology or discriminatory equity ideology topics'" from the student section to the professional collection for review. Compl. ¶ 32; Dkt. 1-4 (Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA administrators, educators, and staff (Feb. 5, 2025)). On February 10, 2025, DoDEA issued a letter to parents and guardians of students stating that staff had reviewed "books potentially related to gender ideology or discriminatory equity ideology topics," as required under the President's EOs, and that "books identified for review will be relocated to the professional collection for evaluation with access limited to professional staff." Dkt. 1-7 (Letter from Michelle Howard-Brahaney, DoDEA Europe Director for Student Excellence, to Parents and Students (Mar. 7, 2025)).

In early March 2025, DoDEA schools began to implement the EOs on a school-by-school basis. Compl. ¶ 37-38. For example, at DoDEA Wiesbaden Middle School in Germany, the principal notified teachers that "[n]o books will be able to be checked out from the library" during the librarian's review and removal of books related to gender ideology or discriminatory equity ideology topics. *Id.* ¶ 38. The email further directed teachers to remove such books from their classrooms. *Id.* At another DoDEA high school in Germany, an online training for school librarians instructed them "to scan their collection for books referencing 'gender ideology' or 'gender identity' to identify necessary quarantines." *Id.* ¶ 40.

---

oppress members of another race, color, sex, or national origin; or (viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

90 Fed. Reg. 8853-8854 § 2(b) (Jan. 29, 2025).

**JA17**

Throughout this process, Plaintiffs' parents repeatedly requested a copy of the materials that would be removed. For example, on February 12, 2025, Plaintiffs "C.Y. and E.Y.'s parent requested a copy of the materials selected for review/removal at Aviano Middle-High School" in Italy, but the principal stated, "no books had yet been removed from the school" and did not respond to the parent's follow-up for a "list of materials relocated for review." *Id.* ¶ 35. In the absence of definitive information, Plaintiffs, their parents, and other sources attempted to compile information about the "quarantined" books. Dkt. 10 at 8; Compl. ¶¶ 44-47. Plaintiff L.K. 3 further reported that she had been unable check out *A Handmaid's Tale* by Margaret Atwood, *The Giver* by Lois Lowry, *Nineteen Eighty-Four* by George Orwell, or *Ground Zero* by Alan Gratz.[3] Dkt. 10 at 9.

**B. Curricular Changes**

On January 29, 2025, Secretary Hegseth issued a DoD memorandum establishing the "Restoring America's Fighting Force" Task Force to implement the EO and stating, "[n]o element within DoD will provide instruction on Critical Race Theory (CRT), DEI, or gender ideology as part of a curriculum or for purposes of workforce training." Dkt. 1-10 (Memorandum from Pete Hegseth, Secretary of Defense, U.S. Dep't of Defense, to Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency & DOD Field Activity Directors (Jan. 29, 2025)). Shortly thereafter, Lori Pickel, DoDEA Acting Chief Academic Officer, issued a list of specific curricular materials "potentially related to gender ideology or discriminatory equity ideology topics" and directed instructors to cease teaching them. Dkt. 1-11 at Attachment

---

[3] In a sworn declaration submitted by Defendants, Dr. Jayme Linton, Chief Academic Officer of DoDEA, stated "our integrated library system [] indicates that these four books have been unavailable because other library patrons have checked them out. These books are overdue and should be returned." Dkt. 29-4, Linton Decl. ¶ 28.

6

**JA18**

A. Among other topics, the list removed all curricular material on gender and sex in Advanced Placement ("AP") Psychology. *Id.* Plaintiffs C.Y. and M.T., both enrolled in AP Psychology at the time of the Complaint, raised concerns "about the ability to obtain Advanced Placement [in Psychology] because they will be tested on content that is banned by DoDEA." Compl. ¶ 71. DoDEA also removed substantial portions of health education courses, including chapters on sexuality, sexually transmitted diseases, the reproductive system, menstruation, fetal development, abuse, and puberty. *Id.* ¶¶ 55-56.

The curricular changes at DoDEA schools extended to cultural celebrations as well. On January 31, 2025, DoD released an internal guidance document titled "Identity Months Dead at DoD," which barred the use of official resources

> to host celebrations or events related to cultural awareness months, including National African American/Black History Month, Women's History Month, Asian American and Pacific Islander Heritage Month, Pride Month, National Hispanic Heritage Month, National Disability Employment Awareness Month, and National American Indian Heritage Month.

Compl. ¶ 57 (citing U.S. Dep't of Defense, *Identity Months Dead at DOD* (Jan. 31, 2025)). In late February 2025, DoDEA Chief of Staff Taylor York issued a letter requiring schools to "cancel all planned special activities and non-instructional events related to former monthly cultural awareness month observances," except for "host national engagement" celebrations.[4] Dkt.1-13 (Letter from Taylor York, DoDEA Civil Rights Analyst and Program Manager, to Jay M. Burcham, DoDEA Chief of Staff (Feb. 24, 2025)). According to Plaintiffs E.K. and S.K. at

---

[4] Plaintiffs contend "[t]he difference between a banned cultural awareness month activity and an allowed 'host nation engagement' activity is unclear and amorphous." Compl. ¶ 57. For example, the memorandum specifically bans Black History Month assemblies and Women's History Month events but allows Guam History & Chamorro Heritage Day in Guam." *Id.* Guam is not a host "nation." *Id.*

**JA19**

Crossroads Elementary School and O.H., S.H., H.H., and E.G., at Barsanti Elementary School, their schools "cancelled all Black History Month programming and removed curricula and library displays about Black people." Compl. ¶ 58. Plaintiff O.H. alleged that prior to the cancellations, she had selected Maya Angelou "as the subject of her Black History Month presentation." Dkt. 10 at 10-11. At Aviano Middle-High School, teachers were directed to remove posters of Malala Yousafzai and Frida Kahlo. *Id.* at 11. Plaintiff E.K.'s school in Quantico, Virginia cancelled Black History Month, Women's History Month, and Lunar New Year celebrations while "commemorat[ing] Valentine's Day, St. Patrick's Day, and Easter." *Id.* at 12. Plaintiffs L.K. 1, L.K. 2, and L.K. 3's school cancelled Holocaust Remembrance Day. *Id.*

In response to Defendants' actions, students have protested the removal of educational materials, including through "staged walkouts, carrying signs with messages like: 'Read Banned Books' and 'All History Matters.'" Compl. ¶ 62. Some students were threatened with punishments due to excessive "unexcused absences." *Id.* Plaintiffs assert that they are "increasingly afraid to discuss race and gender in their classrooms, because they fear being silenced by teachers fearful of violating the EOs and DoDEA guidance." *Id.* ¶ 80.

**C. DoDEA Procedures for Book and Curricular Removal**

DoDEA Reg. 2992.01 (2010) sets forth the process for selecting materials used in classrooms and libraries of DoDEA schools. Dkt. 29-1 at 7. The Regulation permits each school to select books for the information centers (i.e., libraries) in the schools. *Id.* at 12. DoDEA teachers have discretion over the materials in their classrooms. *Id.* The criteria for selecting classroom and library materials include educational significance, contribution of the subject matter to the curriculum and interests of students, reviews and recommendations, integrity, and presentation of cultural diversity—particularly as "it relates to the host nation, state, or local

8

**JA20**

community." *Id.* at 7-8. The Regulation includes mechanisms for challenging selected material. *Id.* at 9-11, 13-14 ("Procedures for Challenging Materials").

Following the issuance of the EOs, DoDEA launched an "Administrative Operational Compliance Review" of all classroom resources and library books to comply with the EOs. Dkt. 29-4, Linton Decl. ¶ 14. Per the review process, any library books "potentially related to gender ideology or discriminatory equity ideology topics as defined in the Executive Orders were relocated to the professional collection for evaluation." *Id.* ¶ 15. With respect to curricular resources "potentially related to gender ideology or discriminatory equity ideology topics as defined the in the Executive Orders," DoDEA "directed staff not to use them for instruction while the review is ongoing." *Id.* To determine resources for potential review, DoDEA first used subject headings and key words, and then relocated or paused use of the identified materials. *Id.* ¶ 16. Next, "subject matter experts at DoDEA headquarters in each content area gathered the resources proposed for review and provided an initial recommendation for each resource," with additional review from Division Chiefs and the Office of Civil Rights. *Id.* ¶ 17. This review by subject matter experts is ongoing. After the current stage of the process, DoDEA will conduct "an even more focused review that assesses the educational and pedagogical value of each resource prior to making a recommendation for final disposition of these materials." *Id.* ¶ 19. Thereafter, the recommendation will be sent to the DoDEA Director for her final assessment, and then to the Assistant Secretary of Defense for Manpower and Reserve Affairs, Timothy D. Dill, for final review and decision. *Id.* ¶ 20.

9

**JA21**

## D. Procedural History

On April 15, 2025, Plaintiffs filed their Complaint against Defendants in this Court. Dkt. 1. The Complaint alleges violations of Plaintiffs' First Amendment right to receive information and seeks declaratory judgment on Defendants' First Amendment violations as well as preliminary and permanent injunctive relief barring Defendants from enforcing the EOs. *Id.* ¶¶ 83-101. On May 7, 2025, Plaintiffs filed the instant Motion for Preliminary Injunction seeking to enjoin "Defendants from enforcing Executive Order Nos. 14168, 14185, and 14190 and related memoranda, directives, and guidance in DoDEA schools." Dkt. 10 at 25. The Motion further requests the Court to order the Government to "return[] all books and curriculum already quarantined or removed based on potential violation of the Executive Orders to their preexisting shelves, classrooms, and instructional units." *Id.* at 26. Plaintiffs' Motion is fully briefed. *See* Dkts. 10, 29, 36.

On June 3, 2025, this Court held a hearing on the motion for preliminary injunction. Dkt. 37. In both their briefing and at the hearing, Plaintiffs repeatedly stated that they requested the list of books removed from DoDEA libraries to no avail and instead "compiled the current reported list of books removed . . . through their own observation." Dkt. 10 at 8; *see also* Dkt. 47 ("Tr.") at 7:24-8:1, 14:12-13, 16:19-25. Consequently, the Court ordered that Defendants submit all information available regarding the centralized list of removed books to the Court and to Plaintiffs. Tr. at 32:17-33:3. On June 6, 2025, Defendants moved for a six-day extension to produce the list of library books, which the Court subsequently granted. Dkts. 38, 40. On June 11, 2025, Defendants filed a motion asking the Court to reconsider its order to produce the list of removed books. Dkt. 41. Defendants reasoned that the list was protected under the "deliberative process privilege" and, thus, not a necessary part of the record for preliminary injunction. Dkt. 42 at 4-12.

10

**JA22**

Defendants proposed that, in the alternative, the Court could conduct an *in camera* review of the list *ex parte* to adjudicate the privilege issue. *Id.* at 12.

On June 16, 2025, the Court issued an order permitting Defendants to produce the list of books *ex parte* for *in camera* review, and Defendants filed the list that same day. Dkts. 45, 46. Upon conducting its *in camera* review of the list of books, this Court issued a Memorandum Order on July 11, 2025 denying the Motion for Reconsideration (Dkt. 41) on the grounds that (1) the deliberative process privilege did not apply and (2) the list was germane to the record for preliminary injunction. Dkt. 54. The Court attached the list of books, as submitted by Defendants, to its Order. *Id.* at Attachment A.

**Legal Standard**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019)). To obtain a preliminary injunction, a movant must establish (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm absent preliminary relief, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The failure to show any one of the relevant factors mandates denial of the preliminary injunction." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016).

Generally, "preliminary injunctions are issued to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *See Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012). However, the standard for a preliminary injunction "becomes even more exacting when a

11

**JA23**

plaintiff seeks a preliminary injunction *that mandates action,* as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial." *Vollette v. Watson,* No. 2:12-cv-231, 2012 WL 3026360, at *3 (E.D. Va. July 24, 2012). Finally, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).

### Discussion

As an initial matter, Defendants seek to apply a heightened legal standard to Plaintiffs' request for an injunction on the basis that Plaintiffs seek a mandatory, as opposed to prohibitory, injunction. Dkt. 29 at 7. The Court finds otherwise. "Whereas mandatory injunctions alter the status quo, prohibitory injunctions 'aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" *League of Women Voters of N. Carolina v. North Carolina,* 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Pashby v. Delia,* 709 F.3d 307, 319 (4th Cir. 2013)). The "status quo" refers to "the last uncontested status between the parties which preceded the controversy." *Id.* Here, Plaintiffs' Motion expressly asks the Court to order the Government "to restore the status quo to how it existed on January 19, 2025, by returning all books and curriculum already quarantined or removed based on potential violation of the Executive Orders to their preexisting shelves, classrooms, and instructional units." Dkt. 10 at 26; *see also Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.,* 775 F. Supp. 3d 1160, 1174 (D. Colo. 2025), *appeal filed,* No. 25-1105 (10th Cir. 2025) (holding that plaintiffs' requested relief to order a school district to return removed books to libraries did not constitute a mandatory injunction). Accordingly, the Court finds that Plaintiffs seek a prohibitory injunction, and the ordinary *Winter* factors apply.

12

**JA24**

## A. Standing

The Court must first address whether Plaintiffs have standing to raise a claim. "Standing 'is a threshold jurisdictional question' that ensures a suit is 'appropriate for the exercise of the [federal] courts' judicial powers.'" *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (alteration in original) (quoting *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001)). While Defendants contend that Plaintiffs lack standing on their challenge to the book removals, they raise no such challenge with respect to Plaintiffs' claims regarding the curricular changes. Dkt. 29 at 15. Nevertheless, because standing is a constitutional requirement bearing on jurisdiction, the Court must address it *sua sponte* even where the parties have not properly raised the issue. *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020).

To establish Article III standing, a plaintiff must show (1) a concrete, particularized, and actual or imminent injury-in-fact that is (2) fairly traceable to the challenged action by the defendant, and is (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). Where there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 581 U.S. at 439.; *see also Rumsfeld v. Forum for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n. 2 (2006) ("The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" and does not require the Court to also "determine whether the other plaintiffs have standing."). Furthermore, parties "must demonstrate standing 'with the manner and degree of evidence' required at the relevant 'stage[ ] of the litigation.'" *Fernandez v.*

13

**JA25**

*RentGrow, Inc.*, 116 F.4th 288, 295 (4th Cir. 2024) (quoting *Lujan*, 504 U.S. at 561).  "At the preliminary injunction stage, then, [Plaintiffs] must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citing *Winter*, 555 U.S. at 22).

The Complaint here concerns twelve plaintiffs raising two separate First Amendment claims that seek injunctive relief.  *See* Dkt. 1.  Therefore, to satisfy Article III, Plaintiffs must establish that at least one Plaintiff is likely to satisfy the standing requirements for the First Amendment claims with respect to both book removals and curricular changes.  The Court finds that Plaintiffs meet this standard for standing on both claims.

Defendants do not dispute that Plaintiffs have standing as to the curricular changes claim. Indeed, Defendants expressly acknowledge Plaintiffs' loss of curricular material.  Dkt. 29-4, Linton Decl. ¶¶ 22-30.  The Court finds that at least one plaintiff, if not more, is likely to establish an injury-in-fact from these losses of curricular material under Article III standing.  For example, Plaintiff O.H. was denied the opportunity to present her research project on Maya Angelou after her school cancelled Black History Month in compliance with DoDEA guidance barring celebrations or events related to Black History Month.  Dkt. 10 at 10.  Plaintiffs C.Y. and M.T. stated injuries from the removal of the "Gender and Sex" module in their AP Psychology courses, both because of the impact on their Advanced Placement exams as well as the harm of "not learning about how gender and sex impact psychology."  Compl. ¶ 71.  Plaintiffs L.K. 1, S.K., O.H., and E.K. assert injuries from the removal of immigration materials from their curricula, which will affect their fifth-grade curriculum in the coming school year.  *Id.* ¶ 73.  Accordingly, the alleged injuries are not "generalized grievances" about the ability to access curricula.  *Lujan*,

14

**JA26**

504 U.S. at 575. Defendants' pleadings further confirm that they implemented the curricular changes core to Plaintiffs' injuries, thus satisfying traceability. Dkt. 29-4, Linton Decl. ¶¶ 22-30.

Defendants' principal challenge to standing concerns whether Plaintiffs have demonstrated an injury that is traceable to Defendants' actions with respect to the book removals. Dkt. 29 at 15. Defendants argue that "Plaintiffs have failed to establish a particularized injury" because they have not shown "that they sought the information temporarily withdrawn from DoDEA's bookshelves pending further review." *Id.* The Court does not agree. On the evidence presented, the Court finds, for the following reasons, that Plaintiffs are likely to succeed on establishing standing for the book removal claims.

### i.    *Injury-in-fact from book removals*

First, the Court finds that at least one plaintiff has established an injury with respect to the book removals at this stage. An injury-in-fact must be "concrete and particularized[,]" meaning that the injury alleged "must affect the plaintiff in a personal and individual way" and "must actually exist." *Wright v. Cap. One Bank (USA)*, No. 1:21-cv-803, 2024 WL 920057, at *3 (E.D. Va. Mar. 4, 2024) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). A plaintiff seeking injunctive relief may establish an injury-in-fact by asserting adverse effects in the future, but the plaintiff must describe concrete plans to be considered "actual or imminent." *Lujan*, 504 U.S. at 564. "[S]ome day intentions . . . without a description of concrete plans, or indeed even any specification of *when* that some day will be" do not support an "actual or imminent" injury. *Id.*

In First Amendment contexts, both the Supreme Court and Fourth Circuit have asserted that "standing requirements are somewhat relaxed," especially with respect to the injury requirement. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (citing *Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)); *see also Lopez v. Candaele*, 630 F.3d 775,

15

**JA27**

781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing."). Accordingly, courts have said "it is sufficient to show one's First Amendment activities have been chilled" to establish an injury-in-fact. *Cooksey,* 720 F.3d at 235-36 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)).

Here, as Defendants concede, at least Plaintiff L.K. 3 is likely to establish an injury-in-fact from the removal of library books. Dkt. 29 at 15 ("A review of the evidence Plaintiffs submitted to support their motion for a preliminary injunction shows that only one of the named Plaintiffs (L.K.3) has come close to meeting the required showing to establish standing in connection with the book claim."). Plaintiff L.K. 3 attempted to check out four books from the library that had been removed: *A Handmaid's Tale* by Margaret Atwood, *The Giver* by Lois Lowry, *Nineteen Eighty-Four* by George Orwell, or *Ground Zero* by Alan Gratz. Dkt. 10 at 9. Courts addressing analogous facts around book removals have similarly found that a plaintiff's inability to check out a particular book, even if in the future, satisfies the injury-in-fact requirement. For example, in *PEN American Center, Inc. v. Escambia County School Board*, which Defendants directly rely upon, the court held that student-plaintiffs had established standing on a First Amendment challenge to book removals where "the children intended to check out specific removed and restricted books during the upcoming (now, ongoing) school year, but they are unable to do so." 711 F. Supp. 3d 1325, 1329-30 (N.D. Fla. 2024); *see also* Dkt. 29 at 15. Similarly, in *ACLU of Florida, Inc. v. Miami-Dade County School Board*, the Eleventh Circuit found that a student had established an injury for standing purposes when he alleged that the school's policy of removing books prevented him from checking out a particular book "after school resumed in six weeks." 557 F.3d 1177, 1194-95 (11th Cir. 2009).

16

**JA28**

The injury asserted here for L.K. 3 is no different from these precedents. L.K. 3's allegation that a librarian subsequently scolded them for seeking out these books further establishes the injury-in-fact. Dkt. 10 at 9 (citing Dkt. 10-26, Kenkel Decl. ¶ 9). It is glaring to this Court that an adult scolding a middle schooler for her choice of books would be especially "chilling" and injurious to the student's First Amendment rights. Accordingly, the Court finds that Plaintiffs have established an injury for standing purposes as to the book removal claim.

### ii.    Traceability of Plaintiffs' injuries to Defendants' actions regarding book removals

The Court further finds that Plaintiffs have established traceability between their injuries and Defendants' actions with respect to the book removals. "Traceability may be satisfied if Plaintiffs sufficiently allege that Defendants' conduct was a plausible source of the injury . . . suffered." *Wright*, 2024 WL 920057, at *4 (citing *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018)). Defendants aver that even if L.K. 3 suffered an injury from her inability to access her library books, she did not demonstrate "traceability" between her injury and Defendants' actions. Dkt. 29 at 16. In a sworn declaration submitted by Defendants, Dr. Jayme Linton, Chief Academic Officer of DoDEA, stated "our integrated library system [] indicates that these four books have been unavailable because other library patrons have checked them out." Dkt. 29-4, Linton Decl. ¶ 28.

However, the Court finds that there is sufficient evidence demonstrating a plausible nexus between L.K. 3's injury and Defendants' actions in removing books. At the outset, Dr. Linton's declaration does not expressly confirm that the books L.K. 3 sought had never been quarantined. *Id.* (inferring that the books were not accessible to L.K. 3 "because another student is accessing them," not "because of DoDEA's ongoing resource reviews"). To the contrary, Plaintiffs' submitted evidence indicates that at least one of the books L.K. 3 attempted to check out, *A*

17

**JA29**

*Handmaid's Tale*, had been removed from at least one DoDEA library. *See* Dkt. 10-22 (Exhibit 20 to Callahan Decl.) at 4 (depicting scans of a binder titled "Quarantined Books," in which *A Handmaid's Tale* is listed); Dkt. 10-2, Callahan Decl. ¶ 21 ("Although DoDEA has not yet published lists, a binder of books reported to have been removed is attached as Exhibit 20."). It is further puzzling that a librarian would "scold" L.K. 3 for attempting to access books that were merely checked out by another student. Dkt. 10-26, Kenkel Decl. ¶ 9. The librarian's response insinuates that L.K. 3's attempt to check out books was impermissible in some other way. Accordingly, in light of Plaintiffs' submitted evidence, Dr. Linton's declaration alone does not defeat traceability for L.K. 3's claim.

The Court notes that Defendants do not challenge the redressability question on the book removal claim. Nonetheless, the Court finds that Plaintiffs' requested relief would redress their injuries. An injunction ordering Defendants to halt the policy of book and curricular removal and reinstate any removed materials would result in Plaintiffs' ability to exercise their First Amendment right to information. *See Lujan*, 504 U.S. at 569-70 (finding no redressability where a favorable action would not necessarily mitigate plaintiffs' asserted injuries).

### iii.    *Justiciability*

There is the additional question of whether Defendants' July 2025 list of removed books—of which, none of L.K. 3's sought-after books are included—impacts justiciability. *See* Dkt. 42 at 10-11. For standing purposes, the Court finds that the list is not dispositive; "[s]tanding is to be determined as of the commencement of the suit." *Lujan*, 504 U.S. at 570 n.5. Defendants' submitted list was filed three months after the commencement of the suit, and nowhere do Defendants aver that that version of the list was in effect when Plaintiffs filed their Complaint. For the reasons stated above, the list does not impact the standing analysis.

18

**JA30**

The Court further concludes that the recently submitted list cannot render L.K. 3's injuries moot either. *Eden, LLC v. Just.*, 36 F.4th 166, 169 (4th Cir. 2022) (quoting *Fleet Feet, Inc. v. NIKE, Inc.*, 986 F.3d 458, 463 (4th Cir. 2021)) (stating the mootness doctrine bars the Court "from advising on legal questions 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'"); *see also* U.S. Const. art. III, § 2, cl. 1. A matter "does not become moot when a defendant voluntarily ceases its . . . behavior, if there is a reasonable chance that the behavior will resume." *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021). In the context of L.K. 3's claim, the Court has no assurance that L.K. 3's desired books will not be removed from the libraries in the future or, to the extent they are currently removed, made available again to L.K. 3.

The evidence before this Court overwhelmingly suggests that the implementation of the book removal process has been inconsistent and opaque. The Court is uncertain whether the list of books Defendants submitted in July 2025 provides a comprehensive, accurate, and timely picture of the book removals at Plaintiffs' individual schools in the first instance. At the time they submitted the list, Defendants provided little detail to this Court on how the submitted list was prepared. Assistant Secretary Dill's declaration posits that "[t]he list is maintained in a digital shared drive file to which a number of DoDEA professionals have continuous live access." Dkt. 42-1, Dill Decl. ¶ 4.[5] It is not clear who these professionals are, or how much autonomy they possess to edit the list on an ongoing basis.

Furthermore, Defendants' submission of one consolidated list of removed books implies a centralized repository of removed library books. *See* Dkt. 54 at Attachment A. At several points,

_____

[5] The declaration was attached as part of the government's Motion for Reconsideration of the Court's order to submit the list of removed books. Dkt. 42-1.

19

**JA31**

however, Defendants represented to Plaintiffs and the Court that part of the decision-making on book quarantines would be made regionally or at the school level. *See* Dkt. 10-27, Tolley Decl. ¶ 10 ("At this meeting, the principal informed all parents that decision-making regarding book quarantines is being done at a regional level."); Dkt. 29 at 4 ("In the DoDEA global school system, each school has the discretion to select the books for the information centers (*i.e.*, libraries) in its schools."); *id.* at 5 ("At each school in the DoDEA global network, instructional systems specialists identified books in their library collections and in their classrooms that required further review."). Accordingly, it is unclear whether the July 2025 list accurately captures all book removals at Plaintiffs' schools, including at L.K. 3's school. And it is further uncertain who, among the DoDEA professionals with "continuous live access" to the list, is responsible for consolidating the list or ensuring its accuracy and comprehensiveness. Dkt. 54 at Attachment A.

In Defendants' own words, the book removal process has been "iterative" and "dynamic." Dkt. 42 at 10-11. Assistant Secretary Dill's declaration asserts that "[b]ooks continue to be added for a number of reasons, including the arrival of books previously ordered or newly identified." Dkt. 42-1, Dill Decl. ¶ 4. As stated, even if the books are not on the current list, it does not mean they were not on the previous list or, for that matter, will not be included in some future iteration. For these reasons, the Court finds that L.K. 3's claim meets the justiciability thresholds of the standing and mootness doctrines.

To the extent any previously removed books are no longer "quarantined," Defendants have provided no information suggesting that these books were subsequently restored and made available to students. Nor do they suggest that books that are no longer on the list going forward will be restored then. Where the implementation process of book removals appears to this Court

20

**JA32**

to be inconsistent, unstructured, and nontransparent, the Court declines to defer exclusively to Defendants' one submitted list when assessing justiciability.

In the broader scheme, it is troubling to the Court that Defendants continue to question Plaintiffs' standing on the basis that they failed to identify specific books while persistently refusing to share that relevant information with them in the first place. Plaintiffs detail, in great length, the numerous instances in which they asked Defendants for a list of removed books, to no avail. *See, e.g.*, Dkt. 10-23, Keeley Decl., Ex. D at 27-38 (email chain between E.K. and S.K.'s parent and DoDEA Americas Communications Director Michael O'Day in which the parent requested the list of removed books three times before Defendants directed him to file a FOIA request); *id.* ¶¶ 24-25 ("As of the date of this declaration [May 7, 2025], the status of our February 11 FOIA is still listed as 'Assigned for Processing' . . . [since then] my husband has filed five more FOIA requests . . . [and] only two have been even partially fulfilled."); Dkt. 10-25, Young Decl. ¶ 12 ("On February 12, 2025, I requested a copy of the materials selected for review/removal at Aviano Middle-High School. The school principal told me that items were under operational review and that no books had yet been removed from the school. I followed-up but was never provided with a list of materials relocated for review."); Dkt. 10-26, Kenkel Decl. ¶ 20 ("Although I was promised a response within 20 days [of submitting my FOIA request], as required by the administrative rules of the FOIA program, I have not received any of the requested information."); Dkt. 10-27, Tolley Decl. ¶ 12 ("On March 14, 2025, I emailed the librarian to ask if we could discuss the DoDEA guidance on book removals. She responded on March 21, 2025, telling me that all communication on this topic would come from our principal."); Dkt. 10-24, Henninger Decl. ¶ 18 ("I directed several emails to Barsanti Elementary administrators requesting clarification about what changes were occurring as a concerned parent, but have not received

21

**JA33**

specific responses about what materials have been removed from the library or what other changes were occurring . . .").

Despite this lack of transparency, Plaintiffs nevertheless collected ample evidence on the book removals and filed their suit with the information available to them within a few months of the initial Executive Orders. *See* Dkt. 10-1 (index of exhibits submitted with Plaintiffs' preliminary injunction motion). It is impermissible for Defendants to take an action implicating constitutional rights, fail to provide information on that action, and then accuse the parties of lacking precise information for standing in their claims challenging that action. Accordingly, based on the evidence provided by both parties, the Court finds that Plaintiffs have established standing because at least one has shown standing and this matter is justiciable.

### B. Likelihood of Success on the Merits of the First Amendment Claims

The Court now turns to whether Plaintiffs' First Amendment claims satisfy the *Winter* factors for a preliminary injunction. The Fourth Circuit has asserted that where "the irreparable harm that [the plaintiff] has alleged is inseparably linked to his claim of a violation of his First Amendment rights . . . analysis of [the plaintiff's] likelihood of success on the merits becomes the first and the most important factor for a court to consider." *Imaginary Images Inc. v. Evans,* 593 F. Supp. 2d 848, 853-54 (E.D. Va. 2008), *aff'd,* 612 F.3d 736 (4th Cir. 2010) (quoting *Ctr. for Individual Freedom, Inc. v. Ireland,* 2008 WL 1837324, at *2 (S.D. W. Va. Apr. 22, 2008)).

Here, a preliminary—and fundamental—dispute between the parties concerns whether the First Amendment applies in the first instance. At the outset, Defendants declare that the First Amendment does not apply to either the book removals or the curricular changes because these actions constitute government speech. Dkt. 29 at 17-19. Plaintiffs, however, contend that both policies run afoul of the First Amendment. Dkt. 10 at 15-24. On the book removals, Plaintiffs

22

**JA34**

argue that the Court should rely on the Supreme Court's plurality in *Board of Education v. Pico*, which precludes the regulation of school library books in a "narrowly partisan or political manner." Dkt. 10 at 17 (citing 457 U.S. 853 (1982)). On the curricular changes, Plaintiffs argue that Defendants' actions violate students' right to receive curricular information and lack a legitimate pedagogical interest under *Hazelwood School District v. Kuhlmeier*, which governs school curricula. Dkt. 10 at 21-24 (citing 484 U.S. 260 (1988)). The Court first addresses the book removals and then the curricular changes.

### i. *Book Removals*

#### a. Government Speech Doctrine

Defendants attempt to circumvent the First Amendment entirely by asserting that the removal of books from DoDEA libraries constitutes government speech. Dkt. 29 at 17. On Defendants' theory, "[t]he inclusion, or exclusion, of certain materials reflects DoDEA's expressive act of speech that it wishes to convey to its audience—here, schoolchildren." *Id.* at 18. Therefore, Defendants contend that as DoDEA's speech, library curation is exempt from the First Amendment. The Court is unpersuaded.

Ordinarily, the First Amendment's Free Speech Clause "restricts government regulation of private speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). Under the "government speech doctrine," "[t]he Free Speech Clause . . . does not regulate government speech." *Id.*; *see also Page v. Lexington Country Sch. Dist. One,* 531 F.3d 275, 280 (4th Cir. 2008) ("The Government's own speech . . . is exempt from First Amendment scrutiny.") (internal quotation and citation omitted). The doctrine posits that when the government speaks, "it naturally chooses what to say and what not to say" without the restrictions of viewpoint neutrality under the First Amendment. *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022).

23

**JA35**

To determine the "boundary between government speech and private expression," the Supreme Court uses a "holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Id.* at 252. This inquiry considers evidence of "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.*

Despite Defendants' arguments to the contrary, DoDEA school libraries lack the quintessential elements of government speech. Public school libraries have historically been loci of intellectual freedom, where students are "free to inquire, to study and to evaluate, to gain new maturity and understanding.'" *Pico*, 457 U.S. at 868 (plurality opinion) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)); *see also PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 ("[T]he traditional purpose of a library is to provide information on a broad range of subjects and viewpoints."). Viewing public school libraries as places of academic freedom and intellectual pursuit conflicts with the United States' notion that school libraries represent government speech.

It is furthermore doubtful that the public—or DoDEA students, for that matter—perceives the books in school libraries as conveying a government message. *See PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 ("[T]he Court simply fails to see how any reasonable person would view the contents of the school library . . . as the government's endorsement of the views expressed in the books on the library's shelves.").

Here, library books are different in kind from established government speech, such as a set of limited public monuments displayed on government property or license plate designs that the government actively controls. *Summum*, 555 U.S. at 470-73 (finding permanent monuments in a public park were government speech because they "are meant to convey and have the effect of

24

**JA36**

conveying a government message."); *Walker v. Tx. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209-14 (2015) (holding license plate designs by private groups were government speech because state "maintain[ed] direct control over the messages conveyed" by "actively" reviewing designs and rejecting over a dozen proposals.). A city's efforts to present an image through "selective receptivity" of displayed monuments in a public park is "closely identified in the public mind with the government unit that owns the land." *Summum*, 55 U.S. at 472-73. License plates expressly display the state's imprimatur. *Walker*, 576 U.S. at 212 ("The governmental nature of the [license] plates is clear from their faces: The State places the name 'TEXAS' in large letters at the top of every plate."). Conversely, the hundreds of library books in DoDEA libraries, from a wide range of authors, have neither of these characteristics. *See* Dkt. 29-1 at 4, 7-9 (stating DoDEA schools have discretion to select the books and consider factors such as "educational significance, contribution of the subject matter to the curriculum and interests of students, reviews and recommendations, integrity, and presentation of cultural diversity," among others); Dkt. 54 at Attachment A (listing over 500 books that existed in DoDEA libraries and were removed—even if temporarily—to comply with the Executive Orders); *see also Shurtleff*, 596 U.S. at 256 (finding flag raisings did not constitute government speech where the city did not maintain control over the flags' content and approved over 50 unique flags to "accommodate all applicants.").

While Defendants maintain that "courts have repeatedly recognized" that school library curation is government speech, the weight of the case law suggests otherwise. Dkt. 29 at 19. While the Supreme Court has not definitely ruled on this question, sister courts have overwhelmingly found that the government speech doctrine does not pertain to public school libraries. *See Crookshanks*, 775 F. Supp. 3d at 1175-76 (citing case law supporting this proposition); *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) ("Contrary to

**JA37**

Defendants' contention, the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries."); *Virden v. Crawford Cnty., Arkansas*, 2024 WL 4360495, at *5 (W.D. Ark. Sept. 30, 2024) ("[T]he Supreme Court has not extended [the government speech] doctrine to the placement and removal of books in libraries . . . "); *PEN Am. Ctr.*, 711 F. Supp. 3d at 1331.[6]

Defendants claim that *Moody v. NetChoice, LLC* supports their position that "curating a library is an expressive act." Dkt. 29 at 17; 603 U.S. 707, 728 (2024). *Moody* involved First Amendment challenges to Florida and Texas state laws that restricted social media platforms' ability to control third-party posts. 603 U.S. at 717. The Supreme Court held that "[a] private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment." *Id.* at 729-30. Thus, *Moody* concerned the expressiveness of *private* curation; it did not concern the government speech doctrine. *See id.* at 719. Rather, the Court made explicit that "it is no job for government to decide what counts as the right balance of private

---

[6] The Fifth Circuit recently stated in *Little v. Llano County* that the curation of a public library constitutes government speech. 138 F.4th 834, 865 (5th Cir. 2025). However, only a plurality of the en banc panel joined that portion of the opinion. *Id.* The plurality's opinion reasoned that "libraries curate their collections for expressive purposes." *Id.* at 837-38. The majority opinion rested on plaintiffs' lack of standing to challenge public library book removals. *Id.* at 835 (majority opinion). Not only did the government speech theory fail to receive a majority, but it also contravened the weight of precedent in other jurisdictions. *See Penguin Random House v. Gibson*, 2025 WL 2408178, at *22 (M.D. Fla. Aug. 13, 2025) ("There is some conflicting authority among other circuits, but the argument that it is government speech has yet to obtain endorsement by a majority opinion."). Moreover, public school libraries pose a different context than public libraries in general. Indeed, the Supreme Court has observed that in a school setting, students' First Amendment rights must be construed "in light of the special characteristics of the school environment." *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969). At the hearing before this Court on June 3, 2025, the government further distinguished between a public library and a school library. Tr. at 27:8-15. Accordingly, the Court finds *Llano County* unpersuasive here.

expression." *Id.* (stating that it is not up to government to "'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences.").

Finally, Plaintiffs note that "the government speech doctrine requires the Government to *add* its own message to the marketplace of ideas, and not to wield Government power in order to regulate or *suppress* private speech rights." Dkt. 36 at 6 (citing *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024)). Indeed, in *National Rifle Association of America v. Vullo*, the Supreme Court made clear that even in "government speech" contexts, where "the complaint plausibly alleges coercive threats aimed at punishing or suppressing disfavored speech, the plaintiff states a First Amendment claim." 602 U.S. 175, 197 (2024). In their Complaint, Plaintiffs note that students have been threatened with punishments for protesting the removal of educational materials, and that Plaintiffs "are increasingly afraid to discuss race and gender in their classrooms, because they fear being silenced by teachers." Compl. ¶¶ 62, 64, 80. The Court has recognized that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). This presents an even greater justification for the First Amendment's application here.

Where other courts have declined to extend the government speech doctrine to the public library context, this Court follows suit. The Supreme Court has cautioned that the government speech doctrine is "susceptible to dangerous misuse," and, therefore, "we must exercise great caution before extending our government speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Accordingly, this Court heeds that warning and finds that Defendants have not shown that the government speech doctrine shields them from application of the First Amendment.

27

**JA39**

b.  First Amendment Standard for Book Removals

In applying the First Amendment, the Court must still determine the appropriate legal standard. Here, the parties disagree once again. Plaintiffs rely extensively on the Supreme Court's plurality opinion in *Pico*, which concerned a similar First Amendment challenge to book removals in public school libraries. Dkt. 10 at 17-19 (citing 457 U.S. 853). In *Pico*, a plurality of Supreme Court Justices asserted that "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'"[7] 457 U.S. at 872 (plurality opinion) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Concurring with the judgment in full and the reasoning in part, Justice Blackmun agreed that schools could not impermissibly suppress books based on the ideas within them, though he rejected a constitutional "right to receive information." *Id.* at 877-78 (Blackmun, J., concurring). Justice White's concurrence, on the other hand, concurred only in the judgment and found it unnecessary to "issue a dissertation on . . . the First Amendment" absent further findings of fact from the district court. *Id.* at 883 (White, J., concurring). On Plaintiffs' read, taking the plurality and concurrences together, "a majority of Justices . . . agreed that removing books from school libraries implicates students' First Amendment rights." Dkt. 10 at 18.

Conversely, Defendants contest applying *Pico* here on the basis that it lacks precedential value. Dkt. 29 at 23-24. Instead, Defendants maintain that if the Court were to reject the government speech doctrine—which it does—then the Supreme Court's standard in *Hazelwood School District v. Kuhlmeier* governs this case. *Id.* at 19-22 (citing 484 U.S. 260 (1988)). In

---

[7] Justices Brennan, Marshall, and Stevens joined the plurality opinion of the court. Justice Blackmun concurred in part and concurred in the judgment. Justice White concurred in the judgment. Chief Justice Burger and Justices Powell, Rehnquist, and O'Connor dissented.

JA40

*Hazelwood*, the Supreme Court held that schools have discretion to regulate school-sponsored speech, defined as "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 271. However, the school's actions must be "reasonably related to legitimate pedagogical concerns." *Id.* at 273. Defendants aver that the book reviews implement "pedagogical standards and priorities" underlying the EOs: removing books on "gender ideology," "discriminatory equity ideology," and "invidious race and sex discrimination" as they define those terms. Dkt. 29 at 22.

This Court is not the first to address whether *Pico* or *Hazelwood* provides the appropriate First Amendment standard to a public school library book removal challenge. In the absence of a Supreme Court majority, "the precedential value of *Pico* has perplexed courts for years, including in the recent years." *Crookshanks*, 775 F. Supp. 3d at 1178; *see also PEN Am. Ctr.*, 711 F. Supp. 3d at 1331 ("The applicable legal standard for evaluating alleged First Amendment violations in the school library context is not entirely clear . . . ."); *K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 913 (E.D. Mo. 2022) ("[I]t is not clear, what, if anything, from *Pico* is binding on the case here.").

Justice White's concurrence, which set forth the narrowest grounds for a holding, has contributed, in part, to the puzzle of *Pico*'s precedential value. Under *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). On one hand, Justice White's concurrence may be read as implicitly seeking to understand the motivation behind the school board's removal decision. *Pico*, 457 U.S. at 883 (White, J., concurring) ("The unresolved factual

29

**JA41**

issue, as I understand it, is the reason or reasons underlying the school board's removal of the books."); *Crookshanks*, 775 F. Supp. 3d at 1179 ("Justice White preferred to return the case to the district court to determine why the school board removed the books."). As Defendants aver, another read of Justice White's decision interprets it "to mean that the precedential holding of *Pico* is that disputes of fact in that case's record prevented entry of summary judgment." Dkt. 29 at 23; *see also Griswold v. Driscoll*, 616 F.3d 53, 57 (1st Cir. 2010) (Souter, J.) (observing that "Justice White concurred in the judgment without announcing any position on the substantive First Amendment claim"); *Walls v. Sanders*, 760 F. Supp. 3d 766, 779 n.49 (E.D. Ark. 2024) ("Moreover, Justice White's decisive concurrence in the judgment . . . was anodyne enough that nearly nothing of substance was actually done in *Pico*.").

Nevertheless, because *Pico* provides the sole Supreme Court precedent on book removals in public school libraries, courts have long relied on it for guidance in public school book removal cases. *Case v. Unified Sch. Dist. No. 233*, 895 F. Supp. 1463, 1469 (D. Kan. 1995) (*Pico* "is the only Supreme Court decision dealing specifically with removal of books from a public school library" and "must be used as a starting point"); *see also Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001, 1020 (S.D. Iowa, Mar. 25, 2025) ("Notwithstanding the splintered nature of the decision, *Pico* provides some guidance that remains applicable today. Almost all justices agreed that school boards can violate the First Amendment in *some* circumstances when making decisions about the removal of books from the school library.").[8]

_____

[8] Additionally, while not addressing book removals, the Fourth Circuit has repeatedly relied on the plurality opinion in *Pico*. *See Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) (citing *Pico* for the proposition that the First Amendment "protects *both* a speaker's right to communicate information and ideas to a broad audience *and* the intended recipients' right to receive that information and those ideas."); *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 353 (4th Cir. 2001) (citing *Pico* for proposition that "the First Amendment guarantees viewers and listeners the right to receive information.").

**JA42**

*Hazelwood*'s application to a school library book matter similarly remains unclear given that it was decided in the context of school-sponsored speech in a school newspaper. *Compare ACLU of Fla.* 557 F.3d at 1202 ("[A school newspaper situation and school library book situation] may be sufficiently analogous to extend the *Hazelwood* standard here, or they may not be.") *with GLBT Youth in Iowa Schs. Task Force,* 114 F.4th at 670 ("The purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical missions of the school, which may involve some limitation of expression.").

Accordingly, in reviewing challenges to public school library book removals, most courts have simply declined to resolve the *Pico* and *Hazelwood* dilemma and, instead, applied both cases. *See PEN Am. Ctr., Inc.,* 711 F. Supp. 3d at 1325 (holding that the common theme in *Pico* and *Hazelwood* asserts that "school officials cannot remove books solely because they disagree with the views expressed in the books"); *ACLU of Fla.,* 557 F.3d at 1202 ("The question of what standard applies to school library book removal decisions is unresolved. And for reasons that will become apparent later we have no need to resolve it here."); *Crookshanks,* 775 F. Supp. 3d at 1179-84 (applying both *Pico* and *Hazelwood* in book removal case). This Court also declines to resolve it. Accordingly, the Court will evaluate Defendants' removal of DoDEA library books under both *Pico* and *Hazelwood* to determine (1) whether the underlying motivation for removal is improper, and (2) whether legitimate pedagogical interests justify the book removals. *See PEN Am. Ctr., Inc,* 711 F. Supp. 3d at 1331; *ACLU of Fla.,* 557 F.3d at 1202; *Crookshanks,* 775 F. Supp. 3d at 1179-84. Under both decisions, the Court finds that Plaintiffs will likely succeed in proving that Defendants' removal of DoDEA library books runs afoul of the First Amendment.

First, in applying the *Pico* framework, the Court focuses on Defendants' stated motivations for removing the books. Taken together, *Pico*'s plurality opinion and concurrences support the

31

**JA43**

proposition that the First Amendment bars schools from removing books to "prescribe what shall be orthodox" or because of the impermissibility of the underlying ideas. *Pico*, 457 U.S. at 872 (plurality opinion) (quoting *Barnette*, 319 U.S. at 642); *id.* at 875, 881-82 (Blackmun, J., concurring) ("[T]he State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons."); *id.* at 883 (White, J., concurring) ("The unresolved factual issue, as I understand it, is the reason or reasons underlying the school board's removal of the books."); *see also Crookshanks,* 775 F. Supp. 3d at 1179 ("Under the *Pico* framework, the Court looks to the District's stated motivations behind removing the 19 books."); *Pen Am. Ctr.*, 711 F. Supp. 3d at 1331 ("[T]he common theme in all of the potentially relevant standards (e.g., *Pico* plurality . . . ) is that school officials cannot remove books solely because they disagree with the views expressed in the books."). Here, Plaintiffs have demonstrated a likelihood of showing that Defendants' stated motivations for removing over 500 library books set forth an impermissible partisan or political motivation. Plaintiffs contend, and Defendants concede, that the book removals stem directly from the President's Executive Orders. Dkt. 1-4 (Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA administrators, educators, and staff (Feb. 5, 2025)) ("DoDEA will conduct an operational compliance review to ensure alignment with the applicable Executive Orders" . . . including by relocating "books potentially related to gender ideology or discriminatory equity ideology topics as defined in the Executive Orders . . . ").

To further demonstrate the partisan motivation, Plaintiffs point to the President's own words as a direct link between his EOs and his war on "wokeness." Dkt. 10 at 7. In a March 6, 2025 statement to Congress, the President proclaimed:

> [W]e're getting wokeness out of our schools and out of our military, and it's already out, and it's out of our society. We don't want it. Wokeness is trouble. Wokeness

32

**JA44**

is bad. It's gone. It's gone.

Dkt. 10-10 at 15.    However, Defendants contend:

> It is a significant logical leap to conclude that teaching students about the binary sexes is a "narrowly partisan" act . . . given the state of debate and discourse of the last several years . . . Were Plaintiffs' approach adopted, any issue that has a connection to the subject matter of a child's education discussed in an election or more generally in political discourse—be it local, state, or national level—becomes a [sic] partisan subject to *Pico*-plurality scrutiny.

Dkt. 29 at 25; *id.* n.7. The Court disagrees.

The *Pico* plurality asserted that "[i]f [the school district] *intended* by their removal decision to deny [students] access to ideas with which petitioners disagreed, and if this intent was the decisive factor in [the school district's] decision, then [the school district has] exercised [its] discretion in violation of the Constitution." *Pico*, 457 U.S. at 870-71 (plurality opinion); *id.* at 879 (Blackmun, J., concurring) ("[T]he State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons."). The Executive Orders—and by extension, Defendants' book removals—do exactly this. The record is clear that by removing books, Defendants intended to deny Plaintiffs access to ideas that they, by virtue of the Presidential EOs, found distasteful, "radical" or "divisive." Dkt. 1-2 at 3.

The Court recognizes that it would be different if DoDEA sought to remove library books solely upon the "educational suitability" of the books. *Pico*, 457 U.S. at 871 (plurality opinion) (finding it valid to remove books for educational suitability); *Crookshanks*, 775 F. Supp. 3d at 1182 (finding the record showed that book removal process sought to maintain conservative values, rather than an "educational mission," in violation of *Pico*). And indeed, Defendants contend that the removal of library books arises from "only the pedagogical concern of ensuring that students receive instruction on the biological binary of sex and promoting inclusivity values through merit (and thereby eliminating any remaining vestiges of discrimination) . . . ." Dkt. 29

33

**JA45**

at 25. However, the Court is not persuaded. The Executive Orders set forth generalized directives, without any particular focus on educational suitability. Similarly, the book removals do not focus on books that "contain[] offensive language" or are "psychologically or intellectually appropriate for the age group," or "manifestly inimical to the public welfare"—reasons deemed to be proper bases for book removal in Justice Blackmun's *Pico* concurrence. *Pico*, 457 U.S. at 893 (Blackmun, J., concurring) (citations omitted).

Moreover, the faulty implementation of the removals suggests that the removals were not rooted in pedagogical concerns. Defendants purport to have one standard list of "quarantined books" across all DoDEA schools. *See* Dkt. 54 at Attachment A. As previously discussed, the list does not differentiate between the appropriateness and pedagogical interests across different age groups. *Id.* Defendants also maintain that the list of removed books submitted to the Court is tentative and pending further review. Dkt. 42 at 10-11 (stating the list of removed books is "iterative," "dynamic," and "non-final"). Thus, that Defendants removed books with any inkling of the partisan ideas central to the EOs, without even completing the detailed review process, further evinces the improper partisan motivation underlying their actions. It raises additional concerns that the completion of the book review process may simply set forth *post hoc* pedagogical justifications. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004) (footnote omitted) ("Although we do not second-guess the *pedagogical* wisdom or efficacy of an educator's goal, we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was *pretextual*."). Accordingly, the Court finds that under the principles of *Pico*'s plurality and concurrences, Plaintiffs have demonstrated a likelihood of proving that Defendants were impermissibly motivated by a partisan interest when removing DoDEA library books.

**JA46**

Defendants' arguments do not fare any better under the *Hazelwood* standard. At the outset, it is unclear whether book removals constitute school-sponsored speech under *Hazelwood*. *Hazelwood* recognized schools' ability to control student expression "that might reasonably [be] perceive[d] to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. "These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* Per Defendants, the DoDEA libraries are "designed to 'meet the [schoolchildren's] educational needs' and 'enrich and support the curriculum.'" Dkt. 29 at 21 (citing Dkt. 29-4, Linton Decl. ¶ 6). However, Defendants provide no authority to support their argument that school library book collections constitute "school-sponsored speech." *See Crookshanks*, 775 F. Supp. 3d at 1183. Rather, Defendants go to great lengths to analogize library collections to other types of school activities that the Fourth Circuit and Supreme Court have deemed to be school-sponsored speech. Dkt. 29 at 20 (quoting *Fleming v. Johnson Cnty. Sch. Distr. R-1*, 298 F.3d 918, 925 (10th Cir. 2002)) ("[I]f the school band, drama club, and choir are constitutional adjuncts of a school's curriculum, then surely school libraries are within the curricular activities or resources 'that affect learning.'").

This Court is skeptical whether library books can reasonably be said to "bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. As stated earlier, libraries are intended to provide a breadth of information to students, and like with government speech, it strains credulity that the curation of a library collection would bear the school's imprimatur. *See PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 ("[T]he traditional purpose of a library is to provide information on a broad range of subjects and viewpoints . . . ."); *see also Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 723 (2d Cir. 1994) ("[T]he distinguishing factor

**JA47**

between library resources and curriculum is that library resources are something that students voluntarily may view at their leisure, whereas curriculum is required material for students.").

Even if *Hazelwood* provided the proper standard here, Defendants have not demonstrated legitimate pedagogical interests behind the book removals. Defendants assert that "DoDEA's ongoing review efforts are borne of its compliance with the President's Executive Orders and Departmental educational objectives, which in turn, were borne out of a desire to implement its pedagogical standards and priorities." Dkt. 29 at 22. As stated earlier, the book removals implement, in whole, the President's EOs, which are not limited to or inclusive of any "pedagogical standards and priorities." *Id.* The February 2025 memo to DoDEA administrators set a clear directive to remove any books related to the EOs, without any additional pedagogical considerations. Dkt. 1-4 (Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA administrators, educators, and staff (Feb. 5, 2025)).

*Hazelwood* recognized several legitimate pedagogical interests, including preventing encouragement of "drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the 'shared values of a civilized order,'" and speech that would "associate the school with any position other than neutrality on matters of political controversy." 484 U.S. at 272 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986)). The Fourth Circuit has added that a pedagogical interest is one broadly "relating to teaching or pedagogy." *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998) (en banc). Merely limiting books "on gender ideology and discriminatory equity ideology" and ones with "invidious race and sex discrimination," as these concepts are defined by the EOs, is not sufficient to establish a pedagogical concern. Dkt 29 at 22. If anything, Defendants' stated pedagogical interests, which

36

**JA48**

they concede are "part of national discourse," alone "associate the school with any position other than neutrality on matters of political controversy." *Id.* at 21-22.

Furthermore, as stated earlier, the fact that Defendants do not differentiate the quarantined books among different schools and age groups evinces the lack of pedagogy here. Surely, if Defendants were concerned with pedagogical interests through book removals, they would be able to tender evidence of the age-level perspective they consider and detailed information on the specific pedagogical standards at issue. "It is only when the decision to censor . . . has no valid educational purpose that the First Amendment is so directly and sharply implicate[d] . . . as to require judicial intervention to protect students' constitutional rights." *Hazelwood*, 484 U.S. at 273 (internal quotation marks omitted).

Accordingly, the Court finds that Plaintiffs have demonstrated a likelihood of success that Defendants' actions with respect to the removal of library books are unconstitutional under the First Amendment.

### ii.   *Curricular Removal*

Next, the court will address the First Amendment challenge to the curricular changes. Courts have long acknowledged the state's control over public education. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities."). That being said, the government's control over education is not limitless; it must be "reasonable." *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923). Indeed, the Supreme Court has struck down governmental attempts to "forbid[] the teaching in school of any subject except in English," *id.* at 400, as well as bars on teaching evolution "for the sole reason that it is deemed to conflict with a particular religious doctrine" held by those in power, *Epperson*, 393 U.S. at 103, 106. In *Hazelwood*, the Court reiterated that schools are still limited by the First

37

**JA49**

Amendment, in that they can only regulate school-sponsored speech when "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273.

Neither party disputes that *Hazelwood* applies to Defendants' curricular changes at DoDEA schools.[9] Dkt. 10 at 21-22; Dkt. 29 at 10. *Hazelwood* directly concerned educators' ability to "exercise editorial control" over school-sponsored speech, specifically "activities [that] may fairly be characterized as part of the school curriculum." 484 U.S. at 262, 271; *see also Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) (applying *Hazelwood* to students' right to access curricular materials); *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989) (applying *Hazelwood* to curricular restrictions). Under *Hazelwood*, the Court finds that Plaintiffs are likely to establish that Defendants' curricular changes fall short of the First Amendment.

While *Hazelwood* permitted educators to exercise control over school-sponsored speech, DoDEA's curricular changes stem from a directive from the President of the United States. Unlike other public schools, DoDEA schools lack school boards. Defendants, however, purport to characterize the President as being "in the role occupied by an elected local school board." Dkt. 29 at 12. At the hearing before this Court, Defendants contended that just as school boards are a byproduct of the electoral process, so too is the President. The Court is unpersuaded. While a school board is elected primarily based on their educational priorities, the President is not. Moreover, the President is far removed from the operation of DoDEA schools. Under the enabling statute of DoDEA, Congress granted the Secretary of Defense discretion to establish educational

---

[9] While Defendants appear to argue that curriculum constitutes government speech, their analysis rests entirely on the *Hazelwood* standard. Dkt. 29 at 10. Furthermore, contrary to Defendants' representation, Plaintiffs do not suggest at any point that *Pico* provides the relevant standard to review the curricular changes. *Id.* at 12; Dkt. 10 at 10.

institutions for dependents of servicemembers. *See* 10 U.S.C. § 101(a)(12)(A)-(B). The Secretary bears oversight over the Director of DoDEA, who oversees all DoDEA schools. Compl. ¶ 18.

Defendants further contend that "simply because the directive to review materials originated from outside of DoDEA does not mean that the review is divorced from pedagogical interests." Dkt. 29 at 12. In some instances, that could be true. However, at this stage, the Court finds that Plaintiffs will likely succeed in demonstrating that the curricular changes do not reflect "legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. Plaintiffs have offered evidence that shows that the Secretary of Defense and DoDEA administrators immediately deferred to the President's directives absent any further pedagogical review or cited interest. For example, Secretary Hegseth issued a January 2025 memorandum barring DoD from "provid[ing] instruction on Critical Race Theory (CRT), DEI, or gender ideology . . . ." Dkt. 1-10 at 2 (Memorandum from Pete Hegseth, Secretary of Defense, U.S. Dep't of Defense, to Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency & DOD Field Activity Directors (Jan. 29, 2025)). Subsequently, Lori Pickel directed instructors to cease using any curricula "potentially related to gender ideology or discriminatory equity ideology topics," which included a list of prohibited curricular materials. Dkt. 1-11 (Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA Administrators and School Level Employees (Feb. 5, 2025)). The directives from Secretary Hegseth and Ms. Pickel include no specific pedagogical interests, nor do they reflect a detailed pedagogical review process, given their immediacy.

The Court agrees with Plaintiffs that Defendants have "not put forward any purported pedagogical interests around the effectiveness or age appropriateness of curriculum to justify removal . . . ." Dkt. 10 at 24. In all candor, the Court cannot contemplate the pedagogical basis for banning the "Gender and Sex" module from Advanced Placement Psychology; lessons on

39

**JA51**

immigration in elementary school; chapters on "Human Reproductive System, Menstrual Cycle, and Fetal Development," "Abuse and Neglect," and "Adolescence and Puberty" from health education textbooks; and celebrations related to "identity months," including Black History and Women's History Months. Compl. ¶¶ 52, 56-57; Dkt. 1-11 at Attachment A.

Consequently, the Court finds that Plaintiffs have established that they are likely to succeed on the merits of their First Amendment challenge to the curricular changes.

## C. Irreparable Injury

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 512 F. Supp. 2d 424, 429 (S.D. W. Va. 2007), *rev'd*, 553 F.3d 292 (4th Cir. 2009)). Defendants assert that "Plaintiffs have failed to establish any irreparable injury—especially when, as noted, Plaintiffs have alternative access to the books and curricular information." Dkt. 29 at 27. The Supreme Court, however, has made clear that "[t]he loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Courts have also held that a "[r]estraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression." *Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982).

The Court further rejects Defendants' argument that Plaintiffs did not engage in "reasonable diligence" prior to seeking this preliminary injunction. Dkt. 29 at 27. Defendants aver Plaintiffs delayed their claims because they brought their Complaint months after Defendants' actions and just as the school year was set to end. *Id.* at 27-28. It was not unreasonable for

40

**JA52**

Plaintiffs to dedicate time to "weigh their constitutional rights against the consequences of suing" DoDEA, including "public shaming and humiliation," especially where Plaintiffs remain enrolled in their respective schools. *Crookshanks*, 775 F. Supp. 3d at 1188. Any purported delay in bringing suit does not negate the irreparable injury to Plaintiffs.

Furthermore, as discussed earlier, any purported delay is especially reasonable given Defendants refused to provide Plaintiffs with their requested information about DoDEA's actions. *Supra*, at 20-21. Accordingly, in light of Defendants' lack of transparency, Plaintiffs required time to collect sufficient evidence to bring this suit. Therefore, the Court finds that Plaintiffs have established that they will suffer irreparable harm absent the relief they seek.

### D. Balance of Equities and Public Interest

The parties agree that "[w]hen the Government is the party opposing injunctive relief, the balance of equities and public interest factors 'merge.'" Dkt. 10 at 25 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); Dkt. 29 at 28. Defendants also do not dispute that "upholding constitutional rights surely serves the public interest;" rather, they aver that no constitutional violation exists here. Dkt. 29 at 28 (quoting *Giovani Carandola Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). As the Court stated earlier, Plaintiffs have shown they are likely to prevail on their constitutional claims.

Furthermore, any injury to the government from a preliminary injunction is minimal, given that all that is required of the government is to return the book collection and curricular materials to their status quo. *See Crookshanks*, 775 F. Supp. 3d at 1189. The Fourth Circuit has stated that the government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th

41

**JA53**

Cir. 2013).  Conversely, a preliminary injunction would significantly benefit Plaintiffs, especially since the new school year has started.  Accordingly, the Court finds that the balance of equities and public interest favor Plaintiffs.

Because each of the *Winter* factors substantially weigh in Plaintiffs' favor, the Court will grant a preliminary injunction.

### E.  Bond and Scope of Injunctive Relief

Defendants raise two additional issues relevant to the Court's grant of a preliminary injunction.  First, Defendants ask this Court to assess whether bond is required here.  Dkt. 29 at 29.  Defendants contend "a bond order should reflect the disruption caused to DoDEA to recalibrate its school curricula to comply with any order that grants Plaintiffs' request for injunctive relief." *Id.*  Conversely, Plaintiffs argue that the Court has discretion to waive the bond requirement given "a fundamental constitutional right is at stake and where the bond requested 'would be an enormous financial barrier.'"  Dkt. 36 at 17-18 (quoting *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 290 (D. Md. 2025), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025)).

Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The purpose of Rule 65(c) seeks to "provide a mechanism for reimbursing an enjoined party from harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).  The Court "has discretion to set the bond amount 'in such sum as the court deems

**JA54**

proper.'" *Id.* (quoting *District 17, UMWA v. A & M Trucking, Inc.,* 991 F.2d 108, 110 (4th Cir. 1993)).

While the Court cannot "disregard the bond requirement altogether," it may issue a waiver. *Id.*; *Pashby*, 709 F.3d at 332. Ordinarily, courts have waived the bond requirement in public interest cases or matters involving constitutional rights, where a bond may impact Plaintiffs' ability to seek judicial review. *Sustainability Inst. v. Trump*, 784 F. Supp. 3d 861, 879 (D.S.C. 2025) ("District courts often waive the bond requirement in public interest cases, recognizing that the failure to do so could prevent certain plaintiffs from obtaining meaningful judicial review."); *Nat'l Ass'n of Diversity Officers in Higher Educ.*, 767 F. Supp. 3d at 291 ("[B]ecause the Plaintiffs seek to protect their First and Fifth Amendment rights, and because a bond of the size Defendants appear to seek would essentially forestall Plaintiffs' access to judicial review, the Court will set a nominal bond of zero dollars."); *see also Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1186 (N.D. Fla. 2022), *aff'd sub nom. Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) ("[Considering the] unlawful impact on Plaintiffs' First Amendment rights weighs against requiring a bond, this Court waives the bond requirement.").

Defendants make no proffer of a proposed bond amount. And the Court finds that the "disruption caused to DoDEA," Dkt. 29 at 29, from an injunction is not only minimal, because the injunction restores the status quo, but also does not outweigh the impact on Plaintiffs' First Amendment rights. Accordingly, the Court waives the bond requirement.

Second, Defendants also challenge the scope of any injunctive relief. Plaintiffs contend that any injunction should apply to all DoDEA schools. Dkt. 36 at 18. Defendants counter that "relief should be limited to the five DoDEA schools at issue in this case." Dkt. 29 at 30. The Court agrees with Defendants. Plaintiffs likened DoDEA to a single school district. DoDEA,

43

**JA55**

however, is comprised of 161 schools across nine districts in eleven foreign countries, seven states, Guam, and Puerto Rico. Dkt. 1 at ¶ 19. Plaintiffs have brought neither a facial challenge nor a putative class action suit here. Furthermore, the Supreme Court recently held that universal injunctions likely exceed the power Congress granted to federal courts. *Trump v. CASA, Inc.*, 145 S.Ct. 2540, 2551 (2025) ("A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power."). The Fourth Circuit has similarly disfavored nationwide injunctions. *See CASA de Md., Inc. v. Trump*, 971 F.3d 220, 256 (4th Cir. 2020) (Wilkinson, J.) ("Nationwide injunctions are plainly inconsistent with this conception of the judicial role and the proper scope of the federal courts' remedial power."). Therefore, the Court denies Plaintiffs' request for relief across all DoDEA schools.

## Conclusion

Accordingly, for the foregoing reasons, the Court finds that Plaintiffs have demonstrated that they are entitled to a preliminary injunction as to Plaintiffs' DoDEA schools. Accordingly, Plaintiffs' Motion for a Preliminary Injunction is granted. Dkt. 9. Defendants DoDEA, Dr. Beth Schiavano-Narvaez, and Secretary of Defense Peter Brian Hegseth are enjoined from further removal of educational books and curricular content in implementation of Executive Order Nos. 14168, 14185, and 14190 and any related memoranda, directives, and guidance at Plaintiffs' DoDEA schools: Crossroads Elementary School, Barsanti Elementary School, Aviano Middle-High School, Stollars Elementary School, and Egdren Middle High School. Defendants are furthermore ordered to immediately restore the books and curricular materials that have been removed since January 19, 2025, due to the Executive Orders, to their preexisting shelves, classrooms, and units at Plaintiffs' five schools.

Entered this 2нᵗ day of October, 2025.
Alexandria, Virginia

_____/s/
Patricia Tolliver Giles
United States District Judge

44

**JA56**

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| E.K. and S.K., *minors, by and through their parent and next friend Lindsey Keeley, et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:25-cv-637 (PTG/IDD) |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*, | ) ) ) ) ) | |
| *Defendants*. | ) ) | |

## ORDER

This matter comes before the Court on Plaintiffs E.K. and S.K., *et al.*'s, Motion for Preliminary Injunction. Dkt. 9. In this suit, twelve students of military families (collectively, "Plaintiffs") at five Department of Defense Education Activity ("DoDEA") schools bring First Amendment claims against Defendants DoDEA, Director of DoDEA Dr. Beth Schiavano-Narvaez, and Secretary of Defense Peter Brian Hegseth (collectively, "Defendants"). Dkt. 1 ("Compl.") ¶¶ 4, 10-15, 17-18. For the reasons set forth in an accompanying memorandum opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Dkt. 9) is **GRANTED in part** and **DENIED in part**; it is further

**ORDERED** that the injunction applies to Plaintiffs' five DoDEA schools: Crossroads Elementary School, Barsanti Elementary School, Aviano Middle-High School, Stollars Elementary School, and Egdren Middle High School; it is further

**ORDERED** that Defendants DoDEA, Dr. Beth Schiavano-Narvaez, and Secretary of Defense Peter Brian Hegseth, along with their agents, are enjoined from further removals of

JA57

educational books and curricular content in implementation of Executive Order Nos. 14168, 14185, and 14190 and any related memoranda, directives, and guidance at Plaintiffs' DoDEA schools; and it is further

**ORDERED** that Defendants and their agents immediately restore the library books and curricular materials that have been removed since January 19, 2025 in implementation of the EOs to their preexisting shelves, classrooms, and units at Plaintiffs' five schools.

Entered this 20th day of October, 2025.
Alexandria, Virginia

_____
Patricia Tolliver Giles
United States District Judge

2

**JA58**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend, JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y. minors, by and through their parent and next friend ANNA YOUNG; L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent NATALIE TOLLEY, <br><br>     Plaintiffs, <br><br>v. <br><br>DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense, <br><br>     Defendants. | Case No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**INTRODUCTION**

1.  The Department of Defense Education Activity ("DoDEA") is quarantining library books and whitewashing curricula in its civilian schools. Right now, DoDEA is scrubbing references to race and gender from its libraries and lessons with no regard to how canonical, award-winning, or age-appropriate the material might be.

1

2. This system-wide censorship is explicitly taking place to comply with Presidential Executive Orders ("EOs") 14168, 14185, and 14190, which ban "gender ideology" and "divisive concepts," among other viewpoints.

3. DoDEA's book and curricular removals violate students' First Amendment right to receive information. While the government has broad discretion to populate public school libraries and create curricula, the First Amendment imposes guardrails to ensure *removals* are justified. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982) (plurality opinion.) Public school districts cannot suppress educationally valuable books and materials about race and gender in public schools simply because a new presidential administration finds certain viewpoints on those topics to be politically incorrect.

4. Plaintiffs are twelve students from six families currently attending DoDEA-operated schools in grades ranging from pre-kindergarten to high school, within the United States and around the world. Plaintiffs value having access to a wide variety of books in their school libraries and expect teachers to convey information accurately, comprehensively, and according to their expertise. Through its censorship, DoDEA is prohibiting its educators from meeting Plaintiffs' expectations.

5. Plaintiffs are irreparably harmed by not having access to library books about race and gender, indisputably important topics in modern society. Plaintiffs are also irreparably harmed by the removal of race, gender, and even health curricula by DoDEA to comply with EOs 14168, 14185, and 14190. Beyond what has been explicitly prohibited via DoDEA directive, students cannot be sure what their teachers are withholding out of fear of noncompliance.

**JA60**

6.    Plaintiffs bring this First Amendment lawsuit to challenge the Department of Defense's ongoing and unconstitutional removal of books from their school libraries and suppression of topics and educational materials in their curricula.

## JURISDICTION AND VENUE

7.    This Court has subject-matter jurisdiction under the First Amendment to the U.S. Constitution and 28 U.S.C. § 1331.

8.    This Court has personal jurisdiction over federal officers sued in their official capacity for declaratory and injunctive relief. *See* 5 U.S.C. § 702; *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 140 (1951) (citing *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 701-702 (1949).

9.    Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. §§ 1391(b) and (e) because at least one official-capacity Defendant resides here, and because a substantial part of the events giving rise to Plaintiffs' claims occurred here.

## PARTIES

**A.    Plaintiffs**

10.    Plaintiffs E.K. and S.K., by and through their parent and next friend Lindsey Keeley, are minor dependents of an active-duty military servicemember. They attend Crossroads Elementary School ("Crossroads ES") in Quantico, Virginia, a school operated by DoDEA. They are currently in first and fourth grades, respectively.

11.    Plaintiffs O.H., S.H., and H.H., by and through their parent and next friend Jessica Henninger, are minor dependents of an active-duty military servicemember. All three students are currently enrolled in and attend Barsanti Elementary School ("Barsanti ES") in Fort Campbell, Kentucky, a school operated by DoDEA. They are currently in fourth grade, kindergarten, and pre-kindergarten, respectively.

3

**JA61**

12.    Plaintiff E.G., by and through their parent and next friend Megan Jebeles, is a minor dependent of an active-duty military servicemember.  Plaintiff E.G. is currently enrolled in and attends Barsanti ES in Fort Campbell, Kentucky, a school operated by DoDEA. E.G. is currently in fourth grade.

13.    Plaintiffs C.Y. and E.Y., by and through their parent and next friend Anna Young, are minor dependents of an active-duty military servicemember. They attend Aviano Middle-High School in Aviano, Italy, a school operated by DoDEA. They are currently in eleventh and ninth grades, respectively.

14.    Plaintiffs L.K. ("L.K. 1"), L.K. ("L.K. 2"), and L.K. ("L.K. 3"), by and through their parent and next friend Anna Kenkel, are minor dependents of an active-duty military servicemember. L.K. 1 and L.K. 2 attend Sollars Elementary while L.K. 3 attends Edgren Middle High School. Both are DoDEA schools located on the Misawa Air Base in Japan. They are currently in fourth, sixth, and eighth grades, respectively.

15.    Plaintiff M.T., by and through their parent and next friend Natalie Tolley, is a minor dependent of an active-duty military servicemember. Plaintiff M.T. is currently enrolled and attends Aviano Middle-High School in Aviano, Italy, a school operated by DoDEA. M.T. is currently in eleventh grade.

**B.    Defendants**

16.    Defendant DoDEA is a Department of Defense field activity responsible for, *inter alia*, planning, directing, coordinating, and managing federally-funded pre-kindergarten to twelfth grade ("Pre-K-12") schools. Its principal office and place of business is located at 4800 Mark Center Drive, Alexandria, Virginia 22350-1400.

17.    Defendant Dr. Beth Schiavino-Narvaez is Director of DoDEA. In her official capacity, Dr. Schiavino-Narvaez is vested with oversight authority over all Defense Department

4

**JA62**

Pre-K-12 schools, both domestically and internationally, including those attended by Plaintiffs. Dr. Schiavino-Narvaez's principal office and place of business is located at 4800 Mark Center Drive, Alexandria, Virginia 22350-1400.

18.    Defendant Peter Brian Hegseth is the United States Secretary of Defense. The Secretary of Defense's duties include control over and administration of DoDEA. In his official capacity, Secretary Hegseth's principal office and place of business is located at 1000 Defense Pentagon, Washington, D.C. 20301-1000.

### FACTUAL BACKGROUND

**A.    DoDEA Provides a Public School Education to Military Families Around the World**

19.    DoDEA principally provides pre-kindergarten, elementary, and secondary educational opportunities to dependents of military personnel.  DoDEA also educates dependents of civilian employees of the Department of Defense. Worldwide, DoDEA provides pre-kindergarten, elementary, and secondary education to approximately 67,000 children annually in 161 accredited schools. Those schools are divided among 9 districts located in 11 foreign countries, 7 states, Guam, and Puerto Rico.

20.    DoDEA is a civilian agency within the Department of Defense that operates like any other public school district, except that it is run by the federal government, and it is not geographically contiguous.

21.    By statute, DoDEA was created to provide appropriate educational opportunities for dependents of military personnel. 10 U.S.C. § 2164(2)(1)(B). DoDEA is a Department of Defense field activity, *i.e.*, an "organizational entity . . . established by the Secretary of Defense . . . to perform a supply or service activity common to more than one military department; and that

5

**JA63**

is designated by the Secretary of Defense as a Department of Defense Field Activity." 10 U.S.C. § 101(a)(12)(A)-(B).

22.     Internationally, the Secretary's authority for establishing a Department of Defense school system is conferred by federal statute. For dependents of military servicemembers stationed abroad, the Secretary *must* "establish and operate a program . . . to provide a free public education through secondary school." 20 U.S.C. § 921(a).

23.     Domestically, the Secretary of Defense's education authorization is discretionary. The Secretary "*may* enter into arrangements to provide for the elementary and secondary education" of military dependents in the United States if the Secretary determines that "appropriate educational programs are not available through a local educational agency." 10 U.S.C. § 2164(a)(1) (emphasis added).

24.     DoDEA is responsible for planning, directing, coordinating, and managing each of the DoDEA schools attended by Plaintiffs.

**B.      President Donald Trump Issues Multiple Executive Orders Requiring the Department of Defense to Remove References to Race and Gender**

25.     On January 20, 2025, the President of the United States issued EO 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.[1]  EO 14168, among other things, directs federal agencies, including the Department of Defense, to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," and "cease issuing such statements, policies, regulations, forms, communications or other messages." *Id.* at § 3(e).

---

[1] Ex. 1, Exec. Order No. 14,168, 90 Fed. Reg. 8615, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025).

**JA64**

26.     One week later, on January 27, 2025, the President issued EO 14185 titled Restoring America's Fighting Force.[2]  That EO directs:

> The Department of Defense and the Armed Forces, including any educational institution operated or controlled thereby, are prohibited from promoting, advancing, or otherwise inculcating the following un-American, divisive, discriminatory, radical, extremist, and irrational theories: (i) "divisive concepts," as defined in section 3(c) of this order, and "race or sex stereotyping," or "race or sex scapegoating" as both terms are defined in section 2 of Executive Order 13950, as amended; (ii) that America's founding documents are racist or sexist; and (iii) "gender ideology," as defined in section 3(b) of this order.

*Id.* at § 6.

27.     On January 29, 2025, the President issued EO 14190 titled Ending Radical Indoctrination in K-12 Schooling.[3]  The President directs, *inter alia*, that within ninety (90) days, agencies  "shall provide an Ending Indoctrination Strategy to the President, through the Assistant to the President for Domestic Policy, containing recommendations and a plan for: (i) eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology." *Id.* at § 3.

28.     Following the issuance of the above EOs, on March 4, 2025, the President of the United States addressed a Joint Session of Congress, making clear his ideological objectives. In his address, the President said:[4]

> [W]e are getting wokeness out of our schools and out of our military and it's already out and it's out of our society, we don't want it. Wokeness is trouble, wokeness is bad, it's gone. It's gone. And we feel so much better for it, don't we? Don't we feel better? *Id.*

---

[2] Ex. 2, Exec. Order No. 14,185, 90 Fed. Reg. 8763, *Restoring America's Fighting Force* (Jan. 27, 2025).

[3] Ex. 3, Exec. Order No. 14,190, 90 Fed. Reg. 8853, *Ending Radical Indoctrination in K-12 Schooling* (Jan. 29, 2025).

[4] DONALD TRUMP, President of the United States, Address Before a Joint Session of Congress (Mar. 4, 2025), (transcript available in *The New York Times*, Mar. 4, 2025, https://www.nytimes.com/ 2025/03/04/us/politics/transcript-trump-speech-congress.html (last visited Apr. 4, 2025)).

7

**JA65**

29.  Upon information and belief, the President's references to "wokeness" relate directly to "gender ideology" and "divisive concepts" as described in the EOs.

30.  The collective effect of these EOs and presidential pronouncements has been to require federal agencies, including the Department of Defense and its civilian DoDEA field activity, to censor references to slavery, civil rights, race, ethnicity, immigration, diversity, sexual orientation, and gender identity.

31.  The Department of Defense and DoDEA have already taken concrete steps to implement the President's EOs and directives.

**C.    The Department of Defense and DoDEA "Quarantines" Books from Libraries and Classrooms Based on the Books' Content About Race and Gender**

32.  On February 5, 2025, Lori Pickel, Acting Chief Academic Officer for DoDEA, circulated a memorandum to DoDEA educators, administrators, and staff requiring schools to review their libraries and remove certain books from circulation. The memorandum stated, "[i]n light of the recent Executive Orders . . . Information Center books potentially related to gender ideology or discriminatory equity ideology topics . . . will be relocated to the professional collection for evaluation."[5]

33.  Two days later, DoDEA Europe issued a memorandum to administrators and school-level employees stating, "Information Specialists must ensure books potentially related to gender ideology or discriminatory equity ideology are removed from the student section of the Information Center and placed in the professional collection."[6]

---

[5] Ex. 4, Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA administrators, educators, and staff (Feb. 5, 2025).

[6] Ex. 5, Letter from Charles Kelker, DoDEA Europe Chief of Staff, to DoDEA Europe Administrators and School Level Employees (Feb. 7, 2025).

**JA66**

34.     On February 10, 2025, DoDEA sent a similar letter to sponsors, parents, and guardians of DoDEA students stating that, in compliance with recent EOs, DoDEA staff had reviewed "books potentially related to gender ideology or discriminatory equity ideology topics." The letter further stated that "books identified for review will be relocated to the professional collection for evaluation with access limited to professional staff."[7]

35.     On February 12, C.Y. and E.Y.'s parent requested a copy of the materials selected for review/removal at Aviano Middle-High School.  The school principal responded that items were under operational review and that no books had yet been removed from the school. C.Y. and E.Y.'s parent followed-up but was never provided with a list of materials relocated for review.

36.     Despite this lack of transparency, Plaintiffs have been able to confirm that books have in fact been removed from DoDEA school libraries.

37.     On March 7, 2025, DoDEA Europe issued a letter to parents and students regarding actions DoDEA Europe had taken in compliance with the recent EOs.  The letter stated in part that some library materials from DoDEA Europe schools were "temporarily relocated to the professional collection, where they will be reviewed by [] staff, region and Headquarters.  Access to these materials is currently limited to professional staff."[8]

38.     Elsewhere in Europe, school administrators also took steps to implement the President's EOs and the Department of Defense's book-removal guidance. Shawn Knudsen, Principal of DoDEA Wiesbaden Middle School in Wiesbaden, Germany, sent an email in February to teachers stating, "[n]o books will be able to be checked out from the library next week as Ms.

---

[7] Ex. 6, Letter from Beth Schiavino-Narvaez, DoDEA Director, to DoDEA Sponsors, Parents, and Guardians (Feb. 10, 2025).

[8] Ex. 7, Letter from Michelle Howard-Brahaney, DoDEA Europe Director for Student Excellence, to Parents and Students (Mar. 7, 2025).

9

**JA67**

Lindsay goes through and removes from circulation any books that are related to gender ideology or discriminatory equity ideology topics…" The email also instructed teachers to remove "[a]ny book which relates to gender ideology or discriminatory equity ideology" from their classrooms.[9]

39.     In response to media inquiries, DoDEA Communications Chief Will Griffin has echoed the language of the EOs confirming that DoDEA is ending "radical indoctrination" of children by evaluating "books potentially related to gender ideology or discriminatory equity ideology" for removal.[10]

40.     At a DoDEA high school in Germany, school librarians received an online training to facilitate book removal.  The training instructed librarians to scan their collection for books referencing "gender ideology" or "gender identity" to identify necessary quarantines.

41.     The training in Germany further stated that *Both Sides Now* by Peyton Thomas must be quarantined just because it "refers to transgender."[11]  *Both Sides Now* is a fictional novel about a transgender teen participating in a national debate competition, which received the 2022 International Literacy Association Award for Young Adult Fiction.



---

[9] Ex. 8, Email from Shawn Knudsen to Wiesbaden MS All Staff (Feb. 7, 2025).

[10] Dan Lamothe, *Trump DEI crackdown targets students' book access in Defense Department schools*, WASHINGTON POST (Feb. 7, 2025), https://www.washingtonpost.com/national-security/2025/02/07/defense-department-hegseth-books-schools/?utm_source=chatgpt.com.

[11] Ex. 9, Information Centers and Executive Orders, Examples, https://rise.articulate.com/share/Co7fkmnPI6eyrWDe00At1Votq7bwAhcH#/lessons/fsi4yBCKusWPX_Tolm08NJhL4nTRoQke.

10

**JA68**

42.      Media reports have also provided information about DoDEA's book quarantines. On February 13, 2025, news outlet The Guardian reported that it had obtained a list of books selected by DoDEA schools for review in compliance with the President's EOs. This list included *No Truth Without Ruth,* a picture book biography of the late Justice Ruth Bader Ginsburg, written by Kathleen Krull, winner of the 2011 Children's Book Guild Nonfiction Award.  The Guardian's list also includes *New York Times* bestseller *Freckleface Strawberry*, a picture book about "learning to love the skin [you're] in" written by Oscar award-winning actress Julianne Moore.[12]

43.      National news outlet USA Today reported that a student at DoDEA Ramstein High School in Germany stated that classic books such as *To Kill a Mockingbird* by Harper Lee, a book about the trial of a Black man falsely accused of a crime, and *Fahrenheit 451* by Ray Bradbury, a reflection on book-burning and censorship, disappeared from the school pending review for diversity concepts and language.[13]  *To Kill a Mockingbird* received the Pulitzer Prize for Fiction in 1961.  *Fahrenheit 451* has won numerous literary awards and is frequently included in high school and college curricula.

44.       In Kentucky and Tennessee, the local news outlet Clarksville Now reported that librarians at elementary schools in Fort Campbell (a military installation located along the Kentucky-Tennessee border near Clarksville, Tennessee) believed they must remove "any books that mention slavery, the civil rights movement or the treatment of Native Americans." At one

---

[12] Ed Pilkington, *Pentagon schools suspend library books for 'compliance review' under Trump orders,* The Guardian (Feb. 13, 2025), https://www.theguardian.com/us-news/2025/feb/13/pentagon-schools-closed-libraries-trump; Karina Tsui and Andy Rose, *Julianne Moore says her book about embracing differences was removed from Pentagon-run schools*, CNN (Feb. 17, 2025, 10:08 AM), https://www.cnn.com/2025/02/17/entertainment/julianne-moore-book-removed/index.html.

[13] Cybele Mayes-Osterman, *Students at US military high school in Germany protest Hegseth's anti-DEI push,* USA Today (Mar. 6, 2025 12:02 AM), https://www.usatoday.com/story/news/world/2025/03/06/military-high-school-hegseth-protest/81162900007/.

11

**JA69**

elementary school at the military installation, efforts to comply with the EOs have "amounted to hundreds of books in several stacks, filling rolling carts" for removal.[14]

45.    The military news outlet Task & Purpose published a list of books pulled from a DoDEA high school library in Europe.  The list, compiled by a student at the high school, included *New York Times* bestseller *The Kite Runner* by Khaled Hosseini, a novel set against the backdrop of Afghanistan's turbulent history under Soviet and Taliban rule.  The list also included *Well-Read Black Girl: Finding Our Stories, Discovering Ourselves* by Glory Edim, an anthology of essays from prominent Black women writers reflecting on the impact of literature on their lives.[15]  Even the U.S. Vice President was not immune from censorship under the EOs: the list further targeted *Hillbilly Elegy: A Memoir of a Family and Culture in Crisis* by J.D. Vance, a memoir detailing the struggles of working-class white Americans.

46.    At a DoDEA elementary school in Italy, twenty-five books were removed from the library in response to the EOs, including children's books *Julian is a Mermaid* by Jessica Love and *The Antiracist Kid* by Tiffany Jewell.  *Julian is a Mermaid*, a picture book about a boy who makes a mermaid costume and participates in a parade, received the Stonewall Book Award in 2019.  *The Antiracist Kid* is an illustrated book about recognizing and responding to injustice.

47.    At a DoDEA school in Japan, librarians were asked to pull all books with titles related to gender identity, transgender, or nonbinary topics, pursuant to EO 14168.  As a result, sixty-one books were quarantined at the school, including *A Queer History of the United States* by

---

[14] Chris Smith, *Books mentioning slavery, civil rights removed from shelves at Fort Campbell schools,* CLARKSVILLE NOW (Feb. 13, 2025 10:53 AM), https://clarksvillenow.com/local/books-mentioning-slavery-civil-rights-removed-from-shelves-at-fort-campbell-schools/.

[15] Patty Nieberg, *'Hillbilly Elegy,' 'Kite Runner' among books being reviewed over 'idealogy' concerns at on-base military schools*, TASK & PURPOSE (Feb. 14, 2025 3:13 PM), https://taskandpurpose.com/culture/dod-schools-book-removal/.

**JA70**

Michael Bronski and an Advanced Placement ("AP") psychology examination preparation book, *AP Psychology Premium*. *A Queer History of the United States* won the 2012 Stonewall Book Award and the 2012 Lambda Literary Award for LGBT Nonfiction.

48.    These examples of removed books are illustrative and not exhaustive. DoDEA schools are presently evaluating and removing books around the world to implement the President's EOs and guidance received from Department of Defense and DoDEA officials. DoDEA schools are providing varying levels of transparency about the specific books affected.

49.    Plaintiffs reasonably fear that more books at more DoDEA schools will be reviewed and removed pursuant to the EOs.

**D.    DoDEA Removes Age-Appropriate School Curricula Based on Content About Race and Gender**

50.    Shortly after the President's EOs, on January 29, 2025, Secretary Hegseth issued a memorandum titled "Restoring America's Fighting Force." This memorandum established a task force to implement the EO and states, "[n]o element within DoD will provide instruction on Critical Race Theory (CRT), DEI, or gender ideology as part of a curriculum or for purposes of workforce training."[16]

51.    Within a week of Secretary Hegseth's memorandum, Lori Pickel, Acting Chief Academic Officer for DoDEA, instructed educators to cease using curricular materials "potentially related to gender ideology or discriminatory equity ideology topics." The Acting Chief Academic Officer's memorandum identified specific instructional resources that DoDEA educators must

---

[16] Ex. 10, Memorandum from Pete Hegseth, Secretary of Defense, U.S. Dep't of Defense, to Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency & DOD Field Activity Directors (Jan. 29, 2025).

**JA71**

cease using immediately.[17]  The list includes a historically accurate biography of Robert Cashier,

a civil war veteran who was born female but enlisted and fought valiantly as a man in the Union

Army. It also includes health education for middle school, and units on gender and sexuality in AP

Psychology courses.[18]  The full list of prohibited curriculum materials is reflected below:

The following list includes selected instructional resources that should not be used by DoDEA educators during the operational compliance review.

| **AP Psychology** | | | |
|---|---|---|---|
| Company | Resource/Grade | Course | Do not use this resource |
| College Board | AP Psychology | AP Psychology | Please exclude "gender identity" from learning objective 3.6.A.8 and excluding Module 32 Gender and Sex |
| McGraw Hill | AP Psychology | AP Psychology | Chapter 11 – Sexuality and Gender |
| **Elementary Social Studies** | | | |
| Company | Resource/Grade | Course | Do not use this resource |
| TCI | Biographies K-5 | Elementary SS Grade K-5 | Albert Cashier, Civil War Veteran |
| TCI | G5 Western Hemisphere: Lesson 7: Migration to the United States Impact on People and Places | Elementary SS Grade 5 | Section 4 Reading - How Does Immigration Affect the U.S.? |
| TCI | G4 Lesson 3: The Peopling of the United States | Elementary SS Grade 4 | Explore Reading - A Nation of Immigrants |
| **Secondary ELA** | | | |
| Company | Resource/Grade | Course | Do not use this resource |
| HMH | READ 180 | Strategic Literacy 6-12 | Independent Reading Novel - Becoming Nicole |
| **Secondary Health** | | | |
| Company | Resource/Grade | Course | Do not use this resource |
| G-W | 6th through 8th grade Health | Comprehensive Health Skills for Middle School | Comprehensive Health Skills for Middle School Chapter 18.1 |
| **Secondary Social Studies** | | | |
| Company | Resource/Grade | Course | Do not use this resource |
| HMH ED | Grade 6: My Friend in Learning | 6th Grade Eastern World | My Friend in Learning Professional Learning. New for You Seasonal Bundle: Black History Month 2025 |

---

[17] Ex. 11, Memorandum from Lori Pickel, DoDEA Acting Chief Academic Officer, to DoDEA Administrators and School Level Employees (Feb. 5, 2025).

[18] *Id.* at Attachment A.

14

**JA72**

52. C.Y. and E.Y.'s parent received a community email from the DoDEA Chief Academic Officer about upcoming changes to the AP Psychology course, specifically the removal of Module 32 on Gender and Sex.

53. A few weeks later, on March 3, 2025, DoDEA parents with children in AP Psychology received an email confirming changes to course content. The email states, "[f]or the remainder of school year 2024-2025, DoDEA teachers will not use class time to teach, discuss, or cover AP Psychology Module 32 on Gender and Sex, including 'gender identity' in objective 3.6.A.8. or any other related content."[19] Plaintiffs C.Y. and M.T. are enrolled in the affected AP Psychology course.

54. Within a week, DoDEA Europe sent a letter to parents stating that a "small number" of curricula resources were identified for further review to ensure their compliance with EO 14190.[20]

55. DoDEA has also required the removal of a substantial portion of curricula from its health education courses. This includes the removal of Chapter 18.1, titled "What is Sexuality?" from sixth through eighth grade health classes. Upon information and belief, chapter 18.1 does not advocate for any particular sexuality or gender identity. It simply defines terms, accurately and without bias, that are commonly used in everyday conversation.

56. Upon information and belief, additional chapters have been removed from DoDEA health education textbooks, including chapters titled "Communicable Diseases: Sexually Transmitted Diseases," "Unwanted Sexual Activity: Sexual Harassment," "Human Reproductive System, Menstrual Cycle, and Fetal Development," "Abuse and Neglect," and "Adolescence and

---

[19] Ex. 12, E-mail on Behalf of the DoDEA Chief Academic Officer, to DoDEA Parents (Mar. 3, 2025).

[20] Ex. 7, Letter from Michelle Howard-Brahaney, DoDEA Europe Director for Student Excellence, to Parents and Students (Mar. 7, 2025).

15

**JA73**

Puberty."  In order to comply with the EOs, DoDEA students are not learning about health, hygiene, biology, and abuse.  These changes are causing irreparable harm to DoDEA students.

57.    The curricular changes extend to cultural celebrations as well.  On January 31, 2025, the Department of Defense released guidance titled, "Identity Months Dead at DoD."  The guidance states: "DoD Components [including DoDEA schools] and Military Departments will not use official resources, to include man-hours, to host celebrations or events related to cultural awareness months, including National African American/Black History Month, Women's History Month, Asian American and Pacific Islander Heritage Month, Pride Month, National Hispanic Heritage Month, National Disability Employment Awareness Month, and National American Indian Heritage Month."[21]  To implement the Department of Defense guidance, on February 24, 2025, DoDEA Chief of Staff Taylor York issued a letter stating: "[s]chools must cancel all planned special activities and non-instructional events related to former monthly cultural awareness month observances."[22]  The memorandum continues, however, to allow celebrations for what it has termed "host national engagement."  The difference between a banned cultural awareness month activity and an allowed "host nation engagement" activity is unclear and amorphous.  For example, the memorandum specifically bans Black History Month assemblies and Women's History Month events but allows Guam History & Chamorro Heritage Day in Guam.  This distinction is nonsensical, particularly because Guam is part of the United States and therefore not a "host nation."

---

[21] U.S. Dep't of Defense, *Identity Months Dead at DOD* (Jan. 31, 2025), https://www.defense.gov/News/Releases/Release/article/4050331/identity-months-dead-at-dod/.

[22] Ex. 13, Letter from Taylor York, DoDEA Civil Rights Analyst and Program Manager, to Jay M. Burcham, DoDEA Chief of Staff (Feb. 24, 2025).

**JA74**

58.    Plaintiffs E.K. and S.K.'s school, Crossroads ES, as well as Plaintiffs O.H., S.H., H.H., and E.G.'s school, Barsanti ES, cancelled all Black History Month programming and removed curricula and library displays about Black people.

59.    On February 13, 2025, news outlet Clarksville Now reported that schools in Fort Campbell "had to remove all bulletin boards that reference Black History Month and Black leaders such as Martin Luther King Jr., Harriet Tubman and Rosa Parks." The schools also cancelled curricula for Asian American and Pacific Islander Heritage Month.[23]

60.    Implementation of these curricular changes has expanded beyond banning the enumerated lessons and cultural events. For example, DoDEA high schools often offer "Yearbook" as a class for curriculum credit, designed to teach students writing, photography, editorial, and publishing skills. In response to the EOs, DoDEA has started scrutinizing school yearbooks for content related to gender. On February 13, 2025, DoDEA Civil Rights Analyst and Program Manager Taylor York wrote a letter to DoDEA Chief of Staff Jay Burcham regarding restrictions to DoDEA sponsored school yearbooks. The letter stated in part, "[s]tudent yearbooks are not to include any visual depictions, written content, or editorial choices that would directly or indirectly support the instruction, advancement, and/or promotion of 'gender ideology' and/or 'social transition.'"[24]

61.    These examples of removed lessons and cancelled cultural celebrations are illustrative and not exhaustive. DoDEA schools around the world are presently evaluating curricula and educational programming in order to implement the President's EOs and guidance

---

[23] Chris Smith, *Books mentioning slavery, civil rights removed from shelves at Fort Campbell schools,* CLARKSVILLE NOW (Feb. 13, 2025 10:53AM), https://clarksvillenow.com/local/books-mentioning-slavery-civil-rights-removed-from-shelves-at-fort-campbell-schools/.

[24] Ex. 14, Letter from Taylor York, DoDEA Civil Rights Analyst and Program Manager, to Jay Burcham, DoDEA Chief of Staff (Feb. 13, 2025).

17

**JA75**

received from Department of Defense and DoDEA officials, with varying levels of transparency about the specific educational programming being affected. Plaintiffs anticipate that in the near future, more curricula, courses, lessons, and educational programming at more DoDEA schools will be restricted based on their content purportedly referencing race and gender ideologies.

> **E.      Students, Parents, and Educators Protest the Censorship of Educational Materials**

62.      Throughout February, March, and April 2025, DoDEA students around the world have protested the removal of books and suppression of references to diversity, race, sex, and gender from their schools and curricula. DoDEA students have staged walkouts, carrying signs with messages like: "Read Banned Books" and "All History Matters."[25]

63.      "Most, if not all, of the students" at Aviano Middle-High School attended at least part of the planned protest on April 10, 2025, according to a Stars & Stripes report.[26] Similar protests against book quarantines and curricular changes took place at DoDEA schools around the world. Some Plaintiffs participated in and organized protests at their respective schools.

64.      Ahead of the planned walkouts, some students were threatened with punishments in excess of "unexcused absences," the appropriate response to a walkout during school hours.[27]

---

[25] Jennifer H. Svan, *Hundreds of students demonstrate in support of diversity at four Defense Department schools overseas*, STARS AND STRIPES (Mar. 6, 2025), https://www.stripes.com/theaters/europe/2025-03-06/hundreds-protest-dodea-schools-dei-policies-17056022.html; Brian McElhiney, *DODEA students on Okinawa demonstrate in support of diversity*, STARS AND STRIPES (Mar. 10, 2025), https://www.stripes.com/theaters/asia_pacific/2025-03-10/dei-student-walkout-dodea-okinawa-17094043.html.

[26] David Choi, *DODEA students worldwide push back on DEI cuts with walkout demonstrations*, STARS AND STRIPES (Apr. 10, 2025), https://www.stripes.com/theaters/asia_pacific/2025-04-10/dodea-dei-student-protests-walkouts-17428249.html.

[27] Cybele Mayes-Osterman, *Military Schools Threaten Pro-DEI Student Protestors with Disciplinary Action*, USA TODAY (Apr. 10, 2025), https://www.usatoday.com/story/news/politics/2025/04/10/military-schools-student-walkouts/83306129007/.

18

**JA76**

Students who in fact engaged in walkouts on April 10, 2025, reportedly faced a variety of disciplinary measures.[28]

65.     Notwithstanding these notable protests, upon information and belief many DoDEA families hesitate to publicly complain or resist changes in their schools because they fear retaliation from their supervisors, other families on base, and non-military pressure groups.

**F.     Plaintiffs Have Suffered and Continue to Suffer Immediate and Irreparable Harm to their First Amendment Rights**

66.     All Plaintiffs are experiencing irreparable harms stemming from their reduced access to books, curricula, and educational information about race and gender in DoDEA schools.

67.     Defendants are censoring age-appropriate and canonical books and curricula from DoDEA schools.  By revoking students' access to books and curricula about race and gender for partisan, political reasons and without an educational justification, Defendants are violating students' First Amendment right to receive information.

68.     Defendants' actions in banning books and scrubbing curricula do not stem from rational, age-appropriate, evidence-based concerns, but rather from animus.  Defendants are pursuing an arbitrary "anti-wokeness" agenda aimed at the suppression of minority and dissenting viewpoints and experiences, to the detriment of tens of thousands of American students learning around the world.

69.     Students' limited access to disfavored viewpoints will lead to a reduction in diversity of thought and critical thinking skills.

70.     Book removals have affected every DoDEA school and upon information and belief every plaintiff has had their access to books restricted as a result of the EOs and DoDEA's

---

[28] *Id.*

19

**JA77**

compliance. Plaintiffs are harmed by the forced removal of books that their schools had deemed fit to include in the library collection. Reading and exploring a broad variety of ideas is essential to Plaintiffs education, but they are being inhibited without justification.

71. Plaintiffs C.Y. and M.T. are currently enrolled in AP Psychology so they are suffering direct harm as a result of changes to that course. They are both concerned about the ability to obtain Advanced Placement because they will be tested on content that is banned by DoDEA, specifically Module 32 on Gender and Sex. Plaintiffs C.Y. and M.T., as teenage girls, suffer especially acute harm by not learning about how gender and sex impact psychology. But the harm is not limited to girls enrolled in AP Psych. The changes to the course will also affect any other students, including E.Y., who are currently enrolled in DoDEA schools and have an interest in taking AP Psychology in the future.

72. Plaintiffs L.K. 2 and L.K. 3 are in 6th and 8th grades, respectively, and have suffered irreparable harm from having important information withheld from their health curriculum, as well as changes to independent reading and Black History Month materials. They are being denied access to information relevant to their physical wellbeing as well as information about the history of Black people in the United States.

73. Plaintiffs L.K. 1, S.K., O.H., and E.G. are all in 4th grade and have had curricular materials related to immigration removed. Learning about the migration of people into the United States is critical for Plaintiffs to understand themselves, their classmates, and the world around them. Plaintiffs are being denied access to information based on directives from the President despite their schools' previous determination that this lesson is educationally appropriate and valuable. Next year, their fifth grade-curriculum will be similarly affected by the removal of a lesson on the impact of immigration on the United States.

**JA78**

74. Plaintiffs E.K., S.H., and H.H., are younger students who have had less direct impact on their curriculum but their future interest in a quality DoDEA education has been severely impacted by the EOs and compliance directives.

75. Likewise, all Plaintiffs were and continue to be denied the right to learn about important Black leaders and activists and the history of Black people in the United States because Black History Month was canceled throughout DoDEA and library displays and curricula were removed from the school.

76. Regardless of Plaintiffs' racial and ethnic backgrounds, they are entitled to and deservingly expect to learn about all racial backgrounds that are embedded in American history. Because the EOs specifically target books based on race, Plaintiffs are being denied the right to receive a holistic education on foundational American history. Plaintiffs are also harmed in that they are denied access to information about targeted racial and cultural experiences, even if not necessarily their own. A well-rounded education does not exist without Black and Indigenous American historical figures like Rosa Parks and Martin Luther King Jr. The removal of books and lessons merely because of the racial background of American historical figures sets up all DoDEA students to be vastly behind their peers.

77. Similarly, DoDEA cancelled Women's History Month. The majority of Plaintiffs are girls. They expect and deserve to learn about women's history, women's struggles, women's determination, and women's impact on the world. But because Defendants' actions specifically target books and curricula that discuss gender, Plaintiffs are being denied the right to see themselves and their stories represented in their schools. Meanwhile, Plaintiffs who are boys are denied access to information and history about women that is relevant to everyone.

**JA79**

78.     Compounding the injury of the removals, DoDEA has not been transparent about its censorship. Parents and teachers have asked for clarification and instructions from administrators and district superintendents about the implementation of the EOs and related guidelines. They have inquired about specific materials being removed from the library, the cessation of specific cultural celebrations, and whether other specific clubs and activities stand to be adversely affected. Some parents have filed Freedom of Information Act ("FOIA") requests to obtain more detailed information. These efforts have been largely unsuccessful. Administrators have instead directed concerned parents to the DoDEA policy and the EOs. This has made it impossible for Plaintiffs' parents to identify and fill the gaps in their children's education caused by the EOs.

79.     As a result of Defendants' conduct, DoDEA school libraries have been (and will continue to be) diminished, resulting in students having access to a smaller universe of books. Upon information and belief, DoDEA schools are often the best source of age-appropriate English-language educational materials for American military students living abroad.

80.     As books and curricula are removed from DoDEA schools, Plaintiffs and, upon information and belief, other DoDEA students are increasingly afraid to discuss race and gender in their classrooms, because they fear being silenced by teachers fearful of violating the EOs and DoDEA guidance.

81.     Defendants' actions are diminishing students' right to receive information regarding their own identities and history. Defendants' actions are also forcing students to study in censored classrooms, which has significantly impaired their ability to learn about an array of different communities and gain exposure to people with differing experiences and viewpoints.

**JA80**

82.    Defendants have made clear that the process of reviewing and removing books and curricula is ongoing and system-wide in DoDEA schools.  Without an injunction ordering Defendants to cease removing books and curricula about race and gender, DoDEA will continue to deprive students of access to an unknown number of books and ideas.  The removal of books and curricula has already caused Plaintiffs irreparable injury and will continue to do so if not enjoined.

**CLAIMS FOR RELIEF**
**FIRST CLAIM**
**Violation of the First Amendment to the United States Constitution –**
**Right to Receive Information (Books)**
**(All Defendants)**

83.    Plaintiffs re-allege and incorporate each and every allegation above.

84.    The First Amendment provides in part that the government "shall make no law . . . abridging the freedom of speech."

85.    EOs 14168, 14185, and 14190, both on their face and as implemented by Defendants, violate the First Amendment because they prohibit books to promote a narrowly partisan, political, or racially biased agenda to the detriment of Plaintiffs.  *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982) (plurality opinion) *("Pico")*.

86.    The First Amendment protects both the right to speak and the right to receive information.  Courts have recognized that students' First Amendment rights extend into public schools, even if the school context might limit some aspects of those rights.

87.    The First Amendment provides standards for evaluating library book access restrictions and curriculum removals.  Plaintiffs' right to receive information and ideas includes the right to access and read the books available in the school library, a non-curricular space for voluntary, self-led access to materials that is entitled to unique protection in the school

23

**JA81**

environment under the U.S. Constitution as recognized by the Supreme Court in *Pico*. Defendants have violated that right by removing library books for purely partisan, political reasons.

88.     The library materials removed by Defendants have educational value and are educationally suitable for Plaintiffs and other students at DoDEA schools. Upon information and belief, there has been no assertion by DoDEA that any of the removed materials are obscene or otherwise unprotected by the First Amendment.

89.     The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.

90.     Plaintiffs are entitled to declaratory relief that EOs 14168, 14185, and 14190 are unconstitutional and unenforceable in that they require the removal and exclusion of materials from a school library based solely on their disfavored topics and viewpoints.

91.     Plaintiffs are entitled to injunctive relief and request this Court enjoin Defendants from enforcing EOs 14168, 14185, and 14190 by removing and excluding materials from school libraries solely on the basis they contain references to race or gender. Plaintiffs further request that this Court order Defendants to restore any materials already removed from their respective library programs or classrooms to comply with EOs 14168, 14185, and 14190.

92.     Plaintiffs are suffering irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of EOs 14168, 14185, and 14190 and DoDEA guidance. Plaintiffs have no plain, adequate, or speedy remedy at law.

**SECOND CLAIM**
**Violation of the First Amendment to the United States Constitution –**
**Right to Receive Information (Curriculum)**
**(All Defendants)**

93.     Plaintiffs re-allege and incorporate each and every allegation above.

24

**JA82**

94.    The First Amendment provides in part that the government "shall make no law . . . abridging the freedom of speech."

95.    EOs 14168, 14185, and 14190, on their face and as implemented by Defendants, violate the First Amendment because they ban curricular materials about specific concepts on the topics of race, gender, and sex, and impose restrictions on the ideas that students may be exposed to in public schools.

96.    Government actions that impede the rights of students to receive information and ideas without legitimate pedagogical justification violate the First Amendment. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

97.    The curricula materials removed by Defendants have educational value and are educationally suitable for Plaintiffs and other students at DoDEA schools.  Upon information and belief, there has been no assertion by DoDEA that any of the removed materials are obscene or otherwise unprotected by the First Amendment.

98.    The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.

99.    Plaintiffs are entitled to declaratory relief that EOs 14168, 14185, and 14190 are unconstitutional and unenforceable in that they require the removal and exclusion of materials from their school curricula by executive fiat.

100.    Plaintiffs are entitled to injunctive relief and request this Court enjoin Defendants from enforcing EOs 14168, 14185, and 14190 by removing and excluding materials from school curricula solely on the basis they contain certain content or viewpoints.  Plaintiffs further request that this Court order Defendants to restore any materials already removed from their respective

**JA83**

school programs or curricula in implementing EOs 14168, 14185, and 14190 and DoDEA guidance.

101.    Plaintiffs are suffering irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of EOs 14168, 14185, and 14190 and DoDEA guidance. Plaintiffs have no plain, adequate, or speedy remedy at law.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs respectfully request:

A.    Declaratory judgment finding that Defendants have violated Plaintiffs' rights under the First Amendment to the United States Constitution;

B.    Preliminary and permanent injunctive relief barring Defendants Dr. Schiavino-Narvaez and Secretary Hegseth, in their official capacities, from enforcing EOs 14168, 14185, and 14190 in DoDEA schools by directing the removal of books based on the governments' classifications of content and viewpoint as relating to "gender ideology" and "divisive concepts";

C.    Preliminary and permanent injunctive relief barring Defendants Dr. Schiavino-Narvaez and Secretary Hegseth, in their official capacities, from enforcing EOs 14168, 14185, and 14190 in DoDEA schools by directing the removal of curricula based on the governments' classifications of content and viewpoint as relating to gender ideology and discriminatory equity ideology;

D.    Reinstatement to school library shelves and classrooms of books and curricula removed by DoDEA to comply with EOs 14168, 14185, and 14190;

E.    Any and all other relief as the Court deems just and proper.

26

**JA84**

Dated: April 15, 2025

Respectfully submitted,

/s/ Matthew Callahan
Matthew Callahan, VSB No. 99823
Eden Heilman, VSB No. 93554
ACLU OF VIRGINIA FOUNDATION
701 E. Franklin Street, Suite 1412
Richmond, VA 23219
(804) 644-8080
mcallahan@acluva.org
eheilman@acluva.org

Emerson J. Sykes*
Tyler Takemoto*
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
esykes@aclu.org
ttakemoto@aclu.org

Corey M. Shapiro*
William E. Sharp*
ACLU OF KENTUCKY FOUNDATION
325 W. Main Street, Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org

*Attorneys for Plaintiffs*

\* Motions for *pro hac vice* admission forthcoming

27

**JA85**

# EXHIBIT 1

USCA4 Appeal: 25-2497    Doc: 24    Filed: 03/30/2026    Pg: 92 of 283

# Presidential Documents

**Executive Order 14168 of January 20, 2025**

## Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of ''woman'' improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2**. *Policy and Definitions.* It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

  (a) ''Sex'' shall refer to an individual's immutable biological classification as either male or female. ''Sex'' is not a synonym for and does not include the concept of ''gender identity.''

  (b) ''Women'' or ''woman'' and ''girls'' or ''girl'' shall mean adult and juvenile human females, respectively.

  (c) ''Men'' or ''man'' and ''boys'' or ''boy'' shall mean adult and juvenile human males, respectively.

  (d) ''Female'' means a person belonging, at conception, to the sex that produces the large reproductive cell.

  (e) ''Male'' means a person belonging, at conception, to the sex that produces the small reproductive cell.

  (f) ''Gender ideology'' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Sec. 3**. *Recognizing Women Are Biologically Distinct From Men.* (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term "sex" and not "gender" in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

**Sec. 4**. *Privacy in Intimate Spaces.* (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

Sec. 5. *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

Sec. 6. *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

Sec. 7. *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) "The White House Toolkit on Transgender Equality";

(ii) the Department of Education's guidance documents including:

(A) "2024 Title IX Regulations: Pointers for Implementation" (July 2024);

(B) "U.S. Department of Education Toolkit: Creating Inclusive and Non-discriminatory School Environments for LGBTQI+ Students";

(C) "U.S. Department of Education Supporting LGBTQI+ Youth and Families in School" (June 21, 2023);

(D) "Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela" (June 21, 2023);

(E) "Supporting Intersex Students: A Resource for Students, Families, and Educators" (October 2021);

(F) "Supporting Transgender Youth in School" (June 2021);

**JA89**

(G) ''Letter to Educators on Title IX's 49th Anniversary'' (June 23, 2021);

(H) ''Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families'' (June 2021);

(I) ''Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County'' (June 22, 2021);

(J) ''Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students'' (June 9, 2021); and

(K) ''Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS'' (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled ''Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972''; and

(iv) the Equal Employment Opportunity Commission's ''Enforcement Guidance on Harassment in the Workplace'' (April 29, 2024).

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

**JA90**

# EXHIBIT 2

USCA4 Appeal: 25-2497    Doc: 24    Filed: 03/30/2026    Pg: 97 of 283

# Presidential Documents

**Executive Order 14185 of January 27, 2025**

## Restoring America's Fighting Force

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* As Chief Executive and as Commander in Chief, I am committed to meritocracy and to the elimination of race-based and sex-based discrimination within the Armed Forces of the United States. No individual or group within our Armed Forces should be preferred or disadvantaged on the basis of sex, race, ethnicity, color, or creed.

Unfortunately, in recent years civilian and uniformed leadership alike have implemented Diversity, Equity, and Inclusion (DEI) programs and their attendant race and sex preferences within the Armed Forces. These actions undermine leadership, merit, and unit cohesion, thereby eroding lethality and force readiness. They also violate Americans' consciences by engaging in invidious race and sex discrimination.

**Sec. 2**. *Policy.* It is the policy of my Administration that the Department of Defense, the Department of Homeland Security with regard to the United States Coast Guard (USCG), and every element of the Armed Forces should operate free from any preference based on race or sex.

**Sec. 3**. *Definitions.* (a) A ''DEI office'' means an office, division, job, or other unit of an institution established for the purpose of:

(i) influencing hiring or employment practices at the institution with respect to race, sex, color, or ethnicity, other than through the use of color-blind and sex-neutral hiring processes; or

(ii) promoting differential treatment of or providing special benefits to individuals on the basis of race, sex, color, or ethnicity.

(b) The term ''gender ideology'' has the meaning given to that term in section 2(f) of the Executive Order of January 20, 2025, (Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government).

(c) The term ''divisive concepts'' has the meaning given to that term in section 2(a) of Executive Order 13950 of September 22, 2020 (Combating Race and Sex Stereotyping).

**Sec. 4**. *Abolishing the DEI Bureaucracy.* The Secretary of Defense and the Secretary of Homeland Security shall abolish every DEI office within the Department of Defense and the Department of Homeland Security with regard to the USCG, respectively, including any vestiges of DEI offices, such as sub-offices, programs, elements, or initiatives established to promote a race-based preferences system that subverts meritocracy, perpetuates unconstitutional discrimination, and promotes divisive concepts or gender ideology.

**Sec. 5**. *Department of Defense Internal Review.* The Secretary of Defense shall conduct an internal review that documents actions taken in pursuit of DEI initiatives, including all instances of race and sex discrimination and activities designed to promote a race- or sex-based preferences system. The report shall be delivered to the Secretary of Defense within 90 days of the date of this order.

**Sec. 6**. *Protecting American Values.* (a) The Department of Defense and the Armed Forces, including any educational institution operated or controlled thereby, are prohibited from promoting, advancing, or otherwise inculcating the following un-American, divisive, discriminatory, radical, extremist, and irrational theories:

(i) "divisive concepts," as defined in section 3(c) of this order, and "race or sex stereotyping," or "race or sex scapegoating" as both terms are defined in section 2 of Executive Order 13950, as amended;

(ii) that America's founding documents are racist or sexist; and

(iii) "gender ideology," as defined in section 3(b) of this order.

(b) The Department of Defense and the Armed Forces shall not hire employees, contractors, or consultants to teach the theories set forth in subsection (a) of this section.

(c) The Secretary of Defense and the Secretary of Homeland Security shall carefully review the leadership, curriculum, and instructors of the United States Service Academies and other defense academic institutions associated with their respective Departments to ensure alignment with this order. In addition, these institutions shall be required to teach that America and its founding documents remain the most powerful force for good in human history.

**Sec. 7**. *Implementation.* (a) The Secretary of Defense and the Secretary of Homeland Security shall issue detailed guidance for the implementation of this order to their respective departments within 30 days of the date of this order.

(b) Within 180 days of the date of this order, the Secretary of Defense and the Secretary of Homeland Security shall submit a report through the Deputy Chief of Staff for Policy documenting the progress of their respective Departments in implementing this order, and any recommendations for action to fulfill the objectives of this order.

**Sec. 8**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 9**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

USCA4 Appeal: 25-2497 Doc: 24 Filed: 03/30/2026 Pg: 99 of 283
Case 1:25-cv-00637-PTG-IDD Document 1-2 Filed 04/15/25 Page 4 of 4 PageID# 36

**Federal Register** / Vol. 90, No. 21 / Monday, February 3, 2025 / Presidential Documents **8765**

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 27, 2025.*

[FR Doc. 2025–02181
Filed 1–31–25; 8:45 am]
Billing code 3395–F4–P

**JA94**

# EXHIBIT 3

# Presidential Documents

**Executive Order 14190 of January 29, 2025**

## Ending Radical Indoctrination in K–12 Schooling

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose and Policy.* Parents trust America's schools to provide their children with a rigorous education and to instill a patriotic admiration for our incredible Nation and the values for which we stand.

In recent years, however, parents have witnessed schools indoctrinate their children in radical, anti-American ideologies while deliberately blocking parental oversight. Such an environment operates as an echo chamber, in which students are forced to accept these ideologies without question or critical examination. In many cases, innocent children are compelled to adopt identities as either victims or oppressors solely based on their skin color and other immutable characteristics. In other instances, young men and women are made to question whether they were born in the wrong body and whether to view their parents and their reality as enemies to be blamed. These practices not only erode critical thinking but also sow division, confusion, and distrust, which undermine the very foundations of personal identity and family unity.

Imprinting anti-American, subversive, harmful, and false ideologies on our Nation's children not only violates longstanding anti-discrimination civil rights law in many cases, but usurps basic parental authority. For example, steering students toward surgical and chemical mutilation without parental consent or involvement or allowing males access to private spaces designated for females may contravene Federal laws that protect parental rights, including the Family Educational Rights and Privacy Act (FERPA) and the Protection of Pupil Rights Amendment (PPRA), and sex-based equality and opportunity, including Title IX of the Education Amendments of 1972 (Title IX). Similarly, demanding acquiescence to ''White Privilege'' or ''unconscious bias,'' actually promotes racial discrimination and undermines national unity.

My Administration will enforce the law to ensure that recipients of Federal funds providing K–12 education comply with all applicable laws prohibiting discrimination in various contexts and protecting parental rights, including Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d *et seq.;* Title IX, 20 U.S.C. 1681 *et seq.;* FERPA, 20 U.S.C. 1232g; and the PPRA, 20 U.S.C. 1232h.

**Sec. 2**. *Definitions.* As used herein:

(a) The definitions in the Executive Order ''Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government'' (January 20, 2025) shall apply to this order.

(b) ''Discriminatory equity ideology'' means an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations, including that:

(i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin;

(ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin;

(iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin;

(v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part;

(vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;

(vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin; or

(viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

(c) "Educational service agency" (ESA) has the meaning given in 20 U.S.C. 1401(5), and the terms "elementary school," "local educational agency" (LEA), "secondary school," and "state educational agency" (SEA) have the meanings given in 34 CFR 77.1(c).

(d) "Patriotic education" means a presentation of the history of America grounded in:

(i) an accurate, honest, unifying, inspiring, and ennobling characterization of America's founding and foundational principles;

(ii) a clear examination of how the United States has admirably grown closer to its noble principles throughout its history;

(iii) the concept that commitment to America's aspirations is beneficial and justified; and

(iv) the concept that celebration of America's greatness and history is proper.

(e) "Social transition" means the process of adopting a "gender identity" or "gender marker" that differs from a person's sex. This process can include psychological or psychiatric counseling or treatment by a school counselor or other provider; modifying a person's name (e.g., "Jane" to "James") or pronouns (e.g., "him" to "her"); calling a child "nonbinary"; use of intimate facilities and accommodations such as bathrooms or locker rooms specifically designated for persons of the opposite sex; and participating in school athletic competitions or other extracurricular activities specifically designated for persons of the opposite sex. "Social transition" does not include chemical or surgical mutilation.

**Sec. 3**. *Ending Indoctrination Strategy.* (a) Within 90 days of the date of this order, to advise the President in formulating future policy, the Secretary of Education, the Secretary of Defense, and the Secretary of Health and Human Services, in consultation with the Attorney General, shall provide an Ending Indoctrination Strategy to the President, through the Assistant to the President for Domestic Policy, containing recommendations and a plan for:

(i) eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K–12 schools, including based on gender ideology and discriminatory equity ideology; and

(ii) protecting parental rights, pursuant to FERPA, 20 U.S.C. 1232g, and the PPRA, 20 U.S.C. 1232h, with respect to any K–12 policies or conduct implicated by the purpose and policy of this order.

(b) The Ending Indoctrination Strategy submitted under subsection (a) of this section shall contain a summary and analysis of the following:

(i) All Federal funding sources and streams, including grants or contracts, that directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology:

(A) in K–12 curriculum, instruction, programs, or activities; or

(B) in K–12 teacher education, certification, licensing, employment, or training;

(ii) Each agency's process to prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used by an ESA, SEA, LEA, elementary school, or secondary school to directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology in:

(A) K–12 curriculum, instruction, programs, or activities; or

(B) K–12 teacher certification, licensing, employment, or training;

(iii) Each agency's process to prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used by an ESA, SEA, LEA, elementary school, or secondary school to directly or indirectly support or subsidize the social transition of a minor student, including through school staff or teachers or through deliberately concealing the minor's social transition from the minor's parents.

(iv) Each agency's process to prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used by an ESA, SEA, LEA, elementary school, or secondary school to directly or indirectly support or subsidize:

(A) interference with a parent's Federal statutory right to information regarding school curriculum, records, physical examinations, surveys, and other matters under the PPRA or FERPA; or

(B) a violation of Title VI or Title IX; and

(v) A summary and analysis of all relevant agency enforcement tools to advance the policies of this order.

(c) The Attorney General shall coordinate with State attorneys general and local district attorneys in their efforts to enforce the law and file appropriate actions against K–12 teachers and school officials who violate the law by:

(i) sexually exploiting minors;

(ii) unlawfully practicing medicine by offering diagnoses and treatment without the requisite license; or

(iii) otherwise unlawfully facilitating the social transition of a minor student.

(d) The Assistant to the President for Domestic Policy shall regularly convene the heads of the agencies tasked with submitting the Ending Indoctrination Strategy under subsection (a) of this section to confer regarding their findings, areas for additional investigation, the modification or implementation of their respective recommendations, and such other policy initiatives or matters as the President may direct.

**Sec. 4**. *Reestablishing the President's Advisory 1776 Commission and Promoting Patriotic Education.* (a) The President's Advisory 1776 Commission (''1776 Commission''), which was created by Executive Order 13958 of November 2, 2020, to promote patriotic education, but was terminated by President Biden in Executive Order 13985 of January 20, 2021, is hereby reestablished. The purpose of the 1776 Commission is to promote patriotic education and advance the purposes stated in section 1 of Executive Order 13958, as well as to advise and promote the work of the White House Task Force on Celebrating America's 250th Birthday (''Task Force 250'') and the United States Semiquincentennial Commission in their efforts to

**8856**    **Federal Register** / Vol. 90, No. 21 / Monday, February 3, 2025 / Presidential Documents

provide a grand celebration worthy of the momentous occasion of the 250th anniversary of American Independence on July 4, 2026.

(b) Within 120 days of the date of this order, the Secretary of Education shall establish the 1776 Commission in the Department of Education.

(c) The 1776 Commission shall be composed of not more than 20 members, who shall be appointed by the President for a term of 2 years. The 1776 Commission shall be made up of individuals from outside the Federal Government with relevant experience or subject-matter expertise.

(d) The 1776 Commission shall have a Chair or Co-Chairs, at the President's discretion, and a Vice Chair, who shall be designated by the President from among the Commission's members. An Executive Director, designated by the Secretary of Education in consultation with the Assistant to the President for Domestic Policy, shall coordinate the work of the 1776 Commission. The Chair (or Co-Chairs) and Vice Chair shall work with the Executive Director to convene regular meetings of the 1776 Commission, determine its agenda, and direct its work, consistent with this order.

(e) The 1776 Commission shall:

(i) facilitate the development and implementation of a "Presidential 1776 Award" to recognize student knowledge of the American founding, including knowledge about the Founders, the Declaration of Independence, the Constitutional Convention, and the great soldiers and battles of the American Revolutionary War;

(ii) in coordination with the White House Office of Public Liaison, coordinate bi-weekly lectures regarding the 250th anniversary of American Independence that are grounded in patriotic education principles, which shall be broadcast to the Nation throughout calendar year 2026;

(iii) upon request, advise executive departments and agencies regarding their efforts to ensure patriotic education is appropriately provided to the public at national parks, battlefields, monuments, museums, installations, landmarks, cemeteries, and other places important to the American founding and American history, as appropriate and consistent with applicable law;

(iv) upon request, offer advice and recommendations to, and support the work of Task Force 250 and the United States Semiquincentennial Commission regarding their plans to celebrate the 250th anniversary of American Independence; and

(v) facilitate, advise upon, and promote private and civic activities nationwide to increase public knowledge of and support patriotic education surrounding the 250th anniversary of American Independence, as appropriate and consistent with applicable law.

(f) The Department of Education shall provide funding and administrative support for the 1776 Commission, to the extent permitted by law and subject to the availability of appropriations.

(g) Members of the 1776 Commission shall serve without compensation but, as approved by the Department of Education, shall be reimbursed for travel expenses, including per diem in lieu of subsistence, as authorized by law for persons serving intermittently in the Government service (5 U.S.C. 5701–5707).

(h) Insofar as chapter 10 of title 5, United States Code (commonly known as the Federal Advisory Committee Act), may apply to the 1776 Commission, any functions of the President under that Act, except that of reporting to the Congress, shall be performed by the Secretary of Education, in accordance with the guidelines issued by the Administrator of General Services.

(i) The 1776 Commission shall terminate 2 years from the date of this order, unless extended by the President.

**Sec. 5**. *Additional Patriotic Education Measures.* (a) All relevant agencies shall monitor compliance with section 111(b) of title I of Division J of

**Federal Register** / Vol. 90, No. 21 / Monday, February 3, 2025 / Presidential Documents    **8857**

Public Law 108–447, which provides that ''[e]ach educational institution that receives Federal funds for a fiscal year shall hold an educational program on the United States Constitution on September 17 of such year for the students served by the educational institution,'' including by verifying compliance with each educational institution that receives Federal funds. All relevant agencies shall take action, as appropriate, to enhance compliance with that law.

(b) All relevant agencies shall prioritize Federal resources, consistent with applicable law, to promote patriotic education, including through the following programs:

(i) the Department of Education's American History and Civics Academies and American History and Civics Education-National Activities programs;

(ii) the Department of Defense's National Defense Education Program and Pilot Program on Enhanced Civics Education; and

(iii) the Department of State's Bureau of Educational and Cultural Affairs and Fulbright, U.S. Speaker, and International Visitor Leadership programs, as well as the American Spaces network.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 29, 2025.*

[FR Doc. 2025–02232

Filed 1–31–25; 11:15 am]

Billing code 3395–F4–P

**JA100**

# EXHIBIT 6



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**HEADQUARTERS**
4800 MARK CENTER DRIVE
ALEXANDRIA, VA  22350-1400

FEB 1 0 2025

DoDEA Sponsors, Parents, and Guardians,

In light of the President's recent Executive Orders titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" and "Ending Radical Indoctrination in K-12 Schooling," DoDEA is conducting an operational compliance review to ensure alignment with the Executive Orders.

As part of this review, DoDEA-adopted instructional resources and Information Center (library) books potentially related to gender ideology or discriminatory equity ideology topics were examined. DoDEA's curriculum and instruction team, referencing terms and definitions in the above Executive Orders, identified a small number of items for further review. Information Center books identified for review will be relocated to the professional collection for evaluation with access limited to professional staff.

On January 31, 2025, the Secretary of Defense issued guidance to all Department of Defense (DoD) components and Military Departments prohibiting the use of official resources to host celebrations or events related to cultural awareness months. As a DoD entity, DoDEA is fully complying with that guidance.

We are working through the Executive Orders at DoDEA headquarters to determine required actions for DoDEA schools and providing guidance, as appropriate, to ensure there are consistent policies and practices in place that comply with current Executive Orders and DoD guidance. We are continuing to work with Region, District, and school leadership during this process. I am in constant contact with our region leadership to ensure appropriate implementation throughout the Activity.

DoDEA is committed to its core mission in support of the Warfighter – providing a top tier education to our military-connected students. We at DoDEA are honored to serve more than 67,000 students, and their families, and in so doing play an important role in supporting our country's military readiness.

The strength of our DoDEA community lies in its people – students, educators, and families. We remain committed to fostering a learning environment where every student feels valued, supported, and empowered to succeed in a dynamic world.

Sincerely,

Beth Schiavino-Narvaez, Ed.D.
Director

**JA102**

# EXHIBIT 11



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**HEADQUARTERS**
**4800 MARK CENTER DRIVE**
**ALEXANDRIA, VA  22350-1400**

February 5, 2025

MEMORANDUM FOR DODEA DIRECTORS FOR STUDENT EXCELLENCE
  DODEA CHIEFS OF INSTRUCTIONAL LEADERSHIP DEVELOPMENT
  DODEA DISTRICT SUPERINTENDENTS
  DODEA COMMUNITY SUPERINTENDENTS
  DODEA INSTRUCTIONAL SYSTEMS SPECIALISTS
  DODEA REGION CHIEFS OF STAFF
  DODEA PRINCIPALS
  DODEA ASSISTANT PRINCIPALS
  DODEA EDUCATORS

SUBJECT: Administrative Operational Compliance Review of *DoDEA Adopted Instructional Resources*
  Related to Gender and/or Discriminatory Equity Ideology Topics

To comply with the recent Executive Orders titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" and "Ending Radical Indoctrination in K-12 Schooling," DoDEA is conducting an operational compliance review to ensure alignment with the applicable Executive Orders. As part of this review, *DoDEA adopted instructional resources* potentially related to gender ideology or discriminatory equity ideology topics, as defined in the Executive Orders, should not be utilized for instruction. Specific resources identified are in Attachment A. A small number of links to external resources have been deactivated, but this should not impact routine use of adopted resources for educators.  Educators are expected to implement this directive immediately. Principals must ensure that educators are aware of and comply with this instruction. If educators or school leaders have a question about use of a specific resource not listed in Attachment A, please notify your district ISS with the specific resource. District ISS should then share that information with their HQ ISS counterpart to be added to the compliance review and notice will be provided if use of an instructional resource should be discontinued.

We will provide further guidance upon receipt of official instructions. As a federal agency, we are committed to compliance with the Executive Orders and will ensure our policies and practices align accordingly.

For general questions about this guidance, not inquiries about specific resources, please contact Josh Adams, Acting Chief of Curriculum and Instruction at joshua.adams@dodea.edu or Anne Cannon, HQ Elementary Content Program Manager at anne.cannon@dodea.edu.

PICKEL.LORI.
P.1230368224
Digitally signed by
PICKEL.LORI.P.1230368224
Date: 2025.02.05 13:37:09
-05'00'

Ms. Lori Pickel
Acting Chief Academic Officer

Attachment:
As stated

cc:
President, ACEA
President, FEA
Director, FEA-SR
President, OFT

**JA104**

Attachment A

The following list includes selected instructional resources that should not be used by DoDEA educators during the operational compliance review.

### AP Psychology

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| College Board | AP Psychology | AP Psychology | Please exclude "gender identity" from learning objective 3.6.A.8 and excluding Module 32 Gender and Sex |
| McGraw Hill | AP Psychology | AP Psychology | Chapter 11 – Sexuality and Gender |

### Elementary Social Studies

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| TCI | Biographies K-5 | Elementary SS Grade K-5 | Albert Cashier, Civil War Veteran |
| TCI | G5 Western Hemisphere: Lesson 7: Migration to the United States Impact on People and Places | Elementary SS Grade 5 | Section 4 Reading - How Does Immigration Affect the U.S.? |
| TCI | G4 Lesson 3: The Peopling of the United States | Elementary SS Grade 4 | Explore Reading - A Nation of Immigrants |

### Secondary ELA

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| HMH | READ 180 | Strategic Literacy 6-12 | Independent Reading Novel - Becoming Nicole |

### Secondary Health

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| G-W | 6th through 8th grade Health | Comprehensive Health Skills for Middle School | Comprehensive Health Skills for Middle School Chapter 18.1 |

### Secondary Social Studies

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| HMH ED | Grade 6: My Friend in Learning | 6th Grade Eastern World | My Friend in Learning Professional Learning. New for You Seasonal Bundle: Black History Month 2025 |

**JA105**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG;  L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY,<br><br>               Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,<br><br>               Defendants. | Case No. 1:25-cv-00637-PTG-IDD<br><br>Hon. Patricia Tolliver Giles |

**NOTICE OF MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs hereby respectfully move the Court for a preliminary injunction restraining Defendants from removing library books and curricular materials from Department of Defense Education Activity ("DoDEA") schools pursuant to Executive Orders ("EOs") 14168, 14185, and 14190, and related guidance. Plaintiffs have

1

**JA106**

suffered irreparable harm as a result of Defendants' actions and will continue to suffer such harm absent preliminary injunctive relief. Specifically, Plaintiffs request that the Court:

(1) bar Defendants from directing the removal of books based on the government's classifications of content and viewpoint as relating to "gender ideology" and "divisive concepts";

(2) bar Defendants from directing the removal of curricula based on the government's classifications of content and viewpoint as relating to gender ideology and discriminatory equity ideology; and

(3) reinstate these books and curricula to school library shelves and classrooms.

In support of this Motion, Plaintiffs submit several exhibits, including the declarations of Lindsey Keeley, parent and next friend of minor Plaintiffs E.K. and S.K.; Jessica Henninger, parent and next friend of minor Plaintiffs O.H., S.H., and H.H.; Anna Young, parent and next friend of minor Plaintiffs E.Y. and C.Y.; Anna Kenkel, parent and next friend of minor Plaintiffs L.K., L.K., and L.K.; and Natalie Tolley, parent and next friend of minor Plaintiff M.T. Plaintiffs also include a declaration to attach official government documents and communications.

Plaintiffs also submit a Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction that demonstrates that Plaintiffs are likely to prevail on the merits of their claims, a preliminary injunction is necessary to prevent further irreparable harm to Plaintiffs, the balance of harms weighs in Plaintiffs' favor, and a preliminary injunction serves the public interest.

**JA107**

Respectfully submitted,

Dated: May 7, 2025

*/s/ Matthew Callahan*
Matthew Callahan, VSB No. 99823
Eden Heilman, VSB No. 93554
ACLU OF VIRGINIA FOUNDATION
P.O. BOX 26464
RICHMOND, VA 23261
(804) 644-8080
mcallahan@acluva.org
eheilman@acluva.org

Emerson J. Sykes*
Tyler Takemoto*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
esykes@aclu.org
ttakemoto@aclu.org

Corey M. Shapiro*
William E. Sharp*
ACLU OF KENTUCKY FOUNDATION
325 W. Main Street, Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org

*Attorneys for Plaintiffs*

* Motions for *pro hac vice* admission forthcoming

3

**JA108**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2025, I electronically filed the foregoing Notice of Motion

for a Preliminary Injunction with the Clerk of the Court using the CM/ECF system. I have

arranged for the following, who have not yet entered an appearance in the case to be registered

participants of the Electronic Case Filing System, to also be served by U.S. Mail:

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Peter Brian Hegseth, Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301

Department of Defense Education Activity
4800 Mark Center Drive
Alexandria, VA 22350

Dr. Beth Schiavino-Narvaez
4800 Mark Center Drive
Alexandria, VA 22350

*/s/ Matthew Callahan*
Matthew Callahan
ACLU OF VIRGINIA FOUNDATION
*Attorney for Plaintiffs*

4

**JA109**

# EXHIBIT 11



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**EUROPE**
**UNIT 29649**
**APO AE 09136-9649**

7 Feb 25

TO:  DoDEA Europe Administrators and School-level Employees

To ensure compliance with executive orders and recent DoD guidance, the following must be adhered to:

**We will not be holding cultural observances pending further guidance**

As a guide, all planned special activities and non-instructional events related to the former monthly cultural awareness observances will not be held pending further guidance.  No man-hours or government resources are authorized for the planning, preparation, or execution of such activities or events currently.  All internal and external communication platforms including but not limited to school social media accounts and websites, should refrain from disseminating information regarding the former monthly cultural awareness observances.

Host Nation language and culture classes, international exchanges, and the like, are permitted to continue as scheduled.

School administrators should communicate that prohibited events which have been planned already are currently cancelled pending further guidance from the DoD

**Review email signature blocks**

Email signature blocks must not include self-identified pronouns and should not include quotes, sayings, or mottos.

**Review and revise locally created documents**

School-level documents requesting student information must use the term "sex" not "gender." Ensure available responses are "male" or "female" only, without reference to gender.  This also applies to informal forms and personal data collection created by an educator, counselor, nurse, coach, or other staff.

**Ensure compliance of school facilities, programs, and activities**

All facilities, programs, and activities designated as for girls may only be accessed by biological females and all facilities, programs, and activities designated as for boys may only be accessed by biological males.  This includes athletic activities.  A student's sex is the sex recorded in his/her official school record.

**Assess signage**
Any signage supporting the inculcation or promotion of gender ideology must be removed.  Signage for shared intimate spaces, such as restrooms and locker rooms, shall use the terms "women,"

**JA111**

"woman," "girls," "girl," "men," "man," "boys" or "boy." Single-user unisex facilities remain available to anyone of either sex.

**Curriculum, policies, databases, contracts**

Curriculum guidance for classroom instruction related to gender ideology and discriminatory equity ideology has been issued identifying selected instructional resources that should not be used by DoDEA educators during the operational compliance review.

Continue teaching to standards with DoDEA adopted resources, except for the resources potentially related to gender ideology and discriminatory equity ideology that are under the operational compliance review.

Information Specialists must ensure books potentially related to gender ideology or discriminatory equity ideology are removed from the student section of the Information Center and placed in the professional collection. Specific instructions for removing books will be provided to school administrators.

Key personnel at DoDEA Headquarters are addressing compliance actions that apply activity-wide, such as modifications to official DoDEA policy, forms, document, electronic communication and database systems, contracts, curriculum and any additional items that originate out of Headquarters.

**Counseling Services**

If a student is experiencing emotional/psychological distress at school related to being recognized by their biological sex, he/she continues to be equally entitled to the same mental health services as are made available to any other student who is experiencing emotional/psychological distress at school for whatever reason. The counseling support provided, however, must remain objective and neutral in its application without taking action that would unlawfully facilitate the gender transition of a minor student.

Thank you for your support as we implement these new DoD guidlines.

*Chas E Kelker*

CHARLES E. KELKER, Ed.D.
Chief of Staff

2

**JA112**

# EXHIBIT 15



**DEPARTMENT OF DEFENSE
EDUCATION ACTIVITY EUROPE
UNIT 29649
APO AE 09136-9649**

7 March 2025

Dear Parents and Students,

At the heart of our mission is a commitment to provide the highest quality education and we recognize that this goal is achieved through strong partnerships with families. Partnering with parents/guardians is a cornerstone of academic success. Through communication and mutual feedback, we work together to address the needs of each student, ensuring a comprehensive and effective educational experience. Our commitment to providing the best education every day, everywhere, is grounded in this collaboration. By aligning with parents, we create a unified approach that supports students' growth and achievement.  Our focus remains on ensuring that every student receives a rigorous, high-quality education that prepares them for academic excellence and success in college, career, and the demands of the 21st century.

The Department of Defense Education Activity (DoDEA) is currently reviewing its policies and instructional resources to ensure compliance with recent Executive Orders and Department of Defense (DoD) policies. As a Department of Defense entity, we are committed to adhering to the guidance from the President and the Secretary of Defense.

**Cultural Observances:** On January 31, 2025, the Secretary of Defense issued guidance to all Department of Defense (DoD) components and Military Departments prohibiting the use of official resources to host celebrations or events related to cultural awareness months. As a DoD entity, DoDEA is adhering to this guidance.

However, events that directly support Host Nation language and culture classes, international exchanges, or other location-based cultural education efforts will continue as planned.

**Review of Library Materials:** Schools have completed their review of library materials, and these materials are currently being reviewed at the Region/ HQ levels. We are examining materials in each Information Center (school libraries) that may relate to gender ideology or discriminatory equity ideology, as defined in the Executive Order 14190, "Ending Radical Indoctrination in K-12 Schooling." It is important to note that no materials have been permanently removed from our school libraries. Some materials are temporarily relocated to the professional collection, where they will be reviewed by our staff, region and Headquarters. Access to these materials is currently limited to professional staff. We are working diligently to complete the thoughtful review process and will provide more information soon.

**Curriculum & Instruction:** DoDEA is conducting an operational compliance review of

**JA114**

curriculum resources. A small number of materials have been identified for further review. The use of these few items is paused until further guidance and to ensure that our curricular resources remain in alignment with current expectations. The small number of identified resources will not impact routine use of adopted materials or access to our standards. We will provide timely updates if any significant changes occur.

**Clubs and Extracurricular Activities:** DoDEA students retain the right to organize and participate in non-curriculum-related student groups. DoDEA students retain the right to convene student-sponsored, non-curriculum-related student groups with a DoDEA employee volunteer non-participating sponsor, in alignment with DoDEA's "Student Rights and Responsibilities" (DoDEA Administrative Instruction 1353.01, available on www.dodea.edu).

**Commitment to Open Communication:** We understand that these changes may raise questions. We are dedicated to maintaining open and transparent communication. DoDEA Europe will work with you and provide updates when they are available. As questions arise, please reach out to your school principal, district superintendent, or me.

Our priority remains providing a top-tier education that prepares students for success in an ever-changing world. The success of the DoDEA community is rooted in its people—students, educators, and families. We deeply appreciate your ongoing support and partnership.

Michelle Howard-Brahaney, Ph.D.
Director for Student Excellence

**JA115**

Case 1:25-cv-00637-PTG-IDD    Document 10-18    Filed 05/07/25    Page 1 of 2 PageID# 348

# EXHIBIT 16

## RELEASE
### IMMEDIATE RELEASE

# Identity Months Dead at DoD

Jan. 31, 2025

Guidance from the Secretary of Defense: "Identity Months Dead at DoD"

Our unity and purpose are instrumental to meeting the Department's warfighting mission. Efforts to divide the force – to put one group ahead of another – erode camaraderie and threaten mission execution.

Going forward, DoD Components and Military Departments will not use official resources, to include man-hours, to host celebrations or events related to cultural awareness months, including National African American/Black History Month, Women's History Month, Asian American and Pacific Islander Heritage Month, Pride Month, National Hispanic Heritage Month, National Disability Employment Awareness Month, and National American Indian Heritage Month. Service members and civilians remain permitted to attend these events in an unofficial capacity outside of duty hours.

Installations, units, and offices are encouraged to celebrate the valor and success of military heroes of all races, genders, and backgrounds as we restore our warrior culture and ethos. We are proud of our warriors and their history, but we will focus on the character of their service instead of their immutable characteristics.

This guidance is effectively immediately.

Hosted by Defense Media Activity - WEB.mil

**JA117**

# EXHIBIT 17

Controlled Unclassified Information

Date:  February 24, 2025

To:    Jay M. Burcham, DoDEA Chief of Staff

From: Taylor York, DoDEA Civil Rights Analyst and Program Manager

Re:    **Guidance on Cultural Observances and Compliance with SECDEF Directive**

This guidance applies to distinguishing between which DoDEA conducted or sponsored events and activities are prohibited as in conflict with the directive from the Secretary of Defense (SECDEF) ending past practices regarding cultural observance months and which are not prohibited and may proceed, as usual.  It was coordinated through the DoDEA Office of General Counsel and applicable DoD and DoDEA Leadership.  I recommend the following guidelines be distributed as necessary to promote compliance in DoDEA operations:

**Guidance on Cultural Observances and Compliance with SECDEF Directive Overview**

DoD is aligning its policies with the SECDEF's directive regarding cultural awareness month observances.  Effective January 30, 2025, no official resources, including man-hours, may be used to plan, prepare, or execute events related to cultural awareness months.  Service members and civilians may still attend such events in an unofficial capacity outside of duty hours.

At the same time, installations, units, and offices are encouraged to recognize and celebrate the valor and success of military heroes of all backgrounds, emphasizing their service and character rather than their immutable characteristics.

**What This Means for DoDEA Schools**

- Cultural Awareness Events: Schools must cancel all planned special activities and non-instructional events related to former monthly cultural awareness month observances.

- Government Resources: No school or DoDEA resources, including social media and websites, may be used to promote or facilitate these events.

- Host Nation Engagement: Events that directly support Host Nation language and culture classes, international exchanges, or other location-based cultural education efforts may continue.

- Communication: School administrators should ensure that all stakeholders are aware that events previously planned under the cultural awareness month observances policy are now canceled.

Controlled Unclassified Information

1

**JA119**

Controlled Unclassified Information

## Rationale for Host Nation Engagement

The goal of Host Nation engagement is to:

- Provide students with cultural knowledge necessary for situational awareness and safety in their Host Nation.
- Ensure students feel more comfortable navigating daily life in a foreign country.
- Offer practical understanding of the Host Nation's customs, laws, and societal norms to avoid misunderstandings or conflicts.
- Treat all students equally, as this engagement is relevant to every student living overseas, regardless of background.

## Determining If an Event Qualifies as Host Nation Engagement

To determine whether an event or activity is permissible under this directive, apply the following test:

1. Is the event/activity specific to the geographic region of the school and not an Activity-wide event?
    - If yes, proceed to the next step.

2. Does the event supplement the Host Nation class or international exchange efforts?
    - If yes, proceed to the next step.

3. Does the event help students better understand their daily lives in the Host Nation, making them safer and more aware?
    - If yes, it qualifies as Host Nation engagement and may continue.

## Examples of Permissible and Non-Permissible Events

Permissible (Host Nation Engagement Events):

- Guam History & Chamorro Heritage Day in Guam – Aligns with local cultural education efforts.
- Oktoberfest Celebrations in Germany – Provides cultural and historical context related to life in the host country.
- Japanese Tea Ceremony in Japan – Supports language and cultural instruction.

Not Permissible (Cultural Awareness Month Observances):

- Black History Month Assemblies
- Hispanic Heritage Month Festivities
- LGBTQ+ Pride Month Celebrations
- Women's History Month Events

Controlled Unclassified Information

2

**JA120**

Controlled Unclassified Information

These events listed above fall under cultural awareness month observances that cannot be supported with DoDEA resources or duty hours.

**Frequently Asked Questions (FAQ)**

1. Can schools still recognize historical military figures of diverse backgrounds?

Yes. The SECDEF memo encourages recognition of military heroes from all backgrounds, emphasizing service and character rather than identity.

2. Can teachers discuss cultural heritage in classroom lessons?

Yes, if the discussion is tied to curriculum requirements and is part of an instructional lesson, not a separate event.

3. Are schools allowed to post about cultural awareness months on social media?

No. DoDEA communication platforms, including websites and social media, should refrain from posting about cultural awareness month observances.

4. What if an event was already planned before this guidance?

All planned cultural awareness month events should be canceled immediately. Schools should communicate this change to staff, students, and families.

5. Can we have guest speakers from diverse backgrounds?

Yes, if the speaker's focus is on military service, leadership, or history rather than cultural identity awareness.

6. How do we explain this to parents and community members who are concerned?

Schools should emphasize that this policy is about consistently applying DoD guidance while still providing meaningful Host Nation engagement for students stationed overseas.

Any questions or concerns regarding maintaining compliance may be directed to Ms. Taylor York, DoDEA Civil Rights Analyst and Program Manager, via MS Teams or email at Taylor.York@dodea.edu.

Controlled Unclassified Information

3

**JA121**

# EXHIBIT 18



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

JAN 2 9 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Restoring America's Fighting Force

The Department of Defense (DoD) has an obligation to the American public to ensure their sons and daughters serve under the best leadership we can provide them. Doing so is a national security imperative. A foundational tenet of the DoD must always be that the most qualified individuals are placed in positions of responsibility in accordance with **merit-based, color-blind policies**.

The DoD mission is to win the Nation's wars. To do this, we must have a lethal fighting force that rewards individual initiative, excellence, and hard work based on merit. In the Executive Order of January 27, 2025 (Restoring America's Fighting Force), the President and Commander in Chief prohibited any preference or disadvantage for an individual or a group within the Armed Forces on the basis of sex, race, or ethnicity.

Diversity, equity, and inclusion (DEI) policies, as defined in the January 27, 2025, Executive Order, are incompatible with the values of DoD. The DoD will strive to provide merit-based, color-blind, equal opportunities to Service members but will not guarantee or strive for equal outcomes.

To ensure DoD focuses on its core mission of providing the military forces needed to deter war and ensure our nation's security, the Department will ensure all decisions related to hiring, promotion, and selection of personnel for assignments are based on merit, the needs of the Department, and lastly, the individual's desires.

**Restoring America's Fighting Force Task Force.** To ensure compliance with the principles above, I direct the establishment of a multi-functional "Restoring America's Fighting Force" Task Force charged with overseeing the Department's efforts to abolish DEI offices and any vestiges of such offices that subvert meritocracy, perpetuate unconstitutional discrimination, and promote radical ideologies related to systemic racism and gender fluidity.

The Under Secretary of Defense for Personnel and Readiness (USD(P&R)) will establish a Task Force to oversee the elimination of any program, element, or initiative that was established to promote divisive concepts as defined in Executive Order 13950 of September 22, 2020 (Combating Race and Sex Stereotyping), or gender ideology as defined in Executive Order of January 20, 2025 (Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government). The Task Force will provide an initial report to the USD(P&R) of actions taken by DoD to terminate DEI initiatives by March 1, 2025, and a final report no later than June 1, 2025. The Task Force has the authority to task the Military

**JA123**



OSD000599-25/CMD000952-25

Departments and DoD Components for necessary information for the report and establish deadlines for compliance.

**Promotion and Selection Reform.** The DoD will not consider sex, race, or ethnicity when considering individuals for promotion, command, or special duty. DoD Components and the Secretaries of Military Departments, may designate categories of assignment that require exceptions to this policy due to clear operational need.

**Elimination of Quotas, Objectives, and Goals.** No DoD Component will establish sex-based, race-based, or ethnicity-based goals for organizational composition, academic admission, or career fields.

**Prohibition on Instruction on Critical Race Theory, Gender Ideology, and DEI.** No element within DoD will provide instruction on Critical Race Theory (CRT), DEI, or gender ideology as part of a curriculum or for purposes of workforce training.

**Instruction to Promote a Lethal Force.** The U.S. Service Academies and other defense academic institutions shall teach that America and its founding documents remain the most powerful force for good in human history.

**Boards and Councils.** All advisory boards, councils, and working groups will cease operations related to gender ideology, DEI, and CRT.

The USD(P&R) will oversee the implementation of this memorandum, in coordination with the Secretaries of the Military Departments. The Department will continue to monitor the progress of these efforts through the Restoring America's Fighting Force Task Force.

The strength of the DoD comes from our unity and our shared purpose. We will focus on lethality, meritocracy, accountability, standards, and readiness. Providing Service members an equal opportunity to excel will help us remain the strongest and most lethal fighting force the world has ever known.

SD29

2

**JA124**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

<table>
<tr>
<td>

E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG;  L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY,

　　　　　　　Plaintiffs,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,

　　　　　　　Defendants.

</td>
<td>

Case No. 1:25-cv-00637-PTG-IDD

Hon. Patricia Tolliver Giles

</td>
</tr>
</table>

**DECLARATION OF LINDSEY KEELEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Lindsey Keeley, declare as follows,

1.　　I am more than 18 years old, competent to be a witness, and the facts set forth in this declaration are based on my own personal knowledge.

2.　　I am married to an active-duty service member stationed in Quantico, Virginia. I am employed as a clinical pharmacist at a hospital in Northern Virginia.

1

**JA125**

3. My husband and I have been married since 2011. We have been together through five duty stations at various locations across the United States. I have learned from experience that being part of a military family calls for sacrifice. My children and I have endured long separations while my husband has been deployed throughout Europe and the Middle East. These deployments included combat operations against Taliban forces in Afghanistan and against the Islamic State in Iraq and the Levant (ISIL) in Iraq.

4. We have two children. S.K. is in first grade and E.K. is in fourth grade. Both have attended Crossroads Elementary School since August 2023. Crossroads is a Quantico DoD Educational Activity (DoDEA) school in Virginia.

5. We expect our children to be eligible for DoDEA schools through high school, and for our family's relationship with DoDEA schools to continue. My husband recently received accompanied orders overseas where DoDEA schools are the primary available English-language schools. He could serve for an additional ten years at his current rank, meaning that our children could attend DoDEA schools through high school wherever my husband's service takes us.

6. Our family has enjoyed our experience with DoDEA schools. DoDEA schools consistently perform well on National Assessment for Education Progress (NAEP) rankings and metrics, and our experience has been positive. We have had a great rapport with our children's teachers. Student-teacher ratios, teaching methods, and curricular materials have all been excellent for our children.

7. Since President Trump's Executive Orders targeting Diversity, Equity, and Inclusion, however, we have become very concerned with the negative impacts to our children's current and future education in DoDEA schools.

2

**JA126**

8. S.K. (our first grader) is very creative. She enjoys art and music and loves to illustrate stories. She even creates illustrations of her math problems in the margins of her worksheets. S.K.'s teachers at DoDEA support and encourage her creativity and have been responsive to all of our questions about S.K.'s education needs and learning style in the classroom.

9. E.K. (our fourth grader) is a strong reader, who enjoys socializing. She often talks about the diverse interactions school provides for her. E.K.'s favorite place at school is in the library, where the librarian is E.K.'s former third grade teacher. The librarian fosters E.K.'s love of reading. E.K. especially enjoys checking out and taking home books from the library's student section, which has stories on a wide array of topics.

10. As a child, I attended public schools in a small town in Oklahoma, where my mother taught elementary school for forty years. I have seen recent news reports about the "culture wars" in Oklahoma public schools and its current public-school commissioner, but my experience as a student in the 1990s and early 2000s was very positive. I credit the balanced education I received, including in math and science, with helping me successfully complete my graduate education in pharmacy studies. I was also exposed to viewpoints and experiences that were different from my own, which helped me become a well-rounded student.

11. My husband's education as a child was very different. He was homeschooled in a politically conservative, religious household that followed a 'classical Christian education' model. Expanding the narrow viewpoint this provided has been one of the defining challenges of his adult life, and it is important to us, as parents, that our children be afforded a school experience more similar to mine.

12. My husband's educational experience was very similar to the model Secretary of Defense Pete Hegseth proposes in his 2022 book, *Battle for the American Mind: Uprooting a*

3

**JA127**

*Century of Miseducation*. Because my husband grew up in a similar school environment, we know that it is not the kind of academic model we want for our children. We value and respect different viewpoints and do not want our children to attend a school that forces them to accept a single, often religious, orthodoxy. Instead, my husband and I want our children to enjoy an inclusive and science-based education like the one I received. I am deeply concerned DoDEA schools will transform to comply with the education model centered on religion described in Secretary Hegseth's book.

13. While I understand that my spouse, as an active-duty service member, signed away many of his First Amendment rights, our kids should not be treated like second-class citizens. They have the same rights as everyone else, including at school.

14. Earlier this year, the White House issued two Executive Orders that DoDEA has cited as justification for the changes we are starting to see in our school. Those Executive Orders are Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; and Order No. 14190, Ending Radical Indoctrination in K-12 Schooling.

15. Additionally, on January 27, 2025, the White House issued Executive Order No. 14185, Restoring America's Fighting Force (collectively, with Executive Orders 14168 and 14190, the "Executive Orders"). Two days later, on January 29, 2025, my husband received an all-hands email attaching a memorandum from Secretary Hegseth. The memorandum, also called "Restoring America's Fighting Force," placed a "[p]rohibition on Instruction on Critical Race Theory, Gender Ideology, and [Diversity, Equity, and Inclusion]," specifically forbidding any DoD element, which includes the DoDEA school my children attend, from providing instruction on these topics.

**JA128**

16.     On February 5th, 2025, DoDEA Headquarters directed all schools to immediately remove from use several DoDEA-adopted instructional resources (including curriculum modules and library books) as part of an ongoing compliance review, as set forth in a memorandum. The memorandum included an attachment listing resources for removal and it also mandates educators and school leaders to identify additional materials for removal. The memorandum does not provide a timeline for reviewing materials for compliance, but it is my understanding that students at DoDEA schools will not have access to any of the flagged materials while they are under review. The impact on our children, E.K. and S.K., therefore, will be immediate.

17.     On February 7, 2025, additional guidance was issued directing at least one additional DoDEA region—DoDEA Europe, which is where my husband and our family will be stationed beginning this summer—to implement the Executive Orders and the related directives. A true and correct copy of this guidance, obtained pursuant to my family's DoDEA Freedom of Information Act (FOIA) request #25-F-0015, is attached as **Exhibit A**.

18.     On February 10, 2025, our family received a letter from DoDEA Director Dr. Beth Schiavano-Narvaez confirming that DoDEA was complying with DoD guidance prohibiting use of official resources to mark cultural awareness months. This was the first time I heard about actual changes taking place at DoDEA schools, including that students' access to certain items was already being restricted. A true and correct copy of Dr. Schiavano-Narvaez's February 10 letter is attached as **Exhibit B**.

19.     On February 20, 2025, my husband attended the Quantico School Advisor Council. I wanted to attend but was unable to do so because the meeting took place in the middle of the workday.   A true and correct copy of the February 20, 2025, meeting minutes is attached as **Exhibit C**.

**JA129**

20.    During the meeting, my husband, in his personal capacity as a parent, asked for clarification about Dr. Schiavano-Narvaez's February 10 letter. Specifically, he asked for a list of titles that had been removed from the library. He also asked for confirmation that DoDEA maintained its academic integrity and independence as the curriculum was brought into compliance with the various executive orders; he posed a specific hypothetical, asking whether DoDEA would have to teach that the world was flat if it had been instructed to do so. Lastly, my husband asked for general transparency as the process unfolded. During that meeting, parents were told that the school could not "celebrate cultural things."

21.    The District Superintendent said at the meeting that all communications regarding the items under review would come from DoDEA Headquarters. She also confirmed that there was virtually no academic independence from DoD guidance, even in the case of the hypothetical regarding the flat-world conspiracy theory.

22.    We have repeatedly asked DoDEA administrators for updates, beginning on February 11, 2025—just one day after Dr. Schiavano-Narvaez's letter first alerted us that changes were underway. To this day, we have received little-to-no specific information about any actions taken. We are frustrated by the lack of information. More importantly, I am familiar with 10 U.S.C. § 2164a (Rights of Parents in DoDEA Schools). I know that as a DoDEA parent, I have the right to view curriculum standards and to receive advance notification of changes to those standards. Despite this, we are facing an information void, in spite of our repeated requests for updates about our children's education.

23.    Our local school administrators have not answered our questions. Instead, they have referred us to the DoDEA Americas Public Affairs Officer (PAO). Rather than provide us with new information, however, the PAO has merely rehashed and paraphrased Dr. Schiavano-

**JA130**

Narvaez's February 10 letter. When we pressed for more, the PAO referred us to the DoDEA Civil Rights Division. Ms. Taylor York, the DoDEA Civil Rights Program Manager, told us the DoDEA was not obligated to allow parents full access to library holdings or listings until December 22, 2025, citing the timelines identified in the FY2024 National Defense Authorization Act. A true and correct copy of email communications with Quantico CES administrators, DoDEA NY/VA Superintendent, DoDEA Americas PAO, and DoDEA Civil Rights Program and Compliance Branch is attached as **Exhibit D**.

24. At every turn, when we sought specific information about the changes impacting our children's school, we were referred back to the verbiage in the Executive Orders. We were also told to submit FOIA requests to obtain information. Because we had anticipated it would be difficult to get information, my husband had already started this process, sending an initial FOIA request on February 11, 2025 (#25-F-00107). The February 11 FOIA requested lists of all books removed from my children's school as of that date, as well as written records or minutes documenting the work of the DoDEA curriculum and instruction team that decided on the list for removal. As of the date of this declaration, the status of our February 11 FOIA is still listed as "Assigned for Processing." The FOIA Office provided an interim response on April 18, 2025, estimating a fulfillment date of 18 May—more than 90 calendar days after submission. ***See*** **Exhibit E.**

25. Since the February 11 FOIA, my husband has filed five more FOIA requests. Of these six total requests, only two have been even partially fulfilled. Because I am familiar with the FOIA Statute and 10 U.S.C. § 2164a, I expected DoDEA to fulfill our FOIA requests.

26. At this point, we have attempted and exhausted every administrative recourse available to us in an attempt to get basic information about our children's education. Yet still, we

**JA131**

have not received a satisfactory answer to the simple question: "What books are being removed from my children's school library?"

27.    What we do know, based on the little information provided to us, is that our children's school curriculum has changed. For example, our older daughter (E.K.) is in fourth grade, and DoDEA has directed certain readings, including one titled, "A Nation of Immigrants," to be removed from DoDEA schools' fourth grade curricula. The only reason given for removing these materials is compliance with the Executive Orders.

28.    I looked for, and did not find, any prior notification of this change to the curriculum or of Crossroads' academic standards, on the DoDEA website or elsewhere, although as a keenly interested parent, I know such notification is required by 10 U.S.C. § 2164a. The impact on E.K. is immediate because she cannot access the reading at school during the compliance review period. With the school year nearing an end, she has forever lost the opportunity to learn about the text in an educational setting as part of her fourth-grade curriculum.

29.    E.K., herself, noticed changes at her school and expressed her concern. In prior years, Crossroads has commemorated Black History Month by teaching about prominent Black figures and placing displays in the library for the entire month of February. Crossroads has also recognized March as Women's History Month in prior years by teaching about the women's rights movement and placing displays of historically significant women throughout the school.

30.    This year, however, partway through February, E.K. noticed that the Black History Month displays had been taken down and that her school was no longer teaching about the history of Black people in the United States or even acknowledging February as Black History Month. This disappointed and upset E.K. because she has always enjoyed learning about historically and

8

**JA132**

culturally significant art, literature, and events associated with the Black community during the school year.

31.     E.K. also noticed that Crossroads did not acknowledge March as Women's History Month. As a mother of two young girls, I find this change incredibly alarming. I fear that the school is telling my children that the accomplishments of women no longer matter or that there is something wrong, or discriminatory, with celebrating achievements made by women throughout history, even in the face of adversity.

32.     In the past, Crossroads provided my children with the opportunity to learn about culturally inclusive topics in an academic setting that included meaningful discussions with teachers and classmates. As a parent, I cannot replicate this type of academic environment at home, so it is important that I ensure my children are afforded the opportunity to benefit from a culturally rich curriculum in school. Now, however, both my children are being denied opportunities to learn about the history and culture of marginalized groups from teachers who are trained to help students from a variety of backgrounds understand the people and world around them.

33.     While our children have noticed some changes in school, officials have refused to tell us what specific modifications have been implemented. Although DoDEA has directed certain readings to be removed from grade-level curricula, DoDEA has also mandated educators and school leaders to identify additional materials for removal and compliance review. This means that I still cannot answer with certainty E.K.'s repeated question, "What books have they removed?" from her favorite place in school—the library.

34.     I have tried to determine which books have been removed from DoDEA schools because it is important for me to know what is included—or excluded—from my children's curricula. I have seen social media and anonymous online postings indicating which books and

**JA133**

other materials have been removed from DoDEA schools for "review" across various locations. Based on my review of these lists, it appears dozens of titles have been removed from DoDEA schools all over the world.

35.     Changes to DoDEA school curricula under the Executive Orders and guidance are also not being applied evenly. As an example, Dr. Schiavano-Narvaez's February 10 letter indicated that all cultural heritage months would be cancelled. Crossroads took down its Black History Month display in February and did not commemorate Women's History Month in March. During those same months, however, Crossroads devoted resources (class time and spaces) to commemorate Valentine's Day, St. Patrick's Day, and Easter. No such commemoration was held for other culturally significant holidays such as Ramadan and Eid al-Fitr, although these also occurred during recent weeks. Similarly, Lunar New Year, which was commemorated in 2024, was not marked this year—a difference that even our first grader, S.K., commented on.

36.     This has led me to believe that DoDEA schools are allowed to acknowledge some culturally significant days or months (ones with Christian significance) while restricting others. I do not want my children to be at a school that deprioritizes marginalized cultures. These actions, however, are entirely consistent with Secretary Hegseth's criticism of "Cultural Marxist" influences and his promotion of "Western Christian" culture.[1]

37.     My family and I have also noticed and discussed that the DoDEA removal lists include subjects and materials relating to gender. I understand this to be an attempt to comply with Executive Order 14168, which states that "sex" is an "immutable" classification based on a "biological classification as either male or female" not a person's "gender identity." (*See* EO 14168 Sec. 2(a).)

---

[1] Battle for the American Mind, pp. 172-174, 217, Chapter 11 entire, in reference to what he calls the "Western Christian Paideia" versus the "Cultural Marxist Paideia."

10

**JA134**

38. From my training and work as a healthcare professional, I understand that scientific research supports the conclusion that a person's gender identity is separate (and sometimes different) from a person's biological sex assigned at birth. Erasing the entire dimension of gender contradicts established science and adopts non-scientific ideology as "truth." My profession is based on science, and ignoring science in favor of ideology would lead to disastrous outcomes for my patients. Because of my own educational and professional experience, it is extremely important to me that my children's education be grounded in science and the scientific method. A school system that is divorced from scientific reality is not the kind of school system that I want for my children.

39. This attempted deletion of gender identity also runs counter to my children's direct experience. E.K. and S.K. both know a number of queer or gender non-conforming people. We have sought to raise our children to be open to, and accepting of, diversity across the range of human experience, and this ideologically motivated push to erase diversity within the school environment is entirely at odds with those goals.

40. No justification has been provided for these changes at my children's school other than the Executive Orders and related DoDEA directives. At no point has DoDEA conveyed that the removed books or curriculum materials were inaccurate or age-inappropriate, and the established procedures for book challenges and removal have not been applied. Nor has DoDEA said that the removals are based on pedagogical evidence of any kind. Despite Executive Order 13985's stated aim of "ending radical indoctrination," the effect of the Executive Orders and DoDEA directives has been to deny E.K. and S.K. access to diverse viewpoints in what feels like an attempt to indoctrinate my children with an un-scientific and ahistorical set of ideas.

11

**JA135**

41.     The changes to the curricula in DoDEA schools have been done in haste and behind closed doors, and officials have provided no pedagogical reason for the modifications. Based on our family's experience, the changes have resulted in applied academic standards being replaced with ideological screenings, and I fear that my E.K. and S.K. can no longer obtain the type of independent, well-rounded education to which they are entitled.

42.     I do not want my children educated in a school system that substitutes ideology for science, history, and current events. This approach will not make our children more competitive in the workplace, in research, or in academia. Removing the cultural context of historical events or teaching that it is un-American merely to observe that America's founding documents are racist and sexist[2] is similarly counter-factual and blinds our children to the various forces that have shaped our country and global society throughout history, and into the present moment.

43.     These actions are rapidly destroying the positive experience that we have enjoyed at DoDEA.  Our society already asks for tremendous sacrifices from the families of uniformed servicemembers—asking us to also give up on a quality education for our children is a sacrifice that we should never have to make.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 4, 2025.

_____
Lindsey Keeley

---

[2] EO 14185, Restoring America's Fighting Force. Obviously, if the Constitution had been neither racist nor sexist there would have been no need for the 13th, 15th, 19th or 24th Amendments.

**JA136**

# EXHIBIT A



## DEPARTMENT OF DEFENSE EDUCATION ACTIVITY
## HEADQUARTERS
4800 MARK CENTER DRIVE
ALEXANDRIA, VA  22350-1400

February 5, 2025

MEMORANDUM FOR DODEA DIRECTORS FOR STUDENT EXCELLENCE
DODEA CHIEFS OF INSTRUCTIONAL LEADERSHIP DEVELOPMENT
DODEA DISTRICT SUPERINTENDENTS
DODEA COMMUNITY SUPERINTENDENTS
DODEA INSTRUCTIONAL SYSTEMS SPECIALISTS
DODEA REGION CHIEFS OF STAFF
DODEA PRINCIPALS
DODEA ASSISTANT PRINCIPALS
DODEA EDUCATORS

SUBJECT: Administrative Operational Compliance Review of *DoDEA Adopted Instructional Resources* Related to Gender and/or Discriminatory Equity Ideology Topics

To comply with the recent Executive Orders titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" and "Ending Radical Indoctrination in K-12 Schooling," DoDEA is conducting an operational compliance review to ensure alignment with the applicable Executive Orders. As part of this review, *DoDEA adopted instructional resources* potentially related to gender ideology or discriminatory equity ideology topics, as defined in the Executive Orders, should not be utilized for instruction. Specific resources identified are in Attachment A. A small number of links to external resources have been deactivated, but this should not impact routine use of adopted resources for educators.  Educators are expected to implement this directive immediately. Principals must ensure that educators are aware of and comply with this instruction. If educators or school leaders have a question about use of a specific resource not listed in Attachment A, please notify your district ISS with the specific resource. District ISS should then share that information with their HQ ISS counterpart to be added to the compliance review and notice will be provided if use of an instructional resource should be discontinued.

We will provide further guidance upon receipt of official instructions. As a federal agency, we are committed to compliance with the Executive Orders and will ensure our policies and practices align accordingly.

For general questions about this guidance, not inquiries about specific resources, please contact (b)(6)   , Acting Chief of Curriculum and Instruction at (b)(6)   @dodea.edu or (b)(6)   HQ Elementary Content Program Manager at (b)(6)   @dodea.edu.

(b)(6)

Acting Chief Academic Officer

Attachment:
As stated

cc:
President, ACEA
President, FEA
Director, FEA-SR
President, OFT

**JA138**

Attachment A

The following list includes selected instructional resources that should not be used by DoDEA educators during the operational compliance review.

**AP Psychology**

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| College Board | AP Psychology | AP Psychology | Please exclude "gender identity" from learning objective 3.6.A.8 and excluding Module 32 Gender and Sex |
| McGraw Hill | AP Psychology | AP Psychology | Chapter 11 – Sexuality and Gender |

**Elementary Social Studies**

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| TCI | Biographies K-5 | Elementary SS Grade K-5 | Albert Cashier, Civil War Veteran |
| TCI | G5 Western Hemisphere: Lesson 7: Migration to the United States Impact on People and Places | Elementary SS Grade 5 | Section 4 Reading - How Does Immigration Affect the U.S.? |
| TCI | G4 Lesson 3: The Peopling of the United States | Elementary SS Grade 4 | Explore Reading - A Nation of Immigrants |

**Secondary ELA**

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| HMH | READ 180 | Strategic Literacy 6-12 | Independent Reading Novel - Becoming Nicole |

**Secondary Health**

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| G-W | 6th through 8th grade Health | Comprehensive Health Skills for Middle School | Comprehensive Health Skills for Middle School Chapter 18.1 |

**Secondary Social Studies**

| Company | Resource/Grade | Course | Do not use this resource |
|---|---|---|---|
| HMH ED | Grade 6: My Friend in Learning | 6th Grade Eastern World | My Friend in Learning Professional Learning. New for You Seasonal Bundle: Black History Month 2025 |

**JA139**



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**EUROPE**
**UNIT 29649**
**APO AE 09136-9649**

7 Feb 25

TO: DoDEA Europe Administrators and School-level Employees

To ensure compliance with executive orders and recent DoD guidance, the following must be adhered to:

**We will not be holding cultural observances pending further guidance**

As a guide, all planned special activities and non-instructional events related to the former monthly cultural awareness observances will not be held pending further guidance. No man-hours or government resources are authorized for the planning, preparation, or execution of such activities or events currently. All internal and external communication platforms including but not limited to school social media accounts and websites, should refrain from disseminating information regarding the former monthly cultural awareness observances.

Host Nation language and culture classes, international exchanges, and the like, are permitted to continue as scheduled.

School administrators should communicate that prohibited events which have been planned already are currently cancelled pending further guidance from the DoD

**Review email signature blocks**

Email signature blocks must not include self-identified pronouns and should not include quotes, sayings, or mottos.

**Review and revise locally created documents**

School-level documents requesting student information must use the term "sex" not "gender." Ensure available responses are "male" or "female" only, without reference to gender. This also applies to informal forms and personal data collection created by an educator, counselor, nurse, coach, or other staff.

**Ensure compliance of school facilities, programs, and activities**

All facilities, programs, and activities designated as for girls may only be accessed by biological females and all facilities, programs, and activities designated as for boys may only be accessed by biological males. This includes athletic activities. A student's sex is the sex recorded in his/her official school record.

**Assess signage**

Any signage supporting the inculcation or promotion of gender ideology must be removed. Signage for shared intimate spaces, such as restrooms and locker rooms, shall use the terms "women,"

**JA140**

"woman," "girls," "girl," "men," "man," "boys" or "boy." Single-user unisex facilities remain available to anyone of either sex.

**Curriculum, policies, databases, contracts**
Curriculum guidance for classroom instruction related to gender ideology and discriminatory equity ideology has been issued identifying selected instructional resources that should not be used by DoDEA educators during the operational compliance review.

Continue teaching to standards with DoDEA adopted resources, except for the resources potentially related to gender ideology and discriminatory equity ideology that are under the operational compliance review.

Information Specialists must ensure books potentially related to gender ideology or discriminatory equity ideology are removed from the student section of the Information Center and placed in the professional collection. Specific instructions for removing books will be provided to school administrators.

Key personnel at DoDEA Headquarters are addressing compliance actions that apply activity-wide, such as modifications to official DoDEA policy, forms, document, electronic communication and database systems, contracts, curriculum and any additional items that originate out of Headquarters.

**Counseling Services**

If a student is experiencing emotional/psychological distress at school related to being recognized by their biological sex, he/she continues to be equally entitled to the same mental health services as are made available to any other student who is experiencing emotional/psychological distress at school for whatever reason. The counseling support provided, however, must remain objective and neutral in its application without taking action that would unlawfully facilitate the gender transition of a minor student.

Thank you for your support as we implement these new DoD guidlines.

(b)(3):10 U.S.C. §130b; (b)(6)

Chief of Staff

2

**JA141**

JA142

Page 5

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

JA143

Page 6

Withheld pursuant to exemption

(b)(5) ; (b)(6)

of the Freedom of Information and Privacy Act

# EXHIBIT B



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**HEADQUARTERS**
4800 MARK CENTER DRIVE
ALEXANDRIA, VA 22350-1400

FEB 1 0 2025

DoDEA Sponsors, Parents, and Guardians,

In light of the President's recent Executive Orders titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" and "Ending Radical Indoctrination in K-12 Schooling," DoDEA is conducting an operational compliance review to ensure alignment with the Executive Orders.

As part of this review, DoDEA-adopted instructional resources and Information Center (library) books potentially related to gender ideology or discriminatory equity ideology topics were examined. DoDEA's curriculum and instruction team, referencing terms and definitions in the above Executive Orders, identified a small number of items for further review. Information Center books identified for review will be relocated to the professional collection for evaluation with access limited to professional staff.

On January 31, 2025, the Secretary of Defense issued guidance to all Department of Defense (DoD) components and Military Departments prohibiting the use of official resources to host celebrations or events related to cultural awareness months. As a DoD entity, DoDEA is fully complying with that guidance.

We are working through the Executive Orders at DoDEA headquarters to determine required actions for DoDEA schools and providing guidance, as appropriate, to ensure there are consistent policies and practices in place that comply with current Executive Orders and DoD guidance. We are continuing to work with Region, District, and school leadership during this process. I am in constant contact with our region leadership to ensure appropriate implementation throughout the Activity.

DoDEA is committed to its core mission in support of the Warfighter – providing a top tier education to our military-connected students. We at DoDEA are honored to serve more than 67,000 students, and their families, and in so doing play an important role in supporting our country's military readiness.

The strength of our DoDEA community lies in its people – students, educators, and families. We remain committed to fostering a learning environment where every student feels valued, supported, and empowered to succeed in a dynamic world.

Sincerely,

Beth Schiavino-Narvaez, Ed.D.
Director

**JA145**

# EXHIBIT C

**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**AMERICAS**
**MID-ATLANTIC DISTRICT, QUANTICO FIELD OFFICE**
**3308 JOHN QUICK ROAD**
**QUANTICO, VA 22134**
**703.630.7012**

February 20, 2025

MEMORANDUM FOR RECORD

SUBJECT:   Minutes for the Quantico School Board Meeting of February 20, 2025

1.  **Call to Order**:  The Quantico School Board meeting was called to order by Vice President, Mrs. Soucie, February 20, 2025 at 1:33 PM at the Crossroads ES Commons Area.

2.  **Members Present were**:
    Denise Eves, School Board Clerk
    Alexis Soucie, School Board Member  Vice President
    Amy Rosalez, Board Member
    Amanda Willmoth, Board Member
    Ashley Lockridge, Board Member
    Anne Hickey, Board Member
    Austin Porter, Board Member
    Dr. Vickie Bannerman, NYVA Community Superintendent

**Others Present**:
    Ben Kolodziej, Interim Crossroads Principal          Miles Shea, QMHS Principal
    Dr. Lynsee Lee, Assistant Principal, CES
    Newly elected school board members were sworn in by Dr. Bannerman.

1.  **Approval of Agenda**: Approved agenda

2.  **Approval of Past Minutes**:  Approved minutes change to November 2024.

3.  **School Liaison Report: given by Penny Rowley**

    School liaison is partnering with schools to provide bullying education and bring assemblies to the schools to educate the students.

    **PEA Report:** No PEA member was present

4.  **School/Updates/Presentations:**

    **CrossroadsES: given by Ben Kolodziej and Lynsey Lee**
    Kindergarten students sang to the board and those in attendance.
    Mr. Shea has been picked as the Principal of the Year for Americas.
    Introduced Dr. Lynsee Lee as the new Assistant Principal for CES.
    Enrollment: 610
    Current vacancies
    Book Fair
    Read across America
    Fun Run over $20,000 for PEA.
    NEAP testing
    New Principal will arrive in March, Dr. Mannie

**JA147**

**Quantico MHS given by Miles Shea**
Thanked Dr. Lee and Mr. Kolodziej for supporting both schools.
Enrollment: 288
Activities include the Marine Corps Ball
White House tour
Athletics: great winter sport program
Door decorating contest
Winter Concert
NAEP: selection of students were tested.
April 30th to take possession of the building. DODEA is required to occupy the new school within 90 days, and the plan is for teachers to move during the summer.  Pictures were shown.

5. **Board President Comments:**
   Board Vice President thanked parents for being there, emphasized their support and highlighted that we are all a team. Encouraged parents to continue to voice concerns, and ask questions. If we do not know, we cannot help. Nice to have the parents in attendance for the meeting.  School board email will be provided to schools and school liaison to share with parents as a means for them to express their concerns and have the board address them.

6. **Community Superintendent comments**:
   **Pilot program:**
   Dr. Bannerman shared that approval for Pilot program expansion. DODEA HQ is working on a fair way to allow families living off base to have their children attend Quantico schools. At this time she does not know when the details will be finalized, or applications will open. The application process is still being worked out. More to come. Dr. Bannerman explained what the Pilot Program is.
   Parent Monbeck: asked a question concerning the already short staffed schools and challenges complying with IEP's. Asked how many teachers will be added to the team? Dr Bannerman stated that was part of the ongoing discussion.

7. **Continuous Business**:
   Dr. Bannerman shared that at this time actions taken in compliance with the EO: an OSHA poster was removed, books have been removed from the school libraries. Dr. Bannerman stated that the gender recognition forms have to be updated. Restrooms are girls/boys, teachers were told to remove pronouns from their signatures. Athletics: male/females. Diversity (DEI) posters, and celebrations have been removed.
   Vice president asked why the differences between QMHS and Crossroads in removal of books from the library (QMHS has removed 10 so far, Crossroads zero). Mr. Kolodziej stated the librarian completed a training, and they were still working through what the actions required are. Dr. Bannerman would work to get a list of removed books to parents, if allowed by DODEA HQ.

8. **New Business**:

9. **Individuals Wishing to Address the Board: Letter from Director.**  C
   Lt. Col Keely asked what the impact from the EO has been to the schools, what is being done and will need to be. Specifically changes in curriculum, impact on activities (Black history month, women's history month etc). Dr. Bannerman stated that all requirements and changes are coming from DODEA HQ. Principal don't have the information, and at this time no one has the information. She also shared that DODEA employees have been informed they are not to respond

2
**JA148**

to media requests. DODEA HQ is working with the executive order. All guidance will come directly from DODEA HQ. We are a federal agency. Dr Bannerman has been told regarding the curriculum, is that teachers are to continue using the approved curriculum. It is inclusive and they are following the standards. At this time DODEA cannot highlight and celebrate cultural things.

Follow-up question: How does it affect us? Dr. Bannerman stated it's however HQ tells us.

International parent asked: Concerned about communication and as a new family how is the communication passed about changes and updates.

Dr. Bannerman responded that communication will be pushed, when they receive it and are told they can share it.

Parent: Capt Haskey stated that a few unfortunate incidents have come to his attention: These are concerns from Crossroads staff members expressing their concerns to his wife. They include CES staff members not receiving a duty-free lunch break. Staff members being Inappropriately touched by a student, on more than one occasion. His wife has been threatened that a student was going to shoot her, administration at CES was informed along with his command.

Dr. Bannerman stated she appreciated him sharing his concerns, that this is the first she was hearing of these issues. She asked him to either email her or speak with her after so they could gather further information.

Woods: CES parent expressed concerns about her child having a LTS in the classroom, and not receiving information about what students are learning, or if there are concerns. Parent expressed that she has no clue what is being taught in class. 2nd grade.

Mr. Kolodziej acknowledges what the parent was saying, and agreed communication could have been better. He shared that there will be a certified teacher on Monday for the 2nd grade.

Vice president asked if moving forward perhaps information about changes in teachers could be shared with parents before changes occurred.

Kindergarten parent: shared concerns about no communication with the teachers. She is hearing from others that there are concerns about her student in class, but she is not hearing from teachers. Is not aware of how the student is doing. Mr. K again expressed that communication should be better. That report cards are coming out. Vice president asked about progress reports, don't these come out quarterly?

Dr. Bannerman stated that we need to have reasonable expectations of our teachers. It's a lot for the teachers to communicate weekly and send out information. But she will discuss with the principals and come to a solution.

10. **Announcement of Next Meeting:** The next school board meeting will be held on March 13th at Quantico MHS Media Center at 11:30 AM.

1.      **Adjournment.**   Vice President motioned to adjourn the meeting. The Quantico School Board meeting was adjourned at 3:00 PM.


Respectfully submitted,


_____                    _____
    Dr. Vickie Bannerman                                    Marta Sullivan
NYVA Community Superintendent                    School Board President

2
**JA149**

# EXHIBIT D

USCA4 Appeal: 25-2497    Doc: 24    Filed: 03/30/2026    Pg: 156 of 283

Case 1:25-cv-00637-PTG-IDD    Document 10-23    Filed 05/07/25    Page 27 of 40
PageID# 396

 Gmail

**Paul Keeley <keeleyp1@gmail.com>**

---

## Clarification on withdrawn books?

---

**York, Taylor Ms. CIV OSD/DoDEA-HQ** <Taylor.York@dodea.edu>                    Tue, Mar 4, 2025 at 11:19 AM
To: Paul Keeley <keeleyp1@gmail.com>, "Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas"
<Pamela.Westbrook@dodea.edu>, "Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas" <Lynsey.Lee@dodea.edu>, "Kolodziej,
Benjamin Mr. CIV OSD/DoDEA-Americas" <Benjamin.Kolodziej@dodea.edu>
Cc: "O'day, Michael Mr. CIV OSD/DoDEA-Americas" <Michael.Oday@dodea.edu>, DoDEA Americas Supt NY/VA
<DoDEAAmericasSuptNY/VA@dodea.edu>, "Lindsey N. Keeley" <lindseykeeley44@gmail.com>, Americas PAO
<americaspao@dodea.edu>

Dear Paul Keeley,

**Please note the <u>exceptions</u> in Section 589 subsection (c) of the National Defense Authorization Act of FY 2024** that make clear certain rights enumerated are not in effect until <u>two years after</u> the effective date of the NDAA FY2024.  The effective date is December 22, 2023, so the following provisions are <u>not effective until December 22, 2025</u>:

> **"(c) EXCEPTIONS.—**
>
> 1. **Paragraph (5) of subsection (a)** and **paragraph (3) of subsection (b) shall not be effective until the day that is two years after** the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024.

**Paragraph (5) of subsection (a)** reads:  "(a) IN GENERAL.—The parent of a child who attends a school operated by the Department of Defense Education Activity has the following rights**…(5) The right to inspect a list of the books and other reading materials contained in the library of the school."**

**Paragraph (3) of subsection (b)** reads: **"(3) provide parents access to the online school library catalog;"**

As for your remaining requests, please note that disclosure of anything listed in subsection (b) must first be weighed against any Federal laws or regulation that would make the disclosure unlawful.

> **"(c) EXCEPTIONS.—**
>
> (2) A requirement set forth in **subsection (b) shall not apply in a case in which the requirement would violate any applicable provision of a Federal** or State **statute or regulation**.

Adhering to the restrictions in section (c)(2) that may apply to the release of records is what the FOIA process exists to address.  Through the FOIA process, what you are entitled to by law will be provided to you, in accordance with applicable law.

Yours truly,

**JA151**

Taylor York, LLM, CCEP (Ms.)

Civil Rights Analyst and Program Manager

Civil Rights Program and Compliance Branch

DoD Education Activity

PRIVACY ACT PROTECTED: Any misuse or unauthorized disclosure of this information may result in both civil and criminal penalties. If you have received this correspondence in error, please notify the sender at once and destroy any copies.

---

**From:** Americas PAO <americaspao@dodea.edu>
**Sent:** Tuesday, March 4, 2025 9:39 AM
**To:** Paul Keeley <keeleyp1@gmail.com>; Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas <Pamela.Westbrook@DODEA.EDU>; Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas <Lynsey.Lee@DODEA.EDU>; Kolodziej, Benjamin Mr. CIV OSD/DoDEA-Americas <Benjamin.Kolodziej@DODEA.EDU>
**Cc:** O'day, Michael Mr. CIV OSD/DoDEA-Americas <Michael.Oday@dodea.edu>; Americas PAO <americaspao@dodea.edu>; DoDEA Americas Supt NY/VA <DoDEAAmericasSuptNY/VA@DODEA.EDU>; Civil Rights (HQ) <Civil.Rights@DODEA.EDU>; Lindsey N. Keeley <lindseykeeley44@gmail.com>
**Subject:** RE: Clarification on withdrawn books?


Good morning LtCol,


As noted in the DoDEA CRP guidance below, any request for such records, including a list of library books or reading materials, must be submitted through the official DoDEA FOIA process. You can find detailed information on how to submit a request, along with the necessary forms, on the DoDEA website at: https://www.dodea.edu/offices/executive-services/freedom-information-act-foia.


Once your request is submitted, the FOIA office will process it in accordance with federal guidelines and provide you with the information you're seeking.


v/r

Michael


Michael O'Day

Americas Communications Director

Department of Defense Education Activity

700 Westpark Drive Peachtree City, GA 30269

(706) 715-9683

Media Inquiries: AmericasPAO@dodea.edu


**JA152**

USCA4 Appeal: 25-2497    Doc: 24    Filed: 03/30/2026    Pg: 158 of 283
Case 1:25-cv-00637-PTG-IDD    Document 10-23    Filed 05/07/25    Page 29 of 40
PageID# 398

DVIDS - Department of Defense Education Activity Americas

"Fostering Understanding One Story at a Time!"

---

**From:** Paul Keeley
**Sent:** Tuesday, March 4, 2025 8:24 AM
**To:** Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas ; Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas ; Kolodziej, Benjamin Mr. CIV OSD/DoDEA-Americas
**Cc:** O'day, Michael Mr. CIV OSD/DoDEA-Americas ; Americas PAO ; DoDEA Americas Supt NY/VA ; Civil Rights (HQ) ; Lindsey N. Keeley
**Subject:** Re: Clarification on withdrawn books?

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Good morning Crossroads team. As I understand from the various emails I have received (below), books under review are being held in the professional section and have not been removed from the library. Please let me know how I can access a listing of the holdings within the professional section, or let me know a good time to come review the holdings in person.

As stated in the Code of Federal Regulations, Title 10, Section 2164a, parents of DoDEA children have:

(5) The right to inspect a list of the books and other reading materials contained in the library of the school

Since I've been told that these materials have not been removed, and the law does not differentiate between student/ professional holdings, I would like to exercise my right to inspect the list of ALL books and reading materials contained in the library of the school. I have extensively searched through the online library listings since receiving the below reply, and have noted a number of materials are no longer listed which I have good reason to believe were previously listed, hence my request.

Thanks,

Paul Keeley

> On Feb 27, 2025, at 5:53 AM, Civil Rights (HQ) <Civil.Rights@dodea.edu> wrote:

> Greetings, Paul Keeley.

> You have reached the DoDEA Civil Right Program and Compliance (CRPC) Branch.

**JA153**

USCA4 Appeal: 25-2497      Doc: 24      Filed: 03/30/2026      Pg: 159 of 283

The DoDEA CRPC Branch is an independent and impartial office within DoDEA that has exclusive authority to accept and guide through to final resolution formal written reports alleging Executive Order 13160 (EO 13160) discrimination in DoDEA operations. EO 13160 specifically mandates that, "*No individual, on the basis of race, sex, color, national origin, disability, religion, age, sexual orientation, or status as a parent, shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination in, a Federally conducted education or training program or activity*."

DoDEA is committed to supporting a higher quality learning and work experience for its students, employees, and other participants through enforcement of protections against unlawful discrimination aimed at ensuring equal treatment of and appreciation for the value added by each unique individual. You may visit the DoDEA CRP website at https://www.dodea.edu/offices/civil-rights-program to learn more about the types of discrimination protected against under EO 13160.

Regarding your concerns raised, below, DoDEA is required to operate lawfully in compliance with Federal laws, Executive Orders, regulations and DoD policy. If any such authority is changed or modified, it is not a wholesale denial of rights to pause operations and/or access to resources pending a thorough review to ensure DoDEA may maintain its lawfully compliant operations. Taking steps to equalize programs or policies that did not treat all people and students equally in their diversity but provided more favorable treatment to one group based on their protected class, alone, is not a denial of rights but a reallocation of equal treatment guarantees.

Regarding Black History Month, the Secretary of Defense ordered a change within DoD impacting the past practice of how Special Emphasis Months may be observed. The DoD has directed that DoD, its components and Activities, of which DoDEA is included, "*will not use official resources, to include man-hours, to host celebrations or events related to cultural awareness months, including National African American/Black History Month, Women's History Month, Asian American and Pacific Islander Heritage Month, Pride Month, National Hispanic Heritage Month, National Disability Employment Awareness Month, and National American Indian Heritage Month. Service members and civilians remain permitted to attend these events in an unofficial capacity outside of duty hours*." The DoD seeks to celebrate the valor and success of heroes of all races, genders, and backgrounds, equally, and not put people into separate boxes. Since our schools support families of active military and military connected personnel, DoDEA schools are part of this less restricted approach to honoring and celebrating people whose accomplishments serve the greater good. Instruction may now focus on the character of the diverse people we admire and do it anytime of the year, not just for one month a year.

Requests for what guidance was provided, what books are included in the review, what criteria is being used, what is the timeline, what curriculum changes will be made, etc., are all related to business operations and are, thus, business records. As a Federal agency, DoDEA's business records are governed under the Freedom of Information Act (FOIA). Federal employees are not free to release business records at will. Any requests for business records must be submitted through the DoDEA FOIA process, located at https://www.dodea.edu/offices/executive-services/freedom-information-act-foia.

**JA154**

Case 1:25-cv-00637-PTG-IDD    Document 10-23    Filed 05/07/25    Page 31 of 40
PageID# 400

Yours truly,


Civil Rights Program and Compliance Branch

DoD Education Activity

4800 Mark Center Drive

Alexandria, VA 22350

PRIVACY ACT PROTECTED: Any misuse or unauthorized disclosure of this information may result in both civil and criminal penalties. If you have received this correspondence in error, please notify the sender at once and destroy any copies.

---

**From:** O'day, Michael Mr. CIV OSD/DoDEA-Americas <Michael.Oday@dodea.edu>
**Sent:** Wednesday, February 26, 2025 11:13 PM
**To:** Paul Keeley <keeleyp1@gmail.com>; Civil Rights (HQ) <Civil.Rights@DODEA.EDU>
**Cc:** Americas PAO <americaspao@dodea.edu>; DoDEA Americas Supt NY/VA <DoDEAAmericasSuptNY/VA@DODEA.EDU>; Kolodziej, Benjamin Mr. CIV OSD/DoDEA-Americas <Benjamin.Kolodziej@DODEA.EDU>; Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas <Lynsey.Lee@DODEA.EDU>; Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas <Pamela.Westbrook@DODEA.EDU>
**Subject:** Re: Clarification on withdrawn books?


LtCol,


Please contact the DoDEA Civil Rights Program at Civil.Rights@dodea.edu with any further questions on this topic.


v/r
Michael

Michael O'Day
Americas Communications Director
Department of Defense Education Activity
700 Westpark Drive Peachtree City, GA 30269
(706) 715-9683
Media Inquiries: AmericasPAO@dodea.edu

DVIDS - Department of Defense Education Activity Americas
"Fostering Understanding One Story at a Time!"

---

**From:** Paul Keeley <keeleyp1@gmail.com>
**Sent:** Wednesday, February 26, 2025 10:33:28 PM
**To:** O'day, Michael Mr. CIV OSD/DoDEA-Americas <Michael.Oday@dodea.edu>; Civil Rights (HQ) <Civil.Rights@DODEA.EDU>
**Cc:** Americas PAO <americaspao@dodea.edu>; DoDEA Americas Supt NY/VA <DoDEAAmericasSuptNY/VA@DODEA.EDU>; Kolodziej, Benjamin Mr. CIV OSD/DoDEA-Americas <Benjamin.Kolodziej@DODEA.EDU>; Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas <Lynsey.Lee@DODEA.EDU>; Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas

**JA155**

USCA4 Appeal: 25-2497    Doc: 24    Filed: 03/30/2026    Pg: 161 of 283

Case 1:25-cv-00637-PTG-IDD    Document 10-23    Filed 05/07/25    Page 32 of 40
PageID# 401

<Pamela.Westbrook@DODEA.EDU>
**Subject:** Re: Clarification on withdrawn books?

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Thank you for your note and the additional contact. I have two additional questions based on this response--perhaps the Civil Rights Program can clarify. As noted before, I am requesting this information in my personal capacity as a parent of two children within DoDEA schools.

First, is it the position of DoDEA that the Letter to Parents dated 10 February fulfills the statutory requirement contained in 10 USC Sec 2164a to notify parents of an alteration of academic standards?

Second, in light of Mr. O'Day's statement that "no books have been permanently removed," can you please provide the expected length of time wherein these books will be inaccessible to the students? Timelines matter--for example, if the resources listed for the 4th grade are not returned to use before the end of the school year, then my oldest--PII -will not receive that block of instruction per the current approved DoDEA curriculum. Likewise, Black History Month ends in two days; even if the 6th Grade module on Black History Month were returned to the classroom by next Monday, it will have effectively been removed for the entire 6th grade for this academic year.

I also understand from this response that the online school library catalog will contain all books within the school library and thus (as of today) will reflect that no books have been removed at the present time. Access to their children's school catalog by a parent, again, is guaranteed by 10 USC Sec 2164a and I therefore expect that my local DoDEA school will have no issues providing me access to that full listing without further permission from DoDEA HQ.

Thank you for your consideration.

-Paul Keeley

keeleyp1@gmail.com

PII          (cell / Signal)

On Wed, Feb 26, 2025 at 7:42 AM O'day, Michael Mr. CIV OSD/DoDEA-Americas <Michael.Oday@dodea.edu> wrote:

> LtCol,
>
> Thank you for reaching out.
>
> As a field activity of the Office of the Secretary of Defense, I can assure you that we are in compliance with all applicable executive orders and Department of Defense guidance.
>
> Teaching students about the lives and experiences of people from different backgrounds than their own is part of the high-quality education DoDEA offers. We expect little to no impact on our students while ensuring each learner receives appropriate direction to excel at their own pace and in their own

**JA156**

USCA4 Appeal: 25-2497    Doc: 24    Filed: 03/30/2026    Pg: 162 of 283

Case 1:25-cv-00637-PTG-IDD    Document 10-23    Filed 05/07/25    Page 33 of 40
PageID# 402

way.

No materials have been permanently removed from our school libraries pending completion of the review. During this period, materials under review will have access limited to professional staff.

We appreciate your continued support in your child's education.

Please contact the DoDEA Civil Rights Program at Civil.Rights@dodea.edu with any further questions on this topic.

v/r

Michael

Michael O'Day

Americas Communications Director

Department of Defense Education Activity

700 Westpark Drive Peachtree City, GA 30269

(706) 715-9683

Media Inquiries: AmericasPAO@dodea.edu

DVIDS - Department of Defense Education Activity Americas

"Fostering Understanding One Story at a Time!"

---

**From:** Paul Keeley <keeleyp1@gmail.com>
**Sent:** Tuesday, February 25, 2025 10:50 PM
**To:** Americas PAO <americaspao@dodea.edu>; DoDEA Americas Supt NY/VA VA@DODEA.EDU>
**Cc:** Kolodziej, Benjamin Mr. CIV OSD/DoDEA-Americas <Benjamin.Kolodziej@DODEA.EDU>; Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas <Lynsey.Lee@DODEA.EDU>; Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas <Pamela.Westbrook@DODEA.EDU>
**Subject:** Re: Clarification on withdrawn books?

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Good evening,

I'm writing to follow up on the below request, as well as to address additional questions that I have following the Quantico school board meeting held last week. While I have yet to receive anything through official channels, I am now in possession of the memo dated 5 February (with attachment A) detailing the initial tranche of immediately withdrawn materials--which included both library books as well as curricular materials. I received this from multiple corroborating sources external to the school, to include my congressman's office, media outlets, and other concerned parents from different parts

**JA157**

USCA4 Appeal: 25-2497 Doc: 24 Filed: 03/30/2026 Pg: 163 of 283
Case 1:25-cv-00637-PTG-IDD Document 10-23 Filed 05/07/25 Page 34 of 40
PageID# 403

of the DoDEA system.

I'm trying to reconcile this information with the information provided at the school board meeting, which led me to believe that the existing approved DoDEA curriculum is still being taught. The majority of items in the attachment appear to be from the curriculum, and are neither supplemental materials nor library books. Please clarify if the approved curriculum is still being taught--or, if not, what academic or educational standards led to these changes during the school year.

At the meeting we were told that our school librarian received a day of training prior to beginning a further review of holdings at Crossroads Elementary School. I am following up my verbal request that the training materials used be provided to parents--as well as the academic or educational standards that this review is founded upon.

I was also subsequently informed that a representative from DoDEA HQ will be inspecting/verifying compliance at Quantico DoDEA schools, to include final determination of what additional materials will be removed from the library. Can you please confirm or deny this; if correct, when will this inspection take place? I'd also request that parents (or at minimum school board members, or the MCCS School Liaison) be allowed to observe this inspection.

Finally, when will the consolidated list of removed materials & curriculum changes across DoDEA be provided to parents?

Thanks,

-Paul Keeley

keeleyp1@gmail.com

Cell/Signal: PII

On Sat, Feb 15, 2025 at 10:24 AM Paul Keeley <keeleyp1@gmail.com> wrote:

> OK, just so that I understand correctly—you either do not have, or are not authorized to provide this list to parents?
>
> Thanks,
>
> Paul Keeley
>
> Sent from my iPhone
>
>> On Feb 15, 2025, at 12:39 AM, Americas PAO <americaspao@dodea.edu> wrote:

**JA158**

Case 1:25-cv-00637-PTG-IDD    Document 10-23    Filed 05/07/25    Page 35 of 40 PageID# 404

LtCol,

I understand, and as a field activity of the Office of the Secretary of Defense, I can assure you that we are in compliance with all applicable executive orders and guidance.

Please let me know if there is anything else I can assist you with.

v/r
Michael

Michael O'Day
Americas Communications Director
Department of Defense Education Activity
700 Westpark Drive Peachtree City, GA 30269
(706) 715-9683
Media Inquiries: AmericasPAO@dodea.edu

DVIDS - Department of Defense Education Activity Americas
"Fostering Understanding One Story at a Time!"

**From:** Paul Keeley <keeleyp1@gmail.com>
**Sent:** Friday, February 14, 2025 8:56 pm
**To:** Americas PAO <americaspao@dodea.edu>
**Cc:** Kolodziej, Benjamin Mr. CIV OSD/DoDEA-Americas <Benjamin.Kolodziej@DODEA.EDU>; Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas <Lynsey.Lee@DODEA.EDU>; Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas <Pamela.Westbrook@DODEA.EDU>; Lindsey N. Keeley <lindseykeeley44@gmail.com>; Americas PAO <americaspao@dodea.edu>
**Subject:** Re: Clarification on withdrawn books?

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Michael,

Thanks for your quick response outlining the ongoing policy and resource review at DoDEA.

However, I would still like to know which specific books/resources have been removed from circulation across DoDEA Information Centers/libraries. Dr. Narvaez stated in her letter that "a small number" of books had been pulled for further review; I am simply asking for the titles of these books so that I can be better informed as to the impact of these ongoing changes.

As a parent of two students currently in DoDEA schools, I am hoping to receive a direct answer without having to FOIA my own school system.

**JA159**

USCA4 Appeal: 25-2497    Doc: 24    Filed: 03/30/2026    Pg: 165 of 283
Case 1:25-cv-00637-PTG-IDD    Document 10-23    Filed 05/07/25    Page 36 of 40
PageID# 405

Thanks,

-Paul Keeley

On Feb 14, 2025, at 4:35 PM, Americas PAO <americaspao@dodea.edu> wrote:

Good afternoon LtCol and Mrs. Keeley,

Thank you for reaching out.
DoDEA is reviewing its current policies and instructional resources in light of recent Executive Orders and Department of Defense guidance. Teaching students about the lives and experiences of people from different backgrounds than their own is part of the high-quality education DoDEA offers. However, there are some resources that appear to be in violation of the spirit of recent directives. DoDEA is reviewing its library collections for compliance as part of a larger review.
We anticipate little to no impact on students learning in an academically rigorous environment, continuing to provide the highest quality educational services to all our military-connected students. While ensuring each learner receives appropriate guidance to excel at their own pace and in their own way.
We appreciate your continued partnership in your child's education.

v/r
Michael
Michael O'Day
Americas Communications Director
Department of Defense Education Activity
700 Westpark Drive Peachtree City, GA 30269
(706) 715-9683
Media Inquiries: AmericasPAO@dodea.edu

DVIDS - Department of Defense Education Activity Americas
"Fostering Understanding One Story at a Time!"

---

**From:** Kolodziej, Benjamin Mr. CIV OSD/DoDEA-Americas <Benjamin.Kolodziej@DODEA.EDU>
**Sent:** Friday, February 14, 2025 4:24 PM
**To:** Paul Keeley <keeleyp1@gmail.com>; Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas <Lynsey.Lee@DODEA.EDU>; Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas <Pamela.Westbrook@DODEA.EDU>
**Cc:** Lindsey N. Keeley <lindseykeeley44@gmail.com>; Americas PAO <americaspao@dodea.edu>
**Subject:** RE: Clarification on withdrawn books?

Good Afternoon, LtCol and Mrs. Keeley!

Thank you for your inquiry. All questions regarding DoDEA Information Centers should be directed to AmericasPAO@DoDEA.edu . They are copied on this message.

**JA160**

I hope you enjoy a wonderful holiday weekend and many thanks for your continued partnership!

Ben Kolodziej
Acting Principal
Crossroads ES

---

**From:** Paul Keeley <keeleyp1@gmail.com>
**Sent:** Tuesday, February 11, 2025 9:27 PM
**To:** Kolodziej, Benjamin Mr. CIV OSD/DoDEA-Americas <Benjamin.Kolodziej@DODEA.EDU>; Lee, Lynsey Dr. CIV, OSD/DoDEA-Americas <Lynsey.Lee@DODEA.EDU>; Westbrook, Pamela Dr. CIV OSD/DoDEA-Americas <Pamela.Westbrook@DODEA.EDU>
**Cc:** Lindsey N. Keeley <lindseykeeley44@gmail.com>
**Subject:** Re: Clarification on withdrawn books?

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Hello, just checking to see if there is any further insight you can share on this, and adding in Drs. Lee and Westbrook. As parents of two students at CES PII ████████████ we are following up on the message yesterday from Dr. Narvaez notifying us that a number of books have been withdrawn from DoDEA libraries/Information Centers. Can you confirm if this action affects Crossroads, and also provide the specific list of titles that are under consideration? We have not been able to find any further information on DoDEA or Crossroads websites, and would like to know how these new policies will be affecting our childrens' education both at Crossroads and beyond.

Thanks,

-Paul and Lindsey Keeley

On Mon, Feb 10, 2025 at 8:56 PM Paul Keeley <keeleyp1@gmail.com> wrote:

> Good evening,
>
> As parents of two students at CES, we received an email earlier today from DoDEA notifying us that a number of books have been withdrawn from DoDEA libraries. In the interest of transparency for our children's education, can you confirm if this action affects Crossroads, and also provide the specific list of titles?
>
> Thanks,
>
> -Paul and Lindsey Keeley
>
> Sent from my iPhone

**JA161**

# EXHIBIT E

**Email Details**

| From: | foia@dodea.edu |
|---|---|
| To: | keeleyp1@gmail.com |
| Cc: | |
| Bcc: | |
| Subject: | DoDEA FOIA Interim Response to FOIA Request Case Number 25-F-00155 |
| Date Sent: | 4/18/2025 10:08:39 AM |
| Attachments: | |
| Body: | |

Dear Paul Keeley:

 This letter is in regard to your Freedom of Information Act (FOIA) request dated March 04, 2025, which I received March 05, 2025, for a copy of "all submissions, lists, or catalogs of items removed from the student-accessible holdings of any DoDEA library and placed into the professional holdings of any DoDEA library during the course of the Operation Review for compliance described in the Message to Parents from Dr. Narvaez dated 10 February. This request is specifically for all additional items not already included in Attachment A to the DoDEA HQ Memo dated 5 February, and is intended to capture all items identified by educators/school leaders to District ISS, which should have also been shared with HQ ISS for addition to the compliance review. (Date Range for Record Search: From 01/20/2025 To 03/04/2025)".

Your request has been assigned FOIA case number 25-F-00155.

We are currently unable to meet the 20-business day suspense.  We are currently estimating a completion date of May 18,2025.  The Agency is working as quickly as possible to process your request.

Please note, you have the right to seek dispute resolution service from the OSD FOIA Public Liaison, Ms. Toni Fuentes at 571-372-0462, email at OSD.FOIALiaison@mail.mil.  Additionally, you may contact the Office of Government Information Services (OGIS) to inquire about the FOIA mediation services they offer. The contact information for OGIS is: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769 for any further assistance and to discuss any aspect of your request.

If you have any questions, please feel free to contact our office at FOIA@hq.dodea.edu.

Sincerely,  **JA163**

Freedom of Information Act/Privacy Act

Requester Service Center

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG; L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense, <br><br> Defendants. | Case No. 1:25-cv-00637-PTG-IDD <br><br> Hon. Patricia Tolliver Giles |

## DECLARATION OF JESSICA HENNINGER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Jessica Henninger, declare as follows,

1.      The facts set forth in this declaration are based on my personal knowledge.

2.      This declaration is made in my personal capacity as a parent, and it is not intended to, nor does it represent the position of the United States Government, the Department of Defense (DoD), or any of the Armed Services.

1

**JA165**

3. My spouse is an active-duty enlisted service member currently stationed at Fort Campbell, Kentucky where we have lived since October, 2024. We expect to be stationed at Fort Campbell for 3 years.

4. My spouse and I have three children who are currently attending (for the 2024-2025 school year) Barsanti Elementary located at 7409 McAuliffe Loop, Fort Campbell, Kentucky 42223-6025. Barsanti Elementary is a DoD Educational Activity (DoDEA) school and our children O.H., S.H., and H.H. are in pre-Kindergarten, Kindergarten, and fourth grade, respectively. During my spouse's active duty military service, we have also been stationed at Fort Meade, Maryland, and Vicenzo, Italy. I also have two older adult children who attended public schools in Wisconsin before attending (and ultimately graduating from) DoDEA schools in 2022 and 2024.

5. We intend for our three school-aged children to continue attending a DoDEA school throughout the duration of this duty station. After my spouse completes this duty station, we also intend to enroll our children in available DoDEA schools, if any, at the next duty station.

6. We place a great deal of importance on the value of our children's education. Personally, I attended and graduated from Waupaca High School in Wisconsin before going on to receive my Bachelor of Fine Arts degree in Theatre Performance and Costume Design from Viterbo University in LaCrosse, Wisconsin. I also obtained my Associate Degree in Nursing from Fox Valley Technical College in Appleton, Wisconsin.

7. Our general experience with DoDEA education has thus far been positive. Up until January, the curriculum was in keeping with academic standards that we believed were comparable to the best public-school systems nationwide. And it has been my experience that all of our children who have attended DoDEA schools have had excellent experiences with their teachers and staff, and each have enjoyed excellent student-teacher ratios and individualized attention.

2

**JA166**

8.   We value the student body diversity at DoDEA schools, as well the excellent education DoDEA schools have provided because we believe that those aspects will help prepare our children for future success.

9.   At Barsanti Elementary specifically, all three of our children attending Barsanti have thrived there. They do well both academically and socially. They frequently avail themselves of age-appropriate books at Barsanti Elementary's library where they have been exposed to books on various topics.

10.   Since the signing of President Trump's Executive Orders targeting Diversity, Equity, and Inclusion, however, we have become very concerned with the negative impacts to our children's current and future education in DoDEA schools.

11.   Specifically, I am aware that earlier this year the White House issued two Executive Orders that have been cited by DoDEA as justifications for various changes that have been implemented in our school. Those Executive Orders are Executive Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; and Executive Order No. 14190, Ending Radical Indoctrination in K-12 Schooling.

12.   Additionally, I am aware that on January 27, 2025, the White House issued Executive Order No. 14185, Restoring America's Fighting Force. This order was followed two days later by Secretary Hegseth's memorandum of the same name, which in part placed a "[p]rohibition on Instruction on Critical Race Theory, Gender Ideology, and [Diversity, Equity, and Inclusion]," specifically forbidding any element within DoD from providing instruction on these topics as part of a curriculum.

13.   And I am aware that on February 7, 2025, DoDEA received guidance from the Secretary of Defense prohibiting the use of "official resources" to "host celebrations or events

3

**JA167**

related to cultural awareness months." In accordance with that directive, a then-ongoing Black History Month assignment for my child's fourth grade class was cancelled.

14.     Specifically, O.H. had chosen Maya Angelou as the subject of her Black History Month project. She completed the research and prepared her presentation when the program was abruptly cancelled. That cancellation deprived O.H. of the opportunity to deliver her presentation and share her research about Ms. Angelou's life and contributions in a Black History Month program at school, and of the opportunity to observe and learn from her classmates' presentations about their chosen subjects for the school's live wax museum program.

15.     Because my two younger children are in kindergarten and pre-kindergarten, I am less certain about the direct impact on their curriculum. Nevertheless, I am very concerned about their future DoDEA education.  I believe that the removal of these curricular materials, the cancellation of Black History Month and similar programs, and the removal of books has negatively impacted my children's future ability to obtain a high-quality education at their DoDEA school.

16.     I am concerned that the current and future quality of DoDEA education is being, and will be, harmed because the recent changes reflect political decisions unrelated to their educational impact. Further, these changes in DoDEA educational offerings, whether curricular or library materials, are resulting in my children receiving less exposure at school to people whose experiences are different from their own. I believe that these changes negatively affect the accuracy of information being disseminated about American history through the censorship politically disfavored viewpoints. And I further believe that exposure to information about people whose experiences differ, whether due to gender identity, race, or some other reason, helps children learn to be more empathetic and to think critically beyond the realm of their own experiences.

4

**JA168**

17.     Further, on February 10, 2025, DoDEA Headquarters informed parents of DoDEA students, including myself, that it was conducting "an operational compliance review to ensure alignment with" the Executive Orders identified above. As part of that review, DoDEA notified us that library books "potentially related to gender ideology or discriminatory equity ideology" were examined and that its "curriculum and instruction team" identified a number of items "for further review."

18.     Following receipt of the above letter, I directed several emails to Barsanti Elementary administrators requesting clarification about what changes were occurring as a concerned parent, but have not received specific responses about what materials have been removed from the library or what other changes were occurring (other than the cancellation of my fourth grader's Black History Month project and the removal of immigration-related content).

19.     As a result of these Executive Orders, Office of the Secretary of Defense guidance, and implementing DoDEA memoranda, Barsanti Elementary has changed the curriculum, prohibited learning about African Americans', women's, and other marginalized groups' history and culture, and removed books and other materials from classrooms and libraries.

20.     Furthermore, these changes have been conducted in haste, behind closed doors, reflect ideological screening criteria as opposed to academic standards, and without adequate notice to parents, including myself.

21.     Also, before and after filing this suit, I have communicated with Megan Jebeles, who is the parent and next friend of E.G., a 4th grade student at Barsanti Elementary. She has conveyed to me her concerns about the educational impact upon her 4th grader caused by the Executive Orders and memoranda mentioned above, including the curriculum changes and removal of library books. She expressed that she, too, objects to E.G.'s decreased exposure to

5

**JA169**

diverse life experiences caused by these changes, as well as the fact that the curriculum and library decisions negatively impact the quality of education and are being made for reasons other than an educational purpose.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on this the 1st day of May, 2025.

Jessica Henninger

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

<table>
<tr><td>

E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG;  L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY,

Plaintiffs,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,

Defendants.

</td><td>

Case No. 1:25-cv-00637-PTG-IDD

Hon. Patricia Tolliver Giles

</td></tr>
</table>

**DECLARATION OF ANNA YOUNG IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Anna Young, declare as follows,

1.      I am more than 18 years old, competent to be a witness, and the facts set forth in this declaration are based on my own personal knowledge.

**JA171**

2. This declaration is made in my personal capacity as a parent, and it is not intended to, nor does it represent the position of the United States Government, the Department of Defense (DoD), or any of the Armed Services.

3. I am married to an active-duty service member stationed at the Aviano Air Base in Aviano, Italy. I have four children, two of whom, E.Y. and C.Y., attend Aviano Middle-High School on the Air Base in Aviano, Italy. Aviano Middle-High School is a Department of Defense Education Activity ("DoDEA") School. E.Y. is in the ninth grade, and C.Y. is in the eleventh grade. I take an active role in my children's education and regularly volunteer in their school programs.

4. I grew up in California and have lived in various states across the U.S., as well as internationally. Since getting married, our family has been stationed at multiple Air Bases around the world, including in Japan, South Korea, Germany, and Italy. Frequent relocations have been a consistent part of our journey as a military family. Overall, E.Y. has moved five times; she has attended three elementary schools, two middle schools, and one high school. C.Y. has moved six times and attended three elementary schools, one middle school and one high school.

5. C.Y. began in DoDEA schools as a kindergartener in Osan, AB South Korea and E.Y. began in the second grade in Spangdahlem, AB Germany. As a family, we have occasionally chosen to enroll E.Y. and C.Y. in alternative educational programs. Nonetheless, I have consistently valued the availability of consistent, high-quality DoDEA schools.

6. Similarly, E.Y. and C.Y. appreciate the numerous opportunities available to them and the ease of access to these opportunities at their DoDEA schools. C.Y. enjoys her AP Psychology class and takes pleasure in reading the U.S. History textbook. This school year, E.Y.

**JA172**

was limited to taking AP courses available to her grade level, but she plans to enroll in a wider variety of courses as she progresses.

7.      E.Y. is an avid reader, with a particular interest in historical fiction and classic novels. As a parent, I am committed to nurturing my daughters' curiosity. We maintain a home library that includes numerous banned books, which E.Y. frequently explores. Given the recent changes in the school's library collection and my daughters' curriculum, the importance of our home library and the broad access it provides for my children has increased significantly.

8.      Over the years, E.Y. and C.Y. have actively participated in a variety of extracurricular activities offered through their DoDEA schools. Both are members of the National Honor Society. C.Y. has played basketball and volleyball, and she has been involved with the cross-country club. She serves in Student Government, representing the entire school, as well as in Class Government, representing her class. E.Y. has played volleyball and soccer, is a member of the Red Cross Club, and has participated in the Robotics Club. Most of these activities are provided through the school, except for the Red Cross, which is organized through the Base.

9.      Over the course of approximately eight years that my children have attended DoDEA schools, our family has benefited from excellent teachers who have consistently gone above and beyond to support my daughters, encouraging them to reach their full potential. For instance, E.Y.'s sixth-grade mathematics teacher recognized her aptitude in math and provided her with advanced materials, despite the absence of a formal advanced math program in middle schools. Furthermore, I appreciate the small class sizes, which ensure that C.Y. and E.Y. receive substantial support in both their academic pursuits and extracurricular activities. In my experience, most of the faculty and staff are familiar with nearly every student, contributing to a close and tight-knit school environment.

10. As a parent, I also greatly value the multicultural experiences my children have encountered. I believe these experiences have helped them become well-rounded individuals who are empathetic, open-minded, and capable of connecting with people from diverse backgrounds with respect and curiosity. Until recently, C.Y. and E.Y. regularly participated in cultural celebrations in each country where we lived. These celebrations are typically organized through their DoDEA schools and include observing cultural holidays and traditions of the host country, as well as exposure to several new languages, among other activities.

11. Earlier this year, the White House issued three Executive Orders that DoDEA has cited as justification for the changes we are starting to see in our school. Those Executive Orders are Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; Order No. 14185, Restoring America's Fighting Force and Order No. 14190, Ending Radical Indoctrination in K-12 Schooling (collectively, with the "Executive Orders").

12. On February 12, 2025, I requested a copy of the materials selected for review/removal at Aviano Middle-High School. The school principal told me that items were under operational review and that no books had yet been removed from the school. I followed-up but was never provided with a list of materials relocated for review. Despite this lack of transparency, I have been able to confirm that books have in fact been removed from DoDEA school libraries. When I again followed up with an administrator, I was told that the books are still available, but only to DoDEA employees. This is clearly a restriction on my children's access to information.

13. On March 3, 2025, I received an email from DoDEA Europe about curriculum changes to Advanced Placement Psychology – a course C.Y. is currently enrolled in. The email

**JA174**

stated that Module 32 on Gender and Sex was going to be removed. Fortunately, C.Y.'s teacher had already covered this unit. However, due to the curriculum changes, the teacher was unable to review the materials at the end of the year, as she typically would, to prepare students for the exam. I am worried this lack of review will place C.Y. at a disadvantage compared to other students taking the A.P. Psychology exam who will benefit from the holistic end of year review of materials on *all* topics. Such a holistic review was not available to C.Y. because of the curriculum changes at DoDEA schools. Additionally, if E.Y. decides to take AP Psychology in her sophomore, junior, or senior year, she will not have access to this important information.

14.     E.Y. has been quite disappointed by her school's decision to restrict access to information. In response, she participated in a walkout at school to protest the changes to the curriculum and reading materials. E.Y. was one of six freshmen students who took part in the walkout. C.Y. would have participated in the protest, but she was unable to attend school that day because she was sick.

15.     C.Y. informed me that the Gay Straight Alliance (GSA) has been disbanded. She has also noticed other changes in the usual school routine. Typically, during Black History Month and Women's History Month, administrators make announcements featuring fun facts or quotes related to historical figures or significant events. Unfortunately, these announcements were canceled this year. Additionally, the posters and decorations that are normally displayed in the hallways have been removed. In one instance, a teacher was told to remove decorations and posters of women and African American historical figures. Lastly, Asian American and Pacific Islander Heritage Month, which is usually celebrated to honor the heritage of service members from those backgrounds, is unlikely to be commemorated this year. C.Y. is disappointed by the absence of these celebrations and commemorations.

16.     My husband intends to retire in Summer 2026. By that time, C.Y. will graduate from Aviano Middle-High School. E.Y., however, will be beginning her junior year. Whether E.Y. would continue in DoDEA schools is dependent on the job opportunities available to my husband at that time and our evaluation of the options available for E.Y.'s education.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on May 6, 2025.

_/s/ Anna Young_
_____
Anna Young

**JA176**

# ECF ATTESTATION

I, Matthew Callahan, am the ECF User whose ID and password are being used to file this

document. I have obtained authorization to file this document from Anna Young, declarant.

/s/ Matthew Callahan
Matthew Callahan
ACLU OF VIRGINIA FOUNDATION
*Attorney for Plaintiffs*

**JA177**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER; E.G., a minor, by and through his parent and next friend MEGAN JEBELES; E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG; L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense, <br><br> Defendants. | Case No. 1:25-cv-00637-PTG-IDD <br><br> Hon. Patricia Tolliver Giles |

**DECLARATION OF ANNA KENKEL IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Anna Kenkel, declare as follows,

1.      I am more than 18 years old, competent to be a witness, and the facts set forth in this declaration are based on my own personal knowledge.

2.      This declaration is made in my personal capacity as a parent, and it is not intended

1

**JA178**

to, nor does it represent the position of the United States Government, the Department of Defense (DoD), or any of the Armed Services.

3.  I am married to an active-duty service member stationed at the Misawa Air Base in Japan.

4.  We have four children, three of whom currently attend DoD Educational Activity (DoDEA) schools on the Misawa Air Base. We have had at least one child in a DoDEA school since 2017. Currently, L.K. 1 is in fourth grade and L.K. 2 is in sixth grade at Sollars Elementary School. L.K. 3 is in eighth grade at Edgren Middle High School. My youngest child is two years old and not yet in school.

5.  My two youngest daughters, L.K. 1 and L.K. 2, do gymnastics and drama. Their DoDEA teachers are supportive of their interests. My oldest daughter, L.K. 3, is a passionate and involved student. She is a member of the student counsel, participates in drama, and she plays tennis. All of these activities, with the exception of gymnastics, are run through my daughters' DoDEA schools.

6.  Until recently, my family has had a great experience with DoDEA schools. My daughters love school and are passionate about learning. I have also experienced the high-quality, well-rounded DoDEA education firsthand: I attended a DoDEA elementary school in The Philippines, as a child, and I worked as a DoDEA teacher in Japan from 2009 through 2010. I also currently volunteer as the Secretary for the Parent Teacher Organization at Sollars Elementary. As PTO Secretary, I help run book fairs, fundraisers, and other school events, often collaborating with teachers and others from the school community. My role provides me visibility into the school, and as a result, I am very familiar with the contents of the school library and the educational programming at the school.

**JA179**

7.      One of the things I have always appreciated most about DoDEA is the high value placed on diversity and learning from difference. We are part of a school community full of people who appreciate the opportunity to live overseas and learn about and celebrate a variety of cultures. Many parents, including myself, choose to send their children to DoDEA schools for that type of enrichment. The DoDEA schools I have had experience with as a student, parent, teacher, and volunteer have celebrated their multi-culturalism. Because of the current administration's attacks on all things Diversity, Equity, and Inclusion (DEI), this rewarding and appealing aspect of DoDEA schools and students' experiences is being harmed.

8.      Earlier this year, the White House issued three Executive Orders that DoDEA has cited as justification for the changes we are starting to see in our school. Those Executive Orders are Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; Order No. 14185, Restoring America's Fighting Force and Order No. 14190, Ending Radical Indoctrination in K-12 Schooling (collectively, the "Executive Orders").

9.      We have since learned that many high-quality books would be removed from DoDEA schools, purportedly in compliance with these orders. My daughter in eighth grade (L.K. 3) is interested in reading some of the books. On the day we found out the books would soon be removed, L.K. 3 tried to check out some of the books from the school library. The school librarian scolded her, refusing to allow her to check out the books. This caused my daughter great distress. Since then, she has not been able to check out those books, which included *The Giver* by Lois Lowry, *Nineteen Eighty-Four* by George Orwell, and *Ground Zero* by Alan Gratz. These books have since been removed from the school library and they have been unavailable since February 2025. Her favorite book, *A Handmaid's Tale* by Margaret Atwood, has also been removed.

3

**JA180**

10.    L.K. 1 and L.K. 2 have also already had dozens of books purportedly related to "gender ideology" removed from their school library. Although I have not been able to verify all of the contents, I received a list of the books removed and have been able to confirm that at least some of the books on this list are no longer in the library, including, for example, *No Truth Without Ruth: The Life of Ruth Bader Ginsberg* and *Finding Wonders: Three Girls Who Changed Science.* These are age-appropriate books that teach children about prominent historical figures' lives. They are being removed simply because the historical figures are women. A true and correct copy of the list of removed books I received is attached as **Exhibit A.**

11.    L.K. 3 (my eighth grader) is an avid reader and has been very upset by the removal of books and curricular materials from her school. She helped organize and participated in two walkouts to protest the changes at her school. She was the only middle school student to participate in the second walkout. After her participation, L.K. 3 was called into the principal's office and reprimanded.

12.    My daughters' schools have also made changes to the curriculum in response to the Executive Orders. For example, L.K. 1 (my fourth grader) has already had curricular materials relating to immigration removed from her class. Lesson 3 titled "The Peopling of the United States" has been removed. The reading associated with this lesson was *A Nation of Immigrants* by John F. Kennedy.

13.    L.K. 2 (my sixth grader) has also suffered irreparable harm from having important information withheld from her health curriculum. She is being denied access to critical information about physical wellbeing and health. These changes could also affect my other daughters. It is my understanding that the Physical Education Teacher at Edgren Middle High School was required to teach sexual education, and he refused to teach the lesson because of his religious beliefs.

4

**JA181**

14.     The curricular changes extend to cultural celebrations at my daughters' DoDEA schools as well. Previously, multicultural holidays were integrated into the DoDEA curriculum. For example, at the end of the year, the students have historically put together a cultural performance. This was a highlight for students and families. Even though the celebration often focused on Hispanic culture, *all* students participated. These opportunities for cultural exchange and engagement are some of my favorite things about DoDEA schools.

15.     This year, after the Executive Orders, the teachers at Sollars Elementary School took down a bulletin board celebrating Black History Month and Women's History Month. Many cultural celebrations were also cancelled. The only cultural celebrations allowed have been those considered to be "host nation" celebrations. A packet on Black history was also removed from the curriculum for L.K. 2. This packet included a resource titled "My Friend in Learning Professional Learning - New for You Seasonal Bundle: Black History Month 2025." My daughters are being denied the opportunity to learn about the history of historically marginalized people in the United States.

16.     My daughters have also been particularly negatively impacted by the cancellation of Holocaust Remembrance Day. My husband is half-Jewish and has relatives who were killed during the Holocaust. I am worried that my daughters and their classmates will miss out on important historical information and lose the chance to see their family history reflected in the curriculum.

17.     Because my youngest child is not yet enrolled in school, he has not been directly impacted by the book and curriculum removals at DoDEA schools.  He is biracial, however, and the cancellation of Black History Month and likely cancellation of Juneteenth celebrations has negatively impacted our family acutely. It is very important to our family to learn about and

**JA182**

celebrate Black history and culture. In the past, DoDEA schools have celebrated Juneteenth. I have requested information on whether Juneteenth will be celebrated this year but have not yet received an answer.

18. My three older children are very upset by their schools' recent refusal to recognize heritage months and restrict their access to culturally inclusive books and materials. I believe that the removal of these curricular materials, the cancellation of Black History Month and similar programs, and the removal of books has severely impacted all of my children's opportunity to obtain a high-quality education at their DoDEA school.

19. Individual school leaders seem to be doing their best to serve their students and continue providing a well-founded education. However, I continue to worry that the President's Executive Orders will require the removal of more high-quality, age-appropriate materials and books from my children's schools.

20. The changes have been made without notification, transparency, or input from parents, which I believe is a violation of DoDEA's legal obligations. In early March 2025, I submitted a Freedom of Information Act (FOIA) request to DoDEA seeking information regarding the recent book and curriculum removal reviews and potential removals of curricula and library materials in DoDEA schools. I received acknowledgment of my request from the FOIA office. Although I was promised a response within 20 days, as required by the administrative rules of the FOIA program, I have not received any of the requested information. Attached as **Exhibit B** are true and correct copies of my correspondence with the FOIA office regarding this request.

6

**JA183**

Case 1:25-cv-00637-PTG-IDD    Document 10-26    Filed 05/07/25    Page 7 of 18 PageID# 429

21.   The school and curriculum changes have weighed very heavily on my daughters. They are worried about their and their friends' ability to receive a high-quality education in DoDEA schools given the ongoing censorship of diverse viewpoints.

22.   Since the signing of President Trump's Executive Orders targeting DEI, I have become very concerned with the negative impacts on my children's current and future education in DoDEA schools. The changes I have seen in my daughters' schools have deprived them of a well-rounded education, and my family fears the situation will only get worse. Before the Executive Orders, our family decided that my husband would retire in the fall. In the wake of the Executive Orders and related DoDEA actions, I am now confident that we made the right decision because despite my love for DoDEA schools, they cannot provide the same high-quality education that I have known.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on _MAY 6_, 2025 at _MISAWA, JAPAN_.

_Anna Kenkel_
Anna Kenkel

7

**JA184**

# EXHIBIT A

37 basket items for **gender ideology**

| Cover | Type | Title | Author | Branch | Collection | Call Number | Status |
|---|---|---|---|---|---|---|---|
| | | Drum dream girl : how one girl's courage changed music | Lo?pez, Rafael, Engle, Margarita | Library | | E ENG | Available |
| | | The ghost of Sir Herbert Dungeonstone | McMullan, Kate, Basso, Bill | Library | | F MCM | Available |
| | | Finding wonders : three girls who changed science | Atkins, Jeannine | Library | | F ATK | Available |
| | | Madam President | Smith, Lane | Library | | E SMI | On Loan |
| | | Bella at midnight | Ibatoulline, Bagram, Stanley, Diane | Library | | F STA | Available |
| | | Who has what? : all about girls' bodies and boys' bodies | Westcott, Nadine Bernard, Harris, Robie H | Library | | 612.6 HAR | Available |
| | | Nobody's princess | Friesner, Esther M | Library | | F FRI | Available |

**JA186**

| Cover | Type | Title | Author | Branch | Collection | Call Number | Status |
|---|---|---|---|---|---|---|---|
| | | Interstellar Cinderella | Underwood, Deborah, Hunt, Meg | Library | | E UND | Available |
| | | The trouble with May Amelia | Holm, Jennifer L, Gustavson, Adam | Library | | F HOL | Available |
| | | The curious world of Calpurnia Tate | Kelly, Jacqueline | Library | | F KEL | Available |
| | | Shabanu : daughter of the wind | Staples, Suzanne Fisher | Library | | F STA | Available |
| | | Our only May Amelia | Holm, Jennifer L | Library | | F HOL | Available |
| | | Crane | Stone, Jeff | Library | | F STO | Available |
| | | Palace of stone | Hale, Shannon | Library | | F HAL | Available |
| | | Jane and the dragon | Baynton, Martin | Library | | E BAY | Available |

JA187

| Cover | Type | Title | Author | Branch | Collection | Call Number | Status |
|---|---|---|---|---|---|---|---|
| | | Julia?n is a mermaid | Love, Jessica | Library | | E LOV | Available |
| | | Hour of the Olympics | Murdocca, Sal, Osborne, Mary Pope | Library | | F OSB | Available |
| | | Mickey & me | Gutman, Dan | Library | | F GUT | Available |
| | | Hannah Pritchard : pirate of the Revolution | Pryor, Bonnie | Library | | F PRY | Available |
| | | Let the games begin! | McPhillips, Robert, Quinn, Jordan | Library | | F QUI | Available |
| | | Palace of stone | Hale, Shannon | Library | | F HAL | Available |
| | | Chu Ju's house | Whelan, Gloria | Library | | F WHE | Available |
| | | Punxsutawney Phyllis | Hill, Susanna Leonard, Ebbeler, Jeffrey | Library | | E HIL | Available |

JA188

| Cover | Type | Title | Author | Branch | Collection | Call Number | Status |
|---|---|---|---|---|---|---|---|
| | | The best beekeeper of Lalibela : a tale from Africa | Jenkins, Leonard, Kessler, Cristina | Library | | E KES | Available |
| | | The terracotta girl : a story of ancient China | Hu, Caroline, Gunderson, Jessica | Library | | F GUN | Available |
| | | Freckleface Strawberry : best friends forever | Moore, Julianne, Pham, LeUyen | Library | | E MOO | Available |
| | | My 13th season | Roberts, Kristi | Library | | F ROB | Available |
| | | Dragon dreams | Florian, Melanie, Rennert, Laura | Library | | F REN | Available |
| | | Batcat. 1 | Ramm, Meggie | Library | | 741.5 RAM | Available |
| | | Rapunzel lets her hair down | Warburton, Sarah, Bradman, Tony | Library | | F BRA | On Loan |
| | | Bone detectives | Townsend, John | Library | | 614 TOW | Available |

JA189

Case 1:25-cv-00637-PTG-IDD Document 10-26 Filed 05/07/25 Page 13 of 18 PageID# 435

| Cover | Type | Title | Author | Branch | Collection | Call Number | Status |
|---|---|---|---|---|---|---|---|
| | | Sally Ride | Abawi, Atia, Flint, Gillian | Library | | 921 RID | Available |
| | | No truth without Ruth : the life of Ruth Bader Ginsburg | Krull, Kathleen, Zhang, Nancy | Library | | 921 GIN | Available |
| | | Regarding the trees : a splintered saga rooted in secrets | Klise, M. Sarah, Klise, Kate | Library | | F KLI | Available |
| | | Home base : a mother-daughter story | Kath, Katie, Tate, Nikki | Library | | E TAT | Available |
| | | If the world were 100 people | McCann, Jacqueline, Cushley, Aaron | Library | | 304.6 MCC | Available |
| | | Be your true self | Gonzalez, Maribel Valdez | Library | | 155.2 GON | Available |

JA190

# EXHIBIT B

Case 1:25-cv-00637-PTG-IDD    Document 10-26    Filed 05/07/25    Page 15 of 18 PageID# 437

**From:** FOIA/PA Requests <FreedomofInformationActPARequests@dodea.edu>
**Date:** March 6, 2025 at 3:54:15 AM GMT+9
**To:** anna.kenkel@gmail.com
**Subject: Acknowledgement to FOIA Request Case Number 25-F-00157**

Dear Anna Kenkel:

This letter is to acknowledge receipt of your Freedom of Information Act (FOIA) request dated March 04, 2025, which I received March 05, 2025, for a copy of "5 March 2025 FOIA Officer Civil Rights Program Department of Defense Education Activity (DoDEA) 4800 Mark Center Drive Alexandria, VA 22350-1400 Subject: FOIA Request for Records Related to the Review and Potential Removal of Curricula and Library Materials Dear FOIA Officer, Pursuant to the Freedom of Information Act (5 U.S.C. § 552), I hereby request access to and copies of all records and documents, including but not limited to internal communications, meeting minutes, policies, criteria, and procedural guidelines regarding the recent reviews and potential removals of curricula and library materials in DoDEA schools. Specifically, I am interested in records that address the following areas: 1. Review Process: - The criteria and guidelines used to assess and determine which curricula and library materials are subject to review or removal. - Documentation detailing the transparency and decision-making process associated with these reviews. 2. Compliance with the Executive Order on Diversity, Equity, and Inclusion (DEI): - Any records that explain how DoDEA's review and removal actions align with the mandates of the DEI Executive Order, particularly with respect to ensuring equitable representation of diverse perspectives and historical contexts. - Information regarding measures taken to ensure that these processes do not disproportionately limit access to materials representing marginalized or underrepresented communities. 3. Appeals or Complaints Process: - Documentation on the formal channels available for parents, educators, or community members to submit appeals or complaints regarding the removal of educational materials. - Any records relating to the implementation or outcomes of this process. If available in electronic format, please provide the records in that medium. If some records are withheld in part or in full, please provide a detailed justification for the denial, including the specific exemption(s) under FOIA that apply. Thank you for your prompt attention to this request. Please contact me at Anna.kenkel@gmail.com if you require any additional information or clarification regarding this request. Sincerely, Anna Kenkel DODEA Parent at Misawa AB, Japan".

Your request has been assigned FOIA case number 25-F-00157.

Under the administrative rules of the FOIA program, the agency has 20 working days from the date of this letter to respond to your request. It is important to note your request will be processed in the order it was received. Also, you are a considered a Private Individual requester, and as such, is entitled to 2 hours of search time to find request documents and 100 pages of copying free of charge. If charges exceed the amount stated, you will be contacted for approval before proceeding with the FOIA process.

Your request will be answered as quickly as possible. If you have any questions, please contact our office at FOIA@dodea.edu.

**JA192**

**JA193**

From: Anna Kenkel <anna.kenkel@gmail.com>
Sent: Monday, April 7, 2025 7:01 PM
To: FOIA/PA Requests <FreedomofInformationAct/PARequests@dodea.edu>
Subject: FOIA 25-F-00157

Case 1:25-cv-00637-PTG-IDD    Document 10-26    Filed 05/07/25    Page 16 of 18
PageID# 438

***This message originated from outside of DoDEA.***

Hello,

It has been over 20 working days and I have received a response.  Could you please follow the guidelines and provide a response?

Very Respectfully,

Anna Kenkel
Sent from my iPhone

**JA193**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG;  L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY,<br><br>                    Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,<br><br>                    Defendants. | Case No. 1:25-cv-00637-PTG-IDD<br><br>Hon. Patricia Tolliver Giles |

**DECLARATION OF NATALIE TOLLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Natalie Tolley, declare as follows,

1. I am more than 18 years old, competent to be a witness, and the facts set forth in this declaration are based on my own personal knowledge.

2. I am married to an active-duty service member stationed at the Aviano Air Base in Italy. My husband is in the Air Force, and he has been for the past fifteen years.

1

**JA194**

3. I have a PhD in Public Health. I am currently unemployed, but I worked at Temple University as a researcher from 2006 to 2008.

4. Of my husband's fifteen years in service, we have spent approximately half of them living overseas. We have been at Aviano Air Base since August 2022. Before that, our family was in Utah, Korea, and Colorado Springs. We've also spent time stationed at the Misawa Air Force Base in Japan from 2015 to 2018.

5. My daughter, M.T., was enrolled in Department of Defense Education Activity (DoDEA) school at Misawa and she is now in the eleventh grade at Aviano Middle-High School in Aviano, Italy. Aviano Middle-High School is a DoDEA school.

6. Our experience with DoDEA schools has generally been positive; the principal and teachers are usually accessible.

7. M.T.'s favorite class is history. She enjoys learning about ancient civilizations and their mythologies. M.T. loves reading and being in the library. Her favorite books are Percy Jackson and similar fantasy and mystery books. M.T. has enjoyed the wide variety of extracurricular activities available through her school – she has participated in three school plays, cross-country, track, soccer, choir, and violin. M.T. excelled in choir and she qualified for the DoDEA All-Europe Choir and String Ensemble.

8. I am similarly engaged in my children's education. I served as the Secretary of the School Advisory Committee (SAC) from September 2022 to October 2023.

9. On March 3, 2025, I received an email from DoDEA Europe about curriculum changes to Advanced Placement Psychology – a course M.T. is currently enrolled in. The email stated that the unit covering gender was going to be removed. I

2

**JA195**

reached out to the course's teacher and the principal for clarification. They were both surprised and informed me that they had not yet been notified of the changes. I continued to follow up with the principal about the pending changes to M.T.'s class, but did not receive additional information.

10. On March 6, 2025, I attended an SAC meeting. The book removal process was in its early stages and there was robust discussion about the decision to remove books based on the Executive Orders and the impact it would have on our children's education and experiences. At this meeting, the principal informed all parents that decision-making regarding book quarantines is being done at a regional level. The principal said that of the twenty-two thousand books in the library, they are likely to remove approximately eighteen books. I think the removal of eighteen books simply based on President Trump's disagreement with the ideology of these books is too much.

11. On March 7, 2025, the principal of Aviano Middle-High School sent families a letter from Michelle Howard-Brahaney, attached as **Exhibit A**. This letter informed parents that DoDEA was reviewing its policies and resources to ensure compliance with Executive Orders and DoD policies. In part, the letter stated, "[s]chools have completed their review of library materials, and these materials are currently being reviewed at the Region/ HQ levels. We are examining materials in each Information Center (school libraries) that may relate to gender ideology or discriminatory equity ideology, as defined in the Executive Order 14190, 'Ending Radical Indoctrination in K-12 Schooling.'"

**JA196**

12. On March 14, 2025, I emailed the librarian to ask if we could discuss the DoDEA guidance on book removals. She responded on March 21, 2025, telling me that all communication on this topic would come from our principal.

13. In previous years, multi-cultural curricula have been robust at Aviano Middle High School. Black History Month lessons included biographical studies on Black historical figures like Ruby Bridges, Rosa Parks, and Martin Luther King Jr. There were no events held for Black History Month this year. Women's History Month was also cancelled, and this was especially hard as a mother of three daughters. I identify as Asian American, and we expect that Asian American and Pacific Islander Heritage Month will not be celebrated in May.

14. Teachers have also been forced to change their classroom decorations in light of the Executive Orders. For example, a teacher removed wall decorations and posters of Malala Yousafzai and Frida Kahlo.

15. The students at Aviano Middle-High School have coordinated multiple walkouts to express their dissatisfaction with the changes being made. M.T. has participated in these walkouts, making signs to voice her disappointment.

16. Our family has at least one more Permanent Change of Station. I do not know where we will end up being stationed, but our family is hoping to be in the United States.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on May 5, 2025 at *Aviano*, *Italy*.

_____
Natalie Tolley

4

**JA197**

# EXHIBIT A



**DEPARTMENT OF DEFENSE
EDUCATION ACTIVITY EUROPE
UNIT 29649
APO AE 09136-9649**

7 March 2025

Dear Parents and Students,

At the heart of our mission is a commitment to provide the highest quality education and we recognize that this goal is achieved through strong partnerships with families. Partnering with parents/guardians is a cornerstone of academic success. Through communication and mutual feedback, we work together to address the needs of each student, ensuring a comprehensive and effective educational experience. Our commitment to providing the best education every day, everywhere, is grounded in this collaboration. By aligning with parents, we create a unified approach that supports students' growth and achievement.  Our focus remains on ensuring that every student receives a rigorous, high-quality education that prepares them for academic excellence and success in college, career, and the demands of the 21st century.

The Department of Defense Education Activity (DoDEA) is currently reviewing its policies and instructional resources to ensure compliance with recent Executive Orders and Department of Defense (DoD) policies. As a Department of Defense entity, we are committed to adhering to the guidance from the President and the Secretary of Defense.

**Cultural Observances:** On January 31, 2025, the Secretary of Defense issued guidance to all Department of Defense (DoD) components and Military Departments prohibiting the use of official resources to host celebrations or events related to cultural awareness months. As a DoD entity, DoDEA is adhering to this guidance.

However, events that directly support Host Nation language and culture classes, international exchanges, or other location-based cultural education efforts will continue as planned.

**Review of Library Materials:** Schools have completed their review of library materials, and these materials are currently being reviewed at the Region/ HQ levels. We are examining materials in each Information Center (school libraries) that may relate to gender ideology or discriminatory equity ideology, as defined in the Executive Order 14190, "Ending Radical Indoctrination in K-12 Schooling." It is important to note that no materials have been permanently removed from our school libraries. Some materials are temporarily relocated to the professional collection, where they will be reviewed by our staff, region and Headquarters. Access to these materials is currently limited to professional staff. We are working diligently to complete the thoughtful review process and will provide more information soon.

**Curriculum & Instruction:** DoDEA is conducting an operational compliance review of

**JA199**

curriculum resources. A small number of materials have been identified for further review. The use of these few items is paused until further guidance and to ensure that our curricular resources remain in alignment with current expectations. The small number of identified resources will not impact routine use of adopted materials or access to our standards. We will provide timely updates if any significant changes occur.

**Clubs and Extracurricular Activities:** DoDEA students retain the right to organize and participate in non-curriculum-related student groups. DoDEA students retain the right to convene student-sponsored, non-curriculum-related student groups with a DoDEA employee volunteer non-participating sponsor, in alignment with DoDEA's "Student Rights and Responsibilities" (DoDEA Administrative Instruction 1353.01, available on www.dodea.edu).

**Commitment to Open Communication:** We understand that these changes may raise questions. We are dedicated to maintaining open and transparent communication. DoDEA Europe will work with you and provide updates when they are available. As questions arise, please reach out to your school principal, district superintendent, or me.

Our priority remains providing a top-tier education that prepares students for success in an ever-changing world. The success of the DoDEA community is rooted in its people—students, educators, and families. We deeply appreciate your ongoing support and partnership.

Michelle Howard-Brahaney, Ph.D.
Director for Student Excellence

**JA200**

# DEX 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| E.K. and S.K., minors, by and through their parent and next friend, LINDSEY KEELEY, *et al.*, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:25-cv-637 (PTG/IDD) |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF TIMOTHY D. DILL

Pursuant to 28 U.S.C. § 1746, I hereby declare, under penalty of perjury as follows:

1. I am currently the official performing the duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)) of the Department of Defense ("Department"), headquartered in Washington, D.C. I have served in this position since January 22, 2025. The information below is based on my personal knowledge and information available to me in my role at the Department.

2. In this role, as established by DoD Directive 5124.10, "Assistant Secretary of Defense for Manpower and Reserve Affairs," March 14, 2018, I am the principal advisor to the Secretary of Defense, the Deputy Secretary of Defense, and the Under Secretary of Defense for Personnel and Readiness, on all matters related to manpower and reserve affairs, including civilian and military personnel policies; military community and family policy; Total Force manpower, requirements, and resources; and Reserve Component integration. Among other responsibilities, these include oversight of the Department of Defense Education Activity (DoDEA), a DoD

**JA202**

component established as a DoD Field Activity pursuant to 10 U.S.C. § 191 and its chartering Directive, DoD Directive 1342.20, "Department of Defense Education Activity (DoDEA)", July 7, 2020.

3. DoDEA operates the Department's prekindergarten through 12th grade educational school system for eligible dependents in certain areas of the United States pursuant to 10 U.S.C. §§ 2164-2164b and overseas pursuant to 20 U.S.C. §§ 921-932. DoD operates such a school system to further military readiness and the quality of life of service members so that they can be sure that their children will receive a quality education no matter where their military assignments may have them living. The DoDEA chartering directive, DoD Directive 1342.20, describes its mission as follows:

> "The mission of DoDEA is to provide an exemplary education by effectively and efficiently planning, directing, and overseeing the management, operation, and administration of DoDEA, which provides instruction from preschool through grade 12 to eligible dependents as prescribed by law and policy. In order to attain the highest levels of student achievement, DoDEA uses performance-driven, efficient management systems and establishes a network of partnerships and alliances with such groups as parents, students, teachers, the military communities, local school systems, institutions of higher education, and professional organizations."

4. The DoDEA Director, currently Dr. Beth Schiavino-Narvaez, is under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness (USD(P&R)), through the ASD(M&RA).

5. Following the issuance of Executive Order 14190 (EO 14190), *Ending Radical Indoctrination in K-12 Schooling*, signed on January 29, 2025, and Executive Order 14168 (EO 14168), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, signed January 20, 2025, I directed DoDEA to establish a process to identify and review any materials that may be inconsistent with EO 14190 and EO 14168 and with Departmental educational policy objectives.

**JA203**

6. The Department has the responsibility of ensuring the quality education of military-connected children worldwide. This includes ensuring that resources available in DoDEA schools serve an educational purpose and are age appropriate.

7. As the organization responsible for K-12 education in the Department, DoDEA is best positioned to establish an identification and review process of information center and curricular materials. As such, I rely on DoDEA's subject matter expertise in childhood education and school administration when developing and implementing policy directives impacting DoDEA schools.

8. The DoDEA Director provides interim progress updates to me on a regular basis. Based on this information, I understand that DoDEA has identified a small portion of DoDEA information center and curricular resources as requiring further review and consideration.

9. To conduct this review, DoDEA established a panel of librarians, educators, and other professionals. This review will include analysis of: (1) the educational suitability and value of identified resources for K-12 children in the DoDEA school system, (2) the factual nature of the material, and (3) whether the material contains discriminatory or divisive content. The review process established by DoDEA is subject to my review and approval.

10. DoDEA's review of certain of its information center and curricular resources is ongoing. Upon completing that review, the DoDEA panel will provide recommendations to the DoDEA Director concerning the final disposition of the reviewed materials. The DoDEA Director will provide her assessment of the recommended final disposition of these materials, including analysis from the panel, to me for final review and approval of the disposition of these materials.

**JA204**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___May 22, 2025___

Timothy D. Dill
Performing the Duties of the
Assistant Secretary of Defense for
Manpower and Reserve Affairs

**JA205**

# DEX 3

JA206

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| E.K. and S.K., minors, by and through their parent and next friend, LINDSEY KEELEY, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:25-cv-637 (PTG/IDD) |
| v. | ) ) ) | |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF DR. BETH SCHIAVINO-NARVAEZ**

Pursuant to 28 U.S.C. § 1746, I hereby declare, under penalty of perjury as follows:

1.      I am the Director of the Department of Defense Education Activity (DoDEA). I make this declaration based on my personal knowledge and information provided to me in my role at DoDEA.

2.      I completed my graduate studies at the Harvard University Graduate School of Education where I earned a master's degree in School Leadership, a master's degree in Education Policy and Management, and a doctorate from the Urban Superintendents Program. I earned my Bachelor of Science degree in Elementary Education from Pennsylvania State University. I had 30 years of experience in education prior to assuming the role of Director of DoDEA, which included serving as DoDEA's Chief Academic Officer, Chief of Instructional Leadership Development for DoDEA's Pacific Region, and Superintendent for Hartford, Connecticut Public Schools.

3.      DoDEA is a DoD component established as a DoD Field Activity through its chartering Directive, DoD Directive 1342.20, "Department of Defense Education Activity (DoDEA)," July 7, 2020. As its Director I report to the Under Secretary of Defense for Personnel

1

**JA207**

and Readiness (USD(P&R)) through the Assistant Secretary of the Defense for Manpower and Reserve Affairs (ASD(M&RA)).  Mr. Timothy D. Dill is currently Performing the Duties of the ASD(M&RA).

4.    DoDEA is one of only two federally operated school systems and, as a DoD component, operates independently of the Department of Education.  It is responsible for planning, directing, coordinating, and managing prekindergarten (pre-K) through 12th grade educational programs on behalf of the Department of Defense. DoDEA is globally positioned, operating 161 accredited schools in 9 districts located in 11 foreign countries, 7 states, Guam, and Puerto Rico. DoDEA is committed to ensuring that all eligible school-aged children of military families are provided a world-class education that prepares them for postsecondary education and career success.

5.    DoDEA serves several categories of military connected students both inside and outside the continental United States. Full eligibility requirements are detailed in DoDEA Administrative Instruction 1344.01, *Eligibility and Enrollment Requirements for DoDEA Schools*, but briefly summarized, in the continental United States, pre-K-12 grade students are generally eligible to attend tuition free if they are dependent children of active-duty service members living in permanent housing on base or a dependent of federal government civilians living in permanent housing on base. Outside the continental United States, pre-K-12 students may attend tuition free if they are command-sponsored children of active-duty service members or DoD civilians.

6.    I understand that the Plaintiffs in the above-captioned lawsuit attend one of the following DoDEA schools: Crossroads Elementary School in Quantico, Virginia; Barsanti Elementary School in Fort Campell, Kentucky; Aviano Middle High in Aviano, Italy; Sollars Elementary School in Misawa, Japan; and Edgren Middle High in Misawa, Japan.

2

**JA208**

### A. The President's Executive Orders

7. The President's Executive Orders, *Ending Radical Indoctrination in K-12 Schooling* (EO 14190), signed on January 29, 2025, and *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (EO 14168), signed January 20, 2025, require the Department of Defense, which includes DoDEA, to ensure that federal resources are not used to support gender ideology and discriminatory equity ideology, as defined in the EOs. As a federal entity, DoDEA adjusts practices to fully meet the Executive Orders, directives, and guidance issued by the President of the United States and leadership of the Department of Defense. DoDEA's enduring commitment to adhere to federal directives ensures that its educational environment aligns with and reflects the nation's core values.

8. In response to direction from the Department's leadership, DoDEA conducted an operational review to ensure alignment with the Executive Orders, Departmental objectives, and the nation's core values. DoDEA's review encompassed both books in school libraries, known within DoDEA as "Information Centers," as well as DoDEA Adopted Instructional Resources.

9. The review of the selected resources is an ongoing process that is focused on the deliberate, careful and thoughtful identification of resources that may conflict with the EOs or Department's educational objectives.

10. I provide interim informational updates regarding this review to leadership within the Office of the ASD(M&RA) as it progresses. Our last update, provided on March 13, 2025, advised that as of that date, the review comprised approximately 427,000 classroom resource components, of which 41, or 0.01%, were identified for a further review and approximately 457,000 library books, of which 555 titles, or 0.1%, were identified for further review.

3

**JA209**

11.    The current stage of the process is to be followed by an even more focused review, as directed by the ASD(M&RA), that will further assess the educational and pedagogical value of each resource prior to making a recommendation to the ASD(M&RA) for the final disposition of the materials subject to this review. The analysis of the educational and pedagogical value of each resource will be included in the recommendation for final disposition to the ASD (M&RA)

12.    At this time, no recommendations for the final disposition of the materials subject to this review have been proffered to me or the ASD (M&RA).

## B. Secretary Hegseth's Directives

13.    On January 29, 2025, the Secretary of Defense issued a memorandum, "Restoring America's Fighting Force" to all DoD components.  Among other things, this directive prohibits instruction on Critical Race Theory, Gender Ideology and DEI, specifically providing that "No element within DoD will provide instruction on Critical Race Theory (CRT), DEI, or gender ideology as part of a curriculum."

14.    On January 31, 2025, the Secretary of Defense issued a directive to all DoD components, including the Military Departments and Defense Agencies and DoD Field Activities such as DoDEA, prohibiting the use of official resources to host celebrations or events related to cultural awareness months.

15.    Events that directly support Host Nation language and culture classes, international exchanges, or other location-based cultural education efforts continued given their relationship to educating DoDEA students about the country or territory in which they are currently living. Specifically, Host Nation Engagement is intended to provide students with cultural knowledge necessary for situational awareness and safety in their Host Nation and to ensure students feel more comfortable navigating daily life in a foreign country. For example, on May 13, 2025, students at

4

**JA210**

Vicenza Elementary School visited the *Scuola Primari di Lisiera* to conduct a student exchange with that local elementary school.

16. The adjustments to cultural observances have not altered DoDEA's instruction in any way. Our curriculum and lesson plans are not tied to cultural observances or identity months. DoDEA had included those observances as purely supplemental. DoDEA's core curriculum for history, language arts, and other subjects, continues as before. DoDEA's curriculum includes instruction on a variety of historical figures and events in lessons that are not tied to a particular month or time of year.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 23, 2025

Beth Schiavino-Narvaez, Ed.D.
Director, DoDEA

5

**JA211**

# DEX 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| E.K. and S.K., minors, by and through their parent and next friend, LINDSEY KEELEY, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:25-cv-637 (PTG/IDD) |
| v. | ) ) | |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

**DECLARATION OF DR. JAYME LINTON**

Pursuant to 28 U.S.C. § 1746, I hereby declare, under penalty of perjury as follows:

1.      I am the Chief Academic Officer (CAO) for the Department of Defense Education Activity (DoDEA). As the CAO it is my responsibility to support the DoDEA Director, Dr. Beth Schiavino-Narvaez, in setting the strategic vision and supporting the instructional framework and educational approach for DoDEA's academic program. I make this declaration based on my personal knowledge and information provided to me in my role at DoDEA.

2.      I have a Ph.D. in Teacher Education and Development from the University of North Carolina at Greensboro and a master's degree in Curriculum and Instruction from Appalachian State University. I earned my bachelor's degree in Elementary Education from Western Carolina University. I had almost 25 years of experience in education prior to assuming the role of CAO for DoDEA, which included serving as Chief of Strategic & Organizational Excellence for DoDEA; as DoDEA's Education Projects Specialist; as DoDEA's Professional Practice and Improvement Specialist; various roles such as, Program Coordinator, Master of Science in Online Teaching and

1
**JA213**

Instructional Design at Lenoir-Rhyne University; multiple roles, such as Instructional Technology Facilitator, for Newton-Conover City Schools; and as an elementary teacher in North Carolina.

3. DoDEA plans, directs, coordinates, and manages Prekindergarten (Pre-K) through 12th grade education programs for eligible school-aged children of Department of Defense personnel. DoDEA schools are located in Europe, the Pacific, Western Asia, the Middle East, Cuba, and the United States, including the territories of Guam and Puerto Rico.

4. I understand that the Plaintiffs in the above-captioned lawsuit attend one of the following DoDEA schools: Crossroads Elementary School in Quantico, Virginia; Barsanti Elementary School in Fort Campell, Kentucky; Aviano Middle High in Aviano, Italy; Sollars Elementary School in Misawa, Japan; and Edgren Middle High in Misawa, Japan.

## A. Libraries

5. Each of DoDEA's schools has a library, called an "Information Center," that supports DoDEA's mission to provide exemplary educational programs that inspire and prepare all students for success in a global environment. The role of the DoDEA school library program is to support the DoDEA mission to Educate, Engage and Empower military-connected students to succeed in a dynamic world.

6. DoDEA's policy, as established in our Administrative Instruction (AI) 2992.01, "Information Center and Classroom Supplemental Materials Selection Policy and Challenge Procedures," is that "[s]tudents shall be provided a broad range of educational materials that enrich and support the curriculum and meet their educational needs." This policy also explains DoDEA's selection development policy that schools follow when purchasing materials.

7. DoDEA procures and provisions library books (print and digital) for the libraries in 161 schools worldwide in accordance with all federal procurement regulations. There are

2

**JA214**

approximately 457,000 books across all DoDEA libraries. Collections are developed locally and, as a result, DoDEA school library collections vary by school in terms of the presence of specific books and size of collections.

8.      While the library in each school is individual to the school, all of our libraries endeavor to provide a well-balanced collection that supports the school's curriculum, reflects the interests of the local school community, and supports special needs and programs. The resources in the collections will vary among schools to meet student and teacher needs, but all of our libraries provide literary classics, curriculum related materials, and award winning books. The primary role of the libraries is to support, enhance, and enrich the curriculum. DoDEA seeks to align the learning objectives and the collection by selecting resources that are appropriate to the maturity level of the users, are of a variety sufficient to encourage student exploration, are of appropriate reading and comprehension levels and are of a sufficient quantity to support units taught in the curriculum.

9.      Students, guardians and DoDEA staff are permitted to access the libraries. If a student, guardian or teacher has a concern about library materials, or supplemental classroom materials, DoDEA has an established process for working through those concerns as described in DoDEA's Administrative Instruction (AI) 2992.01, Enclosure 5, "Procedures for Challenging Materials." Informal challenges may be initiated by bringing them to the attention of a teacher or school information specialist (librarian). Formal challenges are initiated by filing a *Request for Reconsideration of Information Center or Classroom Supplemental Materials* with the school principal.

## B. Curriculum

10.    DoDEA is responsible for procuring and provisioning classroom resources for 489 different courses of study in elementary, middle and high schools in accordance with all federal procurement regulations. These classroom resources include, but are not limited to, a wide variety of individual components such as: student textbooks, teacher edition textbooks, digital resources, student consumable workbooks, simulations, lab materials, standards, units of study, and vendor-provided lesson planning documents. Classroom resources are centrally procured for all DoDEA schools.

11.    For our curriculum, DoDEA has adopted College and Career Ready Standards in mathematics, literacy, the arts, social studies, and science, which are rigorous, research-based, and reflect the knowledge, skills and dispositions students need for success in college and/or careers and are aligned with the Common Core State Standards, National Core Art Standards, Next Generation Science Standards, College, Career, and Civic Life Framework for Social Studies State Standards, and Society for Health and Physical Education Standards.

12.    The process of reviewing instructional resources for inclusion in DoDEA's curriculum is done through the course of the standard federal procurement process. DoDEA defines its course requirements and only procures resources that meet the established criteria. If any subsequent concerns are raised by teachers, parents or students regarding curricular materials, those are raised to district and regional Instructional Systems Specialists (ISSs) who submit the concerns to headquarters ISSs for review.

## C. The President's Executive Orders and Secretary Hegseth's Directives

13.    The President's Executive Orders, *Ending Radical Indoctrination in K-12 Schooling* (EO 14190), signed on January 29, 2025, and *Defending Women from Gender Ideology*

4

**JA216**

*Extremism and Restoring Biological Truth to the Federal Government* (EO 14168), signed January 20, 2025, require the Department of Defense, which includes DoDEA, to ensure that federal resources are not used to support gender ideology and discriminatory equity ideology, as defined in the EOs.

### D. Book and Curriculum Reviews

14.     Upon issuance of EOs 14190 and 14168 and in accordance with direction from DoD leadership, including the ASD M&RA, DoDEA promptly identified and initiated a comprehensive Administrative Operational Compliance Review of all classroom resources and library books. A process was established to facilitate the examination of all resources and determine what should be retained, modified, or rescinded to ensure alignment with EO 14190, EO 14168, and the Department's educational objectives. DoDEA used key terminology and definitions from the Executive Orders to identify materials needing further review. DoDEA instructional system specialists reviewed procured classroom resources and library books, and educators and school leaders throughout DoDEA were provided a process to refer resources and books for review.

15.     With regard to the review of library books, those potentially related to gender ideology or discriminatory equity ideology topics as defined in the Executive Orders were relocated to the professional collection for evaluation with access limited to professional staff. For DoDEA adopted instructional resources (curriculum and instruction) that were potentially related to gender ideology or discriminatory equity ideology topics as defined in the Executive Orders, we directed staff not to use them for instruction while the review is ongoing.

16.     As an initial matter, subject headings and key words were used to identify resources for potential review. However, this process was carefully performed to ensure that uses of key

5

**JA217**

words implied a potential for noncompliance with the EOs before a resource was selected for review as not all uses of key words are potentially out of compliance. As noted above, resources selected for review were relocated, in the case of library books, or their use paused, in the case of curricular resources.

17.    Following the selection of resources for review, subject matter experts at DoDEA headquarters in each content area gathered the resources proposed for review and provided an initial recommendation for each resource. Additional review is provided by Division Chiefs and the Office of Civil Rights.

18.    The review of the selected resources is an ongoing process that is focused on the deliberate, careful and thoughtful identification of resources that may conflict with the EOs and the Department's educational policy objectives.

19.    The current stage of the process is to be followed by an even more focused review that assesses the educational and pedagogical value of each resource prior to making a recommendation for final disposition of these materials.

20.    The recommendation resulting from this stage of the process will be sent to the DoDEA Director, who will in turn provide her assessment of the recommended final disposition of these materials, including analysis from subject matter experts, to Mr. Timothy D. Dill, Performing the Duties of the ASD (M&RA), for his final review and decision with respect to the final disposition of these materials. The submission to both the DoDEA Director and the ASD(M&RA) will include analysis from our subject matter experts of various factors related to the resources suitability for our school system.

6

**JA218**

21.     Nothing in these orders/directive/policies prohibits students from reading these materials or discussing them while on school grounds. The EOs and Departmental objectives are directed to DoDEA employees' classroom instruction, displays, and expenditure of resources.

### E. Specific Assertions from Plaintiffs

#### i. Crossroads Elementary School, Quantico, Virginia

22.     I am aware that Plaintiff E.K. has stated that *A Nation of Immigrants* was removed from the fourth grade curriculum. Keeley Decl. (Dkt. 10-23) ¶ 27. The fourth grade did not read the supplemental lesson "A Nation of Immigrants" this school year. It was identified as including text that was noncompliant with EO 14190.

#### ii. Barsanti Elementary School, Fort Campbell, Kentucky

23.     I understand that Plaintiffs O.H. (pre-Kindergarten), S.H. (Kindergarten) and H.H. (fourth grade) have broadly asserted that "immigration-related content" was removed from the curriculum. Henninger Decl. (Dkt. 10-24) ¶ 18. No curricular changes were made to pre-Kindergarten or Kindergarten curriculum at Barsanti Elementary pursuant to the EOs. However, this year, Kindergarten did not teach TCI Biographies K-5 Elementary Social Studies, specifically, *Albert Cashier, Civil War Veteran*, as this material is currently under review.

#### iii. Sollars Elementary School, Misawa Air Base, Japan

24.     I understand that Plaintiff L.K.1 has indicated that she "has already had curricular materials relating to immigration removed from her class." Kenkel Decl. (Dkt. 10-26) ¶ 12. The only specific curricular material L.K.1 identified was G4 Lesson 3: The Peopling of the United States and associated reading, *A Nation of Immigrants* by John F. Kennedy. *Id.* The fourth grade Lesson 3, "The People of the U.S.," was taught the week of October 28, 2024 – November 2, 2024, prior to the Executive Order publications and pause of the resource. The fourth grade did not read

the supplemental lesson "A Nation of Immigrants" this school year. It was identified as needing further review and its use was paused.

25. I understand that L.K.1 and L.K.2 have stated that "dozens of books purportedly related to 'gender ideology' have been removed from their school library." Kenkel Decl. ¶ 10. The two titles they specifically reference *No Truth Without Ruth: The Life of Ruth Bader Ginsburg* and *Finding Wonders: Three Girls Who Changed Science. Id.* I am informed by our library staff that these titles are and have been available to students at Sollars Elementary.

26. I understand that Plaintiff L.K.2 has stated she is "being denied access to critical information about physical wellbeing and health." Kenkel Decl. ¶ 13. Chapter 18 of the textbook *Comprehensive Health Skills for Middle School* was not included in the instruction for this school year. Content in chapter 18 addresses biological sex, gender, gender identity, gender roles, and physical and emotional changes during puberty (arousal, masturbation, intercourse), sexual orientation and transgenderism. That change did not alter the health standards and skills that students are expected to learn for the course, which is to help students make informed and responsible decisions regarding their collective health and well-being. The curriculum currently being taught remains aligned with DoDEA-approved standards.

27. I am also aware that L.K.2 has stated that a packet on Black History Month was removed from her classroom curriculum. Kenkel Decl. ¶ 15. The resource "My Friend in Learning Professional Learning – New For You Seasonal Bundle: Black History Month 2025" was not taught at Sollars Elementary this year.

### iv. Edgren Middle High School, Misawa Air Base, Japan

28. I understand that Plaintiff L.K.3 has indicated that she has not been able to check out the *The Giver*, *Nineteen Eighty-Four*, *Ground Zero*, and *A Handmaid's Tale* from her library

8

**JA220**

in Edgren Middle High as of February 2025. I am informed by our library staff that MackinVision, our integrated library system, indicates that these four books have been unavailable because other library patrons have checked them out. These books are overdue and should be returned. It is therefore not the case that these books are not accessible to L.K.3 because of DoDEA's ongoing resource reviews, but rather because another student is accessing them.

### v. Aviano Middle High School, Aviano, Italy

29.    I am aware that Plaintiffs C.Y. and M.T. attend Aviano Middle High School in Aviano, Italy. Young Decl. (Dkt. 10-25) ¶ 13; Tolley Decl. (Dkt. 10-27) ¶ 5. Both C.Y. and M.T. were enrolled in Advanced Placement® (AP) Psychology for the 2024-2025 school year. Young Decl. ¶ 13; Tolley Decl. ¶ 9. The content of gender and sexuality was taught prior to the pause of that content for AP Psychology. It was not taught again as part of the end-of-year wrap-up review provided to students in preparation for AP examinations.

30.    Finally, at Aviano Middle High School, the curriculum in US History and AP US History included the Civil Rights Movement. Historical figures including Rosa Parks, Ruby Bridges, and Rev. Martin Luther King, Jr. were included in those lessons and classroom discussions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 23, 2025

_____
Jayme Linton, Ph.D.
Chief Academic Officer, DoDEA

9

**JA221**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| E.K. and S.K., *minors, by and through their parent and next friend Lindsey Keeley*, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*, <br><br> *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 1:25-cv-637 (PTG/IDD) |

**MEMORANDUM ORDER**

This matter comes before this Court on Defendants' Motion for Reconsideration of this Court's June 3, 2025 Order for Defendants to produce a list of library books currently under review within the Department of Defense. Dkt. 41. First, Defendants contend that the preliminary injunction posture constrains the Court's review to only the necessary factual record, rather than any additional facts "neither party has identified to be necessary to resolving the pending motion." Dkt. 42 at 4-6. Second, Defendants assert that the deliberative process privilege shields disclosure of the list because it is both pre-decisional and deliberative. *Id.* at 7-12. Plaintiffs opposed Defendants' motion. Dkt. 44. To aid its review of the motion, the Court granted Defendants' request to file the list of removed books *ex parte* for the Court's *in camera* review. Having considered the parties' submissions and reviewed the list *in camera*, the Court finds that privilege does not shield disclosure of Defendants' list of books. Furthermore, the Court finds that the list is appropriately part of the factual record for the motion for preliminary injunction. Accordingly, the Court will deny Defendants' Motion for Reconsideration.

**JA222**

## Background

Plaintiffs are twelve students of military families at five Department of Defense Education Activity ("DoDEA") schools who bring First Amendment claims against Defendants DoDEA, Dr. Beth Schiavano-Narvaez, Director of DoDEA, and Peter Brian Hegseth, Secretary of Defense, in connection with their changes to curricular material and removal of library books at DoDEA schools. Dkt. 1 ("Compl.") ¶¶ 4, 10-15. Plaintiffs allege that Defendants' actions—done in implementation of various Presidential Executive Orders allegedly targeting gender ideology, "discriminatory equity ideology," and anti-American sentiments in the federal government— violate their Free Speech rights. *Id.* ¶¶ 51, 83-101. On May 7, 2025, Plaintiffs filed a motion for preliminary injunction seeking to enjoin "Defendants from enforcing Executive Order Nos. 14168, 14185, and 14190 and related memoranda, directives, and guidance in DoDEA schools." Dkt. 10 at 25. The motion further requests the Court to order the Government to "return[] all books and curriculum already quarantined or removed based on potential violation of the Executive Orders to their preexisting shelves, classrooms, and instructional units." *Id.* at 26. The parties completed briefing on the matter. *See* Dkts. 10, 29, 36.

On June 3, 2025, this Court held a hearing on the motion for preliminary injunction. In both their briefing and at the hearing, Plaintiffs have repeatedly stated that they have requested the list of books removed from DoDEA libraries to no avail and instead have "compiled the current reported list of books removed . . . through their own observation." Dkt. 10 at 8; *see also* Dkt. 47 ("Tr.") at 7:24-8:1, 14:12-13, 16:19-25. Consequently, the Court ordered that Defendants submit information available regarding the centralized list of removed books to the Court and to Plaintiffs. Tr. at 32:17-33:3. On June 6, 2025, Defendants moved for a six-day extension to produce the list of library books, which the Court subsequently granted. Dkts. 38, 40. On June 11, 2025,

2

**JA223**

Defendants filed the instant Motion for Reconsideration. Dkt. 41. Defendants proposed that, in the alternative, the Court could conduct an *in camera* review of the list *ex parte* to adjudicate the privilege issues or "stay its order to produce the list until the motion for reconsideration has been resolved." Dkt. 42 at 12. On June 16, 2025, the Court issued an order permitting Defendants to produce the list of books *ex parte* for *in camera* review. Dkt. 45. Defendants filed the list *ex parte* that same day.

**Legal Standard**

While Federal Rules of Civil Procedure 59(e) and 60(b) govern motions for reconsideration of final judgments, Rule 54(b) applies to reconsideration of interlocutory orders. *Fayetteville Invs. v. Comm. Builders, Inc.*, 936 F.2d 1462, 1469-70 (4th Cir. 1991); *Nicholas v. Wyndham Intern., Inc.*, 373 F.3d 537, 541 (4th Cir. 2004) ("Discovery orders are 'inherently interlocutory.'" (quoting *McCook Metals LLC v. Alcoa, Inc.*, 249 F.3d 330, 335 (4th Cir. 2001))). "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003). Rather, a district court retains discretion to "reconsider and modify its interlocutory judgments . . . at any time prior to final judgment." *Id.* at 514-15; *see also Fayetteville Invs.*, 936 F.2d at 1469.[1]

To guide their discretion over Rule 54(b) motions, courts in the Fourth Circuit look to the legal framework for Rule 59 and Rule 60 motions for reconsideration. *Am. Canoe Ass'n*, 326 F.3d at 515; *Orbcomm Inc. v. Calamp Corp.*, 215 F. Supp. 3d 499, 503 (E.D. Va. 2016) (relying on the

---

[1] The Fourth Circuit has held that "a district court's otherwise broad discretion to reconsider interlocutory orders is narrowed in the context of motions to reconsider issues going to the court's Article III subject matter jurisdiction." *Am. Canoe Ass'n*, 326 F.3d at 515. However, no Article III jurisdictional questions are raised here.

3

**JA224**

standards of Rule 59 and 60 even though "the Fourth Circuit has declined to 'thoroughly express [its] views on the interplay of Rules 60, 59 and 54.'" (quoting *Am. Canoe Ass'n*, 326 F.3d at 515)). Therefore, even with Rule 54(b) motions for reconsideration, courts generally "do not depart from a previous ruling unless '(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'" *Orbcomm Inc.*, 215 F. Supp. 3d at 503 (quoting *Am. Canoe Ass'n*, 326 F.3d at 515). Generally, "[a]bsent a significant change in the law or the facts," a court will grant a motion for reconsideration only where it "has patently misunderstood a party," "made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Evans v. Trinity Indus., Inc.*, 148 F. Supp. 3d 542, 544 (E.D. Va. 2015) (quoting *United States v. Smithfield Foods, Inc.*, 969 F. Supp. 975, 977 (E.D. Va. 1997)).

### Discussion

Defendants contend that reconsideration of the Court's Order for the list of removed books is warranted for two reasons. Dkt. 42 at 1. First, Defendants assert that "this Court cannot enlarge the factual record" to consider the list of books at the preliminary injunction phase. *Id.* at 4. Second, Defendants invoke the deliberative process privilege over the list of books, which they claim is pre-decisional and deliberative and therefore protected from disclosure. *Id.* at 6. The Court takes up the privilege issue first and finds that the deliberative process privilege does not apply to the list of books. Furthermore, the Court finds that the list is properly part of the factual record for preliminary injunction.

4

**JA225**

### A. Deliberative Process Privilege

The deliberative process privilege "protects from disclosure documents generated during an agency's deliberations about a policy, as opposed to documents that embody or explain a policy that the agency adopts." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021). The privilege arises from the common law and covers "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."[2] *City of Va. Beach v. U.S. Dep't. of Com.*, 995 F.2d 1247, 1253 (4th Cir. 1993) (quoting *Coastal States Gas Corp. v. Dep't. of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). It "rests on the notion that 'officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance "the quality of agency decisions" by protecting open and frank discussion among those who make them within the Government.'" *Harrison v. Shanahan*, No. 1:18-cv-641, 2019 WL 2216474, at *4 (E.D. Va. 2019) (quoting *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001)).

Information protected by the deliberative process privilege must be "predecisonal and deliberative in nature." *Id.* at *4. To determine whether information is the agency's "settled position, courts must consider whether the agency treats the document as its final view on the matter." *Sierra Club*, 592 U.S. at 268. A document reflects an agency's "settled position" when

---

[2] While the privilege is often discussed in the context of Exemption 5 of the Freedom of Information Act ("FOIA"), Exemption 5 is rooted in the common law privilege. *Sierra Club*, 592 U.S. at 263 ("Exemption 5 incorporates the privileges available to Government agencies in civil litigation, such as the deliberative process privilege, attorney-client privilege, and attorney work-product privilege."); *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (stating that the deliberative process exemption in FOIA "originated as a common law privilege."); *Est. of LeRoux v. Montgomery Cnty.*, 2024 WL 1703939, at *3 (D. Md. Apr. 19, 2024) ("When a case is in federal court based on federal question jurisdiction, federal common law governs assertions of executive privilege.").

5

**JA226**

"the deliberative 'process by which governmental decisions and policies are formulated' will have concluded, and the document will have 'real operative effect.'" *Id.* (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 160 (1975)). Furthermore, whether a document is "deliberative" rests on whether "disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and, thereby, undermine the agency's ability to perform its functions." *Harrison*, 2019 WL 2216474, at *6 n.14 (quoting *Moye, O'Brien, O'Rourke, Hogan & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1278 (11th Cir. 2004)). The Fourth Circuit has deemed documents to be deliberative when they "reflect[] the give-and-take of the consultative process." *City of Va. Beach*, 995 F.2d at 1253 (quoting *Coastal States*, 617 F.2d at 866); *see also Jones v. Murphy*, 256 F.R.D. 510, 518 (D. Md. 2008), *aff'd*, 2009 WL 604937 (D. Md. Feb. 23, 2009) ("The Fourth Circuit has adopted the give-and-take test to determine whether documents are deliberative; thus, the deliberative-process privilege protects conversational documents—those intended to fuel a dialogue[.]").

Once the privilege applies, it is not absolute. Courts may compel disclosure of "predecisional and deliberative" documents in limited circumstances. *Harrison*, 2019 WL 2216474, at *4. The privilege "does not shield statements about a policy after the policy has been finalized, and it 'does not protect purely factual information, unless it is inextricably intertwined with deliberative material.'" *Id.* (quoting *Stone v. Trump*, 356 F. Supp. 3d 505, 514 (D. Md. 2018)). Moreover, "[w]hen a party . . . seeks agency materials, the validity of the privilege 'depends . . . upon a balancing of the public interest in nondisclosure with the need for the information as evidence.'" *Id.* (alteration in original) (quoting *Cipollone v. Liggett Grp. Inc.*, 1987 WL 36515, at *2 (4th Cir. Feb. 13, 1987) (per curiam)). The Court considers several factors: "(1) the relevance of the evidence to the lawsuit; (2) the availability of alternative evidence on the same

6

**JA227**

matters; (3) the government's role (if any) in the litigation; and (4) 'the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions.'" *Cipollone*, 1987 WL 36515, at *2 (quoting *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)). The party asserting the privilege bears the burden of proof and must articulate "specific facts" as opposed to a "conclusory assertion of privilege." *Harrison*, 2019 WL 2216474, at *5 (first quoting *RLI Ins. Co. v. Conseco, Inc.*, 477 F. Supp. 2d 741, 751 (E.D. Va. 2007); and then quoting *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 344 (E.D. Va. 2015)).

The document submitted to the Court for *in camera* review reveals several issues with Defendants' assertion of privilege. First, Defendants contend that the list is pre-decisional because no final decision on which books will be permanently removed has been made. Dkt. 42 at 7. Because the list "leaves agency decisionmakers free to change their minds," Defendants argue that it cannot "reflect the agency's final decision." *Id.* (quoting *Sierra Club*, 592 U.S. at 269). Furthermore, Defendants find dispositive that the final decisionmaker on this matter, Timothy D. Dill, had not seen any iteration of this list or any recommendations from his staff prior to this disclosure to "let alone make any final determinations of disposition." *Id.* at 7-8. Second, Defendants argue that the list is deliberative because it is "comprised of 'opinions that [are] subject to change.'" *Id.* at 10 (alteration in original) (quoting *Sierra Club*, 592 U.S. at 269). Defendants describe an "iterative" and "dynamic" process whereby stakeholders at all levels of DoDEA continue to develop the list and make recommendations for Mr. Dill's final decision. *Id.* at 10-11. Per Defendants, "the release of the document at this pre-decisional stage will have a chilling effect" on the stakeholders' candor with recommendations. *Id.* at 11. Conversely, Plaintiffs aver that the deliberative process privilege does not apply here because the document in question concerns

7

**JA228**

*factual* information, about "events that have already happened," in a case where "the plaintiff's cause of action is directed at the government's intent." Dkt. 44 at 2-3.

The Court agrees with Plaintiffs that the deliberative process privilege does not apply in the first instance. First, the submitted list of books does not include anything remotely deliberative. "One of the rudimentary black letter rules is that while the privilege covers 'opinions' it does not cover 'facts.'" *Cipollone*, 1987 WL 36515, at *2. Here, the list is purely factual because it comprises a spreadsheet of over 500 book titles and authors with no stated opinions. Through the submitted list, the Court cannot find any indicia of "the manner in which the agency evaluates possible alternative policies or outcomes," a reflection of "the personal opinions of the writer," or the agency "give-and-take"—all relevant factors in determining the "deliberative" nature of a document. *City of Va. Beach*, 995 F.2d at 1253; *see also Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 366 (D.C. Cir. 2021) (stating a document is deliberative when it "call[s] for judgment or the candid exchange of ideas."). The Fourth Circuit made clear in *Cipollone* that the privilege protects, in part, "against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Cipollone*, 1987 WL 36515, at *1 (quoting *Coastal States*, 617 F.2d at 866). No such concern exists with the submitted list of books. Rather, the Court finds that the submitted list is squarely the type of "purely factual material" that falls outside of the deliberative process privilege. *EPA v. Mink*, 410 U.S. 73, 88 (1973).

Second, while the Court acknowledges that the submitted list may not be the final decision of Mr. Dill, it finds dispositive that the list has nevertheless already had a "real operative effect." *Sierra Club*, 592 U.S. at 268. As Mr. Dill's declaration acknowledges, the submitted list reflects "[t]he list of books removed from the shelves." Dkt. 42, Ex. 1 ("Second Dill Decl.") ¶ 4. Thus,

8

**JA229**

the list is of legal consequence. *See Sierra Club*, 592 U.S. at 271 (stating that a "decision's 'real operative effect' as an indication of its finality . . . [refers] . . . to the legal, not practical, consequences that flow from an agency's action."). That the list is "iterative" does not mitigate the fact that it reflects an implemented action. Indeed, courts have routinely distinguished between drafts of documents that reflect an "agency's ongoing internal work to settle on a substantive policy approach" from "documents that would simply describe an already-adopted policy." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 363; *see also Cipollone*, 1987 WL 36515, at *1 (stating the privilege "protect[s] against premature disclosure of proposed policies *before they have been finally formulated or adopted.*") (emphasis added) (alteration in original) (quoting *Coastal States*, 617 F.2d at 866). That the Government stamped "pre-decisional" on the document is also not dispositive. "[D]etermining whether an agency's position is final for purposes of the deliberative process privilege is a functional rather than formal inquiry." *Sierra Club*, 592 U.S. at 272–73.

Third, courts have established that the deliberative process privilege "does not apply where 'the plaintiff's cause of action is directed at the government's intent.'" *Est. of LeRoux*, 2024 WL 1703939, at *4 (quoting *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir.)); *Bethune-Hill*, 114 F. Supp. 3d at 339 ("Unlike other cases, where the deliberative process privilege . . . may be employed to 'prevent [the government's] decision-making process from being swept up unnecessarily into the public domain,' this is a case where the decisionmaking process 'is the case.'" (quoting *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 2011 WL 4837508, at *8 (N.D. Ill. Oct. 12, 2011))); *see also Jones v. City of Coll. Park*, 237 F.R.D. 517, 521 (N.D. Ga. 2006) ("[T]he privilege is simply inapplicable, because government intent is at the heart of the issue in this case."); *United States v. Lake Cnty. Bd. of Comm'rs*, 233 F.R.D. 523, 527 (N.D. Ind. 2005) ("[T]he deliberative process privilege does not

9

**JA230**

apply when the government's intent is at issue."). The deliberative process privilege was "fashioned in cases where the governmental decisionmaking process is collateral to the plaintiff's suit. *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d at 1424. Here, the heart of Plaintiffs' suit challenges the Government's underlying intent in removing books from DoDEA libraries. Accordingly, where Plaintiffs' "cause of action is directed at the government's intent . . . it makes no sense to permit the government to use the privilege as a shield." *Id.* For all of these reasons, the Court finds that the deliberative process privilege does not apply to Defendants' submitted list of removed books.

Even if the privilege applied, the *Cipollone* factors would heavily weigh in favor of disclosure. The list of removed books comprises critical evidence to Plaintiffs' allegations of First Amendment violations. In fact, Plaintiffs have attempted several times to access the list of removed books with no success, illustrating that no viable alternative means for acquiring such evidence exists. *See* Dkt. 10 at 8; Tr. at 7:24-8:1, 14:12-13, 16:19-25. Furthermore, "[t]he government is no stranger to this litigation; rather, all of the named defendants are governmental officers or agencies, and plaintiffs' claims go directly to the constitutionality and legality of those agencies' policies." *Harrison*, 2019 WL 2216474, at *8. Finally, the Court does not find that "disclosure would hinder frank and independent discussion regarding contemplated policies and decisions" so as to outweigh disclosure. *Cipollone*, 1987 WL 36515, at *2 ("While the last factor obviously requires a consideration of the policies underlying the privilege, it does so expressly in the context of *weighing* the public interest in nondisclosure of the particular materials at issue.") (alteration in original). Therefore, the material is not privileged and must be publicly disclosed, and the Court finds no basis for reconsideration.

10

**JA231**

## B. Factual Record in the Preliminary Injunction Phase

Defendants' second basis for reconsideration posits that the Court may not "enlarge the factual record beyond what the parties have concluded is necessary for resolution of the motion" at the preliminary injunction phase. Dkt. 42 at 4. As a preliminary matter, Defendants do not cite a single source of authority barring the Court from ordering the submission of additional evidence to resolve a motion for preliminary injunction. Nor have the parties stipulated to a factual record that *excludes* the list of removed books. Rather, Plaintiffs have repeatedly sought to make this list of removed books part of the factual record but had limited access to it prior to this Court's Order. *See* Dkt. 44 at 1; *see also* Dkt. 10-23 ("Keeley Decl.") ¶¶ 24-26, 33-34; Dkt. 10-24 ("Henninger Decl.") ¶ 18; Dkt. 10-25 ("Young Decl.") ¶ 12; Dkt. 10-26 ("Kenkel Decl.") ¶ 20.

More importantly, the Court finds that list of removed books is necessary to resolve the preliminary injunction. Here, the Court is persuaded by Plaintiffs' argument that "the fact that the list is expanding so rapidly" speaks to the ongoing nature of the alleged First Amendment harms. Dkt. 44 at 2; *see* Second Dill Decl. ¶ 4 (stating "[b]ooks continue to be added for a number of reasons[.]"). Defendants even contend that "the Court's universe of consideration is limited to non-privileged factual matters and legal issues that are *germane* to resolve whether Plaintiffs are entitled to emergency relief." Dkt. 42 at 5 (emphasis added). It would be absurd to deem the list of removed books as not germane to a suit about alleged First Amendment harms from removing said books. Accordingly, the Court finds that the list of books is appropriately part of the factual record for preliminary injunction.

11

**JA232**

## Conclusion

For the reasons set forth in this Memorandum Order, it is hereby

**ORDERED** that Defendants' Motion for Reconsideration (Dkt. 41) is **DENIED**; and it is

further

**ORDERED** that the list of books (as submitted to the Court) is deemed filed on the public

docket and included as Attachment A to this Memorandum Order.

Entered this ___11___ day of July, 2025.
Alexandria, Virginia

_____ /s/
Patricia Tolliver Giles
United States District Judge

12

**JA233**

# ATTACHMENT A

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

| | | |
|---|---|---|
| | *This document is PRE-DECISIONAL* | |
| | Author | Resource |
| 1 | Bronski, Michael<br>Pellegrini, Ann<br>Amico, Michael | "You can tell just by looking" : and 20 other myths about LGBT life and people |
| 2 | Thomas, Rachael L | #BlackLivesMatter : protesting racism |
| 3 | Felix, Rebecca | #Pride : championing LGBTQ rights |
| 4 | Ewert, Marcus | 10,000 dresses |
| 5 | Levithan, David | 19 love songs |
| 6 | Jones, Dan | 50 queers who changed the world : a celebration of LGBTQ+ icons |
| 7 | Majumdar, Megha | A burning |
| 8 | Prager, Sarah<br>O'Dwyer, Caitlin | A child's introduction to pride : the inspirational history and culture of the LGBTQIA+ community |
| 9 | Gray, EmmaHill, Eva | A girl's guide to joining the resistance : a feminist handbook on fighting for good |
| 10 | Blohm, Craig E | A history of racism in America |
| 11 | Nagara, Innosanto | A is for activist |
| 12 | Gow, Robin | A million quiet revolutions |
| 13 | Chevat, Richie<br>Bronski, Michael | A queer history of the United States for young people &<br>A queer history of the United States |
| 14 | Bongiovanni, Archie<br>Jimerson, Tristan | A quick & easy guide to they/them pronouns |
| 15 | Singh, Deanna<br>Rodney, Shellene | A smart girl's guide to race & inclusion : standing up to racism and building a better world |
| 16 | Washington, Harriet A | A terrible thing to waste : environmental racism and its assault on the American mind |
| 17 | Carpenter, Nora<br>Callen, Rocky | Ab(solutely) normal : short stories that smash mental health stereotypes |
| 18 | Mardell, Ashley | ABC's of LGBT+ |
| 19 | Delliquanti, Blue | Across a field of starlight |
| 20 | McSmith, Tobly | Act Cool |
| 21 | | Activist athletes : when sport and politics mix |
| 22 | Stamper, Phil | Afterglow |
| 23 | McAdam, Tash | Airlock |
| 24 | Brugman, Alyssa | Alex as well |
| 25 | Gino, Alex | Alice Austen lived here |
| 26 | Cox, Beth<br>Meredith, Samantha | All bodies are wonderful |
| 27 | Johnson, George M | All boys aren't blue : a memoir-manifesto |
| 28 | Sie, James | All kinds of other |
| 29 | Mitchell, Saundra | All out |
| 30 | Collins, Shanni | All you need is love : celebrating families of all shapes and sizes |
| 31 | Bourne, Shakirah<br>Levy, Dana Alison | Allies : real talk about showing up, screwing up, and trying again |
| 32 | Katcher, Brian | Almost perfect |
| 33 | Underhill, Edward | Always the almost : a novel |
| 34 | Ortiz, Paul | An African American and Latinx history of the United States |
| 35 | Sass, A. J | Ana on the edge |
| 36 | Verdi, Jessica | And she was |
| 37 | Garza Villa, Jonny | Ander & Santi were here : a novel |
| 38 | Rankin, Kenrya | Anti-racism : powerful voices, inspiring ideas |
| 39 | Madden, Tobias | Anything but fine |
| 40 | Lankford, Ronald D | Are America's wealthy too powerful? |
| 41 | Savage, Sarah<br>Fisher, Fox | Are you a boy or are you a girl? |
| 42 | Nagle, Jeanne<br>Dunbar, Robert E | Are you LGBTQ? |
| 43 | Colapinto, John | As nature made him : the boy who was raised as a girl |
| 44 | Winn, Kevin P<br>Wing, Kelisa | Atrocities in action |
| 45 | Royce, Ellie<br>Chambers, Hannah | Auntie Uncle : drag queen hero |
| 46 | Tanaka, C. A | Baby drag queen |
| 47 | Bors, Matt | Be gay, do comics! : queer history, memoir, and satire from The Nib |
| 48 | Spangler, Brie | Beast |
| 49 | Gonzalez, Maribel Valdez | Be your true self (Social Justice and You) |
| 50 | Min, Lio | Beating Heart Baby |
| 51 | Cronn-Mills, Kirstin | Beautiful music for ugly children |
| 52 | Nutt, Amy Ellis | Becoming Nicole : the transformation of an American family |
| 53 | Kergil, Skylar | Before I had the words : on being a transgender young adult |
| 54 | Jennings, Jazz | Being Jazz : my life as a (transgender) teen |
| 55 | Harris, Duchess<br>Marciniak, Kristin | Being transgender in America |

## PRIVILEGED & CONFIDENTIAL
## FILED EX PARTE FOR IN CAMERA REVIEW

| # | Author | Title |
|---|--------|-------|
| 56 | Rachel, T. ColeCostello, Rita D | Bend, don't shatter : poets on the beginning of desire |
| 57 | Joseph, Frederick / Joseph, Porsche / Richardson, Taylor Denise | Better than we found it : conversations to help save the world |
| 58 | Stoeve, Ray | Between perfect and real |
| 59 | Coates, Ta-Nehisi | Between the world and me |
| 60 | Santos, Rita | Beyond gender binaries : the history of trans, intersex, and third-gender individuals |
| 61 | Kuklin, Susan | Beyond magenta : transgender teens speak out |
| 62 | Vaid-Menon, Alok | Beyond the gender binary |
| 63 | Winans, Justine Pucella | Bianca Torre is afraid of everything |
| 64 | Eberhardt, Jennifer L | Biased : uncovering the hidden prejudice that shapes what we see, think, and do |
| 65 | Russo, Meredith | Birthday |
| 66 | Joseph, Frederick | Black friend : on being a better white person |
| 67 | Gitlin, Marty | Black lives matter |
| 68 | Evans, William HenryHolmon, Omar | Black nerd problems : essays |
| 69 | Fanon, Frantz | Black skin, white masks |
| 70 | Nehanda, Walela | Bless the blood : a cancer memoir |
| 71 | McAdam, Tash | Blood sport |
| 72 | Jensen, Kelly | Body talk : 37 voices explore our radical anatomy |
| 73 | Patterson, Jodie / Pinkney Barlow, Charnelle | Born ready : the true story of a boy named Penelope |
| 74 | Machias, Jules | Both can be true |
| 75 | Thomas, Peyton | Both sides now |
| 76 | Gaku, Keito / McDonagh, Leo | Boys run the riot. 1 |
| 77 | Gaku, Keito / McDonagh, Leo | Boys run the riot. 2 |
| 78 | Gaku, Keito / McDonagh, Leo | Boys run the riot. 3 |
| 79 | Gaku, Keito / McDonagh, Leo / Padgett, Rose | Boys run the riot. 4 |
| 80 | Kobabe, Maia / Peitzmeier, Sarah | Breathe : journeys to healthy binding |
| 81 | Chii / Whitesides, Shanti | bride was a boy |
| 82 | Rivas, Christopher | Brown enough : true stories about love, violence, the student loan crisis, Hollywood, race, familia, and making it in America |
| 83 | Roem, Danica | Burn the page : a true story of torching doubts, blazing trails, and igniting change |
| 84 | Chambers, VeronicaHarlan, Jennifer | Call and response : the story of Black Lives Matter |
| 85 | Lukoff, Kyle / Lozano, Luciano | Call me Max |
| 86 | Ford, Ronald Martin / Ford, Vanessa / Harren, Kayla | Calvin |
| 87 | Rosen, Lev AC | Camp |
| 88 | Melleby, NicoleSass, A. J | Camp QUILTBAG |
| 89 | Salvatore, Steven | Can't take that away |
| 90 | Garza Villa, Jonny | Canto contigo : a novel |
| 91 | Wilkerson, Isabel | Caste : the origins of our discontents |
| 92 | Thomas, Aiden | Cemetery boys |
| 93 | Lundin, Martha | Challenges for LGBTQ teens |
| 94 | Gitlin, Marty | Chaz Bono |
| 95 | Nishimori, HiroyukiYamazaki, JoeLeach, G... | Cheeky angel. Vol. 1 |
| 96 | Nishimori, HiroyukiYamazaki, JoeLeach, G... | Cheeky angel. Vol. 2 |
| 97 | Nishimori, HiroyukiLeach, GaryCrate, Gabe | Cheeky angel. Vol. 3 |
| 98 | Alexander, T. J | Chef's kiss : a novel |
| 99 | Labelle, Sophie | Ciel in all directions |
| 100 | Lee, Youngran | Click. Vol. 2 |
| 101 | Lee, Youngran / Kim, Janet | Click. Vol. 3 |
| 102 | Lee, Youngran | Click. Vol. 5 |
| 103 | Lee, Youngran | Click. Vol. 7 |
| 104 | Brezina, Corona | Coming out as transgender |
| 105 | Scientific American Editors | Confronting racism |
| 106 | Glasheen, Kate | Constellations |
| 107 | Man, Chella | Continuum |
| 108 | McGrody, Ellen | Coping with gender dysphoria |
| 109 | Lundquist-Arora, Stephanie | Coping with gender fluidity |
| 110 | Orr, Tamra | Coping with racial inequality |
| 111 | Frank, Dennis A | Counseling LGBTQ Americans |

JA236

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

| # | Author | Title |
|---|--------|-------|
| 112 | Beattie, Michael; Lenihan, Penny; Dundas, Robin; Sanderson, Cristiane | Counselling skills for working with gender diversity and identity |
| 113 | Seltzer, Olivia | Cramm this book : so you know WTF is going on in the world today |
| 114 | Petrikowski, Nicki Peter | Critical perspectives on gender identity |
| 115 | Peters, Jennifer | Critical perspectives on social justice |
| 116 | Volponi, Paul | Crossing lines |
| 117 | Steele, Hamish | DeadEndia. 1, The watcher's test |
| 118 | Steele, Hamish | DeadEndia. 2, The broken halo |
| 119 | Steele, Hamish | DeadEndia. 3, The divine order |
| 120 | Gow, Robin | Dear Mothman |
| 121 | Brothers, Meagan | Debbie Harry sings in French |
| 122 | Fine, Cordelia | Delusions of gender : how our minds, society, and neurosexism create difference |
| 123 | Gopal, Jyoti Rajan; Kohli, Svabhu | Desert queen |
| 124 | Novoa, Gabe Cole | diablo's curse |
| 125 | Parks, Casey | Diary of a misfit : a memoir and a mystery |
| 126 | Lukoff, Kyle | Different kinds of fruit |
| 127 | DeWitt, Peter M | Dignity for all : safeguarding LGBT students |
| 128 | Langwith, Jacqueline | Discrimination |
| 129 | Nair, Chandran | Dismantling global white privilege : equity for a post-Western world |
| 130 | Kallen, Stuart A | Does equality exist in America? |
| 131 | Pardes, Bronwen | Doing it right : making smart, safe, and satisfying choices about sex |
| 132 | Pincus, Meeg; Gimbel, Meridth McKean | Door by door : how Sarah McBride became America's first openly transgender senator |
| 133 | Campbell, Curtis | Dragging Mason County |
| 134 | Daniels, April | Dreadnought |
| 135 | Pascoe, C. J | Dude, you're a fag : masculinity and sexuality in high school |
| 136 | Kahn, Ben | Elle Campbell wins their weekend |
| 137 | Sass, A. J | Ellen outside the lines |
| 138 | Ogden, Charlie | Equality & diversity |
| 139 | Adams, Sabrina | Equality, social justice, and our future |
| 140 | Jewell, Tiffany | Everything I learned about racism I learned in school |
| 141 | McCormick, Anita Louise | Everything you need to know about nonbinary gender identities |
| 142 | Zeigler, Cyd | Fair play : how LGBT athletes are claiming their rightful place in sports |
| 143 | Calkhoven, Laurie; Solomon, Andrew | Far from the tree : how children and their parents learn to accept one another...our differences unite us |
| 144 | Callender, Kacen | Felix ever after |
| 145 | Higgins, Nadia | Feminism : reinventing the f-word |
| 146 | Cooper, Brittney C; Tanner, Chanel Craft; Morris, Susana M | Feminist AF : a guide to crushing girlhood |
| 147 | Meem, Deborah T; Gibson, Michelle; Alexander, Jonathan | Finding out : an introduction to LGBT studies |
| 148 | Braden, Ann | Flight of the puffin |
| 149 | Ellison, Joy Michael; Ficorilli, Francesca | Flor fights back : a Stonewall Riots survival story |
| 150 | Forman, Gayle | Frankie & Bug |
| 151 | Winterson, Jeanette; Shelley, Mary Wollstonecraft | Frankissstein : a love story |
| 152 | Clark, Kristin | Freakboy |
| 153 | Rorby, Ginny | Freeing Finch |
| 154 | Giles, Lamar | Fresh ink |
| 155 | Taylor, Keeanga-Yamahtta | From #BlackLivesMatter to Black liberation |
| 156 | Thom, Kai Cheng; Li, Wai-Yant; Ching, Kai Yun | From the stars in the sky to the fish in the sea |
| 157 | Axelrod, JadziaTaylor, JessPeter, CrisMaher | Galaxy : the prettiest star |
| 158 | Pohlen, Jerome | Gay and lesbian history for kids : the century-long struggle for LGBT rights, with 21 activities |
| 159 | Seba, Jaime | Gay characters in theater, movies, and television: new roles, new attitudes |
| 160 | Andryszewski, Tricia | Gay rights |
| 161 | McCarthy, Rose | Gender dysphoria |
| 162 | Petrikowski, Nicki Peter | Gender identity |
| 163 | Cook, Maria; Cornell, Alexis | Gender identity : beyond pronouns and bathroom |
| 164 | Light, Kate | Gender identity : the search for self |
| 165 | Winfield, Cynthia L | Gender identity : the ultimate teen guide |
| 166 | Storck, Kelly; Gringi, Noah | gender identity workbook for kids : a guide to exploring who you are |
| 167 | Eboch, M. M | Gender in the 21st century |

JA237

## PRIVILEGED & CONFIDENTIAL
## FILED EX PARTE FOR IN CAMERA REVIEW

| | | |
|---|---|---|
| 168 | Cronn-Mills, Kirstin | Gender inequality in sports : from Title IX to world titles |
| 169 | McIntosh, Kenneth<br>Walker, Ida | Gender issues |
| 170 | Henneberg, Susan | Gender politics |
| 171 | Kobabe, Maia<br>Kobabe, Phoebe | Gender queer : a memoir by Maia Kobabe ; colors by Phoebe Kobabe. |
| 172 | Locke, Katherine | Gender rebels : 30 trans, nonbinary, and gender expansive heroes past and present |
| 173 | Gino, Alex | George |
| 174 | Girard, M-E | Girl mans up |
| 175 | Madrone, Kelly | GLBTQ : the survival guide for gay, lesbian, bisexual, transgender, and questioning teens |
| 176 | Tarttelin, Abigail | Golden boy : a novel |
| 177 | Polonsky, Ami | Gracefully Grayson |
| 178 | Gino, Alex | Green |
| 179 | Harris, Duchess<br>Rowell, Rebecca | Growing up LGBTQ |
| 180 | Herriot, Lindsay<br>Fry, Kate | Growing up trans : in our own words |
| 181 | Nations, Erin | Gumballs |
| 182 | Davis, Tanita S | Happy families |
| 183 | Bailar, Schuyler | He/she/they : how we talk about gender and why it matters |
| 184 | Yuill, Chris<br>Thorpe, Christopher | Heads up sociology |
| 185 | Oseman, Alice | Heartstopper. Volume 3 |
| 186 | Oseman, Alice | Heartstoper Volume 4 |
| 187 | White, Andrew Joseph | Hell followed with us |
| 188 | Burch, Christian | Hit the road, Manny |
| 189 | Parish, Theo | Homebody |
| 190 | La Sala, Ryan | Honeys |
| 191 | Hirst, Jo<br>Bardoff, Naomi | House for everyone : a story to help children learn about gender identity and gender expression |
| 192 | Kendi, Ibram X | How to be a (young) antiracist & HOW TO BE AN ANTIRACIST |
| 193 | Getty, Stuart<br>Thyng, Brooke | How to they/them : a visual guide to nonbinary pronouns and the world of gender fluidity |
| 194 | Beam, Cris | I am J |
| 195 | Herthel, Jessica<br>Jennings, Jazz<br>McNicholas, Shelagh | I am Jazz! |
| 196 | Bacon, Jennifer Nicole<br>Moreno, Leticia | I am an antiracist superhero! |
| 197 | Thom, Kai Cheng | I hope we choose love : a trans girl's notes from the end of the world |
| 198 | Murphy, Mannie | I never promised you a rose garden |
| 199 | Oseman, Alice | I was born for this |
| 200 | Deaver, Mason | I wish you all the best |
| 201 | Ogden, Charlie | Identity & gender |
| 202 | Maison, Corey | Identity : a story of transitioning |
| 203 | Schmermund, Elizabeth | Identity politics |
| 204 | Bulla, Michael Gray | If I can give you that |
| 205 | Russo, Meredith | If I was your girl |
| 206 | Grimm, Gavin<br>Lukoff, Kyle<br>Yang, J | If you're a kid like Gavin |
| 207 | Brown, Austin Channing | I'm still here : Black dignity in a world made for whiteness |
| 208 | Lombardo, Jennifer | Inside the LGBTQ+ movement |
| 209 | Johnson, Chelsea<br>Council, LaToya<br>Choi, Carolyn<br>Seil Smith, Ashley | Intersection allies : we make room for all |
| 210 | Eboch, M. M | Intersectionality and identity politics |
| 211 | Walton, Jessica<br>MacPherson, Dougal | Introducing Teddy : a gentle story about gender and friendship |
| 212 | Smith, Mychal Denzel | Invisible man, got the whole world watching : a young black man's education |
| 213 | Pinsky, DrewPinsky, Paulina | It doesn't have to be awkward : dealing with relationships, consent, and other hard-to-talk-about stuff |
| 214 | Thorn, Theresa<br>Grigni, Noah | It feels good to be yourself : a book about gender identity |
| 215 | Savage, Dan<br>Miller, Terry | It gets better : coming out, overcoming bullying, and creating a life worth living |
| 216 | Harris, Robie HEmberley, Michael | It's perfectly normal : changing bodies, growing up, sex, gender, and sexual health |
| 217 | Harris, Robie H<br>Emberley, Michael | It's so amazing! : a book about eggs, sperm, birth, babies, gender, and families |

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

| | | |
|---|---|---|
| 218 | Silverman, Erica<br>Hatam, Holly | Jack (not Jackie) |
| 219 | Hoffman, Sarah<br>Hoffman, Ian<br>Case, Chris | Jacob's new dress |
| 220 | Hoffman, Sarah<br>Hoffman, Ian<br>Case, Chris | Jacob's room to choose |
| 221 | Patel, Sonia | Jaya and Rasa |
| 222 | Rodger, Ellen | Jazz Jennings : voice for LGBTQ youth |
| 223 | Clark, Kristin Elizabeth | Jess, Chunk, and the road trip to infinity |
| 224 | Love, Jessica | Julián at the wedding |
| 225 | Love, Jessica | Julián is a mermaid |
| 226 | Hyde, Catherine Ryan | Jumpstart the world |
| 227 | Santana, Sol | Just Ash |
| 228 | Sass, A. J | Just shy of ordinary |
| 229 | McLemore, Anna-Marie | Lakelore |
| 230 | Mapua, Jeff | Lana Wachowski |
| 231 | Sánchez Vegara, Ma Isabel<br>Coles, Olivia Daisy | Laverne Cox |
| 232 | Staley, Erin | Laverne Cox |
| 233 | Stevenson, Noelle<br>Watters, Shannon<br>Ellis, Grace<br>Nowak, Carolyn<br>Williams, Brittney<br>Fleck, Aimee | Leñadoras. Un plan terrible |
| 234 | Moen, Erika<br>Nolan, Matthew | Let's talk about it : the teen's guide to sex, relationships, and being a human |
| 235 | Feldman, Heidi Carolyn | LGBT discrimination |
| 236 | Newton, David E | LGBT youth issues today : a reference handbook |
| 237 | Madrone, Kelly | LGBTQ : the survival guide for lesbian, gay, bisexual, transgender, and questioning teens |
| 238 | Harris, Duchess<br>Marciniak, Kristin | LGBTQ discrimination in America |
| 239 | Apelqvist, Eva | LGBTQ families : the ultimate teen guide |
| 240 | Morlock, Theresa | LGBTQ human rights movement |
| 241 | Henneberg, Susan | LGBTQ rights |
| 242 | Harris, Duchess<br>Lundin, Martha | LGBTQ rights and the law |
| 243 | Harris, Duchess<br>Wheeler, Jill C | LGBTQ service in the armed forces |
| 244 | Cronn-Mills, Kirstin | LGBTQ+ athletes claim the field : striving for equality |
| 245 | | LGBTQ+ history book. |
| 246 | Keehnen, Owen<br>Csicsko, David Lee | LGBTQ+ icons : a celebration of historical LGBTQ+ icons in the arts |
| 247 | Loh-Hagan, Virginia | LGBTQ+ rights |
| 248 | Aoki, Ryka | Light from uncommon stars |
| 249 | Gephart, Donna | Lily and Dunkin |
| 250 | Huntoon, Caroline | Linus and Etta could use a win |
| 251 | Kehoe, Rachel | Living with gender dysphoria |
| 252 | Schmatz, Pat | Lizard radio |
| 253 | Devine, Eric | Look past |
| 254 | Glass, Kelly | Looking at privilege and power |
| 255 | Harrison, Rory | Looking for group |
| 256 | Ford, Michael Thomas | Love & other curses |
| 257 | Bach, Mette | Love is love |
| 258 | Konayama, KataTamosaitis, AmberHawksm | Love me for who I am. 02 |
| 259 | Hicks, Faith ErinWatters, ShannonValero-O | Lumberjanes : bonus tracks |
| 260 | Stevenson, Noelle<br>Ellis, Grace<br>Allen, Brooklyn<br>Watters, Shannon | Lumberjanes. 1, Beware the kitten holy |
| 261 | Stevenson, NoelleEllis, GraceAllen, Brookly | Lumberjanes. 2, Friendship to the max |
| 262 | Stevenson, Noelle<br>Watters, Shannon<br>Ellis, Grace<br>Nowak, Carolyn<br>Williams, Brittney<br>Fleck, Aimee | Lumberjanes. 3, A terrible plan |
| 263 | Stevenson, NoelleWatters, ShannonEllis, Gr | Lumberjanes. 4, Out of time |
| 264 | Stevenson, NoelleWatters, ShannonLeyh, Ka | Lumberjanes. 5, Band together |

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

| | | |
|---|---|---|
| 265 | Watters, ShannonLeyh, KatPietsch, CareyEll | Lumberjanes. 6, Sink or swim |
| 266 | Watters, ShannonLeyh, KatPietsch, CareySo | Lumberjanes. Volume 7, A bird's-eye view |
| 267 | Watters, Shannon Leyh, Kat Pietsch, Carey | Lumberjanes. Volume 8, Stone cold |
| 268 | Watters, ShannonLeyh, KatNowak, Carolyn | Lumberjanes. Volume nine, On a roll |
| 269 | Wibowo, JessicaWibowo, Jacinta | Lunar boy |
| 270 | | Magical boy : a graphic novel. Volume 1 |
| 271 | | Magical boy : a graphic novel. Volume 2 |
| 272 | Harris, DuchessDeal, Heidi | Male privilege |
| 273 | McCarthy, Cory | Man o' war |
| 274 | Retener, Joëlle Wiley, DeAnn | Marley's Pride |
| 275 | Ellor, ZR | May the best man win |
| 276 | Saad, Layla F | Me and white supremacy |
| 277 | Armentrout, Jennifer L | Meet cute |
| 278 | Lee, Emery | Meet Cute Diary |
| 279 | Gow, Robin | Million quiet revolutions |
| 280 | Imani, Blair | Modern HERstory : stories of women and nonbinary people rewriting history |
| 281 | Johnson, Vicki Reid, Gillian | Molly's tuxedo |
| 282 | Xu, Wendy | Mooncakes |
| 283 | Silvera, Adam | More happy than not |
| 284 | Baldacchino, Christine Malenfant, Isabelle | Morris Micklewhite and the tangerine dress |
| 285 | Novoa, Gabe Cole Austen, Jane | Most ardently : a Pride & Prejudice remix |
| 286 | Labelle, Sophie | My dad thinks I'm a boy?! : a trans positive children's book |
| 287 | Pitman, Gayle E Tobacco, Violet | My Maddy |
| 288 | Estrela, Joana Hulme, Jay | My own way |
| 289 | Kilodavis, Cheryl DeSimone, Suzanne | My princess boy |
| 290 | Neal, DeShanna Neal, Trinity Twink, Art | My rainbow |
| 291 | Stuart, Scott | My shadow is pink |
| 292 | Karlsson, Adria Curci, Linus | My sister, Daisy |
| 293 | Osman, Jamila | Navigating intersectionality : how race, class, and gender overlap |
| 294 | Oseman, Alice | Nick and Charlie : a Heartstopper novella |
| 295 | Hughes, Susan Dawson, Willow | No girls allowed : tales of daring women dressed as men for love, freedom and adventure |
| 296 | McAdam, Tash | No one left but you |
| 297 | Gregorio, I. W | None of the above |
| 298 | Wild, A. M Yangni, Kah | Not he or she, I'm me |
| 299 | Higginbotham, Anastasia | Not my idea : a book about whiteness |
| 300 | Hagger-Holt, Sarah | Nothing ever happens here |
| 301 | Bailar, Schuyler | Obie is man enough |
| 302 | Deaver, Mason | Okay, Cupid |
| 303 | Radclyffe Lynch, Katie | OMG queer : short stories by queer youth |
| 304 | Hashimi, Nadia | One half from the east |
| 305 | Woolf, Virginia | Orlando : a biography |
| 306 | Hennessey, M. G Monster, Sfé R | other boy |
| 307 | Compton, D'Lane RMeadow, TeySchilt, Kris | Other, please specify : queer methods in sociology |
| 308 | Lukens, F. T | Otherworldly |
| 309 | McKenna, Miles | Out! : how to be your authentic self |
| 310 | Page, Elliot | Pageboy : a memoir |
| 311 | Wittlinger, Ellen | Parrotfish |
| 312 | Jaryn, Blue Cornejo, Xochitl | Payden's pronoun party |
| 313 | Van Ness, Jonathan Reid, Gillian | Peanut goes for the gold |
| 314 | Clemensha, Chase | People of pride : 25 great LGBTQ Americans |
| 315 | Emezi, Akwaeke | Pet |

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

| # | Author | Title |
|---|--------|-------|
| 316 | Wilson-Trudeau, Marty / Wilson, Phoenix / Kyak-Monteith, Megan | Phoenix gets greater |
| 317 | Finch, Michelle / Finch, Phoenix / Davey, Sharon | Phoenix goes to school : a story to support transgender and gender diverse children |
| 318 | Gravel, Elise / Blais, Mykaell | Pink, blue, and you! : questions for kids about gender and stereotypes |
| 319 | Caldwell, S. A / Season of Victory | Pride : an inspirational history of the LGBTQ+ movement |
| 320 | Stevenson, Robin | Pride : celebrating diversity & community |
| 321 | Wiener, Gary | Privilege in America |
| 322 | Loveless, Gina / Johnston, Lauri | Puberty is gross but also really awesome |
| 323 | Belge, Kathy / Bieschke, Marke | Queer : the ultimate LGBT guide for teens |
| 324 | Criswell, Shelby | Queer as all get out : 10 people who've inspired me |
| 325 | Sicardi, Arabelle / Tanat-Jones, Sarah | Queer heroes |
| 326 | Prager, Sarah / O'Ferrall, Zoë More | Queer, there, and everywhere : 23 people who changed the world |
| 327 | Finke, Leigh / Knapp, Jennifer | Queerfully and wonderfully made : a guide for LGBTQ+ Christian teens |
| 328 | G, Mady / Zuckerberg, J. R | Quick & easy guide to queer & trans identities |
| 329 | Watts, Julia | Quiver : a novel |
| 330 | LaPensée, Elizabeth / Oster, KC | Rabbit chase |
| 331 | Bunker, Lisa / Flint, Gillian | Rachel Levine |
| 332 | Diggs, Barbara | Racial bias : is change possible? |
| 333 | Parks, Peggy J | Racial discrimination |
| 334 | Nichols, Hedreich / Erickson, Leigh Ann / Wing, Kelisa | Racial justice in America : topics for change |
| 335 | Behnke, Alison | Racial profiling : everyday inequality |
| 336 | Green, Meghan | Racism in America : a long history of hate |
| 337 | Bonilla-Silva, Eduardo | Racism without racists : color-blind racism and the persistence of racial inequality in America |
| 338 | Prager, Sarah / Papworth, Sarah | Rainbow revolutionaries : 50 LGBTQ+ people who made history |
| 339 | Smid, Emmi | Rainbow village |
| 340 | Atwood, Megan | Raise the stakes |
| 341 | Angello, Michele / Bowman, Alisa | Raising the transgender child : a complete guide for parents, families & caregivers |
| 342 | Allen, Samantha | Real queer America : LGBT stories from red states |
| 343 | Hill, Katie Rain / Schrag, Ariel | Rethinking normal : a memoir in transition |
| 344 | Gino, Alex | Rick |
| 345 | Albee, Jay | Riley Reynolds crushes costume day |
| 346 | Fleming, Crystal Marie | Rise up! : how you can join the fight against white supremacy |
| 347 | Sanchez Vegara, Ma Isabel / Holmes, Wednesday | RuPaul |
| 348 | Levithan, David | Ryan and Avery |
| 349 | Sadowski, Michael | Safe is not enough : better schools for LGBTQ students |
| 350 | Borinsky, Agnes | Sasha Masha |
| 351 | Yoshino, Kenji / Glasgow, David | Say the right thing : how to talk about identity, diversity, and justice |
| 352 | Gottlieb, Iris | Seeing gender : an illustrated guide to identity and expression |
| 353 | McLemore, Anna-Marie / Fitzgerald, F. Scott | Self-made boys : a Great Gatsby remix |
| 354 | Silverberg, Cory / Smyth, Fiona | Sex is a funny word : a book about bodies, feelings, and you |
| 355 | Poole, Hilary W | Sexuality and gender identity |
| 356 | Ryle, Robyn | She he they me : for the sisters, misters, and binary resisters |
| 357 | Stanborough, Rebecca | She/he/they/them : understanding gender identity |
| 358 | Savage, Sarah / Garcin, Joules | She's my dad! : a story for children who have a transgender parent or relative |
| 359 | Thompson, Tamara | Should parents be allowed to choose the sex of their children? |
| 360 | McAdam, Tash | Sink or swim |
| 361 | Symes-Smith, Esme | Sir Callie and the champions of Helston |
| 362 | Symes-Smith, Esme | Sir Callie and the dragon's roost |
| 363 | Tobia, Jacob | Sissy : a coming-of-gender story |

JA241

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

| | | |
|---|---|---|
| 364 | Baker, Leo | Skate for your life |
| 365 | Huntoon, Caroline | Skating on Mars |
| 366 | Seba, Jaime | Smashing the stereotypes : what does it mean to be gay, lesbian, bisexual, or transgender? |
| 367 | Leyh, Kat | Snapdragon |
| 368 | Oluo, Ijeoma | So you want to talk about race |
| 369 | Andrews, Arin / Lyon, Joshua | Some assembly required : the not-so-secret life of a transgender teen |
| 370 | James, Rory | Some girls bind |
| 371 | Smith, Amber | Something like gravity |
| 372 | Daniels, April | Sovereign |
| 373 | Newman, Lesléa / Mola, Maria | Sparkle boy |
| 374 | Smith, Rachelle Lee | Speaking out : queer youth in focus |
| 375 | Polonsky, Ami | Spin with me |
| 376 | Gillman, Melanie | Stage dreams |
| 377 | Cherry-Paul, Sonja / Kendi, Ibram X / Reynolds, Jason / Baker, Rachelle | Stamped (for kids) : racism, antiracism, and you |
| 378 | Reynolds, Jason / Kendi, Ibram X | Stamped : racism, antiracism, and you |
| 379 | Gill, Joel Christian / Kendi, Ibram X | Stamped from the beginning : a graphic history of racist ideas in America |
| 380 | Kendi, Ibram X | Stamped from the beginning : the definitive history of racist ideas in America |
| 381 | Abdel-Magied, Yassmin / Nandhra, Aleesha | Stand up and speak out against racism |
| 382 | Walton, Jessica / Aska | Stars in their eyes |
| 383 | McSmith, Tobly | Stay gold |
| 384 | Dill, Khodi / starr, stylo | Stay up : racism, resistance, and reclaiming Black freedom |
| 385 | Bausum, Ann | Stonewall : breaking out in the fight for gay rights |
| 386 | Bongiovanni, Archie / Andrews, A | Stonewall Riots : making a stand for LGBTQ rights |
| 387 | Kaye, Julia | Super late bloomer : my early days in transition : an up and out collection |
| 388 | Ellison, Joy Michael / Silver, Teshika | Sylvia and Marsha start a revolution! : the story of the trans women of color who made LGBTQ+ history |
| 389 | Garvin, Jeff | Symptoms of being human |
| 390 | Winans, Justine Pucella | The Otherwoods |
| 391 | Johnston, E. K | That inevitable Victorian thing |
| 392 | Sanchez, Jasper | The (un)popular vote |
| 393 | Slater, Dashka | The 57 Bus |
| 394 | Bryant-Davis, Thema / Arrington, Edith | The antiracism handbook : practical tools to shift your mindset and uproot racism in your life & community |
| 395 | Jewell, Tiffany / Miles, Nicole | The antiracist kid : a book about identity, justice, and activism |
| 396 | Hohn, Nadia L / Nozari, Roza | The antiracist kitchen : 21 stories (and recipes) |
| 397 | Willia / Middle Schoolon, Lisa | The art of being normal |
| 398 | Van Otterloo, Ash | The beautiful something else |
| 399 | Thompson, Lin | The best liars in Riverview |
| 400 | Taylor, Sonya Renee | The book of radical answers : real questions from real kids just like you |
| 401 | Smith, Niki | The deep & dark blue |
| 402 | Ostertag, Molly Knox | The deep dark |
| 403 | Taibbi, Matt / Crabapple, Molly | The divide : American injustice in the age of the wealth gap |
| 404 | Whitley, Jeremy / Indigo, Bre | The dog knight |
| 405 | Simon, Rachel E / Grigni, Noah | The every body book : LGBTQ+ inclusive guide for kids about sex, gender, bodies, and families |
| 406 | Edgmon, H. E | The fae keeper |
| 407 | Deaver, Mason | The feeling of falling in love |
| 408 | Carroll, Georgie / McCann, Hannah | The feminism book |
| 409 | Levithan, David / Merrell, Billy | The full spectrum : a new generation of writing about gay, lesbian, bisexual, transgender, questioning, and other identities |
| 410 | Braun, Eric | The gay rights movement |
| 411 | Wind, Lee | The gender binary is a big lie : infinite identities around world |
| 412 | Testa, Rylan Jay / Coolhart, Deborah / Peta, Jayme | The gender quest workbook : a guide for teens & young adults exploring gender identity |
| 413 | Sanchez, Alex | The greatest superpower |
| 414 | Stanley, Stan | The hazards of love. Book 1, Bright world |
| 415 | Capetta, A. R | The heartbreak bakery |

JA242

## PRIVILEGED & CONFIDENTIAL
## FILED EX PARTE FOR IN CAMERA REVIEW

| | | |
|---|---|---|
| 416 | Oseman, Alice | The heartstopper yearbook |
| 417 | Thompson, Lin | The house that whispers |
| 418 | Moon, SarahLecesne, James | The letter Q : queer writers' notes to their younger selves |
| 419 | Murray, Douglas | The madness of crowds : gender, race and identity |
| 420 | MacGregor, Maya | The many half-lived lives of Sam Sylvester |
| 421 | Alexander, Michelle | The new Jim Crow : mass incarceration in the age of colorblindness |
| 422 | Eli, Adam | The new queer conscience |
| 423 | England, Remi K | The one true me and you : a novel |
| 424 | Medina | The one who loves you the most |
| 425 | Kiely, Brendan | The other talk : reckoning with our white privilege |
| 426 | Clarke, Cat | The pants project |
| 427 | Fitzsimons, Isaac | The passing playbook |
| 428 | Langford, Jo | The pride guide : a guide to sexual and social health for LGBTQ youth |
| 429 | Wang, Jen | The prince and dressmaker |
| 430 | Walls, Dale | The queer girl is going to be okay |
| 431 | Bean, Lexie Grigni, Noah | The ship we built |
| 432 | Thorpe, Christopher Yuill, Chris Hobbs, Mitchell Todd, Megan Tomley, Sarah Weeks, Marcus | The sociology book |
| 433 | White, Andrew Joseph | The spirit bares its teeth |
| 434 | Pochlmann, Tristan | The Stonewall riots : the fight for LGBT rights |
| 435 | McGhee, Heather C | The sum of us : how racism hurts everyone : adapted for young readers |
| 436 | Thomas, Aiden | The sunbearer trials |
| 437 | Bell, Darrin | The talk |
| 438 | Hudson, Wade Hudson, Cheryl Willis | The talk : conversations about race, love & truth |
| 439 | Grove, Emma | The third person |
| 440 | Brill, Stephanie A Pepper, Rachel | The transgender child |
| 441 | Brill, Stephanie A Kenney, Lisa | The transgender teen : a handbook for parents and professionals supporting transgender and non-binary teens |
| 442 | Cole, Olivia A | The truth about white lies |
| 443 | Novoa, Gabe Cole | The wicked bargain |
| 444 | Edgmon, H. E | The witch king |
| 445 | Bennett, MichaelZirin, Dave | Things that make white people uncomfortable |
| 446 | Jewell, Tiffany Durand, Aure?lia | This book is anti-racist |
| 447 | Dawson, Juno Gerrell, Spike | This book is gay |
| 448 | Underhill, Edward | This day changes everything : a novel |
| 449 | Pitman, Gayle E Litten, Kristyna | This day in June |
| 450 | Frankel, Laurie | This is how it always is |
| 451 | Locke, Katherine Melleby, Nicole | This is our rainbow : 16 stories of her, him, them, and us |
| 452 | Oseman, Alice | This winter : a Heartstopper novella |
| 453 | Lee, Yoon Ha | Tiger honor |
| 454 | Prince, Liz | Tomboy |
| 455 | McBride, Sarah | Tomorrow will be different : love, loss, and the fight for trans equality |
| 456 | Lukoff, Kyle | Too bright to see |
| 457 | Bertie, Alex | Trans mission : my quest to a beard |
| 458 | Owl Fisher, Fox | Trans teen survival guide |
| 459 | Gonzales, Kathryn Rayne, Karen | Trans+ : love, sex, romance, and being you |
| 460 | Teich, Nicholas M | Transgender 101 : a simple guide to a complex issue |
| 461 | | Transgender activists and celebrities |
| 462 | Cronn-Mills, Kirstin | Transgender lives : complex stories, complex voice |
| 463 | | Transgender rights : striving for equality |
| 464 | Penne, Barbra | Transgender role models and pioneers |
| 465 | Davis, G. Haron | Transmogrify! : 14 fantastical tales of trans magic |
| 466 | Beam, Cris | Transparent : love, family, and living the T with transgender teenagers |
| 467 | Skelton, J. Wallace Johnson, Nick | Transphobia : deal with it and be a gender transcender |
| 468 | Agna, Gwen Rotner, Shelley | True you : a gender journey |

JA243

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

|  | | |
|---|---|---|
| 469 | McClintick, Joanna<br>Medina, Juana | Twas the night before Pride |
| 470 | Key, Janet | Twelfth |
| 471 | Acho, Emmanuel | Uncomfortable conversations with a black boy |
| 472 | Acho, Emmanuel | Uncomfortable conversations with a black man |
| 473 | Villarosa, Linda | Under the skin : the hidden toll of racism on American lives and on the health of our nation |
| 474 | Dawson, Juno | Understanding gender |
| 475 | Gagne, Tammy | Understanding gender dysphoria |
| 476 | Nardo, Don | Understanding gender identity |
| 477 | Easter, Robin | Upstaged |
| 478 | McLemore, Anna-Marie<br>McLemore, Elliott | Venom & vow |
| 479 | Anders, Charlie Jane | Victories greater than death |
| 480 | Shimura, Takako<br>Thorn, Matt | Wandering Son. Volume five |
| 481 | Shimura, Takako<br>Thorn, Matt | Wandering son. Volume four |
| 482 | Shimura, Takako<br>Thorn, Rachel | Wandering son. Volume one |
| 483 | Shimura, Takako<br>Thorn, Matt | Wandering Son. Volume seven |
| 484 | Shimura, Takako<br>Thorn, Matt | Wandering Son. Volume six |
| 485 | Shimura, Takako<br>Thorn, Rachel | Wandering son. Volume two |
| 486 | Wang, Jen | Wangjawa deuleseumeikeo |
| 487 | Hernandez, Jasmin<br>Swizz Beatz<br>Leerasanthanah, Sunny | We are here : visionaries of color transforming the art world |
| 488 | Anderson, CarolBolden, TonyaStone, Nic | We are not yet equal : understanding our racial divide |
| 489 | Coates, Ta-Nehisi | We were eight years in power : an American tragedy |
| 490 | Hancox, Lewis | Welcome to St. Hell |
| 491 | Robinson, Lisa<br>Berke, Lauren Simkin | Were I not a girl : the inspiring and true story of Dr. James Barry |
| 492 | Locke, Katherine<br>Passchier, Anne | What are your words? : a book about pronouns |
| 493 | Henry, Jessica S<br>Wing, Kelisa | What does it mean to defund the police? |
| 494 | Nichols, Hendreich<br>Wing, Kelisa | What is anti-racism? |
| 495 | Wilson, Lakita<br>Copeland, Gregory | What is Black Lives Matter? |
| 496 | Nichols, HedreichWing, Kelisa | What is the Black Lives Matter movement? |
| 497 | Erickson, Leigh Ann<br>Wing, Kelisa | What is white privilege? |
| 498 | Liang, Bridget | What makes you beautiful |
| 499 | Arnold, Elana K<br>Davick, Linda | What Riley wore |
| 500 | Medina, Nico<br>Murray, Jake | What was Stonewall? |
| 501 | Zalcman, Daniella<br>Ickow, Sara | What we see : women & nonbinary perspectives through the lens |
| 502 | Murguia, Bethanie Deeney | What's your name? |
| 503 | Kawa, Katie | What's gender identity? |
| 504 | Baron, Dennis E | What's your pronoun? : beyond he & she |
| 505 | Lukoff, Kyle<br>Juanita, Kaylani | When Aidan became a brother |
| 506 | McLemore, Anna-Marie | When the moon was ours |
| 507 | Bandele, AshaKnauer, BeneeDavis, Angela Y | When they call you a terrorist : a story of Black Lives Matter and the power to change the world Both versions adult and YA |
| 508 | Allred, Alexandra Powe | When women stood : the untold history of females who changed sports and the world |
| 509 | DiAngelo, Robin J | White fragility : why it's so hard for white people to talk about racism |
| 510 | Blakemore, M. T | White privilege |
| 511 | Ryde, Judy | White privilege unmasked : how to be part of the solution |
| 512 | Anderson, Carol | White rage : the unspoken truth of our racial divide |
| 513 | Pessin-Whedbee, Brook<br>Bardoff, Naomi | Who are you? : the kid's guide to gender identity |
| 514 | Eddo-Lodge, Reni | Why I'm no longer talking to white people about race |
| 515 | | With honor and integrity : transgender troops in their own words |
| 516 | Branfman, Jonathan<br>Benbassat, Julie | You be you! : the kid's guide to gender, sexuality, and family |
| 517 | Mirk, Sarah | You do you : figuring out your body, dating, and sexuality |

**JA244**

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

| | | |
|---|---|---|
| 518 | Holmes, Melisa / Hutchison, Trish / Lowe, Kathryn | You-ology : a puberty guide for every body |
| 519 | Penne, Barbra / Renehan, Patrick | Your rights as an LGBTQ+ teen |
| 520 | Bunker, Lisa | Zenobia July |
| 521 | Niver, Heather Moore | Zoom in on equality |
| 522 | Sanchez, Jasper | The (un)popular vote |
| 523 | Ryle, Robyn | Throw like a girl, cheer like a boy : the evolution of gender, identity, and race in sports |
| 524 | Arreola, Veronica | J is for justice! |
| 525 | Browne, Mahogany L / Taylor, Theodore / Acevedo, Elizabeth / Gatwood, Olivia | Woke : a young poet's call to justice |
| 526 | Tatum, Beverly Daniel | Why are all the Black kids sitting together in the cafeteria? and other conversations about race |
| 527 | Palmer, Bill | What causes sexual orientation? : genetics, biology, psychology |
| 528 | Imani, Blair | Modern HERstory : stories of women and nonbinary people rewriting history |
| 529 | De La Torre, Miguel | Burying white privilege : resurrecting a badass Christianity |
| 530 | Green, Simon Jame | Gay club! |
| 531 | Napoles, Desmond | Be amazing : a history of pride |
| 532 | Kate, Lauren | One true wish |
| 533 | Fatima, El-Mekki | How can I be an ally? |
| 534 | Dyson, Michael | Long time coming : reckoning with race in America |
| 535 | Lee, Youngran | Click. Vol. 6 |
| 536 | Lee, Youngran | Click. Vol. 1 |
| 537 | Lee, Youngran | Click. Vol. 8 |
| 538 | Orr, Tamra | Home and Family Relationships(Teens: Being Gay, Lesbian, Bisexual, or Transgender |
| 539 | Harris, Duchess | LGBTQ social movements in America |
| 540 | Worth, Richard | Life at school and in the community (TEENS : BEING GAY, LESBIAN, BISEXUAL, OR TRANSGE) |
| 541 | Hurt, Avery Elizabeth | Confronting LGBTQ+ discrimination |
| 542 | Tisby, Jemar | How to fight racism : a guide to standing up for racial justice |
| 543 | Loh-hagan, Virginia | Racial justice |
| 544 | Ewing, Chana | An ABC of equality |
| 545 | Laughlin, Kara | The racial justice movement |
| 546 | Rourke, Mooney, Beck | We are Mayhem |
| 547 | Scientific America | The science of identity |
| 548 | Stevenson, Robin | Pride: The celebration and the struggle |
| 549 | Smith, Devlin | The fight for LGBTQ+ rights |
| 550 | Rarus, Pat | The LGBT rights movement |
| 551 | Oseman, Alice | Heartstopper. Volume 5 |
| 552 | Cart, Michael | How beautiful the ordinary : twelve stories of identity |
| 553 | Williams, Alicia | The Talk |
| 554 | Erickson-Schroth, Laura / Jacobs | You're in the wrong bathroom!" : and 20 other myths and misconceptions about transgender and gender- nonconforming people |
| 555 | William, Lauren | 500 AP psychology questions to know by test day |
| 556 | Dwyer, Helen | Abnormal psychology |
| 557 | Weseley, Allyson / McEntarffer, Robert | AP psychology |
| 558 | | AP psychology prep plus, 2020-2021. |
| 559 | Maitland, Laura Lincoln | AP psychology, 2016 |
| 560 | McEntarffer, Robert / Whitlock, Kristin | AP Q&A psychology : 600 questions and answers |
| 561 | Bissinger, Caleb | Are there two Americas? |
| 562 | Weseley, Allyson / McEntarffer, Robert | Barron's AP psychology premium |
| 563 | Harris, Duchess | Black lives matter |
| 564 | Maryellen Lo Bosco | Confronting racism |
| 565 | Hurt, Avery Elizabeth | Coping with hate and intolerance |
| 566 | Fisanick, Christina | Discrimination |
| 567 | Smith, Andrew | Grasshopper jungle : a history |
| 568 | Jaeckel, Jenny | House of Rougeaux |
| 569 | Dutton, Talia | M is for monster |
| 570 | Eboch, M. M | Masculinity in the twenty-first century |
| 571 | Howard, Greg | Middle school's a drag : you better work! |
| 572 | Suen, Anastasia | Respecting diversity |
| 573 | Crespo, Alex | Saint Juniper's folly |
| 574 | Iloh, Candice | Salt the water |
| 575 | White, Jacquelyn W | Taking sides. Clashing views in gender |

JA245

**PRIVILEGED & CONFIDENTIAL**
**FILED EX PARTE FOR IN CAMERA REVIEW**

| | | |
|---|---|---|
| 576 | Guo, Winona<br>Vulchi, Priya | Tell me who you are : sharing our stories of race, culture, and identity |
| 577 | Anthony, David | What's diversity? |
| 578 | Gonzalez, Maya Christina | When a bully is president : truth and creativity for oppressive times |
| 579 | Kyi, Tanya Lloyd<br>Shannon, Drew | This is your brain on stereotypes : how science is tackling unconscious bias |
| 580 | Howell, Izzi | Prejudice |
| 581 | Rusch, Elizabeth | You call this democracy? : how to fix our government and deliver power to the people |
| 582 | Edwards, Sue Bradford | Black Lives Matter |
| 583 | Watters, Shannon<br>Leyh, Kat<br>Pietsch, Carey | Lumberjanes. Volume eleven, Time after crime |
| 584 | Watters, Shannon<br>Leyh, Kat<br>Pietsch, Carey | Lumberjanes. Volume ten, Parents' day |
| 585 | Watters, Shannon<br>Leyh, Kat<br>Pietsch, Carey | Lumberjanes. Volume twelve, Jackalope springs eternal |
| 586 | M.E. Corey | Out of blue comes green |
| 587 | Feinberg, Annah | The Kilroys list : 67 monologues and scenes by women and nonbinary playwrights |
| 588 | Marcovitz, Hal | Teens & LGBT issues |
| 589 | Mukwa, Cameron | The ribbon skirt : a graphic novel |
| 590 | Celano, Marianne | Something happened in our town : a child's story about racial injustice |
| 591 | Payment, Simone | Friendship, dating, and relationships |
| 592 | Sanna, Emily | Gay believers : homosexuality and religion |
| 593 | Palmer, Bill | Homophobia : from social stigma to hate crimes |
| 594 | Nagle, Jeanne | GLBT teens and society |
| 595 | Juno Dawson | What's the T? |
| 596 | De Dios, Ruz, Olga | If you're a drag queen and you know it |

**JA246**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| E.K. and S.K., minors, by and through their parent and next friend, LINDSEY KEELEY, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) | Case No. 1:25-cv-637 (PTG/IDD) |
| v. | ) ) ) | |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## NOTICE OF APPEAL

Pursuant to Federal Rule of Appellate Procedure 3, notice is hereby given that Defendants in the above-captioned case appeals to the United States Court of Appeals for the Fourth Circuit from the Order entered on October 20, 2025 by the Honorable Patricia T. Giles, granting Plaintiffs' motion for a preliminary injunction and entering a preliminary injunction against Defendants. *See* Dkt. Nos. 58-59. The Order dated October 20, 2025 is an appealable interlocutory decision of a district court under 28 U.S.C. § 1292(a)(1).

//

//

//

1
**JA247**

Dated: December 18, 2025

Respectfully submitted,

LINDSEY HALLIGAN
United States Attorney and Special Attorney

TODD W. BLANCHE
Deputy Attorney General

ROBERT K. MCBRIDE
First Assistant United States Attorney

By:        /s/
MEGHAN E. LOFTUS
MATTHEW J. MEZGER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3757/3741
Fax:    (703) 299-3983
Email: meghan.loftus@usdoj.gov
          matthew.mezger@usdoj.gov
          *Counsel for Defendants*

2
**JA248**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY;  O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG;  L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY, | Case No. 1:25-cv-00637-PTG-IDD |
| Plaintiffs, | Hon. Patricia Tolliver Giles |
| v. |  |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense, |  |
| Defendants. |  |

**NOTICE OF CROSS-APPEAL**

Pursuant to Federal Rule of Appellate Procedure 4(A)(3), notice is hereby given that

Plaintiffs cross-appeal to the United States Court of Appeals for the Fourth Circuit from the

Order entered on October 20, 2025 by the Honorable Patricia T. Giles, granting Plaintiffs' motion

for a preliminary injunction and entering a preliminary injunction against Defendants only as to

1

**JA249**

Plaintiffs' five Department of Defense Education Activity (DoDEA) schools. *See* Dkt. 58, Dkt. 59. The Order dated October 20, 2025 is an appealable interlocutory decision of a district court under 28 U.S.C. § 1292 (a)(1).

Dated: December 23, 2025

Respectfully submitted,

/s/ Matthew Callahan_____

Matthew Callahan, VSB No. 99823
Eden Heilman, VSB No. 93554
ACLU of Virginia Foundation
P.O. Box 26464
Richmond, VA 23261
(804) 644-8080
eheilman@acluva.org
mcallahan@acluva.org

Emerson J. Sykes
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
esykes@aclu.org

Corey M. Shapiro
William E. Sharp
ACLU of Kentucky Foundation
325 W. Main Street, Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org

*Counsel for Plaintiffs*

2

**JA250**

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I uploaded a copy of Plaintiffs' Notice of Cross-Appeal using the CM/ECF system, which will cause notice to be served electronically to all parties.

Dated: December 23, 2025                                      Respectfully submitted,

                                                             /s/ Matthew Callahan

                                                             Matthew Callahan, VSB No. 99823
                                                             ACLU of Virginia Foundation
                                                             P.O. Box 26464
                                                             Richmond, VA 23261
                                                             (804) 644-8080
                                                             mcallahan@acluva.org

3

**JA251**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG;  L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY,<br><br>            Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,<br><br>            Defendants. | Case No. 1:25-cv-00637-PTG-IDD<br><br>Hon. Patricia Tolliver Giles |

<u>**PLAINTIFFS' NOTICE TO COURT**</u>

Plaintiffs, through their undersigned counsel, respectfully provide notice of the following changes in status pertaining to their enrollment in Department of Defense Education Activity (DoDEA) schools.

Plaintiff O.H. is currently enrolled in DoDEA school Fort Campbell Middle School for the 2025-2026 academic year. Plaintiffs S.H. and H.H. continue to attend DoDEA school

1

**JA252**

Barsanti Elementary, in which they were enrolled at the time of filing this case. *See* Attach. A, Second Decl. of Jessica Henninger ¶ 5.

Plaintiff E.G. is currently enrolled in DoDEA school Fort Campbell Middle School for the 2025-2026 academic year. *See* Attach. B, Second Decl. of Megan Jebeles ¶ 4.

Plaintiffs E.K. and S.K. are currently enrolled in non-DoDEA local schools in Germany for the 2025-2026 academic year. *See* Attach. C, Second Decl. of Lindsey Keeley ¶ 3.

Plaintiffs L.K. 1, L.K. 2, and L.K. 3 are currently enrolled in non-DoDEA local schools in Arizona for the 2025-2026 academic year. *See* Attach. D, Second Decl. of Anna Kenkel ¶¶ 3-4.

Plaintiff M.T. continues to attend DoDEA school Aviano Middle-High School, in which she was enrolled at the time of filing this case.

Plaintiffs E.Y. and C.Y. continue to attend DoDEA school Aviano Middle-High School, in which they were enrolled at the time of filing this case.

Dated: December 23, 2025

Respectfully submitted,

/s/ Matthew Callahan

Emerson J. Sykes
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
esykes@aclu.org

Matthew Callahan, VSB No. 99823
Eden Heilman, VSB No. 93554
ACLU of Virginia Foundation
P.O. Box 26464
Richmond, VA 23261
(804) 644-8080
mcallahan@acluva.org
eheilman@acluva.org

2

**JA253**

Corey M. Shapiro
William E. Sharp
ACLU of Kentucky Foundation
325 W. Main Street, Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org                                *Counsel for Plaintiffs*

**JA254**

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I uploaded a copy of Plaintiffs' Notice to Court using the CM/ECF system, which will cause notice to be served electronically to all parties.

Dated: December 23, 2025                     Respectfully submitted,

                                             /s/ Matthew Callahan

                                             Matthew Callahan, VSB No. 99823
                                             ACLU of Virginia Foundation
                                             P.O. Box 26464
                                             Richmond, VA 23261
                                             (804) 644-8080
                                             mcallahan@acluva.org

**JA255**

# Attachment A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY;  O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG;  L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY, | Case No. 1:25-cv-00637-PTG-IDD <br><br> Hon. Patricia Tolliver Giles |
|         Plaintiffs, |  |
| v. |  |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense, |  |
|         Defendants. |  |

**SUPPLEMENTAL DECLARATION OF JESSICA HENNINGER**

I, Jessica Henninger, hereby declare:

1.     The facts set forth in this declaration are based on my personal knowledge.

**JA257**

2. This declaration is made in my personal capacity as a parent, and it is not intended to, nor does it represent the position of the US Government, the Department of Defense (DoD), or any of the Armed Services.

3. My spouse is an active duty service member currently stationed at Fort Campbell, Kentucky where we have lived since October, 2024. Fort Campbell is a three-year duty station for my husband.

4. My spouse and I have three children who are (for the 2025-2026 school year) all attending DoD Education Activity (DoDEA) schools.

5. In April, 2025, when this case was filed, all three of our children attended the DoDEA school Barsanti Elementary, 7409 McAuliffe Loop, Fort Campbell, Kentucky 42223-6025. Now, only our two youngest children, S.H. and H.H., attend Barsanti Elementary. They are in Kindergarten and the first grade. Our oldest child, O.H., is now in the fifth grade at a different DoDEA school, Fort Campbell Middle School which is located at 71 South Carolina Avenue, Fort Campbell, Kentucky 42223-5134.

6. Our relationship with DoDEA will continue throughout the duration of this duty station, as we intend to keep the youngest two children enrolled at Barsanti Elementary and the oldest child enrolled at Fort Campbell Middle School until my spouse completes this three-year duty station or we are reassigned to a different duty station, whichever occurs first. We also intend to enroll our children in whatever DoDEA schools are available, if any, at the next as-yet unknown duty station.

7. It is my desire that Fort Campbell Middle School be included within the Court's preliminary injunction ruling issued on October 20, 2025. Specifically, absent the injunction, Fort Campbell Middle School will adhere to the DoDEA implementation guidance relating to

**JA258**

Executive Order Nos. 14168 ("Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"), 14190 ("Ending Radical Indoctrination in K-12 Schooling"), and 14185 ("Restoring America's Fighting Force").

8. That implementation will include the Secretary of Defense's guidance prohibiting "Instruction on Critical Race Theory, Gender Ideology, and [Diversity, Equity, and Inclusion]," forbidding any element within DoD from providing instruction on these topics as part of a curriculum, and "prohibiting the use of official resources to host celebrations or events related to cultural awareness months." Dkt. 10-20: Restoring America's Fighting Force (Jan. 29, 2025); Dkt. 10-18: Identity Months Dead at DoD (Jan. 31, 2025); Dkt. 10-14: DoDEA Letter to Parents (Feb. 10, 2025).

9. Moreover, absent being subject to the Court's Oct. 20, 2025 Preliminary Injunction ruling, Fort Campbell Middle School will also be subject to DoDEA's "operational compliance review to ensure alignment with" the Executive Orders identified above. Dkt. 10-14.

10. Thus, Fort Campbell Middle School, at present, is barred from providing educational opportunities for O.H. to learn about African Americans', women's, and other marginalized groups' history and culture; including a lesson on the impact of immigration on the United States, Dkt 1: Compl., at ¶ 73. O.H. enthusiastically participated in Black History Month lessons and activities before DoDEA banned them, and we would like him to have the opportunity to do so again. While at Barsanti, the injunction is in place and Black History Month is permitted, at Fort Campbell Middle School recognizing Black History Month is prohibited.

11. I have reviewed the list of 596 books banned from DoDEA schools identified by Defendants in this litigation. As a parent, it is my sincere desire that O.H. be exposed to the ideas and themes about racial equity, historical inequality, and diversity contained in those books

3

**JA259**

generally. Further, it is my intention to ensure that O.H. checks out and read books from that list of 596 banned books so that we may discuss the ideas and themes contained in them. Specific books from the list that I intend to ensure O.H. checks out and reads include the following: A Girls Guide to Joining the Resistance, A Smart Girls Guide to Race and Inclusion, Ab(solutely) Normal, All Kinds of Other, Allies, Better Than We Found It, Body Talk, and many more. To be honest, I see the need for every book on this list as long as they are age appropriate to the child themselves. These are all important ideas for children and adult alike to be exposed to and to discuss.

12.    As this court recognized in its Preliminary Injunction ruling, these ongoing curricular and book removals will result in irreparable harm to O.H. in being deprived of her First Amendment right to receive information regarding these subjects.


I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on the 19th day of December, 2025.

_Jessica Henninger_

4

**JA260**

# Attachment B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER; E.G., a minor, by and through his parent and next friend MEGAN JEBELES; E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG; L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY, | Case No. 1:25-cv-00637-PTG-IDD  Hon. Patricia Tolliver Giles |

Plaintiffs,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,

Defendants.

**DECLARATION OF MEGAN JEBELES**

I, Megan Jebeles, hereby declare

1. The facts set forth in this declaration are based on my personal knowledge.

**JA262**

2. This declaration is made in my personal capacity as a parent, and it is not intended to, nor does it represent the position of the US Government, the Department of Defense (DoD), or any of the Armed Services.

3. My spouse is an active duty service member currently stationed at Fort Campbell, Kentucky where we have lived since July, 2024. Fort Campbell is a 3-year duty station for my husband.

4. My spouse and I now have two children, the oldest of which—E.G.—currently attends the fifth grade (for the 2025-2026 school year) at a DoD Education Activity (DoDEA) school, Fort Campbell Middle School.

5. In April, 2025, when this case was filed, E.G. attended fourth grade at Barsanti Elementary, a different DoDEA school at Fort Campbell. At that time, we anticipated that E.G. would remain at Barsanti Elementary through the completion of the fifth grade before transferring to a middle school. However, after successfully completing the fourth grade, E.G. was assigned to attend fifth grade at Fort Campbell Middle School where he now attends. Fort Campbell Middle School is located at 71 South Carolina Avenue, Fort Campbell, Kentucky 42223-5134.

6. We intend to keep E.G. enrolled in Fort Campbell Middle School for the fifth, sixth, and seventh grades, or until my spouse completes this three year duty station and we are reassigned to a different duty station, whichever occurs first. At any future duty station, we nonetheless intend to enroll our children in whatever DoDEA school are available, if any.

7. It is my desire that Fort Campbell Middle School be included within the Court's preliminary injunction ruling issued on October 20, 2025. Specifically, absent the injunction, Fort Campbell Middle School will adhere to the DoDEA implementation guidance relating to Executive Order Nos. 14168 ("Defending Women from Gender Ideology Extremism and

2

**JA263**

Restoring Biological Truth to the Federal Government"), 14190 ("Ending Radical Indoctrination in K-12 Schooling"), and 14185 ("Restoring America's Fighting Force").

8. That implementation will include the Secretary of Defense's guidance prohibiting "Instruction on Critical Race Theory, Gender Ideology, and [Diversity, Equity, and Inclusion]," forbidding any element within DoD from providing instruction on these topics as part of a curriculum, and "prohibiting the use of official resources to host celebrations or events related to cultural awareness months." Dkt. 10-20: Restoring America's Fighting Force (Jan. 29, 2025); Dkt. 10-18: Identity Months Dead at DoD (Jan. 31, 2025); Dkt. 10-14: DoDEA Letter to Parents (Feb. 10, 2025).

9. Moreover, absent being subject to the Court's Oct. 20, 2025 Preliminary Injunction ruling, Fort Campbell Middle School will also be subject to DoDEA's "operational compliance review to ensure alignment with" the Executive Orders identified above. Dkt. 10-14.

10. Thus, Fort Campbell Middle School, at present, is barred from providing educational opportunities for E.G. to learn about African Americans', women's, and other marginalized groups' history and culture; including a lesson on the impact of immigration on the United States, Dkt 1: Compl., at ¶ 73; and from stocking the 596 books identified by Defendants as having been  removed from DoDEA libraries.

11. As this court recognized in its Preliminary Injunction ruling, these ongoing curricular and book removals will result in irreparable harm to E.G. in being deprived of his First Amendment right to receive information regarding these subjects.

3

**JA264**

JA265

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on the __27__ day of October, 2025.

_____
Megan Jebeles

**JA265**

# Attachment C

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER; E.G., a minor, by and through his parent and next friend MEGAN JEBELES; E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG; L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY, | Case No. 1:25-cv-00637-PTG-IDD  Hon. Patricia Tolliver Giles |
|          Plaintiffs, |  |
| v. |  |
| DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense, |  |
|          Defendants. |  |

## SECOND DECLARATION OF LINDSEY KEELEY

I, Lindsey Keeley, hereby declare,

1. I am more than 18 years old, competent to be a witness, and the facts set forth in this

   declaration are based on my own personal knowledge.

**JA267**

2. I am married to an active-duty service member currently stationed in Boeblingen, Germany, where we have lived since July 2025. Prior to July 2025, my husband was stationed in Quantico, Virginia.

3. My husband and I have two children, E.K. and S.K. They are zoned to Patch Elementary School, a DoD Education Activity (DoDEA) school serving U.S. Army Garrison Stuttgart, Germany. However, for the 2025-2026 academic year, in which S.K. is in 2nd grade and E.K. is in fifth grade, after a full consideration of the options available to us we decided to enroll them in local (i.e., non-DoDEA) schools.

4. In April, 2025, when this case was filed, both E.K. and S.K. attended Crossroads Elementary School, a DoDEA school in Virginia. In July, 2025, my husband executed accompanied orders overseas, leading to our relocation to Germany and my children's enrollment in the non-DoDEA schools they currently attend.

5. Although E.K. and S.K currently attend non-DoDEA schools, we expect our family's relationship with DoDEA schools to continue. Based on my husband's current rank, age, and duration of military service, we expect that our children will be eligible to attend DoDEA schools through high school. Obviously, it is a reality of life for military families such as ours that frequent changes of station can lead to our children attending a variety of DoDEA and non-DoDEA schools throughout the course of their K-12 education.

6. Aside from the concern we feel over the changes to DoDEA curricula stemming from the implementation of Executive Orders Nos. 14168 ("Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"), 14190 ("Ending Radical Indoctrination in K-12 Schooling"), and 14185 ("Restoring America's Fighting Force"), as well as the related DoDEA directives, we have enjoyed our previous experience

2

**JA268**

with DoDEA schools and intend to re-enroll our children in DoDEA schools should our current family or school situation change, or if we move in the future to a location where DoDEA schools are a desirable option.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on the 21st day of December, 2025.

_____
Lindsey Keeley

3

**JA269**

# Attachment D

Case 1:25-cv-00637-PTG-IDD    Document 64-4    Filed 12/23/25    Page 2 of 3 PageID# 262

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER; E.G., a minor, by and through his parent and next friend MEGAN JEBELES; E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG; L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY,

          Plaintiffs,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,

          Defendants.

Case No. 1:25-cv-00637-PTG-IDD

Hon. Patricia Tolliver Giles

## SECOND DECLARATION OF ANNA KENKEL

I, Anna Kenkel, hereby declare,

1. I am more than 18 years old, competent to be a witness, and the facts set forth in this declaration are based on my own personal knowledge.

**JA271**

Case 1:25-cv-00637-PTG-IDD    Document 64-4    Filed 12/23/25    Page 3 of 3 PageID# 993

2. This declaration is made in my personal capacity as a parent, and it is not intended to, nor does it represent the position of the US Government, the Department of Defense (DoD), or any of the Armed Services.

3. I am married to a retired service member who currently works for a contracting company for the U.S. Air Force. His official retirement date is November 1, 2025. In Augst of 2025, our family moved to Goodyear, Arizona, where we currently live. We previously lived in Japan, where my husband was an active-duty service member stationed at the Misawa Air Base.

4. We have four children, all of whom currently attend non-DoD Educational Activity (DoDEA) schools.

5. In April 2025, at the time this case was filed, three of my children attended DoDEA schools on the Misawa Air Base. L.K. 1 attended fourth grade and L.K. 2 attended sixth grade at Sollars Elementary School. L.K. 3 attended eighth grade at Edgren Middle School. My youngest child at time of filing was not yet old enough to be in school.

6. Although my husband is retired, he works for a company that is a contractor with the Air Force, so if we were sent overseas on behalf of his company our children would be eligible for DoDEA schools.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on the 22 day of December, 2025.

_____
Anna Kenkel

2

**JA272**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

---

E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY; O.H., S.H., and H.H., minors, by and through their parent and next friend, JESSICA HENNINGER; E.G., a minor, by and through his parent and next friend MEGAN JEBELES; E.Y. and C.Y. minors, by and through their parent and next friend ANNA YOUNG; L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent NATALIE TOLLEY,

          Plaintiffs,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,

          Defendants.

Case No. 1:25-cv-00637-TPG-IDD

Hon. Patricia Tolliver Giles

---

**SECOND DECLARATION OF NATALIE TOLLEY**

I, Natalie Tolley, declare as follows,

1.     I am more than 18 years old, competent to be a witness, and the facts set forth in this declaration are based on my own personal knowledge.

2.     I am married to an active-duty service member stationed at the Aviano Air Base in Italy. My husband is in the Air Force, and he has been for the past fifteen years.

1

**JA273**

3. I have a PhD in Public Health. I am not currently employed, but I worked at Temple University as a researcher from 2006 to 2008.

4. Of my husband's fifteen years in service, we have spent approximately half of them living overseas. We have been at Aviano Air Base since August 2022. Before that, our family was in Utah, Korea, and Colorado Springs. We've also spent time stationed at the Misawa Air Force Base in Japan from 2015 to 2018.

5. My daughter, M.T., was enrolled in Department of Defense Education Activity (DoDEA) school at Misawa and she is now in the twelfth grade at Aviano Middle-High School in Aviano, Italy. Aviano Middle-High School is a DoDEA school.

6. My family joined this lawsuit after we learned of DoDEA's book and curricular removals because we value having a broad range of books and perspectives available in the school library and in the curriculum.

7. Pursuant to this court's order on July 11, 2025, DoDEA's list of 596 "quarantined" books was made public. And pursuant to this court's order granting a preliminary injunction on October 20, 2025, those books were to be replaced in the five schools plaintiffs attended when we filed.

8. On February 18, 2026, M.T. went to her school library and checked out three books that appear on DoDEA's quarantine list, namely:

- The 57 Bus by Dashka Slater

- George by Alex Gino

- Cemetery Boys by Aiden Thomas

2

**JA274**

9.    It is my understanding that these books are only available at M.T. school library because of this court's preliminary injunction.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on February 25, 2026 at *Aviano Air, Italy.*
*Base, Aviano*

_____
Natalie Tolley

3

JA275

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| E.K. and S.K., minors, by and through their parent and next friend LINDSEY KEELEY;  O.H., S.H., and H.H., minors, by and through their parent and next friend JESSICA HENNINGER;  E.G., a minor, by and through his parent and next friend MEGAN JEBELES;  E.Y. and C.Y., minors, by and through their parent and next friend ANNA YOUNG;  L.K., L.K., and L.K., minors, by and through their parent and next friend ANNA KENKEL; and M.T., a minor, by and through her parent and next friend NATALIE TOLLEY,<br><br>           Plaintiffs,<br><br>v.<br><br><br>DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; and PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,<br><br>           Defendants. | Case No. 1:25-cv-00637-PTG-IDD<br><br><br>Hon. Patricia Tolliver Giles |

**SUPPLEMENTAL DECLARATION OF JESSICA HENNINGER IN SUPPORT OF
MOTION TO MODIFY THE PRELIMINARY INJUNCTION**

I, Jessica Henninger, hereby declare:

1.  The facts set forth in this declaration are based on my personal knowledge.

**JA276**

2. This declaration is made in my personal capacity as a parent, and it is not intended to, nor does it represent, the position of the U.S. Government, the Department of Defense (DoD), or any of the Armed Services.

3. My spouse is an active duty service member currently stationed at Fort Campbell, Kentucky, where we have lived since October, 2024. It is our understanding that my spouse will be assigned an overseas duty station, and that in July, 2026, we will relocate to a base in South Korea. It is our intention to enroll our children in DoD Educational Activity (DoDEA) schools upon our relocation overseas.

4. My spouse and I have three children who (for the current 2025-2026 school year) all attend DoDEA schools at Fort Campbell.

5. My daughter O.H. attends Fort Campbell Middle School, a DoDEA school that is not currently included in the Court's preliminary injunction ruling issued on October 20, 2025.

6. On February 18, 2026, I sent an email to Heather Kennedy, the middle school librarian at Fort Campbell Middle School, to request some books for O.H. to read from the library.

7. The three books I requested were *George*, by Alex Gino; *All Boys Aren't Blue*, by George M. Johnson; and *Between Perfect and Real*, by Ray Stoeve.

8. These books were on the list of 596 books banned from DoDEA schools identified by Defendants in this litigation.

9. On February 19, 2026, Heather Kennedy sent me the following response:

DoDEA is complying with an October 20, 2025 order issued by the United States Court of the Eastern District of Virginia, Alexandria Division. The Court issued a partial Preliminary Injunction Order requiring that all resources under review be restored at the following five schools: Crossroads Elementary School, Barsanti Elementary School Aviano Middle High School, Sollars Elementary school, and Edgren Middle High School.

2

**JA279**

DoDEA's review of Information Center resources is still ongoing. Following completion of the review, all resources found to be in compliance with Executive Orders will be returned to circulation. DoDEA always welcomes feedback from parents of students in the DoDEA schools.

10. I followed up with Heather Kennedy requesting clarity on the meaning of her response and asking specifically whether O.H. would be able to check out the three books. I have not received a response from Fort Campbell Middle School, and O.H. has not been able to check out the books requested.

11. I believe that, absent the requested injunction, Fort Campbell Middle School will adhere to the DoDEA implementation guidance relating to Executive Order Nos. 14168 ("Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"), 14190 ("Ending Radical Indoctrination in K-12 Schooling"), and 14185 ("Restoring America's Fighting Force").

12. That implementation will include the Secretary of Defense's guidance prohibiting "Instruction on Critical Race Theory, Gender Ideology, and [Diversity, Equity, and Inclusion]," forbidding any element within DoD from providing instruction on these topics as part of a curriculum, and "prohibiting the use of official resources to host celebrations or events related to cultural awareness months." Dkt. 10-20, Restoring America's Fighting Force (Jan. 29, 2025); Dkt. 10-18, Identity Months Dead at DoD (Jan. 31, 2025); Dkt. 10-14, DoDEA Letter to Parents (Feb. 10, 2025).

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on the 27th day of February, 2026.

Jessica Henninger

3