# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

E.K., *by and through parent and next friend Lindsey Keeley, et al.*,
Plaintiffs-Appellees/
Cross-Appellants,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*,
Defendants-Appellants/
Cross-Appellees.

On Appeal from the United States District Court
for the Eastern District of Virginia

## PRINCIPAL BRIEF FOR APPELLANTS/CROSS-APPELLEES

*Of Counsel:*

EARL G. MATTHEWS
*General Counsel*

SARAH N. SMERLING
*Attorney*

*Department of War*

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION.................................................................................... 1

STATEMENT OF JURISDICTION ....................................................... 3

STATEMENT OF THE ISSUES .......................................................... 4

STATEMENT OF THE CASE ............................................................. 4

    A.    Background...........................................................................4

    B.    Prior Proceedings .............................................................7

SUMMARY OF ARGUMENT...............................................................12

STANDARD OF REVIEW ...................................................................14

ARGUMENT ........................................................................................15

I.    The injunction against removing material from school curricula
should be vacated.............................................................................15

    A.    Selecting school curricula is core government speech..................16

    B.    The district court erred in concluding that the President
cannot set education policy for federally run schools. ..................20

II.    The injunction against removing books from school libraries
should be vacated.............................................................................31

    A.    L.K. 3's withdrawal from DoDEA schools moots plaintiffs'
claims for an injunction against the removal of library
books. ..............................................................................31

    B.    The Free Speech Clause does not restrict the government
from removing books from school libraries. ...............................37

C. The district court erred in concluding that the government may not remove library books because it disagrees with the messages promoted by the books.................................................40

III. At minimum, the preliminary injunction must be narrowed.................44

A. The injunction may protect only plaintiffs who have established Article III injuries.........................................................44

B. The injunction may not extend beyond the DoDEA schools presently attended by plaintiffs. ....................................................47

CONCLUSION...............................................................................................48

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                   **Page(s)**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ...............................................35, 36, 42

*Ambach v. Norwick*,
441 U.S. 68 (1979) ...............................................18, 31, 40

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ...............................................22, 23, 24

*Arkansas Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ...............................................17–18, 39

*Board of Educ. v. Pico*,
457 U.S. 853 (1982) ...............................................7, 9, 28, 39, 40, 41, 42, 43

*Board of Regents of the Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000) ...............................................16, 23, 24, 26, 29

*Boring v. Buncombe Cnty. Bd. of Educ.*,
136 F.3d 364 (4th Cir. 1998) ...............................................15

*Bostic v. Schaefer*,
760 F.3d 352 (4th Cir. 2014) ...............................................47

*Burke v. Hillsborough Cnty. Sch. Bd.*,
752 F. App'x 713 (11th Cir. 2018) ...............................................32–33

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ...............................................45

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ...............................................15, 17, 21, 44

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ...............................................33

*City of Martinsville v. Express Scripts, Inc.*,
128 F.4th 265 (4th Cir. 2025) ............................................................37

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................35

*Collin v. Smith*,
578 F.2d 1197 (7th Cir. 1978) ...........................................................18

*Doe v. Public Citizen*,
749 F.3d 246 (4th Cir. 2014) .............................................................37

*Edwards v. California Univ. of Pa.*,
156 F.3d 488 (3d Cir. 1998) ..............................................................21

*FEC v. Ted Cruz for Senate*,
596 U.S. 289 (2022) ............................................................................44

*Genesis Healthcare Corp. v. Symczyk*,
569 U.S. 66 (2013) ..............................................................................32

*Gill v. Whitford*,
585 U.S. 48 (2018) ..............................................................................45

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ...........................................................44

*Grandson v. University of Minn.*,
272 F.3d 568 (8th Cir. 2001) .............................................................32

*Griggs v. Provident Consumer Disc. Co.*,
459 U.S. 56 (1982) ..............................................................................37

*Griswold v. Driscoll*,
616 F.3d 53 (1st Cir. 2010) ..........................................................15, 17

*Grossman v. South Shore Pub. Sch. Dist.*,
507 F.3d 1097 (7th Cir. 2007) ...........................................................15

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ...................................................7, 9, 20, 21, 26, 27

iv

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ........................................................38

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
78 F.4th 622 (4th Cir. 2023) ......................................34

*Lamont v. Postmaster Gen.*,
381 U.S. 301 (1965) ....................................................39

*Lane v. Simon*,
495 F.3d 1182 (10th Cir. 2007) ...............................33

*Little v. Llano County*,
138 F.4th 834 (5th Cir.), *cert. denied*,
144 S. Ct. 886 (2025) ....................................40, 41, 42

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................................................34

*Marks v. United States*,
430 U.S. 188 (1977) ....................................................42

*Matal v. Tam*,
582 U.S. 218 (2017) ....................................................40

*Mellen v. Bunting*,
327 F.3d 355 (4th Cir. 2003) ....................................36

*Minarcini v. Strongsville City Sch. Dist.*,
541 F.2d 577 (6th Cir. 1976) ....................................35

*Murthy v. Missouri*,
603 U.S. 43 (2024) ..............................................32, 45

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ....................................................16

*New York v. United States*,
505 U.S. 144 (1992) ....................................................26

*Nken v. Holder,*
556 U.S. 418 (2009).............................................................15

*Noel Canning v. NLRB,*
705 F.3d 490 (D.C. Cir. 2013),
*aff'd,* 573 U.S. 513 (2014) ...............................................47

*Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer,*
961 F.3d 1062 (9th Cir. 2020) ..........................................39

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009)................................................16, 18, 40

*Polk v. Montgomery Cnty. Pub. Schs.,*
166 F.4th 400 (4th Cir. 2026)...........................................16

*Pratt v. Independent Sch. Dist. No. 831,*
670 F.2d 771 (8th Cir. 1982) ............................................23

*Red Lion Broad. Co. v. FCC,*
395 U.S. 367 (1969)............................................................38

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
515 U.S. 819 (1995)................................................12, 17, 21

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,*
547 U.S. 47 (2006)........................................................46–47

*Salomon & Ludwin, LLC v. Winters,*
150 F.4th 268 (4th Cir. 2025)...........................................15

*Seila L. LLC v. CFPB,*
591 U.S. 197 (2020)......................................................27, 28

*Shurtleff v. City of Boston,*
596 U.S. 243 (2022)...........................................................17

*Spencer v. Kemna,*
523 U.S. 1 (1998)................................................................32

*Stephens v. County of Albemarle*,
524 F.3d 485 (4th Cir. 2008) ......................................................38

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ..................................................................26

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ......................................................32, 45, 47

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ..........................................10, 44, 45, 47, 48

*Virgil v. School Bd. of Columbia Cnty.*,
862 F.2d 1517 (11th Cir. 1989) ....................................22, 30, 31

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ..................................................................38

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ..................................................................29

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) ......17, 19, 20, 21, 23, 24, 26, 29, 42

*Wells v. Johnson*,
150 F.4th 289 (4th Cir. 2025) ....................................................34

*Willis v. Town of Marshall*,
426 F.3d 251 (4th Cir. 2005) ................................................38–39

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................................15

*Woolard v. Thurmond*,
152 F.4th 1050 (9th Cir. 2025) ..................................................17

*Zykan v. Warsaw Cmty. Sch. Corp.*,
631 F.2d 1300 (7th Cir. 1980) ....................................................28

**U.S. Constitution:**

Art. II § 1, cl. 1 ................................................................................ 27

Amend. XII ..................................................................................... 27

**Statutes:**

10 U.S.C. § 2164 .................................................................................6

20 U.S.C. § 921 ...................................................................................6

28 U.S.C. § 1292(a)(1) .......................................................................3

28 U.S.C. § 1331 .................................................................................3

Ark. Code Ann. § 6-16-156(a)(2) ....................................................19

**Regulatory Materials:**

Exec. Order No. 14,168,
   90 Fed. Reg. 8615 (Jan. 30, 2025) ..........................................4, 30

Exec. Order No. 14,185,
   90 Fed. Reg. 8763 (Feb. 3, 2025) ................................................5
Exec. Order No. 14,190,
   90 Fed. Reg. 8853 (Feb. 3, 2025) .............................................5, 31

Exec. Order No. 14,347,
   90 Fed. Reg. 43,893 (Sep. 10, 2025).............................................5

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................................3

Fed. R. App. P. 4(a)(3).......................................................................3

**Other Authorities:**

Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* (2017)...................................25

George Hunter, *A Civic Biology* (1914) ............................................................25

Elena Kagan, *Presidential Administration,* 114 Harv. L. Rev. 2245 (2001)...........................................................................28

Edward J. Larson, *The Meaning of Human Gene Testing for Disability Rights*, 70 U. Cin. L. Rev. 913 (2002)..............................................................25

John G. Roberts, Jr., *2019 Year-End Report on the Federal Judiciary* (Dec. 31, 2019), https://perma.cc/A3E7-V2CT ...........................18

## INTRODUCTION

The Department of Defense is required to operate primary and secondary school systems to provide education to military-connected students both overseas and in the United States. The Department of Defense Education Activity (DoDEA) operates these school systems. After the President issued a series of Executive Orders directing federal agencies not to promote "gender ideology and discriminatory equity ideology," and the Department of Defense issued additional guidance, DoDEA suspended funding or official support for cultural awareness months, eliminated certain materials from school curricula, and temporarily restricted access to some library books during pending further review. A group of DoDEA students sued, asserting that the agency's actions violated their right to receive information under the Free Speech Clause. The district court enjoined DoDEA from implementing those actions at five schools.

Plaintiffs' claims lack merit. Determining school curricula is core government speech and is not subject to scrutiny under the Free Speech Clause. The government can and must engage in viewpoint discrimination when it decides what to teach in its classrooms; schools should not be agnostic, for example, about the benefits of our constitutional democracy as

opposed to dictatorship. And, as the district court acknowledged, even where the Free Speech Clause applies in the context of secondary education, the government is generally entitled to exercise its discretion broadly. But the district court nonetheless declined to defer to the government's judgment here because the policy direction came not from a local school board but from the President of the United States. That analysis upends both the structure of the federal government and principles of democratic accountability.

Plaintiffs fare no better in their claim challenging the removal of books from DoDEA libraries. As an initial matter, the claim is moot because the only plaintiff held to have standing has now left the DoDEA school system. But in any event, the district court was wrong on the merits. The right to receive information presupposes a willing speaker, but DoDEA is no longer willing to supply certain books to its students. That decision does not deprive plaintiffs of any information; they may buy the books they seek from a bookstore or find them in a local library. But they have no claim to compel the government to provide them with their preferred books, nor can they invoke principles of viewpoint discrimination to control the government's exercise of editorial discretion in deciding what books belong on library shelves.

At a bare minimum, the preliminary injunction must be narrowed. Even apart from the mootness issue that subsequently developed regarding the claim related to library books, the injunction was overbroad when entered because it was not limited to the plaintiff who had actually established standing.

The preliminary injunction should be vacated or, at a minimum, narrowed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331 (federal-question jurisdiction). Complaint, JA61. The district court entered a preliminary injunction on October 20, 2025. Order, JA57–58. Defendants filed a timely notice of appeal on December 18, 2025. Notice of Appeal, JA247–248; *see* Fed. R. App. P. 4(a)(1)(B). Plaintiffs filed a timely notice of cross-appeal on December 23, 2025. Notice of Cross Appeal, JA249–251; *see* Fed. R. App. P. 4(a)(3). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

I. Whether the district court abused its discretion in enjoining DoDEA from removing content from school curricula and requiring removed content to be restored.

II. Whether the district court abused its discretion in enjoining DoDEA from removing books from school libraries and requiring removed books to be restored.

III. Whether, at minimum, the preliminary injunction must be narrowed.

## STATEMENT OF THE CASE

### A.    Background

In January 2025, the President issued three Executive Orders relevant to this case. First, he issued Executive Order 14168, which prohibited the use of federal funds "to promote gender ideology." 90 Fed. Reg. 8615, 8616 (Jan. 30, 2025), JA88. Second, he issued Executive Order 14185, which directed the Secretary of Defense[1] to "carefully review the leadership,

---

[1] To avoid confusion, this brief will refer to the "Department of Defense" and "Secretary of Defense" because all relevant events, including the litigation in district court, occurred when the relevant agency was known exclusively by that name. *Cf.* Exec. Order No. 14,347, 90 Fed. Reg. 43,893 (Sep. 10, 2025) (authorizing use of additional title "Secretary of War" and permitting references to "Department of War").

curriculum, and instructors of the United States Service Academies and other defense academic institutions" to ensure they do not promote a series of "un-American, divisive, discriminatory, radical, extremist, and irrational theories." 90 Fed. Reg. 8763, 8764 (Feb. 3, 2025), JA93. Third, he issued Executive Order 14190, which directed that the Secretary of Defense, along with other cabinet members, recommend a plan for "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K–12 schools, including based on gender ideology and discriminatory equity ideology." 90 Fed. Reg. 8853, 8854 (Feb. 3, 2025), JA97. The Executive Order defined "discriminatory equity ideology" as, among other definitions, teaching that "[m]embers of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex or national origin" or that "[a]n individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin." *Id.* at 8853–54, JA96–97. In response, the Secretary of Defense directed the Department of Defense not to use official resources "to host celebrations or events related to cultural awareness months." Press Release, JA117.

DoDEA runs Pre-K–12 school systems, operating 161 schools on military bases both in the United States and across the globe.[2] Schiavino-Narvaez Declaration, JA208. In February 2025, at the Secretary of Defense's direction, DoDEA began to take steps "to ensure alignment with the Executive Orders, Departmental objectives, and the nation's core values." *See id.*, JA209. First, DoDEA prohibited the use of official resources for cultural awareness months, *id.*, JA210–211, and directed instructors not to use eight specific curricular resources "potentially related to gender ideology or discriminatory equity ideology topics" pending further review, Pickel Memorandum, JA104–106. Second, at each school, DoDEA personnel used keyword and subject searches to identify library books for further review and temporarily limited access to those books pending that review. Linton Declaration, JA217–218.

---

[2] DoDEA is a field activity operating under the direction and authority of the Undersecretary for Personnel and Readiness. *See* 10 U.S.C. § 2164; 20 U.S.C. § 921.

### B. Prior Proceedings

1. Through their parents as next friends, 12 students sued. Complaint, JA59–85. At the time the complaint was filed, those students attended the following DoDEA schools:

| School | Students |
|---|---|
| Crossroads Elementary School (Virginia) | E.K. and S.K. |
| Barsanti Elementary School (Kentucky) | O.H., S.H., H.H., and E.G. |
| Aviano Middle-High School (Italy) | C.Y., E.Y., and M.T. |
| Sollars Elementary School (Japan) | L.K. 1 and L.K. 2 |
| Edgren Middle High School (Japan) | L.K. 3 |

*Id.*, JA61–62.

Plaintiffs raised two claims. Complaint, JA81–84. In their first claim, they alleged that removing books from DoDEA libraries deprived them of their First Amendment right to receive information. *Id.*, JA81–82 (citing *Board of Educ. v. Pico*, 457 U.S. 853, 870 (1982) (plurality opinion)). In their second claim, they alleged that removing material from the curriculum deprived them of the same right. *Id.*, JA82–84 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)).

2. Plaintiffs sought, and the district court granted, a preliminary injunction. *See* Motion for Preliminary Injunction, JA106–107; Order, JA57–58. The district court enjoined DoDEA from "further removals of educational books and curricular content in implementation of [the three Executive

Orders]" at the five schools attended by plaintiffs and required DoDEA to restore the removed materials at those schools. Order, JA57–58.

The district court first concluded that at least L.K. 3 had standing to challenge the removal of library books because she had attempted to check out four books from her school library, which the district court found had been removed due to DoDEA's review. Memorandum Opinion, JA28–30. The district court also noted that L.K. 3 alleged that "a librarian subsequently scolded them for seeking out these books" and concluded that this scolding "further establishes the injury-in-fact." *Id.*, JA29. The district court did not analyze any other plaintiff's alleged injuries stemming from the removal of books. *Cf. id.*, JA27–30.

Turning to the merits, the district court concluded that the removal of books from DoDEA libraries likely violated the Free Speech Clause. Memorandum Opinion, JA35–49. The district court rejected the government's argument that curating library books does not implicate the Free Speech Clause, instead reasoning that "public school libraries" are traditionally "places of academic freedom and intellectual pursuit" and that the government's selection of books does not convey a message. *Id.*, JA24; *see id.*, JA35–39. The district court then purported to apply both the

standard set out by the plurality opinion in *Pico*, 457 U.S. 853—where the Supreme Court, without any opinion garnering a majority, invalidated an effort to remove certain books from school libraries—and the standard articulated in *Hazelwood*, 484 U.S. 260—where the Supreme Court upheld a school's editorial control of a high-school newspaper. Applying the *Pico* plurality opinion, the district court concluded that DoDEA unlawfully removed books from the libraries because it intended "to deny students access to ideas with which [the government] disagreed." Memorandum Opinion, JA45 (quoting *Pico*, 457 U.S. at 871 (plurality opinion)) (cleaned up). The district court then questioned whether the books qualify as "school-sponsored speech" at all for purposes of *Hazelwood*, *id.*, JA237, but, assuming that they did, the district court concluded that DoDEA "ha[s] not demonstrated legitimate pedagogical interests behind the book removals," *id.*, JA48.

On the curricular changes, the district court again concluded that *Hazelwood* provides the governing standard. Memorandum Opinion, JA50. The district court noted that "[w]hile *Hazelwood* permitted educators to exercise control over school-sponsored speech, DoDEA's curricular changes stem from a directive from the President of the United States." *Id.*, JA50.

9

The district court further stated that unlike "a school board," which "is elected primarily based on their educational priorities, the President is not." *Id.*, JA50. The district court concluded that "the Secretary of Defense and DoDEA administrators immediately deferred to the President's directives absent any further pedagogical review or cited interest," and so it discounted DoDEA's articulation of its reasoning for modifying the curriculum. *Id.*, JA51.

The district court accordingly entered a preliminary injunction. Weighing the equities, the district court concluded that any loss of First Amendment freedoms necessarily constitutes irreparable harm and that the government is not harmed by a return to the circumstances in the schools before the events at issue here. Memorandum Opinion, JA52–54. Although the district court refused plaintiffs' request for a universal injunction, *id.*, JA56 (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025)), the district court issued an injunction covering the five schools attended by plaintiffs at the time, *id.*, JA56; Order, JA57. At those schools, the injunction forbids DoDEA from "further removals of educational books and curricular content in implementation of Executive Order Nos. 14168, 14185, and 14190 and any related memoranda, directives, and guidance" and compels DoDEA to

10

"immediately restore the library books and curricular materials that have been removed since January 19, 2025 in implementation of the [Executive Orders] to their preexisting shelves, classrooms, and units." Order, JA57–58.

3. The government appealed and plaintiffs cross-appealed. After the notices of appeal were filed, plaintiffs disclosed a series of enrollment changes for the 2025–2026 school year. *See* Notice to Court, JA252–253. Notably, following their father's deployment to Germany, plaintiffs E.K. and S.K. enrolled in non-DoDEA schools. Second Keeley Declaration, JA268. And in anticipation of their father's retirement from the Air Force, L.K. 1, L.K. 2, and L.K. 3 enrolled in non-DoDEA schools in Arizona. Second Kenkel Declaration, JA272. Finally, plaintiffs O.H. and E.G. now attend Fort Campbell Middle School, a DoDEA school in Kentucky, which is not subject to the district court's injunction. Second Henninger Declaration, JA 258; Second Jebeles Declaration, JA263. Thus, three of the schools to which the injunction applies—Crossroads Elementary School, Sollars Elementary School, and Edgren Middle High School—are no longer attended by any plaintiff. *See* Notice to Court, JA252–253.

Months after the notices of appeal had been filed, plaintiffs moved to modify the preliminary injunction to include Fort Campbell Middle School.

11

Notice of Motion to Modify the Preliminary Injunction, Dkt. 69 (Mar. 12, 2026).

**SUMMARY OF ARGUMENT**

I. The district court improperly enjoined DoDEA from changing its curriculum. The government may engage in viewpoint discrimination when it speaks, and "[w]hen [a school] determines the content of the education it provides, it is the [school] speaking." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). That principle resolves plaintiffs' challenge to DoDEA's curricular changes.

Even the district court recognized that "[c]ourts have long acknowledged the state's control over public education." Memorandum Opinion, JA49. The district court, however, refused to give DoDEA the deference to which school administrators are entitled because "DoDEA's curricular changes stem from a directive from the President of the United States," *id.*, JA50. But the President is an elected official vested with all federal executive power, including over DoDEA. He is, of course, an appropriate decisionmaker to determine whether material should appear in DoDEA's curriculum with advice, as he deems appropriate, from advisors with relevant subject-matter expertise. The district court may not like the

12

President's judgment as an elected official with oversight of the DoDEA school system, but it was not free to second-guess it.

II. The district court improperly enjoined DoDEA from removing books from its libraries. To start, the district court predicated standing to challenge the removal of library books on just one plaintiff, L.K. 3, who has since withdrawn from DoDEA schools because of her father's retirement from the military. Her claim for an injunction is thus moot, and despite subsequent attempts, no other plaintiff has plausibly established a prospective injury from the removal of library books to support the preliminary injunction.

On the merits, the Free Speech Clause does not constrain the government's discretion to decide what books are available at school libraries. Plaintiffs point to thier a right to receive information, but that right does not extend to compelling the government to provide the speech a listener wants to hear. The only speech that is actually at issue here is the government's own speech, in the form of curation of its own libraries. The government may permissibly engage in viewpoint discrimination when it adds and removes books from library shelves.

III. An injunction is a party-specific remedy, which may benefit non-parties only incidentally. The district court deviated from this fundamental principle, and events subsequent to the district court's decision have widened the gap between the injunction that was issued and any potential harm to the plaintiffs. Initially, as to the claim relating to libraries, the district court concluded only that a single plaintiff had standing. That was a sufficient basis to reach the merits (although, as noted above, that plaintiff's claim is now moot), but to determine the scope of relief the district court was required to determine which specific plaintiffs had established standing and were entitled to injunctive relief. The district court did not even purport to engage in that analysis.

Moreover, as to both sets of claims, by its own terms, the preliminary injunction is meant to cover only schools attended by plaintiffs. But subsequent enrollment changes mean that no plaintiffs currently attend three of the five schools subject to the preliminary injunction. It should be vacated in its entirety with respect to those three schools.

## STANDARD OF REVIEW

To obtain a preliminary injunction, plaintiffs must show that they are likely to succeed on the merits, that they will be irreparably harmed absent

14

preliminary relief, and that the balance of the equities and public interest favors them. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of equities and public interest "merge when the Government is the opposing party").

This Court reviews for abuse of discretion the grant of a preliminary injunction; under that standard, "a clear error in factual findings or a mistake of law merits reversal." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 274 (4th Cir. 2025). The Court "review[s] de novo whether there has been a mistake of law." *Id.*

## ARGUMENT

### I. The injunction against removing material from school curricula should be vacated.

Courts appropriately give wide discretion to the government in setting school curricula. *See, e.g.*, *Griswold v. Driscoll*, 616 F.3d 53, 59 (1st Cir. 2010) (Souter, J.); *Grossman v. South Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1100 (7th Cir. 2007); *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005); *see also Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 371 (4th Cir. 1998) (en banc) ("[I]t is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities …."); *cf. Polk v. Montgomery Cnty. Pub. Schs.*, 166 F.4th

15

400, 420 (4th Cir. 2026) ("Be it choosing curriculum or placing administrative requirements on how teachers deliver that curriculum, those decisions are entrusted to the Board, not to judges."). The district court erred in denying DoDEA the authority to remove materials from its curriculum in response to the President's Executive Orders and departmental directives.

## A. Selecting school curricula is core government speech.

"[T]he government can speak for itself." *Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000). When it does, "the Free Speech Clause has no application." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). The government "'is entitled to say what it wishes' and to select the views that it wants to express" free from "First Amendment scrutiny." *Id.* at 467–68 (cleaned up). Indeed, it is often "the very business of government to favor and disfavor points of view." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment). "The Constitution … relies first and foremost on the ballot box," not the First Amendment, "to check the government when it speaks." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022).

"When [a school] determines the content of the education it provides, it is the [school] speaking," and the Free Speech Clause does not limit that act

of government speech. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995); *see also Chiras*, 432 F.3d at 614–15 (selection of textbooks is government speech); *Woolard v. Thurmond*, 152 F.4th 1050, 1057 (9th Cir. 2025) (same); *Griswold*, 616 F.3d at 60 (revisions to curricular material "did not implicate the First Amendment"). "Just as ordinary citizens cannot require the government to express a certain viewpoint or maintain a prior message, students cannot oblige the government to maintain a particular curriculum or offer certain materials in that curriculum based on the Free Speech Clause." *Walls v. Sanders*, 144 F.4th 995, 1003 (8th Cir. 2025). Rather, the "information and speech presented to school children" is an expression the school's own speech. *Woolard*, 152 F.4th at 1057 (cleaned up). The Free Speech Clause does not constrain the government's choice about what materials it offers in school curricula.

When it makes curricular decisions, the government may engage in viewpoint discrimination. *See Walls*, 144 F.4th at 1005; *see also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (describing "a public school prescribing its curriculum" as a paradigmatic example of when the government may engage in viewpoint discrimination). "Indeed, it is not easy to imagine how government could function if it lacked this freedom."

17

*Summmum*, 555 U.S. at 468. Schools must be permitted to make value-based judgments in deciding on curriculum. For example, we expect our public schools to "inculcat[e] fundamental values necessary to the maintenance of a democratic political system." *Ambach v. Norwick*, 441 U.S. 68, 77 (1979); *see also* John G. Roberts, Jr., *2019 Year-End Report on the Federal Judiciary* 1–4 (Dec. 31, 2019), https://perma.cc/A3E7-V2CT (discussing importance of civics education to functioning democracy). So while the government cannot censor speech because it promotes totalitarian rule, *see Collin v. Smith*, 578 F.2d 1197, 1207 (7th Cir. 1978) (permitting a neo-Nazi organization to march in Skokie, Illinois), it certainly can design its curriculum to stress the virtues of democracy and the horrors of dictatorship. And it can do so even though those choices constitute government endorsement of some viewpoints over others. The First Amendment does not require the government to mask those values-based decisions. Instead the government may add or remove material from school curricula for the sole reason that it agrees or disagrees with the message the material promotes.

The Eighth Circuit's recent decision in *Walls* is instructive. There, Arkansas required its public-school authorities to review and amend materials that might "'promote teaching that would indoctrinate students

with ideologies such as Critical Race Theory … that conflict with the principle of equal protection under the law or encourage students to discriminate' based on someone's protected characteristics." *Walls*, 144 F.4th at 1000 (quoting Ark. Code Ann. § 6-16-156(a)(2)). After students and teachers sued to challenge the law, a district court granted the students a preliminary injunction on Free Speech Clause grounds. *Id.* at 1001. The Eighth Circuit vacated that injunction. *Id.* at 1007. The district court explained that "[t]hough a listener's right to receive information means the government cannot stop a willing private speaker from disseminating his message, that right cannot be used to require the government to provide a message it no longer is willing to say." *Id.* at 1002. "[A]s a right housed within a clause that does not regulate the government's own speech, the right to receive information cannot constrain the government's ability to decide what to say and what not to say." *Id.* at 1003. Thus "students cannot oblige the government to maintain a particular curriculum or offer certain materials in that curriculum based on the Free Speech Clause." *Id.*

The same reasoning applies here. DoDEA is no longer willing to include certain materials in its curriculum. *See* Pickel Memorandum, JA104–105. And plaintiffs' right to receive information does not encompass a

corollary right to compel DoDEA to continue providing instruction in the way that plaintiffs might prefer. Therefore, plaintiffs cannot prevail on a free-speech claim challenging DoDEA's removal of curricular materials.

**B.      The district court erred in concluding that the President cannot set education policy for federally run schools.**

The district court accepted that "[c]ourts have long acknowledged the state's control over public education." Memorandum Opinion, JA49. That principle decides this case, as it would be entirely unworkable to permit individual plaintiffs to dictate the content of school curricula based on their own preferences. The district court's contrary conclusion was premised on a misapplication of *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), a case that involved restrictions on student speech rather than the school's own curriculum and that, in any event, created a deferential standard, which the government readily satisfies here.

1. As a threshold matter, *Hazelwood* does not apply to curricular changes. In *Hazelwood*, the Supreme Court articulated a standard for a school's control over "school-sponsored" speech—that is, student speech which "might reasonably [be] perceive[d] to bear the imprimatur of the school." 484 U.S. at 271. Under that framework, schools may "exercis[e]

editorial control over the style and content of *student speech* in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273 (emphasis added).

There is no need for *Hazelwood* balancing where there is no student speech. *See Walls*, 144 F.4th at 1005; *Chiras*, 432 F.3d at 616–17 (*Hazelwood* applies only where a school has opened a forum for speech); *see also Edwards v. California Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998). A student does not speak when her school selects a calculus textbook or adds a foreign-language requirement or decides that high-school seniors will read *Hamlet* instead of *Macbeth*. To the extent any of those curricular choices implicate speech, it is solely the government's speech. *See Rosenberger*, 515 U.S. at 833. Indeed, as pleaded, plaintiffs' claims sound not in their own speech but in their right to receive the government's speech. *See* Complaint, JA81–84. *Hazelwood*'s concern for student speech does not come into play in these circumstances.

In support of its contrary analysis, the district court relied on two out-of-circuit decisions reflecting a line of cases, which cannot be reconciled with modern government-speech doctrine. *See* Memorandum Opinion, JA50 (first citing *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015); and then citing *Virgil v.*

21

*School Bd. of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989)). In *Virgil*,

which was issued in 1989, the Eleventh Circuit acknowledged that "courts …

have failed to achieve a consensus on the degree of discretion to be accorded

school boards to restrict access to curricular materials." 862 F.2d at 1520–21

(collecting cases rejecting challenges to curricular changes). In light of that

perceived void in authority, *Virgil* found *Hazelwood* to be instructive. *See id.*

at 1521. It applied that framework to reject a First Amendment challenge to

a school board's decision to remove from its curriculum a textbook on the

basis of "explicit sexuality and excessively vulgar language." *Id.* at 1523; *see*

*id.* at 1525.

As noted, the Eleventh Circuit in *Virgil* rejected a First Amendment

challenge to a curricular decision, so its holding provides minimal assistance

to plaintiffs here. Moreover, *Virgil* "predates the numerous Supreme Court

decisions holding that the government is permitted to engage in viewpoint

discrimination when it speaks." *Walls*, 144 F.4th at 1004. Illustrating the

point most starkly, the Eighth Circuit once applied *Hazelwood* to curricular

decisions in *Pratt v. Independent School District No. 831*, 670 F.2d 771

(8th Cir. 1982), but has since recognized that its approach could not be

reconciled with Supreme Court precedent, *see Walls*, 144 F.4th at 1004. In

22

particular, since *Virgil* and *Pratt* were decided, "the Supreme Court has instructed that a court must consider 'principles applicable to government speech' when the issue involves 'speech by an instructor or a professor in the academic context.'" *Id.* at 1005 (quoting *Southworth*, 529 U.S. at 235). Unlike the out-of-circuit precedents on which the district court relied, the Supreme Court's more recent teachings are binding and control this case.

The district court's reliance on *Arce* was likewise misplaced. *See* Memorandum Opinion, JA50. *Acre* involved a challenge to an Arizona law restricting the teaching of ethnic studies. 793 F.3d at 973. Relying on *Virgil* and *Pratt*, the Ninth Circuit held that the *Hazelwood* standard precludes the government from "remov[ing] materials otherwise available in a local classroom unless its actions are reasonably related to legitimate pedagogical concerns." *Id.* at 983. As explained above, and as the Eighth Circuit has since recognized, *Virgil* and *Pratt* are inconsistent with modern government-speech doctrine. *Walls*, 144 F.4th at 1004–05. In particular, in *Southworth*, the Supreme Court addressed the First Amendment standards applicable to "extracurricular student speech at a public university," 529 U.S. at 221, but emphasized that "[t]he Court has not held, or suggested, that when the government speaks the rules we have discussed come into play," *id.* at 235.

And the Court contrasted the principles at issue in that case with "the discretion universities possess in deciding matters relating to their educational mission." *Id.* The Ninth Circuit's decision in *Arce* did not account for any of these factors. While the court did gesture towards government speech, *see Arce*, 793 F.3d at 982 (distinguishing cases brought by textbook author and teacher), it failed to explain why a decision about what to include in the curriculum represents student speech rather than the school's speech. Plainly, it is the latter.

*Hazelwood* is ill-suited to govern curricular choices for another key reason as well: in many circumstances, it would hinder democratic accountability. Applying *Hazelwood* to curricular changes requires the government to show that "its actions are reasonably related to legitimate pedagogical concerns." *Arce*, 793 F.3d at 983. Sometimes, pedagogy may provide impetus to change to the curriculum. But other times, the government may direct the use of new learning resources because it decides that the old resources promote an abhorrent message. For example, for decades, many school systems bought textbooks that promoted eugenics. *See, e.g.*, George Hunter, *A Civic Biology* 261–63 (1914); *id.* at 263 (describing some people as "true parasites" and asserting that "[i]f such

people were lower animals, we would probably kill them off to prevent them from spreading. Humanity will not allow this, but we do have the remedy of … preventing intermarriage and the possibilities of perpetuating such a low and degenerate race").[3] At the time, scientists and educators and other leading figures widely embraced eugenics. *See generally* Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* (2017). But a school board need not disagree with the preeminent scientists of the age to change textbooks; it would be enough to say that promoting eugenics is morally wrong.

The government must be free to remove such a textbook from its curriculum solely because it disagrees with the message and to face the electorate's reaction to that choice. Forcing the government to reframe its values-based judgments in terms of learning outcomes makes it harder for the electorate to assign credit or blame for policy choices. *See Walls*, 144 F.4th at 1006; *cf. New York v. United States*, 505 U.S. 144, 168–69 (1992). As the Supreme Court reiterated in *Southworth*, "[w]hen the government

---

[3] *A Civic Biology* was "the best-selling high-school biology textbook of the era in the United States." Edward J. Larson, *The Meaning of Human Gene Testing for Disability Rights*, 70 U. Cin. L. Rev. 913, 917 (2002).

speaks, … it is, in the end, accountable to the electorate and the political process for its advocacy." 529 U.S. at 235.[4]

2. The district court compounded its error by refusing to give DoDEA the deference to which school administrators are entitled when they set a curriculum. As noted earlier, *Hazelwood* applies in a context involving "student expression," which gives rise to free-speech rights. *Hazelwood*, 484 U.S. at 270; *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). But *Hazelwood* still creates a school-friendly standard in light of the need "to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school," *Hazelwood*, 484 U.S. at 271.

The district court did not provide that level of deference here, thus reaching the wrong result even on the erroneous understanding that the

---

[4] The district court suggested that the parties agreed that *Hazelwood* applies to curricular changes. Memorandum Opinion, JA50. That suggestion ignores that the government forcefully argued that the only speech at issue here was government speech to which *Hazelwood* does not apply, Opposition to Motion for Preliminary Injunction, Dkt. 29 at 9–15; *see also id.* at 14 ("Even assuming" the First Amendment applies, "DoDEA's curriculum review still satisfies *Hazelwood*'s 'legitimate pedagogical concerns' test.").

*Hazelwood* standard applied. In particular, the district court concluded that because "DoDEA's curricular changes stem from a directive from the President of the United States," they are entitled to no deference. Memorandum Opinion, JA50. The district court reasoned that unlike "a school board[, which] is elected primarily based on their educational priorities, the President is not." *Id.*, JA50.

That theory turns principles of democratic accountability on their head. The President and Vice President are the only federal officials elected nationwide, and Article II vests all executive power in the President. *See* U.S. Const. art. II, § 1, cl. 1; *id.* amend. XII. As the head of the Executive Branch, the President has the power and duty to supervise subordinate federal officials. *See Seila L. LLC v. CFPB*, 591 U.S. 197, 213 (2020). And as commander-in-chief, the President has responsibility to set policy for the U.S. military including its educational institutions, much like a school board is responsible for local educational policy. The President, thus, is the appropriate, electorally accountable official to set educational policy for DoDEA schools. *See id.* at 224; *see also* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2332–37 (2001) (presidential control over federal bureaucracy promotes democratic accountability). When it

comes to local public schools, courts defer to school boards' decisions about curricular changes almost without exception. *Cf. Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1306 (7th Cir. 1980) (suggesting that only a "flagrant abuse of discretion" would justify judicial second guessing of school board curricular decisions). In the federal system, both the President—who acts in the same democratically accountable role as a school board—and educational officials subordinate to him are entitled to the same deference.

The district court faults the decision to change DoDEA curriculum for "defer[ing] to the President's directives absent any further pedagogical review or cited interest." Memorandum Opinion, JA51. But the Constitution imposes no requirement of review by a committee of educators before elected officials change school policy. After all, "virtually all educational decisions necessarily involve 'political' determinations," *Board of Educ. v. Pico*, 457 U.S. 853, 890 (1982) (Burger, C.J., dissenting). Nor are school boards some sort of utopian body immune from political pressures. Rather, school boards are often sites of fierce political contestation, as they should be in a democratic system. The district court's view further has the perverse effect of punishing the government for making a "decision to change the curriculum" in response "to the electorate and the political process," even

though the Supreme Court has "repeatedly emphasize[d] the role of the political process and elections in regulating government speech." *Walls*, 144 F.4th at 1006; *see also Southworth*, 529 U.S. at 235 (discussing political accountability in the context of government speech by universities); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("[I]t is the democratic electoral process that first and foremost provides a check on government speech."). The Constitution does not isolate curricular decisions from the political process.

There is no basis in *Hazelwood*, much less in government-speech precedents, for the district court's apparent view that a school's decisions about the instruction to be offered must "reflect a detailed pedagogical review process." Memorandum Opinion, JA51. Even under the district court's preferred standards, when the democratically accountable leader of a school system says that he does not think children should be learning from particular sorts of curricular materials, that statement is sufficient to justify a change to the curriculum. *See Virgil*, 862 F.2d at 1525 (deferring to school board's decision to remove from curriculum "masterpieces of Western literature" due to legitimate concern about explicit and vulgar language). And here, in any event, the President only provided a general directive, after

which DoDEA educators identified several resources as "potentially related to gender ideology or discriminatory equity ideology topics," Pickel Memorandum, JA104, and temporarily removed those resources from the curriculum pending further review, *see* Linton Declaration, JA217–18. Courts are not free to second-guess those decisions.

The district court stated that it could not "contemplate the pedagogical basis" for DoDEA's curricular decisions. Memorandum Opinion, JA51. The President, however, made the basis clear. He explained that in his view "gender ideology" promotes a "false claim" and is "internally inconsistent." 90 Fed. Reg. at 8615–16, JA87–88. He further explained his view that it was divisive and wrong to teach that "[m]embers of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin" or that "[m]embers of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin." 90 Fed. Reg. at 8853–54, JA96–97. Schools, of course, have legitimate pedagogical goals in teaching students to eschew racist and sexist thinking and ensuring that available learning materials are age appropriate. *See Ambach*, 441 U.S. at 76–77. There is a policy debate about the degree to which the types of materials the

30

President is concerned about impede the achievement of those pedagogical goals, but the institutional role of the federal courts is not to make their own judgments about those disputes, much less to override the determinations made by democratically accountable officials. *Cf. Virgil*, 862 F.2d at 1525.

## II. The injunction against removing books from school libraries should be vacated.

Plaintiffs challenge to the removal of library books fails twice over. First, any claim relating to the removal of library books is now moot because the only plaintiff held to have standing no longer attends a DoDEA school. Second, DoDEA's book-removal decisions are not subject to scrutiny under the Free Speech Clause.

### A. L.K. 3's withdrawal from DoDEA schools moots plaintiffs' claims for an injunction against the removal of library books.

1. To establish Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable decision. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A plaintiff must meet this requirement for each claim and each form of relief she seeks. *Id.* at 431. When seeking preliminary relief, she must "make a 'clear showing'" that she is "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Further, a plaintiff

must maintain standing throughout all stages of litigation. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). If circumstances change such that a court can no longer grant effectual relief to the plaintiff, the claim for such relief is moot. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71–72 (2013).

Here, the district court based its entire standing analysis for the injunction against the removal of books on plaintiff L.K. 3. *See* Memorandum Opinion, JA28–30. But L.K. 3 is no longer enrolled in a DoDEA school. Second Kenkel Declaration, JA272. Instead, in anticipation of her father's retirement from the Air Force, L.K. 3 enrolled in a non-DoDEA school in Arizona. *Id.*, JA272. And once a student has withdrawn from a school, she cannot maintain standing to pursue claims for prospective relief against the school. *See Grandson v. University of Minn.*, 272 F.3d 568, 574 (8th Cir. 2001) (voluntary withdrawal from school moots claims); *Burke v. Hillsborough Cnty. Sch. Bd.*, 752 F. App'x 713, 716–17 (11th Cir. 2018) (per curiam) (unpublished) (same). Article III dictates that conclusion because to establish standing to obtain injunctive relief, a plaintiff must show a "real or immediate threat that [she] will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Yet a plaintiff who no longer attends a school faces no risk of injury from the school's policies. *See, e.g.,*

*Lane v. Simon*, 495 F.3d 1182, 1186–87 (10th Cir. 2007) (graduation of the plaintiffs from school moots claim for injunctive relief against school authorities "[b]ecause defendants can no longer impinge upon plaintiffs' exercise of freedom of the press").

It makes no difference that L.K. 3's mother asserts that her husband now works for an Air Force contractor, so that her children might again be eligible for DoDEA schools "if [the family] were sent overseas." Second Kenkel Declaration, JA272. Even if L.K. 3 had far more concrete plans to attend a different DoDEA school, those plans would provide no support for this particular injunction, which applies to the school that she previously attended. There is no indication in the record that she would ever attend that school again, so she has no basis to maintain an injunction relating to its practices.

The allegations in the declaration are in any event far too speculative to establish standing even for a different DoDEA school. *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 631 (4th Cir. 2023) (theory of standing cannot "require[ ] guesswork" about what third parties will do). L.K. 3 and her parents have not even alleged that they intend to reenroll her in an DoDEA school if given the opportunity much less

that the opportunity will arise. *See* Second Kenkel Declaration, JA272

(alleging only that "children would be *eligible* for DoDEA schools" if father is

sent overseas (emphasis added)).

2. None of the other 11 plaintiffs have established their standing to

challenge the removal of books from DoDEA libraries either. To establish a

certainly impending future injury, plaintiffs cannot rely on vague "some day

intentions"; rather they must allege "concrete plans" to engage in conduct

that will subject them to injury absent prospective relief. *Wells v. Johnson*,

150 F.4th 289, 304 (4th Cir. 2025) (quoting *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 564 (1992)). In the context of a claimed right to library books,

plaintiffs must show that they have concrete plans to read the books in the

future.[5] *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d

---

[5] In district court, plaintiffs relied on *Minarcini v. Strongsville City School District*, 541 F.2d 577, 583 (6th Cir. 1976), for the proposition that "student plaintiffs had standing to raise a First Amendment right to receive information claim challenging the removal of books from their school library without imposing any requirement plaintiffs had sought to check out the specific titles themselves." Reply in Support of Motion for Preliminary Injunction, Dkt. 36, at 3. *Minarcini*, however, lacks any power to persuade because the Sixth Circuit simply stated that the plaintiffs had standing without analysis. *See* 541 F.2d at 583. Were that not enough, *Minarcini* predates modern standing doctrine; it does not speak to the requirement of imminent harm, which the Supreme Court has clarified is indispensable to obtaining prospective relief, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

1177, 1197 (11th Cir. 2009). If a plaintiff does not actually intend to access a removed book in the library, she has no stake in the outcome of the litigation. This is not a particularly high bar to surmount, but it is a constitutional requirement that plaintiffs have failed to meet, despite evidently being aware of the importance of such allegations insofar as they provided them for L.K. 3.

Two plaintiffs gesture at potential injuries from the book removal policy, but their assertions in this regard are inadequate to establish standing. Months after the district court's preliminary injunction decision, plaintiffs submitted a new declaration stating that M.T., a twelfth-grade student at Aviano Middle-High School, had checked out three books that DoDEA had previously removed from her school library, claiming that but for the injunction, this would not have been possible. Second Tolley Declaration, JA274–275. Any injury attributable to a twelfth-grade student would presumably be short-lived. *See Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003) (graduation moots claims for prospective relief from school policy). But in any event, the post-injunction declaration is inadequate on its own terms. That M.T. successfully checked out three books does not establish a future injury for which she may obtain prospective relief,

especially because she did not allege any intention to check out these or any other books in the future. Additionally, plaintiff O.H.'s mother alleges that she would like her son to read at least 10 books removed from DoDEA libraries and that she tried to obtain three of them. Second Henninger Declaration, JA260; Third Henninger Declaration, JA277–278. But O.H. attends Fort Campbell Middle School, Second Henninger Declaration, JA258, which is not subject to the preliminary injunction, *cf.* Order, JA57. Any injury O.H. may suffer, thus, cannot sustain an injunction entered with respect to schools he does not attend, *see infra* p. 48, or with respect to any other books, *see ACLU of Fla.,* 557 F.3d at 1197. And though plaintiffs have moved to modify the injunction, the district court lacks jurisdiction to expand the injunction to cover Fort Campbell Middle School while this appeal is pending, *see Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam); *Doe v. Public Citizen*, 749 F.3d 246, 258 (4th Cir. 2014); *see also City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265, 272 (4th Cir. 2025) ("Two courts at once is one court too many.").

No other plaintiff has alleged that she unsuccessfully attempted to check out any books from his school library or that she has plans to check out a book that has been removed. *See* Keeley Declaration, JA125–136 (making

no allegations that E.K. or S.K. intends to check out library books); Young Declaration, JA171–176 (making no allegations that E.Y. or C.Y. intends to check out library books); Kenkel Declaration, JA178–184 (making no allegations that L.K. 1 or L.K. 2 intends to check out library books). None of these plaintiffs, therefore, can establish standing for prospective relief to halt the removal of books from DoDEA libraries.

Plaintiffs' lack of standing at this phase of the case provides an independent reason to vacate the preliminary injunction as applied to the removal of library books.

**B.     The Free Speech Clause does not restrict the government from removing books from school libraries.**

1. Plaintiffs' claim in any event fails on the merits. Plaintiffs cannot invoke their First Amendment right to receive information to challenge the removal of books from a government-owned school library. Courts have recognized that, at least in some circumstances, the First Amendment protects a willing listener's right to receive information from a willing speaker. *See, e.g.*, *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976). But that right does not extend to compelling the government to provide the speech that listener wants to hear.

*See Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (plurality opinion) (there is "no basis for the claim that the First Amendment compels others—private persons or governments—to supply information"); *id.* at 16 (Stewart, J., concurring in the judgment) (same); *cf. Stephens v. County of Albemarle*, 524 F.3d 485, 492 (4th Cir. 2008) ("[T]o have standing to assert a right to receive speech, a plaintiff must show that there exists a speaker willing to convey the information to her.").

"The right to hear and the right to speak are flip sides of the same coin." *Willis v. Town of Marshall*, 426 F.3d 251, 260 (4th Cir. 2005) (cleaned up). Thus, for a right-to-receive-information challenge to be viable, the government must interpose some barrier between a listener and "a speaker who is willing to convey information." *Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (cleaned up); *see, e.g.*, *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965).

Here, the only challenged action is the government's refusal to make certain books affirmatively available to plaintiffs. The government has not interposed itself between plaintiffs and those books; plaintiffs remain free to obtain them from other sources such as non-school libraries or bookstores. *See Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting) ("[T]he most obvious

reason that petitioners' removal of the books did not violate respondents' right to receive information is the ready availability of the books elsewhere."). Instead, the government has determined that it will not provide these books itself. To the extent that there is any expressive activity involved in that determination, it is only the government's own speech in determining how to curate its library, which plaintiffs have no First Amendment right to control for similar reasons to those discussed above with regard to the government's curriculum. *See Arkansas Educ. Television Comm'n*, 523 U.S. at 674 (state agency "engages in speech activity" when it "exercises editorial discretion"); *see also Summum*, 555 U.S. at 472–74 (government expresses its views when it selects monuments for display in public parks).

Thus, as the en banc Fifth Circuit recently held, "plaintiffs cannot invoke the right to receive information to challenge [a public] library's removal of … books." *Little v. Llano County*, 138 F.4th 834, 845 (5th Cir.) (en banc) (majority opinion), *cert. denied*, 144 S. Ct. 886 (2025). That reasoning applies *a fortiori* in the context of a school, which students attend to receive the information that educators choose to present to them. *See id. Pico*, 457 U.S. at 913–14 (Rehnquist, J., dissenting); *see also Ambach*, 441 U.S. at 76–80 (describing vital role of schools in inculcating civic values).

A school library is part of the school's pedagogical mission, and as described above democratically accountable leaders are charged with advancing that mission based on their own policy judgments rather than with maintaining viewpoint neutrality.

Practical considerations underscore that point. To function, a government-run library in general, and a school library in particular, must be empowered to engage in viewpoint discrimination when it decides what books will appear on its shelves. Racism is a viewpoint. Antisemitism is a viewpoint. "Giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017). If a school lacks discretion to select books on the basis of viewpoint, it cannot stock books that describe the Holocaust without also maintaining a Holocaust-denial section. *See Little*, 138 F.4th at 850. It follows that a rule prohibiting the government from engaging in viewpoint discrimination when adding or removing books from library shelves would be wholly unworkable.

C. **The district court erred in concluding that the government may not remove library books because it disagrees with the messages promoted by the books.**

1. The district court erred in embracing the plurality opinion in *Pico*. In that case, a local school board ordered certain books removed from school libraries because it considered them to be "anti-American, anti-Christian,

anti-Semitic, and just plain filthy." 457 U.S. at 857 (plurality opinion) (cleaned up). Students sued alleging that the school board's action violated their First Amendment right to receive information. *Id.* at 858–59. The court granted summary judgment to the school board, the Second Circuit reversed, and a fractured Supreme Court affirmed. Writing for a plurality, Justice Brennan concluded that a school cannot remove books from its library if the school "intended by [its action] to deny [students] access to ideas with which [the school] disagreed."[6] *Id.* at 871. Justice White concurred only in the judgment, declining to "decide constitutional questions" and instead concluding that "a material issue of fact … precluded summary judgment." *Id.* at 883–84 (White, J., concurring in the judgment). Chief Justice Burger, Justice Powell, Justice Rehnquist, and Justice O'Connor each wrote dissents. As the narrowest opinion, Justice White's concurrence provides "the holding of the Court." *See Marks v. United States*, 430 U.S. 188, 193 (1977) (quotation marks omitted). Therefore, "*Pico* is of no precedential value as to the application of the First Amendment to these

---

[6] Justice Blackmun joined only part of the plurality opinion, articulating a narrower theory of why he believed the book removals violated the First Amendment. *See Pico*, 457 U.S. at 875–82 (Blackmun, J., concurring in part and concurring in the judgment).

[library] issues." *Little*, 138 F.4th at 844 (majority opinion) (quotation marks omitted); *accord ACLU of Fla.*, 557 F.3d at 1200; *Walls*, 144 F.4th at 1003–04.

For the reasons discussed above, the *Pico* plurality opinion lacks persuasive force. Justice Brennan's analysis turns on a right of access without providing any basis to conclude that such a right is implicated where the government does not intercede between a willing speaker and a willing listener. *See Pico*, 457 U.S. at 887–90 (Burger, C.J., dissenting); *see also supra* pp. 19–20, 38–39. And much like the line of cases from the courts of appeals that applied inapposite First Amendment principles to curricular decisions, *Pico* does not account for more recent cases that explicate the government-speech doctrine generally and its application in the educational context in particular. *See supra* pp. 22–24.

2. The district court was likewise mistaken to the extent that it considered *Hazelwood* applicable in this context. As discussed above, *Hazelwood* was about rules applicable to student speech, and there are no limitations on student speech at issue here. *See supra* pp. 21–26. The district court's statement that "it is unclear whether book removals constitute school-sponsored speech under *Hazelwood*," Memorandum Opinion, JA47,

highlights the court's misunderstanding of the relevant principles. The district court believed that *Hazelwood* might not apply because the curation of library books does not "bear the school's imprimatur." *Id.*, JA47. There should be no serious dispute that it is the school that is selecting books for the library, and to the extent that the selection of such books sends a message, it is the government's message and no one else's. But the fundamental point is that there is no student speech implicated by the accession or deaccession of library books. And without student speech, *Hazelwood*'s balancing framework does not come into play. *See Chiras*, 432 F.3d at 616–17 (*Hazelwood* applies only where a school has opened a forum for speech).

The Eighth Circuit's decision in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), is not to the contrary. In that case, the district court held that students had standing to maintain a claim against the removal of library books but vacated a preliminary injunction for failure to properly consider the facial nature of the challenge. *Id.* at 667–71. Though the district court discussed the potential applicability of the government-speech doctrine, it emphasized that "[s]o long as the intended future conduct alleged by the plaintiffs is arguably proscribed by

43

the statute [they are] challenging, they have standing." *Id.* at 667; *see also*

*FEC v. Ted Cruz for Senate*, 596 U.S. 289, 298 (2022) (in considering standing

a court must "accept as valid the merits of [the plaintiff's] legal claims.").

## III.  At minimum, the preliminary injunction must be narrowed.

"Congress has granted federal courts no … power" to issue "[a]

universal injunction." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). Rather,

an injunction is a party-specific remedy, which may benefit non-parties only

incidentally. *Id.* at 851–52; *see also Califano v. Yamasaki*, 442 U.S. 682, 702

(1979) ("[I]njunctive relief should be no more burdensome to the defendant

than necessary to provide complete relief to the plaintiffs."). The district

court strayed from that principle when it declined to limit its injunction to

the injuries that gave rise to standing, and the injunction must further be

narrowed now that some of the claims have become moot.

### A.  The injunction may protect only plaintiffs who have established Article III injuries.

1. "[S]tanding is not dispensed in gross," so plaintiffs must establish

standing "for each form of relief that they seek." *Murthy*, 603 U.S. at 61

(quotation marks omitted). Because "Article III does not give federal courts

the power to order relief to any uninjured plaintiff," *TransUnion*, 594 U.S. at

431 (quotation marks omitted), a plaintiff's remedy must be "limited to the

inadequacy that produced his injury in fact," *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (cleaned up).

Plaintiffs have made no effort to establish that the removal of books from DoDEA libraries caused a cognizable injury to 9 of the 12 students. At most, they have asserted that three plaintiffs have suffered injuries by their inability to check out books at three schools—only two of which are covered by the injunction. *But see supra* pp. 34–37 (allegations fail to establish standing for prospective relief). The book-removal portion of any injunction, therefore, must be limited to protecting L.K. 3 and M.T. (O.H. does not attend a school covered by the injunction.)

With respect to L.K. 3 and M.T., the injunction was tied to their attendance of Edgren Middle High School and Aviano Middle-High School, respectively. Even assuming that an injunction requiring specific books to remain on the shelves of the libraries at those schools were justified, there is no basis to extend the injunction to three other schools when no plaintiff attending those schools has demonstrated an injury-in-fact that could be remedied by an injunction. At minimum, therefore, the book-review portion of the injunction should be vacated with respect to Crossroads Elementary School, Barsanti Elementary School, and Sollars Elementary School.

2. The district court erred in concluding that it could enter a broader injunction. While the district court failed to explain why it could grant relief to uninjured plaintiffs, it may have misapprehended the principle that "'[t]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement' and does not require the Court to also 'determine whether the other plaintiffs have standing.'" Memorandum Opinion, JA25 (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)). A single party with standing is all it takes for a court to decide the merits of a claim. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). Thus, "a court need not reach the issue of the standing of other parties *when it makes no difference to the merits of the case.*" *Noel Canning v. NLRB*, 705 F.3d 490, 514 (D.C. Cir. 2013) (emphasis added) (quotation marks omitted), *aff'd*, 573 U.S. 513 (2014). But when it does make a difference, the court must continue on with the standing analysis.

Here, the standing of each plaintiff matters. Even if L.K. 3 or M.T. has standing and the district court had jurisdiction to reach the merits, "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *TransUnion*, 594 U.S. at 431 (quotation marks omitted). Thus, the district court was obligated to assure itself of its jurisdiction as to each

46

plaintiff before granting an injunction that benefited all the plaintiffs. To do otherwise is to grant the sort of non-party-specific injunction prohibited by *CASA*. *See* 606 U.S. at 841–46 (repeatedly emphasizing party-specific nature of equitable remedies). Because the district court did not—and could not—satisfy that obligation, the injunction should be vacated to the extent it benefits uninjured plaintiffs.

### B. The injunction may not extend beyond the DoDEA schools presently attended by plaintiffs.

For similar reasons, the district court's order must be vacated in its entirety with respect to Crossroads Elementary School, Sollars Elementary School, and Edgren Middle High School. No plaintiff attends those three schools for the 2025–26 school year. *Compare* Notice to Court, JA252–253, *with* Complaint, JA61–62. Thus, an injunction affecting the curriculum or the content of the libraries at those schools cannot possibly remedy any injury suffered by plaintiffs. "Extending the injunction" to schools not attended by any plaintiff "would not render [*plaintiffs'*] relief anymore complete." *CASA*, 606 U.S. at 853 (emphasis added).

Were those basic principles of equity not enough, the district court's own reasoning justifies only a narrower injunction. The district court expressly concluded that the injunction should not extend beyond the schools

that plaintiffs attend. Memorandum Opinion, JA55–56; Order, JA257.

Because enrollment changes have resulted in a mismatch between the schools attended by plaintiffs and the scope of the injunction, the injunction should be vacated with respect to Crossroads Elementary School, Sollars Elementary School, and Edgren Middle High School.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

*Of Counsel:*

EARL G. MATTHEWS
*General Counsel*

DANIEL TENNY

SARAH N. SMERLING
*Attorney*

*Department of War*

/s/ *Maxwell A. Baldi*

MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*
*maxwell.baldi@usdoj.gov*

MARCH 2026

**CERTIFICATE OF** COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A) because it contains 9,933 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

_/s/ Maxwell A. Baldi_

MAXWELL A. BALDI