# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

E.K., by and through parent and next friend Lindsey Keeley; S.K., by and through parent and next friend Lindsey Keeley; O.H., by and through parent and next friend Jessica Henninger; S.H., by and through parent and next friend Jessica Henninger; H.H., by and through parent and next friend Jessica Henninger; E.G., by and through parent and next friend Megan Jebeles; E.Y., by and through parent and next friend Anna Young; C.Y., by and through parent and next friend Anna Young; L.K., by and through parent and next friend Anna Kenkel; L.K., by and through parent and next friend Anna Kenkel; L.K., by and through parent and next friend Anna Kenkel; M.T., by and through parent and next friend Natalie Tolley,

*Plaintiffs-Appellees,*

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY; DR. BETH SCHIAVINO-NARVAEZ, in her official capacity as Director of the Department of Defense Education Activity; PETER BRIAN HEGSETH, in his official capacity as Secretary of Defense,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:25-cv-00637-PTG-IDD

## AMICUS BRIEF OF ALLIANCE DEFENDING FREEDOM IN SUPPORT OF APPELLANTS AND FOR REVERSAL

James A. Campbell
P. Logan Spena
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
lspena@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jacob P. Warner
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jwarner@ADFlegal.org

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1 and Local Rule 26.1, Amicus Curiae Alliance Defending Freedom states that it has no parent corporation and that it does not issue stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................i

Table of Authorities.........................................................................iv

Identity and Interest of Amicus Curiae..................................................1

Introduction and Summary of the Argument...........................................2

Argument.......................................................................................5

I.  The First Amendment does not require the Department to purchase and offer Plaintiffs' preferred library books. ..................5

    A.  Supreme Court precedent does not support applying heightened review to second-guess the Department's book curation in public-school libraries................................6

    B.  The First Amendment supports applying a history-and-tradition test to the Department's book curation in public-school libraries. ........................................8

        1.  History shows that government can pick which books to offer in public-school libraries if its goal fits with library tradition............................10

        2.  A history-and-tradition test ensures that government does not abuse its discretion. ..................15

    C.  A history-and-tradition test is readily administrable, as seen by its application here. ...............................19

II. Plaintiffs lack standing to challenge, under a First Amendment right to receive information, the Department's removal of content from public-school curriculum. .......................21

    A.  Binding precedent shows that the Department speaks through its curriculum choices. ............................22

    B.  Plaintiffs demand to receive speech from an unwilling speaker—the Department.................................23

C. Standing cannot be forfeited or waived. ...............................24

Conclusion .................................................................................26

Certificate of Compliance ...............................................................27

Certificate of Service ...............................................................28

# TABLE OF AUTHORITIES

## Cases

*ACLU of Florida, Inc. v. Miami-Dade County School Board,*
   557 F.3d 1177 (11th Cir. 2009) .......................................................7

*ACLU v. Holder,*
   673 F.3d 245 (4th Cir. 2011) ................................................... 21, 23

*Adams v. Trustees of the University of North Carolina-Wilmington,*
   640 F. 3d 550 (4th Cir. 2011) .......................................................22

*Arkansas Educational Television Commission v. Forbes,*
   523 U.S. 666 (1998) ......................................................................18

*Board of Education, Island Trees Union Free School District No. 26
   v. Pico,*
   457 U.S. 853 (1982) ......................................................... 6, 8, 20, 24

*Boring v. Buncombe County Board of Education,*
   136 F.3d 364 (4th Cir. 1998) ........................................................22

*Buscemi v. Bell,*
   964 F.3d 252 (4th Cir. 2020) ........................................................25

*Chiras v. Miller,*
   432 F.3d 606 (5th Cir. 2005) ................................................... 23, 24

*City of Austin v. Reagan National Advertising of Austin, LLC,*
   596 U.S. 61 (2022) ..........................................................................9

*E.K. by & through Keeley v. Department of Defense Education
   Activity,*
   807 F. Supp. 3d 517 (E.D. Va. 2025)................................... 6, 19, 24

*Edwards v. California University of Pennsylvania,*
   156 F.3d 488 (3d Cir. 1998).........................................................23

*FEC v. Wisconsin Right To Life, Inc.,*
   551 U.S. 449 (2007) ........................................................................9

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022) ......................................................22

*Lamont v. Postmaster General of United States*,
381 U.S. 301 (1965) .......................................................5

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025)................................ passim

*Martin v. City of Struthers*,
319 U.S. 141 (1943) .......................................................5

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
460 U.S. 1 (1983) ...........................................................8

*Muir v. Alabama Educational Television Commission*,
688 F.2d 1033 (5th Cir. 1982) ........................................7

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005) .........................................16

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .....................................................17

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .....................................................10

*Ramos v. Louisiana*,
590 U.S. 83 (2020) .........................................................7

*Republican Party of Minnesota v. White*,
536 U.S. 765 (2002) .......................................................9

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) .....................................................22

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) .....................................................23

*Stephens v. County of Albemarle*,
524 F.3d 485 (4th Cir. 2008) ...............................21, 23

*Tinker v. Des Moines Independent Community School District,*
 393 U.S. 503 (1969) ...............................................................22

*United States v. American Library Association, Inc.,*
 539 U.S. 194 (2003) ................................... 15, 16, 17, 19

*United States v. Davis,*
 825 F.3d 1014 (9th Cir. 2016) .......................................8

*United States v. Donovan,*
 661 F.3d 174 (3d Cir. 2011) ..........................................8

*United States v. Midwest Oil Company,*
 236 U.S. 459 (1915) ........................................................9

*United States v. Rahimi,*
 602 U.S. 680 (2024) ...................................................9, 10

*Vidal v. Elster,*
 602 U.S. 286 (2024) .............................................. passim

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer
 Council, Inc.,*
 425 U.S. 748 (1976) ................................................21, 24

*Walls v. Sanders,*
 144 F.4th 995 (8th Cir. 2025)..................................22, 23

*Williams-Yulee v. Florida Bar,*
 575 U.S. 433 (2015) ........................................................9

## Other Authorities

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.
 Rev. 1175 (1989) ..............................................................9

Carleton Joeckel, *The Government of the American Public Library*
 (1935) ...................................................................11, 12

CREW: A Weeding Manual for Modern Libraries (Texas State
 Library & Archives Comm'n 2012) ...............................14

David Kaser, *A Book for Sixpence: The Circulating Libraries in Am.* (1980) ................................................................. 12

Edward Greenman, *The Dev. of Secondary Sch. Librs.*, The Library J., Apr. 1913 ...................................................... 12

*First School Library?*, Am. Libr. Ass'n ..................................... 10, 11, 12

Jaeger & Jennings-Roche, *Clarifying Intellectual Freedom, Neutrality, and Professional Expertise to Better Defend Libraries from Books Bans, Disinformation, and Defunding,* The Political Librarian, Apr. 2025 ........................................ 12, 13

Jesse Shera, *Foundations of the American Public Library* (1949) ... 11, 12

Mark G. Yudof, *Personal Speech & Gov't Expression*, 38 Case W. Res. L. Rev. 671 (1987) ................................................... 24

## **Regulations**

*Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) ....................................................... 20, 23

# IDENTITY AND INTEREST OF AMICUS CURIAE[1]

Alliance Defending Freedom is a nonprofit law firm that advances the God-given right to live and speak the truth. It promotes free speech, religious freedom, the sanctity of human life, and parental rights. ADF cares deeply about interpreting constitutional text according to its original public meaning. Where, as here, a court may for the first time consider how the First Amendment applies in a new context, ADF aims to offer guidance—consistent with text, history, and tradition—that may help the court rightly rule and so protect free speech.

---

[1] No counsel for a party authored this brief in whole or in part. No one other than amicus curiae and its counsel made any monetary contribution to fund the preparation or submission of this brief. All parties were timely notified of this brief and consented to its filing.

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

This case arose after Defendants (collectively, the Department) removed from public K-12 schools library books and curriculum that push divisive concepts such as gender ideology. Plaintiffs invoke the right to receive speech to demand ongoing access to that content. Neither binding precedent nor the First Amendment supports that demand.

Start with library books. While the Supreme Court has recognized a right to receive speech, the Court has never invoked that right to force government to provide continuous access to public-library books that no longer advance the government's educational goals. The Department asserts that choosing library books is government speech. This brief takes no position on that issue. Even assuming that the Department does not speak through its library-book curation, history shows that government can, consistent with the First Amendment, choose which public-library books to offer based on their content and viewpoint, provided the government aims to promote public education.

To be sure, the exercise of that discretion is subject to judicial review. If plaintiffs can show that the government is picking books inconsistent with a library's traditional educational purpose—*e.g.*, to punish political rivals by removing all books authored by a Democrat—courts may correct that abuse as inconsistent with historical tradition. Such review requires proof that government is acting inconsistent with the historical purpose of public libraries—to promote public education.

Plaintiffs haven't shown that here. The Department removed controversial content to spark critical thinking and erase confusion. Those are educational goals. Because that traditional exercise of government discretion has long been compatible with the First Amendment, this Court should uphold it and reverse.

This outcome is best legally and practically. Applying heightened review, for example, would forbid not just the Department's policy but *any* viewpoint-based rule for selecting library books—ending public libraries as we know them. And reviewing content rather than purpose would bury courts in impossible demands. Take the ruling below. It follows a nonbinding opinion forbidding viewpoint discrimination unless a court finds that the books were removed due to their lack of relevance, good taste, or some other court-approved reason. But how can a court decide whether a book was nixed based on its ideas or its relevance? It can't. Only a history-and-tradition test allows the public-library tradition to continue while also respecting the freedom of speech.

As for curriculum, Plaintiffs lack standing to bring their claim under a right to receive speech. Plaintiffs must allege that the Department has caused injury to their legally protected interest. Here, they must identify a speaker willing to convey their desired speech to them. Plaintiffs have not done so. Instead, they have demanded speech from an *unwilling* speaker—the Department. Binding precedent holds that public-

school curriculum choices are government speech. Because the Department speaks through its curriculum and does not want to speak Plaintiffs' preferred messages, the Department is an unwilling speaker from whom Plaintiffs are not entitled to receive desired speech. So Plaintiffs suffer no injury to a legally protected interest and lack standing to demand their curriculum based on a right to receive speech.

To be sure, the Department did not raise this standing argument below. The district court considered standing but overlooked that Plaintiffs did not identify a willing speaker to support their claim. That resulted in a vast new rule: students may use the right to receive speech to challenge *any* removal of preferred curriculum that may affect their future education. That rule could overwhelm courts with lawsuits attempting to force public schools to change their curriculum. Because the Court must be sure of its jurisdiction, it may address this argument, even without a party request. The district court's flawed standing analysis must be corrected.

This Court should reverse and uphold the Department's choice to remove the disputed content from its libraries and classrooms.

**ARGUMENT**

The First Amendment does not require the Department to provide ongoing access to Plaintiffs' preferred library books. And Plaintiffs lack standing to challenge the Department's curriculum changes under a right to receive information. The judgment below should be reversed.

**I.    The First Amendment does not require the Department to purchase and offer Plaintiffs' preferred library books.**

The Supreme Court has affirmed a "right to receive" information, *e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943), but Plaintiffs stretch that right far beyond its roots. While heightened scrutiny applies when government *prevents* someone from purchasing or receiving books from private persons, *e.g.*, *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965) (Postal Service could not regulate receipt of "communist … propaganda"), that same scrutiny does not apply when government *decides which books to offer* in public-school libraries. No Supreme Court ruling supports that. The First Amendment has not required it. And mandating it now would bury government with impossible demands. A history-and-tradition test best supports First Amendment interests.

5

**A.** **Supreme Court precedent does not support applying heightened review to second-guess the Department's book curation in public-school libraries.**

Even assuming that students can invoke the right to receive information to challenge the Department's choice of books in public-school libraries, the court below extended that right far beyond its precedential limits. Favoring a plurality opinion in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), the court below applied a form of heightened review to prevent the Department from offering library books consistent with recent executive orders. *E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, 807 F. Supp. 3d 517, 539–44 (E.D. Va. 2025). But the court misread *Pico*'s significance. It banks too much on *Pico*'s plurality and too little on majority pushback.

*Pico* arose from students challenging a school board's choice to remove books from a school library. Justice Brennan's opinion—joined by Justice Marshall and Justice Stevens—said this choice violated the students' right to receive information. *Pico*, 457 U.S. at 866–67 (plurality). Justice Blackmun concurred in the judgment but denied that the "right to receive information" entitles students to ongoing access to preferred library books. *Id*. at 878 (Blackmun, J., concurring). Chief Justice Burger—joined by three more Justices—dissented and agreed with Justice Blackmun that the First Amendment does not entitle students to library books of their choice. *Id*. at 886–88 (Burger, C.J., dissenting), making this the majority position.

The fifth Justice contributing to the plurality judgment was Justice White, and he expressed no opinion on the First Amendment issue. Instead, he suggested a remand so the parties could create a better record.

Where there is no clear majority basis for a judgment, as in *Pico*, courts look to the "position taken by those Members [of the Court] who concurred in the judgments on the narrowest grounds." *Ramos v. Louisiana*, 590 U.S. 83, 103 (2020) (citation modified). Because Justice White's opinion in *Pico* is the narrowest grounds for judgment, *Pico*'s plurality judgment has no precedential value as to whether the First Amendment requires government officials to purchase and offer books in school libraries.

The district court here effectively treated Justice Brennan's plurality opinion in *Pico* as binding. But multiple federal appellate courts have held that opinion has "no precedential value" as to whether government must purchase and provide continuing access to books in public-school libraries. *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982); *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009).

Moreover, the district court wrote off the Justices in *Pico*—who collectively constituted a majority—that rejected the plurality's First Amendment analysis. It should have respected that view. *E.g., Moses H.*

*Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 17 (1983) (deriving a rule from the combination of four dissenting Justices and one concurring Justice); *see United States v. Davis*, 825 F.3d 1014, 1024 (9th Cir. 2016); *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011).

A proper reading of *Pico* does not require subjecting to heightened review government decisions to purchase and offer books in school libraries. *Pico*, 457 U.S. at 878 (Blackmun, J., concurring); *id.* at 886–88 (Burger, C.J., dissenting). That's entirely consistent with the First Amendment.

### B. The First Amendment supports applying a history-and-tradition test to the Department's book curation in public-school libraries.

The First Amendment does not require heightened review for the government's choices of which books to offer in school libraries. Its free-speech protection has "always coexisted with" the historical tradition of governments choosing which books it will shelve in public-school libraries. *Vidal v. Elster*, 602 U.S. 286, 295 (2024); *see Pico*, 457 U.S. at 878 (Blackmun, J., concurring); *id.* at 886–88 (Burger, C.J., dissenting). That tradition should continue.

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." Read literally, this may seem to offer absolute protection for speech. But that view has been rejected. *FEC*

*v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 482 (2007). Relevant "history" helps to shape the contours of constitutional protection. *Vidal*, 602 U.S. at 301; *see also United States v. Rahimi*, 602 U.S. 680, 717–29 (2024) (Kavanaugh, J., concurring) (construing the Second Amendment). And where pre-enactment history is scant, later history is key. *Rahimi*, 602 U.S. at 723 (Kavanaugh, J., concurring); *e.g.*, *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002); *see also* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1183 (1989).

Post-enactment history can reflect and reinforce the original meaning of constitutional text. If government long prohibited or allowed certain conduct, that "creates a strong presumption" that the action is constitutional. *White*, 536 U.S. at 785 (citation modified); *see United States v. Midwest Oil Co.*, 236 U.S. 459, 472–73 (1915). The framers expected that history would "liquidate[ ]" vague meanings of constitutional text. *The Federalist* No. 37 (James Madison); *e.g., Williams-Yulee v. Florida Bar*, 575 U.S. 433, 446 (2015) (recognizing "history and tradition" as relevant when considering the scope of the First Amendment); *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75 (2022) (looking to "unbroken tradition").

While heightened scrutiny often applies to government actions based on content and viewpoint, that rule is not absolute. Where courts, as here, address "the constitutionality" of a government action "for the

first time," they should consider whether the challenged action is consistent with relevant "history" that long accepts the action as "compatible" with the First Amendment. *Vidal*, 602 U.S. at 295, 300–01; *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992) (The First Amendment "does not include a freedom to disregard … traditional limit[s]").

If history shows that government can take an action "consistently with the First Amendment," *id.*, courts take from that history a controlling principle, *e.g.*, *Vidal*, 602 U.S. at 301–08; *see also Rahimi*, 602 U.S. at 728 (Kavanaugh, J., concurring) (canvasing Supreme Court cases invoking post-enactment history to support ruling). Here, relevant history shows that the Department can decide, based on content *and* viewpoint, which books to shelve in public school libraries—provided its goal fits with library tradition. This history-and-tradition test best serves First Amendment interests and is readily enforceable.

> **1.** **History shows that government can pick which books to offer in public-school libraries if its goal fits with library tradition.**

From the early Republic, government has chosen which books to place in public libraries—including in schools. And it has done so based on content and viewpoint. While public-school libraries "cannot be assigned a definite [start] date," *First School Library?*, Am. Libr. Ass'n (ALA), perma.cc/P48Y-JPKE (last visited March 11, 2026), they appeared in the mid-nineteenth century and share the same roots with

other public libraries, *see Little v. Llano Cnty.*, 138 F.4th 834, 861 (5th Cir. 2025) (citing Jesse Shera, *Foundations of the American Public Library* (1949) and Carleton Joeckel, *The Government of the American Public Library* (1935)); ALA*, supra.*

Their earliest precursors were "private religious libraries, which consisted mostly of the Bible and theological works." *Little*, 138 F.4th at 861. Then came "'social libraries,' where private individuals contributed funds to buy books." *Id.* (citing Shera, *supra*, at 59). The first was founded by Benjamin Franklin in 1731. *Id.* Such libraries, "hundreds of which were chartered by the colonies," aimed to "propagate virtue, knowledge, and useful learning." *Id.* (citation modified; citing Shera, *supra*, at 59–60 (discussing charter of the Redwood Library Company of Newport)), and often included large "theological collections" for public use, *id.*

By the mid-1800s, many municipalities had created public libraries, "funded and controlled by the government and meant to strengthen the educational mission of social libraries." *Id.* (citing Joeckel, *supra*, at 24). These "collections were curated to foster education and virtue." *Id.* (citing Shera, *supra*, at 222–25). In fact, "the first municipal library recognized by state statute, the 1848 Boston Public Library," was deemed the "'means of completing [the government's] system of public education.'" *Id.* (citing Joeckel, *supra*, at 17 and Shera, *supra*, at 175).

Given the public libraries' educational mission, "content selection was critical." *Id.* Consider that by 1834, one municipal library consisted

"overwhelmingly of historical, biographical, and theological works." *Id.* (citing Shera, *supra*, at 166). "Novels, despite their popularity, occupied a mere 2% of the collection," *id.* (citing Shera, *supra*, at 166), which was no accident as many educators agreed with Thomas Jefferson that they were "poison[ous] and trashy," *id.* (citing Shera, *supra*, at 222–23 & David Kaser, *A Book for Sixpence: The Circulating Libraries in Am.* 88–90 (1980)). A book's content mattered.

The same was true in state libraries. New York's 1835 library law established the first taxpayer-funded library and authorized school districts to use public funds to purchase school library books. *Id.* at 862 (citing Joeckel, *supra*, at 9, 12); *see* ALA, *supra*. The law also "charged the state superintendent with creating lists of suitable books." *Little*, 138 F.4th at 862. By 1876, "19 states … had passed [similar] laws" allowing schools to offer library books. ALA, *supra*. And by the mid-1890s, libraries appeared in thousands of public schools. Edward Greenman, *The Dev. of Secondary Sch. Librs.*, The Library J., Apr. 1913, at 185.

Library directors considered it "their mission" to improve society—promoting education, morality, and skills for work. Jaeger & Jennings-Roche, *Clarifying Intellectual Freedom, Neutrality, and Professional Expertise to Better Defend Libraries from Books Bans, Disinformation, and Defunding*, The Political Librarian, Apr. 2025 at 90. For better or worse, they offered books "based on [their personal] values." *Id.*; *see Little*, 138 F.4th at 862.

While early public libraries shelved "reference materials, diction-aries, grammars, [and] histories," Jaeger & Jennings-Roche, *supra*, at 90, they also provided "books on political and moral issues." *Id*. And they offered books "on practical sciences." *Id*. Across all content, they exercised "broad" discretion to avoid "potentially controversial" material and made no effort to promote a "diversity" of viewpoints. *Id*.

In other words, library directors chose which books to offer based on content *and* viewpoint. At times, John Marshall's biography of George Washington made the cut, while "trashy novels" did not. *Little*, 138 F.4th at 862. No matter, the government routinely made these judgments. *Id. See also* Greenman, *supra*, at 186–88 (categorizing libraries directed by government board of education or government agents). And the ratification of the Fourteenth Amendment "did not prompt [public libraries] to change" that approach. *Vidal*, 602 U.S. at 315 (Barrett, J., concurring); *see Little*, 138 F.4th at 848, 862; Green-man, *supra*, at 186–88. Governments—through their library directors—continued to choose books based on content and viewpoint—all with the goal of advancing their traditional educational mission.

Public libraries operate much the same way today. True, the pre-ferred content may have changed: "what today's Library Board thinks is worth reading is likely not what" the New York superintendent believed in 1835. *Little*, 138 F.4th at 862. But government—"through those who

curate [its] collections"—still decides which books, in its view, merit attention and does so by "including some books" while "excluding others" based on content and viewpoint. *Id*. Consider this "official guide" for library directors, which tells public libraries to remove:

- "[B]iased, racist, or sexist terminology or views."
- "[S]tereotypical images and views of people with disabilities and the elderly, or gender and racial biases."
- "[O]utdated philosophies on ethics and moral values."
- "[B]ooks on marriage, family life, and sexuality ... [which are] usually outdated within five years."
- "[B]ooks with outdated [political] ideas."
- "[B]iased … and inflammatory items [about immigration]."
- "[O]utdated ideas about gender roles in childrearing."
- "Art histories ... [with] cultural, racial, and gender biases."
- "[Children's] books that reflect racial and gender bias" or have "erroneous and dangerous information."

*Id*. at 862–63 (citing CREW: A Weeding Manual for Modern Libraries (Texas State Library & Archives Comm'n 2012)). This demonstrates that librarians now, no less than in 1835, choose which books to offer based on whether they think the content *and* viewpoint serves the library's educational goals. *Id*. at 863.

This history shows that the application of "heightened … scrutiny … [is] incompatible with the discretion that public libraries must have

14

to fulfill their traditional [educational] missions." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality); *see id.* at 236 (Souter, J., dissenting) ("Public libraries" must be "selective" in which books to offer.). This discretion has "always coexisted with the First Amendment" even though it "necessarily" allows government to make viewpoint-based decisions. *Vidal*, 602 U.S. at 295. This history is "sufficient" to show that government can choose—based on content and viewpoint—which books to offer in public libraries if it does so, consistent with tradition, to further public education. *Id.* at 301.

### 2. A history-and-tradition test ensures that government does not abuse its discretion.

Government's exercise of this book-selection discretion is still subject to limited judicial review. Public libraries have historically chosen which books to offer for a specific purpose—to advance public education. They have not, for example, used their discretion to punish political rivals. Government must exercise its discretion consistent with historical limits. Under those limits, government may choose—based on content and viewpoint—which books to offer in public libraries but only if it does so, consistent with tradition, to further an educational goal.

This is a history-and-tradition test. Plaintiffs must show that the government's book selections are inconsistent with historical purposes of public libraries. While government will keep broad discretion over which books to offer, it must have an educational basis for those

decisions. It must justify its choices as reasonably advancing a "traditio-nal [educational] mission[ ]." *Am. Libr. Ass'n*, 539 U.S. at 206 (plurali-ty). Bare hostility to a political party, for example, would be prohibited because public libraries historically did not remove books because their author was a Democrat. Same goes for bare religious hostility. Govern-ment must exercise its discretion within historical bounds.

This history-and-tradition rule best promotes First Amendment interests in two ways: (1) the rule is narrow—ensuring that government may not extend it to contexts where close scrutiny is needed; and (2) it supports the "marketplace of ideas." *Vidal*, 602 U.S. at 330 (Barrett, J., concurring) (citation modified).

First, the rule is narrow. The government should rarely have dis-cretion to make content- and viewpoint-based choices, aside from the few contexts that historically allow for such discretion. *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005) (listing public museums, libraries, broadcasts, and schools). When government makes viewpoint-based decisions as to which public-library books to offer, it is serving a library's historical purpose—advancing education.

In addition, public libraries have limited cash and "space." *Little*, 138 F.4th at 860. They are unlike internet companies. If public libraries that provide internet access need not, through that nearly limitless me-dium, promote "a diversity of views from private speakers" but can limit

access to content they believe will promote their educational goals, then surely libraries can exercise that same control over scarce shelf space. *Am. Libr. Ass'n*, 539 U.S. at 206 (citation modified); *see id.* at 236 (Souter, J., dissenting) ("Public libraries" must be "selective" in which books to "place in their stacks.").

Moreover, public libraries like those run by the Department do not open a forum. The government "does not create a public forum" by doing nothing or even allowing a "limited" exchange of ideas; it opens a forum only by "intentionally" creating "a non-traditional forum" for public discourse. *Am. Libr. Ass'n*, 539 U.S. at 206 (plurality). If government invites applications or otherwise seeks public control over its book selections, the analysis may differ. But when government alone chooses the books, it does not offer those books "to provide a public forum for [their] authors … to speak." *Id.* It offers the books to educate the public. Forum rules do not apply. *Little*, 138 F.4th at 859.

For good reason. If forum rules applied, public libraries could not offer history books "accepting that the Holocaust happened" without offering others that deny "its occurrence." *Id.* They could not offer books on globe-earth theory without others pushing the flat-earth alternative. Nor could they offer books praising Apollo 11 without offering others that deny it occurred. All viewpoint-discrimination would be prohibited. *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (forum rules

must be "viewpoint neutral"). In that world, the public library "would be a warehouse, not a library." *Little*, 138 F.4th at 848 (citation modified).

Second, a history-and-tradition test supports the marketplace of ideas. It ensures courts can interpose in extreme cases where the government acts inconsistent with its traditional role, while not binding government discretion to such a degree that it would close public libraries altogether. On "logistical grounds alone," government may rather close public libraries than push views that thwart its educational goal. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 681 (1998). This would result in "less speech, not more," and "diminish the … flow of information," *id.* at 680–81—which subverts a key First Amendment goal.

Of course, students will remain free to access desired information elsewhere—online, in stores, at other libraries, or from friends. The Department "does not own every" book. *Little*, 138 F.4th at 848. If public libraries could historically exercise discretion to remove books based on content and viewpoint—when information was far more difficult to access—then surely that practice can continue today when virtually limitless information is just a click away. This is all the more reason to reject heightened scrutiny here: it isn't needed to support the marketplace of ideas. *Vidal*, 602 U.S. at 316 (Barrett, J., concurring).

Public libraries have a "unique context." *Id.* at 299; *cf.* § I.B.1. Their distinct history, limitations, and function ensure that a rule allowing them to continue to exercise their historical discretion will not

extend to contexts where such discretion would pose "a serious risk of censorship." *Id.* at 324 (Barrett, J., concurring). In fact, respecting that rule best promotes First Amendment interests.

**C.     A history-and-tradition test is readily administrable, as seen by its application here.**

This rule also works in practice. It is a "generally applicable principle" that is readily administrable. *Id.* at 324 (Barrett, J., concurring). It empowers government to make "categorical judgments" about which books to offer without shuttering libraries or drowning courts in a flood of book disputes. *Id.* at 319 (Barrett, J., concurring). Indeed, a test like the one proposed here is the best that a court can do, given that there are nearly unlimited decisions "that might be attacked," and each would require courts to unknot the messy "play of factors" behind it. *Am. Libr. Ass'n*, 539 U.S. at 236 (Souter, J., dissenting).

That bears out here. Consistent with a series of executive orders, the Department removed from public-school libraries books that promote "gender ideology, divisive concepts[,] … and discriminatory equity ideology." *E.K.*, 807 F. Supp. 3d at 525. It also removed material deemed "un-American, divisive, discriminatory, radical, extremist[,] and irrational." *Id.* (emphasis removed). Why? The government is not aiming to punish political rivals or further another goal inconsistent with tradition but to "educat[e]" students—to spark "critical thinking"

and erase "confusion." *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853, 8853 (Jan. 29, 2025).

A history-and-tradition test upholds this policy. Government is choosing books to further traditional educational purposes such as boosting critical thinking. *See* § I.B.1. It is not excluding books, for example, because their author is Muslim or Democrat or for another reason inconsistent with tradition. This is simple and practical.

In contrast, heightened review would prohibit not just this policy but *any* viewpoint-based rule—ending the public library as we know it. Even limited heightened review, as the plurality pushed in *Pico*, would stop the Department's "removal" of books (but not their purchase) because it favors some "ideas" over others, unless a court finds that the books were removed due to their lack of "relevance," "good taste," or the like. 457 U.S. at 871, 873. But that wrongly distinguishes book removals from purchases, *Little*, 138 F.4th at 846, requires courts to impossibly decide whether a book was removed based on its ideas or its relevance, and invites burdensome line-by-line removal challenges.

There's one clear answer. Only a history-and-tradition test allows government to run libraries consistent with its traditional discretion while also respecting the First Amendment. The right to receive information does not ensure that people can have "a book of their choice at taxpayer expense." *Id*. at 848.

**II. Plaintiffs lack standing to challenge, under a First Amendment right to receive information, the Department's removal of content from public-school curriculum.**

Moving from the library to the classroom, Plaintiffs again invoke the right to information, this time to challenge the Department's curricular changes. That challenge fails from the start. Plaintiffs lack standing because they demand speech from an unwilling speaker.[2]

To prove standing, Plaintiffs must show that the Department has caused injury to their legally protected interest. *Stephens v. Cnty. of Albemarle*, 524 F.3d 485, 491 (4th Cir. 2008). Here, that means Plaintiffs must establish that the Department is a speaker "willing to convey" the desired information to them. *Id.* at 492; *see Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (requiring a "willing speaker"). Plaintiffs fail to make that "connection." *ACLU v. Holder*, 673 F.3d 245, 255 (4th Cir. 2011). Because they demand speech from an unwilling speaker—the Department—Plaintiffs suffer no injury to a legally protected interest and "lack standing to raise" a claim under the First Amendment right to receive speech. *Id.*

---

[2] If the Court concludes that the Department's book selection is government speech, an analogous argument may establish that Plaintiffs lack standing to challenge the Department's library book choices.

**A.     Binding precedent shows that the Department speaks through its curriculum choices.**

This Court holds that choosing public-school "curriculum," including the material to "study," is government speech. *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 367–68 (4th Cir. 1998); *Polk v. Montgomery Cnty. Pub. Schs.*, 166 F.4th 400, 420 (4th Cir. 2026). That does not mean students or teachers forgo their freedom of speech when they go to class. They have a right to speak too, *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 531 (2022)—but not, as this Court holds, a "right" to demand that a public school implement their preferred "curriculum." *Boring*, 136 F.3d at 370–71.

This tracks with Supreme Court precedent, which holds that university curriculum choices are government speech. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, … [it is] speaking."). If, as this Court holds, universities must offer more freedom to engage in personal speech and yet their curriculum decisions remain government speech, *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F. 3d 550, 563 (4th Cir. 2011), then, as many other courts hold, public K-12 curriculum choices must also be government speech, *e.g., Walls v. Sanders*, 144 F.4th 995, 999 (8th Cir. 2025); *Edwards v. Cal. Univ. of*

22

*Pa.*, 156 F.3d 488, 491 (3d Cir. 1998); *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005).

Binding precedent holds that public-school curriculum choices are government speech. The Department speaks through its choices of what to add or remove from its public-school curriculum.

### B. Plaintiffs demand to receive speech from an unwilling speaker—the Department.

The First Amendment "does not prevent the [Department] from declining to express a view" it no longer wants to express. *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). Here, the Department doesn't want to express Plaintiffs' views on race, gender, and other controversial topics, 90 Fed. Reg. at 8853–57. So it is not a "willing speaker" from whom Plaintiffs may be entitled to receive desired speech. *ACLU*, 673 F.3d at 255. Because Plaintiffs identify no one "willing to convey" their favored speech to them, they lack "standing to assert" their claim based on the "right to receive" information. *Stephens*, 524 F.3d at 492.

This is the path other circuits have taken. Take *Walls*, where the Eighth Circuit addressed a statewide ban on "Critical Race Theory" in public-school curriculum. 144 F.4th at 999. It rejected a challenge to this curriculum change because students may not use the "right to receive information" to require the government to speak "a message it no longer is willing to say." *Id.* at 1002.

Similarly, in *Chiras*, the Fifth Circuit rejected a challenge to public-school "textbook" choices because students may not use the "right to receive information" to demand curriculum of their choice. 432 F.3d at 619. Even *Pico*'s plurality would not go that far—declining to extend its library position to things taught in "the classroom." *Id.* (citing *Pico*, 457 U.S. at 862 (plurality)); *see also* Mark G. Yudof, *Personal Speech & Gov't Expression*, 38 Case W. Res. L. Rev. 671, 683 (1987) (There is no "constitutional right" to demand curriculum or second-guess the government's "choice of textbooks.").

Because the right to receive speech presupposes a willing speaker, *Va. State Bd. of Pharm.*, 425 U.S. at 756, and Plaintiffs demand speech from an unwilling speaker, Plaintiffs do not show they have suffered an injury to a legally protected interest. Their standing fails.

## C.   Standing cannot be forfeited or waived.

The Department did not raise this argument below. So the district court, tight on time and without the benefit of briefing, missed Plaintiffs' standing deficiencies. Overlooking that Plaintiffs must, but did not, identify a willing speaker, the lower court established a vast new rule: students may use the right to receive speech to challenge *any* "removal" of preferred curriculum "materials … [that] will affect their" future education. *E.K.*, 807 F. Supp. 3d at 532.

That standard is wrong and perilous, exposing courts to endless lawsuits asking to change public-school curriculum. Because courts must "assure [themselves] of … jurisdiction and may address standing" even without a party request, *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020), this Court can and should fix that mistake. It's right to do so here.

# CONCLUSION

The Department is doing what government has always done—picking library books and curriculum to promote its educational goals. The First Amendment does not require the Department to offer ongoing access to Plaintiffs' preferred library books. Nor does it allow Plaintiffs to challenge curriculum changes under a right to receive information without identifying a willing speaker. This Court should reverse.

Dated: April 2, 2026

Respectfully submitted,

*s/Jacob P. Warner*

| | |
|---|---|
| James A. Campbell | John J. Bursch |
| P. Logan Spena | ALLIANCE DEFENDING FREEDOM |
| ALLIANCE DEFENDING FREEDOM | 440 First Street NW, Suite 600 |
| 44180 Riverside Pkwy | Washington, DC 20001 |
| Lansdowne, VA 20176 | (616) 450-4235 |
| (571) 707-4655 | jbursch@ADFlegal.org |
| jcampbell@ADFlegal.org | |
| lspena@ADFlegal.org | Jacob P. Warner |
| | ALLIANCE DEFENDING FREEDOM |
| | 15100 N. 90th Street |
| | Scottsdale, AZ 85260 |
| | (480) 444-0020 |
| | jwarner@ADFlegal.org |

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because the brief contains 5,411 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: April 2, 2026

> *s/Jacob P. Warner*
> Jacob P. Warner
> *Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/Jacob P. Warner*
Jacob P. Warner
*Counsel for Amicus Curiae*