# United States Court of Appeals for the Fourth Circuit

E.K., *by and through parent and next friend* LINDSEY KEELEY, *et al.*,

*Plaintiffs–Appellees/ Cross-Appellants*

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*,

*Defendants–Appellants/ Cross-Appellees.*

On Appeal from the United States District Court
for the District of Maryland
No. 1:25-cv-00637

## BRIEF OF DEFENDING EDUCATION
## AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS/CROSS-APPELLEES

J. Michael Connolly
Ryan M. Proctor
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
(703) 243-9423
mikeconsovoymccarthy.com
ryan@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for Amicus Curiae*

April 2, 2026

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Rule 26.1(b), *Amicus* discloses that it has no parent corporations and that no publicly held corporations hold 10% or more of its stock. No publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding.

Dated: April 2, 2026

/s/ *J. Michael Connolly*
J. Michael Connolly
*Counsel for Amicus*

Corporate Disclosure Statement...........................................................................i

Table of Authorities..........................................................................................iii

Interest of *Amicus Curiae* and Introduction .......................................................1

Argument...........................................................................................................3

    I.     The Department of Defense acted to protect parental rights, not undermine them........................................................................................3

    II.    The Department of Defense had good reason to find that promoting gender ideology and critical race theory in its schools would create conflict with parents. ...............................................................................6

Conclusion........................................................................................................17

Certificate of Compliance.................................................................................18

Certificate of Service .......................................................................................19

TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995)................................................................................12

*E.K. v. DoDEA,*
    807 F. Supp. 3d 517 (E.D. Va. 2025)....................................................6

*Gruenke v. Seip,*
    225 F.3d 290 (3d Cir. 2000) ...................................................................5

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025).......................................................................5, 7, 8, 9

*Meyer v. Nebraska,*
    262 U.S. 390 (1923)..........................................................................2, 3, 5

*Mirabelli v. Bonta,*
    146 S. Ct. 797 (2026)................................................................................4

*Parham v. J. R.,*
    442 U.S. 584 (1979)..................................................................................3

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925)..............................................................................3, 5

*Prince v. Massachusetts,*
    321 U.S. 158 (1944)..................................................................................3

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984)..................................................................................4

*SFFA v. Harvard,*
    600 U.S. 181 (2023)................................................................................12

*Smith v. Org. of Foster Families for Equal. & Reform,*
    431 U.S. 816 (1977)..................................................................................4

*Stanley v. Illinois,*
    405 U.S. 645 (1972)..................................................................................3

*Tatel v. Mt. Lebanon Sch. Dist.,*
    637 F. Supp. 3d 295 (W.D. Pa. 2022)..............................................10, 11

*Troxel v. Granville*,
530 U.S. 57 (2000) ...................................................................................3

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .................................................................................4

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .................................................................................5

## Rules

Fed. R. App. P. 29 .........................................................................................1

## Regulations

*Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14,190, 90
Fed. Reg. 8853 (Jan. 29, 2025) .............................................................6

## Other Authorities

A. Hartwig, *Can We Opt Out of Ethnic Studies*, M-A Chronicle (Sept. 8, 2025),
https://perma.cc/ANP4-PK4C ...................................................15

Complaint, *S.E. v. Grey*, 3:24-cv-01611, ECF 1 (S.D. Cal. 2024) ...............11, 12

Defending Education, *Babcock Neighborhood School's Principal Explains That
Teachers Are "Addressing the Unwritten History and Systemic Racism"
Despite Concerns from Parents* (Aug. 9, 2022), https://perma.cc/6G5Q-
YSZB .........................................................................................16

Defending Education, *LiberatEd: K-12 Liberated Ethnic Studies Industrial
Complex* (2025), https://perma.cc/67M2-FTVB.............................13, 14, 15

Defending Education, *Middletown High School English Students Given Essay
Assignment Stating Systemic Racism Is A Fact* (Dec. 12, 2021),
https://perma.cc/TS8U-SL8B.....................................................16

Defending Education, *Oswego District 308's Equity Roadmap* (Feb. 16, 2026),
https://perma.cc/25FM-KBNQ ...................................................16

Human Rights Campaign Foundation, *Born Ready: The True Story of a Boy
Named Penelope*, perma.cc/34SL-3KUZ......................................10

Human Rights Campaign Foundation, *Creating LGBTQ+ Inclusive Schools
Booklist for Elementary*, perma.cc/28LW-Q5JN.............................12

Human Rights Campaign Foundation, *I Am Jazz: Transgender Topics in Elementary School*, perma.cc/Q9DF-LC2D ....................................................10

Lee & Low Books, *Teacher's Guide: When Aidan Became a Brother*, bit.ly/4brodZi .................................................................................................10

*Transgender Reveal in Kindergarten Class Leaves Parents Feeling 'Betrayed,'* CBS News, (Aug. 22, 2017), perma.cc/TLN8-VU4J..........................................9, 10

Defending Education is a national, nonprofit, grassroots association. Its members include many parents with school-aged children. Launched in 2021, it uses advocacy, disclosure, and litigation to combat the increasing politicization and indoctrination of K-12 education.

DE and its parent members have a substantial interest in this case. It is beyond debate that parents have a constitutionally protected and fundamental right to direct the upbringing and education of their children, including in matters of curriculum or programming where that material interferes with the right of parents to direct their children's religious development. In today's schools, gender identity and critical race theory are both ubiquitous, and two of the greatest threats to parental rights in schools. Large segments of the American population believe that sex is immutable and unchanging, and that gender identity is simply one's Internal, subjective, malleable, and often transitory internal belief. On the whole, most Americans also do not believe that American society is fundamentally racist. Yet a growing number of public schools are teaching young children that these radical and divisive ideologies must be accepted, while concealing this

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution toward the preparation or submission of this brief. All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

instruction from parents and preventing them from opting their children out of it.

Here, the Department of Defense Education Activity has done nothing to violate the rights of parents or students. It has not forced any children to attend its schools, prevented parents from teaching their children anything outside of its schools, or prevented parents from opting their children out of instruction that they find objectionable. DoDEA has simply exercised its well-established "power to prescribe a curriculum for institutions which it supports." *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923). Whatever limits may exist on that power, DoDEA satisfied them precisely because (among other rationales) it acted to protect parental rights. Activists promoting gender ideology and critical race theory in public schools have routinely caused conflict with objecting parents. DoDEA recognized this reality and appropriately prevented conflict from arising on the front end by removing content that many parents find objectionable. The district court should have recognized that protecting parental rights was a legitimate pedagogical interest justifying DoDEA's decision.

## ARGUMENT

### I. The Department of Defense acted to protect parental rights, not undermine them.

Parents' right to direct their children's education is fundamental and entitled to robust constitutional protection. But DoDEA has done nothing to interpose itself between parents and their children. By removing content from its instruction that many parents find objectionable, it appropriately sought to protect parental rights, not undermine them.

In our society, it has always been the prerogative of parents to hand down basic values about right and wrong to their children. The Supreme Court has clarified as much. Over a century ago, the Court recognized the right of parents to "establish a home and bring up children" and "to control the education of their own" as fundamental liberties protected by the Due Process Clauses of the Constitution. *Meyer*, 262 U.S. at 399, 401; *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"). And it has consistently reaffirmed this right in subsequent decisions. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion); *Parham v. J. R.*, 442 U.S. 584, 602 (1979); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). This "long-established precedent" makes clear that "parents—not the State—

3

have primary authority with respect to 'the upbringing of children.'" *Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026).

Precedent applying these principles in individual cases provides additional guidance. Because family relationships are the kind of "personal bonds" that "act as critical buffers between the individual and the power of the State," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619-20 (1984); *see also Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) ("the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition'"), those family relationships must be given "a substantial measure of sanctuary from unjustified interference by the State." *Roberts*, 468 U.S. at 618. Hence, the government may not affirmatively interfere with that fundamental right without demonstrating that its actions are narrowly tailored to achieve a compelling state interest. *See Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (The Due Process Clause "forbids the government to infringe…'fundamental' liberty interests of all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.").

This is no less so within the context of public education. Parents do not "shed" their rights "at the schoolhouse gate." *Mahmoud v. Taylor*, 606 U.S.

522, 545 (2025). When public school instruction interferes with parents' ability to direct the upbringing of their children, parents have the broad right to opt their children out, even if the school complains that accommodating objecting parents will be burdensome. *See id.* at 565-69; *Wisconsin v. Yoder*, 406 U.S. 205, 232-35 (1972). "[P]ublic schools must not forget that 'in loco parentis' does not mean 'displace parents.'" *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

This case, however, does not involve an effort by the government to "interfere" with parents' rights to raise their children. *Meyer*, 262 U.S. at 403. DoDEA has not forced any children to attend its schools. *Cf. Pierce*, 268 U.S. at 534-45. It has not forbidden parents to teach their children gender theory or critical race theory outside of its schools. *Cf. Meyer*, 262 U.S. at 402-03. Nor has it denied any parents the right to opt their children out of instruction that they find objectionable. *Cf. Mahmoud*, 606 U.S. at 569.

Whatever limits may exist on DoDEA's power to decide what to teach and what library books to stock in its own schools, DoDEA satisfied them precisely because (among other rationales) it acted to protect parental rights. Public schools can honor parental rights by permitting opt outs for content that parents find objectionable. But they can also do so—and often should do so—by designing their curricula to make opt outs unnecessary in the first place. *See Mahmoud*, 606 U.S.at 567 (deeming a school board's injury to be

"self-inflicted" when it complained the cost of opt outs was too high because so many parents objected to its curriculum). That is precisely what DoDEA did here. The Executive Order on which DoDEA relied in making its curricular and library changes found that schools promoting gender theory and critical race theory have "deliberately block[ed] parental oversight" and "forced" students "to accept … ideologies without question or critical examination." *Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14,190, 90 Fed. Reg. 8853, 8853 (Jan. 29, 2025). And it called on schools to stop promoting these ideologies in part to "protec[t] parental rights." *Id.* That consideration alone constitutes a sufficient "pedagogical interes[t]" to justify DoDEA's decision. *See E.K. v. DoDEA*, 807 F. Supp. 3d 517, 544-46 (E.D. Va. 2025). In concluding otherwise, the district court never considered the government's legitimate interest in avoiding interference with parents' abilities to direct their own children's upbringing. *See id.* Its decision thus cannot stand.

## II. The Department of Defense had good reason to find that promoting gender ideology and critical race theory in its schools would create conflict with parents.

If any doubt remains, the public record makes clear that DoDEA's concerns about parental rights are well substantiated. In recent years, proponents of gender ideology and critical race theory have used the public school machinery of which parents of school-aged children must

6

avail themselves to teach these controversial and divisive ideas as normative and correct over and against objections from parents. These activists have put schools' curricula and course material on a collision course with the rights of parents. DoDEA acted appropriately to prevent any such collision in its schools.

*Gender theory.* The Supreme Court's recent decision in *Mahmoud* illustrates how gender activists have sought to use public schools to replace the values children receive from their parents with their own vision of human sexuality. There, the School Board of Montgomery County, Maryland, incorporated "a variety of 'LGBTQ+-inclusive' storybooks into the elementary school curriculum" in order "to 'disrupt' children's thinking about sexuality and gender." 606 U.S. at 529. The new curriculum appeared as early as Kindergarten, to children as young as five years old. *Id.* at 533. Although many families in Montgomery County, one of the largest and most religiously diverse in the Nation, hold to the traditional views that sex is determined by biology and that marriage is between a man and a woman, the Board insisted on introducing books throughout the curriculum that present transgenderism and same-sex marriage "as things to be celebrated" and "contrary values and beliefs as things to be rejected." *Id.* at 550.

For example, *Born Ready: The True Story of a Boy Named Penelope* "follows the story of Penelope, an apparently biological female [child] who asserts, 'I AM a boy.'" *Id.* at 553. When "Penelope's mother then agrees that Penelope is a boy, … Penelope exclaims: 'For the first time, my insides don't feel like fire. They feel like warm, golden love.'" *Id.* And when Penelope's "brother says 'You can't *become* a boy. You have to be born one,' his mother corrects him by saying: 'Not everything *needs* to make sense. *This is about love*.'" *Id.* "The upshot is that it is hurtful, perhaps even hateful, to hold the view that gender is inextricably bound with biological sex." *Id.* To reinforce the message of the book, the Board instructed teachers to tell students that it is "hurtful" to say that a child "can't be a boy if he was born a girl." *Id.* at 536. Teachers were also to explain, "When we're born, people make a guess about our gender and label us 'boy' or 'girl' based on our body parts. Sometimes they're right and sometimes they're wrong." *Id.*

Another book, *Prince & Knight*, told "the story of a coming-of-age prince whose parents wish to match him with 'a kind and worthy bride.'" *Id.* at 534. "After meeting with 'many ladies,' the prince tells his parents that he is 'looking for something different in a partner by [his] side.'" *Id.* The prince then falls in love with a knight, and the "whole kingdom … applauds 'on the two men's wedding day,'" "'for the prince and his shining knight would live happily ever after.'" *Id.* at 534, 551. The book thus

"clearly conveys the message that same-sex marriage should be accepted by all as a cause for celebration." *Id.* at 551. To reinforce that message, the Board instructed teachers that if a student objects that "two men cannot get married," they should respond, "When people are adults they can get married. Two men who love each other can decide they want to get married." *Id.* at 536.

These curricular changes led to fervent objections from "thousands" of parents. *See id.* at 537-39. But rather than work with objecting parents, the Board responded by prohibiting "opt outs" and refusing to inform families when these new books would be read at school. *Id.* at 538-39. Only the intervention of the Supreme Court prevented the Board from teaching these materials to objecting parents' children against their will. *Id.* at 530.

*Mahmoud* was not an isolated incident. Nearly identical scenarios have unfolded in other school districts across the country in recent years, with predictable results. According to CBS News, Sacramento-area "kindergartners came home very confused, about whether or not you can pick your gender, whether or not they really were a boy or a girl," after their teacher used the storybook *I Am Jazz* to teach them gender identity concepts. *Transgender Reveal in Kindergarten Class Leaves Parents Feeling 'Betrayed,'* CBS News, (Aug. 22, 2017), perma.cc/TLN8-VU4J. Like the storybooks read to young students in *Mahmoud, I Am Jazz* purports to "expand" four- and five-

year-olds' "perceptions and understandings of gender." *Compare* Human Rights Campaign Foundation, *I Am Jazz: Transgender Topics in Elementary School*, perma.cc/Q9DF-LC2D, *with* Human Rights Campaign Foundation, *Born Ready: The True Story of a Boy Named Penelope*, perma.cc/34SL-3KUZ. A parent of one of the kindergartners told CBS that her "daughter came home crying and shaking, so afraid she could turn into a boy." CBS News, *supra*. For its part, the school district said that "the books were age-appropriate and fell within their literature selection policy" and did not "require prior parental notice." *Id.*

In Mount Lebanon, Pennsylvania, parents discovered that their first graders were learning about gender identity—by way of a storybook titled *When Aidan Became a Brother*—only after one of the children asked her mother, "how do you know that I am a girl?" *Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 321 (W.D. Pa. 2022). A typical "teacher's guide" for *When Aidan Became a Brother* provides the following synopsis of its contents:

> When Aidan was born, everyone thought he was a girl. His parents gave him a pretty name, his room looked like a girl's room, and he wore clothes that other girls liked wearing. After he realized he was a trans boy, Aidan and his parents fixed the parts of his life that didn't fit anymore, and he settled happily into his new everyday.

Lee & Low Books, *Teacher's Guide: When Aidan Became a Brother*, bit.ly/4brodZi. Further investigation revealed that, as part of the lessons, the children's teacher "explained to her students that sometimes 'parents are

wrong' and parents and doctors 'make mistakes' when they bring a child home from the hospital." *Id.* at 305.

During a 2023 mandatory equity and inclusion training session for teachers in Encinitas School District in California, the instructor recommended the use of picture books to help children absorb gender identity concepts in a familiar manner. *See S.E. v. Grey*, 3:24-cv-01611, ECF 1, ¶75 (S.D. Cal. 2024). The instructor suggested that elementary school teachers "rea[d] a picture book" to them "and just once in a while, take out the 'he' or 'she,' and say 'they,'" so students could "get used to practicing reading" stories that employ non-binary pronouns. *Id.*

Later that year, an elementary school in the district required fifth graders, some of whom were as young as nine, to read a transgender-themed storybook titled *My Shadow is Pink* and conduct a related in-class assignment. *See id.* ¶2. The rhyming storybook follows the life of a young boy who "loves wearing dresses and dancing around" and playing with "pink toys, princesses, fairies and things not for boys" *Id.* ¶116. The story reaches its conclusion when the boy's father, initially cast as cold and disapproving, admits that he was wrong and accepts the son's identity as a girl. *Id.* ¶117. Multiple parents had already exercised their statutory rights to opt their children out of the formal instruction block on gender identity in the school's health class, but their children were subjected to the same material in general

11

education programming without parental notice or opportunity for opt-out. *Id.* ¶¶99-102.

The incidents described above are just a few of countless similar examples DE has discovered over the past few years while interacting with parents throughout the country. Moreover, all of the books described above can be found on suggested reading lists and lessons templates distributed by groups like the Human Rights Campaign. *See, e.g.*, Human Rights Campaign Foundation, *Creating LGBTQ+ Inclusive Schools Booklist for Elementary*, perma.cc/28LW-Q5JN. These storybooks, teaching prompts, and talking points are all common across disparate school districts. They speak to an alarming trend of schools attempting to "disrupt" the transmission of values from parent to child with activist notions of sex and gender identity.

***Critical race theory.*** Our Constitution is "colorblind." *SFFA v. Harvard*, 600 U.S. 181, 210 (2023). In line with this legal reality, many Americans hold that "there can be no such thing as either a creditor or a debtor race." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring in part and concurring in the judgment). Instead, "we are just one race," "American." *Id.* But aiming to "disrupt" this commonly held view, activists have increasingly sought to teach as fact that America is a systematically and irredeemably racist country.

The most prominent instance of this trend is the rise of ethnic studies courses in public schools. In a 2025 report, DE found that at least 55 public school districts have incorporated ethnic studies into their curricula. DE, *LiberatEd: K-12 Liberated Ethnic Studies Industrial Complex* 3 (2025), https://perma.cc/67M2-FTVB. These courses generally have in common a focus on "racial identities (intersectionality), an oppressor versus oppressed view of the world (critical consciousness)" and "who has privilege (i.e. 'white privilege') and who does not." *Id.*

For instance, one commonly used course by Imagine Learning identifies as one of its goals "deconstructing systems of power that perpetuate inequality," such as "white privilege." *Id.* at 4. Similarly, the Gibbs Smith Education curriculum, used by several school districts in Pennsylvania and California, *see id.* at 18-22, includes lessons on "antiracism, climate justice and activism, decolonization, intersectionality, oppression, power, privilege, white fragility, and whiteness." *Id.* at 6. The curriculum's goals include to center "'counter-narratives of marginalized groups" and equip "students with the skills and knowledge they need to identify and overcome oppression." *Id.* A foundational unit in the curriculum, "Understanding Race and Ethnicity," relies on the critical-race theorists Ibram Kendi and Robin DiAngelo. *Id.* at 7. It includes the question, "How

13

does DiAngelo's description of White self-isolation reflect Kendi's ideas about the complexity of racism and antiracism?" *Id.*

Several California school districts use the Newsela California Ethnic Studies Collection in their curricula. *See id.* at 18-22. "The collection units are 'organized around four core themes of Ethnic Studies: Identity, systems and power, community stories and narratives, and movements and solidarity.'" *Id.* at 10. The "systems and power" unit includes having students "examine the role of racism in the founding of the U.S. system of government," "trace the development of white identity and white supremacy in the United States," and "examine the effect of patriarchal systems on American society, particularly women of color." *Id.* And the "movements and solidarity" unit examines how "social change" and "resistance" can be accomplished through movements like "'Black Power and Black Panthers,' 'People of color in the LGBTQ+ Rights Movement,' 'Black Lives Matter,' the 'Movement for Reparations,' the 'Land Back Movement,' and the 'Environmental Justice Movement.'" *Id.* at 11.

A number of California school districts also use a curriculum established by the University of California, Berkeley. *See id.* at 18-22. The curriculum's first chapter identifies "white supremacist capitalist patriarchy" as an "essential concept to understand, and to help students understand and be able to analyze." *Id.* at 14. This concept is "crucial because

as Black Feminist Theory reminds us, systems of oppression are often interlocking." *Id.* The same chapter includes as readings "The Characteristics of White Supremacy Culture" and "In Defense of Looting." *Id.* Other concepts presented by the curriculum include "critical consciousness, critical race theory, decolonization, environmental justice, liberation, linguistic justice," and "queer theory." *Id.*

Schools adopting this critical approach to race and ethnicity often have little regard for parents and students who object. The Gibbs Smith Education curriculum, for instance, discusses parental opposition to "the teaching of race and ethnic studies" at "School Board Meetings" under the lesson "Forms of Discrimination." *Id.* at 7. The lesson "goes on to state that parent protests of school policies are 'not just a recent phenomenon,' but are akin to the 1960s when 'many White parents put their children into private schools in response to desegregation policies' and to the 1990s when 'conservative parents protested the teaching of sex education in schools.'" *Id.* And some public school districts have made ethnic studies a requirement for graduation, leading the districts to claim that parents have no right to opt their children out of the class. *See, e.g.*, A. Hartwig, *Can We Opt Out of Ethnic Studies*, M-A Chronicle (Sept. 8, 2025), https://perma.cc/ANP4-PK4C (discussing the Sequoia Union High District in California).

Other examples of public schools disregarding objections to critical race theory abound. A public school district in Illinois held "student equity assemblies" for middle schoolers in which students "were segregated based on racial background," informing parents only after the assemblies had already occurred. DE, *Oswego District 308's Equity Roadmap* (Feb. 16, 2026), https://perma.cc/25FM-KBNQ. A public high school in Connecticut required students to write an essay on "how best to address" "systemic racism in the United States," while explicitly prohibiting them from arguing that systemic racism does not exist. DE, *Middletown High School English Students Given Essay Assignment Stating Systemic Racism Is A Fact* (Dec. 12, 2021), https://perma.cc/TS8U-SL8B. And a school principal in Florida publicly lamented that a major obstacle to addressing "systemic racism" in instruction are "former military" parents who "do not acknowledge white privilege." DE, *Babcock Neighborhood School's Principal Explains That Teachers Are "Addressing the Unwritten History and Systemic Racism" Despite Concerns from Parents* (Aug. 9, 2022), https://perma.cc/6G5Q-YSZB.

These examples comprise just a small fraction of the many examples DE has learned from parents of schools pushing divisive concepts of race and ethnicity over parents' objections. As with gender theory, public schools' aggressive promotion of critical race theory regularly places them on a collision course with parents wanting to transmit their values to their

children. By preventing such collisions from occurring in its own schools, DoDEA did not violate parental rights; it honored them.

## CONCLUSION

For these reasons, the Court should reverse the district court's grant of a preliminary injunction.

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Ryan M. Proctor
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
(703) 243-9423
mikeconsovoymccarthy.com
ryan@consovoymccarthy.com
paul@consovoymccarthy.com

April 2, 2026                    *Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Rules 29(a)(5) and 32(a)(7)(B) because it contains 3,668 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared using Microsoft Word in 14-point Palatino.

Dated: April 2, 2026                    /s/ *J. Michael Connolly*
                                        J. Michael Connolly
                                        *Counsel for Amicus*

**CERTIFICATE OF SERVICE**

I certify that on April 2, 2026, I filed this brief with the Clerk of Court using the appellate CM/ECF system, which will provide notice and service on counsel for all parties.

Dated: April 2, 2026

*/s/ J. Michael Connolly*
J. Michael Connolly
*Counsel for Amicus*