**No. 25-2497(L), 26-1002**

---

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

E.K., *by and through parent and next friend Lindsey Keeley*, *et al.*,

Plaintiffs-Appellees/Cross-Appellants,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*,

Defendants-Appellants/Cross-Appellees,

---

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:25-cv-637 (Hon. Patricia Tolliver Giles)

---

## BRIEF OF *AMICI CURIAE* FREEDOM TO READ FOUNDATION and AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

---

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
Tel: (212) 218-3389
Fax: (917) 344-1394
owolfe@seyfarth.com

*Attorneys for Amici Curiae Freedom to Read Foundation and American Association of School Librarians*

Dated: June 2, 2026

## DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici curiae* disclose as follows:

1. Freedom to Read Foundation is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

2. American Association of School Librarians is a not-for-profit organization and a division of the American Library Association, which is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

## **TABLE OF CONTENTS**

Page

DISCLOSURE STATEMENT ................................................................................ i

TABLE OF CONTENTS ...................................................................................... ii

I.     STATEMENT OF INTEREST ................................................................... 1

II.    STATEMENT OF CONTRIBUTIONS ....................................................... 3

III.   INTRODUCTION ..................................................................................... 4

IV.    ARGUMENT ............................................................................................ 6

     A.    Libraries are crucial to American democracy ....................................... 6

     B.    School libraries are critical to our democracy ...................................... 7

     C.    Robust school libraries result in better student outcomes ..................... 7

     D.    Librarians rely upon set standards to curate school libraries ................ 8

     E.    Appellants restricted books notwithstanding their educational merit ....................................................................................................... 11

          1.    Appellants removed from libraries books with significant merit .......................................................................................... 12

          2.    Appellants violated the First Amendment by restricting books regardless of their merit .................................................. 13

     F.    Library curation is not school-sponsored or government speech ....... 16

          1.    School libraries are not equivalent to the school curriculum .................................................................................. 17

          2.    The government does not speak through the contents of library shelves ...................................................................... 20

     G.    The purported availability of the books from other sources does not prevent a constitutional violation ................................................ 24

V.     CONCLUSION ...................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Bd. of Educ. v. Pico*,
    457 U.S. 853 (1982)................................................................6, 14, 17, 24, 25

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011)................................................................17, 20

*Case v. Unified Sch. Dist. No. 233*,
    908 F. Supp. 864 (D. Kan. 1995)................................................................18

*Counts v. Cedarville Sch. Dist.*,
    295 F. Supp. 2d 996 (W.D. Ark. 2003) ................................................................26

*Epperson v. State of Ark.*,
    393 U.S. 97 (1968)................................................................14

*Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas,*
    684 F. Supp. 3d 879 (W.D. Ark. 2023) ................................................................6, 8, 13, 20, 26

*Ginsberg v. New York*,
    390 U.S. 629 (1968)................................................................15, 16, 27

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
    114 F.4th 660 (8th Cir. 2024) ................................................................20, 22

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988)................................................................19, 21

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967)................................................................14

*Little v. Llano County*,
    138 F.4th 834 (5th Cir. 2025) ................................................................24

*Mahanoy Area Sch. Dist. v. B.L.*,
    594 U.S. 180 (2021)................................................................26

*Mahmoud v. Taylor*,
    145 S.Ct. 2332 (2025)................................................................5, 14, 17, 26

*Martin v. City of Struthers*,
  319 U.S. 141 (1943)......................................................................................13

*Matal v. Tam*,
  582 U.S. 218 (2017).................................................................................21, 22

*Miller v. California*,
  413 U.S. 15 (1973).............................................................................15, 16, 27

*Packingham v. North Carolina*,
  582 U.S. 98 (2017).......................................................................................25

*Parents v. Rockford Public School District*,
  2023 Mich. Cir. LEXIS 928 (Kent Cty. Cir. Ct. Oct. 25, 2023) .......................15

*PEN Am. Ctr., Inc. v. Escambia Cty. Sch. Bd.*,
  711 F. Supp. 3d 1325 (N.D. Fl. 2024) ............................................................20

*Penguin Random House, LLC v. Robbins*,
  172 F.4th 581 (8th Cir. 2026) .......................................................................19

*Right to Read Def. Comm. v. Sch. Comm.*,
  454 F. Supp. 703 (D. Mass. 1978)..................................................................18

*Roberts v. Madigan*,
  702 F. Supp. 1505 (D. Colo. 1989)................................................................14

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995).................................................................................23, 25

*Sheck v. Baileyville School Committee*,
  530 F. Supp. 679 (D. Me. 1982)...........................................................16, 18, 26

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022).................................................................................21, 22

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969).................................................................................14, 26

*Walls v. Sanders*,
  144 F.4th 995 (8th Cir. 2025) ............................................................17, 19, 26

iv

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)..................................................................................15

**Other Authorities**

*100 Best Novels*, THE MODERN LIBRARY, available at
https://sites.prh.com/modern-library-top-100......................................13

*A literary celebration of Queen Elizabeth II's record-breaking reign*,
BBC (Apr. 17, 2022), available at
https://www.bbc.co.uk/programmes/articles/2Ynpj933DJ2YG5ns
MS6fn8k/a-literary-celebration-of-queen-elizabeth-iis-record-
breaking-reign ......................................................................................12

*AASL Standards Framework for Learners*, AM. ASS'N OF SCH.
LIBRARIANS (2017), available at https://standards.aasl.org/wp-
content/uploads/2017/11/AASL-Standards-Framework-for-
Learners-pamphlet.pdf............................................................................10

*Access to Resources and Services in the School Library: An
Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N
(2025), available at
http://www.ala.org/advocacy/intfreedom/librarybill/interpretations/
accessresources ...................................................................................10

BLANCHE WOOLLS, ENCYCLOPEDIA OF LIBRARY AND INFORMATION
SCIENCES, SCHOOL LIBRARIES (4th ed. 2017).................................7, 27

Briana Hovendick Francis, et al., *School Librarians Continue to Help
Students Achieve Standards: The Third Colorado Study*, LIBRARY
RESEARCH SERVICE (2010), available at
https://files.eric.ed.gov/fulltext/ED514556.pdf ....................................8

*Code of Ethics*, AM. LIBR. ASS'N (2021), available at
https://www.ala.org/tools/ethics ......................................................9, 11

*Diverse and Inclusive Collections: An Interpretation of the Library
Bill of Rights*, AM. LIBR. ASS'N (2025), available at
http://www.ala.org/advocacy/intfreedom/librarybill/interpretations/
diversecollections...................................................................................10

v

Douglas L. Achterman, *Haves, Halves, and Have-Nots: School Libraries and Student Achievement in California*, U. N. Tex. (2008), available at
https://digital.library.unt.edu/ark:/67531/metadc9800/ ........................................8

*IFLA Guidelines for Library Services to Children aged 0-18*, INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018), available at https://www.ifla.org/wp-content/uploads/2019/05/assets/libraries-for-children-and-ya/publications/ifla-guidelines-for-library-services-to-children_aged-0-18.pdf ........................................11

*Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N (2017), available at https://www.ala.org/advocacy/intfreedom/librarybill/interpretations ........................................10

James Madison, *Letter from James Madison to W.T. Barry*, LIBRARY OF CONGRESS (Aug. 4, 1822), available at https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text ........................................6

Jared Gibbs, *"For Tomorrow Will Worry About Itself"*, 34 W. NEW ENG. L. REV. 381 (2012) ........................................6

Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001), available at https://files.eric.ed.gov/fulltext/ED456861.pdf ........................................8

Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012), available at https://files.eric.ed.gov/fulltext/ED543418.pdf ........................................8

Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (2018), available at http://kappanonline.org/lance-kachel-school-librarians-matter-years-research/ ........................................8

Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993) ........................................8

vi

Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012), available at https://files.eric.ed.gov/fulltext/ED572250.pdf ...................................................7

*Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble), available at https://www.ala.org/advocacy/intfreedom/librarybill ................................9, 11

Richard J. Peltz, *Pieces of Pico*, 2005 BYU EDUC. & L.J. 103 (2005) .................6, 7

Robert McCrum, *The Masterpiece That Killed George Orwell*, THE GUARDIAN (May 9, 2009), available at https://www.theguardian.com/books/2009/may/10/1984-george-orwell ...............................................................................................13

Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89 (1997)...................................................................................................27

*The Giver*, HARPERCOLLINS.COM, available at https://www.harpercollins.com/products/the-giver-lois-lowry?variant=39934449516578 ...................................................12

*The Handmaid's Tale*, HARPERCOLLINS.COM, available at https://www.harpercollins.com/products/the-handmaids-tale-margaret-atwood?variant=39935236702242 .......................................12

U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL LIBRARIES: 1953-2000 1 (2005), available at https://nces.ed.gov/pubs2005/2005324.pdf ........................................7

## I.  <u>STATEMENT OF INTEREST</u>

The Freedom to Read Foundation ("FTRF") was established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections, and make available, any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect, and individuals to access, information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The American Association of School Librarians ("AASL") is the preeminent national professional association for school librarians.  All aspects of the association's work reflect its core values: learning; innovation; equity; diversity; inclusion; intellectual freedom; and collaboration.  AASL is committed to ensuring that all learners have a school library collection that is physically and intellectually accessible and where access is best met at the time of need.

*Amici curiae* believe that viewpoint censorship violates the core value of preserving intellectual freedom and that students have an important First Amendment right to receive information free of viewpoint discrimination.  *Amici* thus have a strong interest in the outcome of this case.

1

Appellants/Cross-Appellees and Appellees/Cross-Appellants consent to the filing of this *amici curiae* brief.

## II. <u>STATEMENT OF CONTRIBUTIONS</u>

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amici curiae* state that no party's counsel authored the brief in whole or part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person (other than the *amici curiae*, their members, or their counsel) contributed money intended to fund preparing or submitting this brief.

### III.    INTRODUCTION

"If a nation expects to be ignorant & free…it expects what never was & never will be.  The functionaries of every government have propensities to command at will the liberty & property of their constituents.  There is no safe deposit for these but with the people themselves; ***nor can they be safe with them without information***.  Where the press is free and ***every man able to read, all is safe***."  Thomas Jefferson, *Letter from Thomas Jefferson to Charles Yancey*, National Archives (Jan. 6, 1816) (emphasis added).

Defendants-Appellants' ("Appellants") removal of books from school libraries undermines the purpose of those libraries.[1]  Appellants removed numerous books, including literary classics such as *The Handmaid's Tale*; *1984*; and *The Giver*.  *See* JA18.[2]  The District Court's held that Plaintiffs-Appellees are likely to succeed on the merits because, *inter alia*, Appellants failed to take the educational, literary, and artistic merit of the books into account.  *See* JA45, JA48.  That holding is consistent with the First Amendment and the history and purpose of libraries.

---

[1] *Amici* only address those portions of the District Court's decision relating to school libraries.  *Amici* do, however, support the arguments raised by Plaintiffs-Appellees relating to curricular changes and their argument that the changes are unconstitutional.  *See* Plaintiffs-Appellees' Br. (Doc. No. 37) at 29-38.

[2] References to "JA__" are to the Joint Appendix (Doc. No. 24).  References to "Def. Br." at to Appellants' appeal brief (Doc. No. 25).

4

Appellants contend that they have unlimited authority to restrict books in the school library, either because of government powers over the school curriculum or because library curation is "government speech," and thus the government can impose viewpoint-based directives on local library curation decisions.

Government power over the curriculum is not unlimited. In *Mahmoud v. Taylor*, 145 S.Ct. 2332 (2025), the Supreme Court held that curriculum decisions cannot override First Amendment rights or impose what Justice Thomas called "ideological conformity." The government's powers over the school library collection are ***more*** limited because that collection is ***not*** the curriculum. Although ***librarians*** provide crucial academic support for the entire school community, the school library ***collection*** is an ***extracurricular*** place of study for ***optional*** reading.

Even setting aside the distinction between the curriculum and the school library, Appellants' argument is dangerous. If the argument is adopted, school libraries in Vermont could decide that children can only see books that criticize President Trump; school libraries in Massachusetts could decide to carry only books that promote Democratic policies; school libraries in Texas could decide to carry only books that praise President Trump; and school libraries in Oklahoma could include only books that promote Republican policies. As those hypotheticals show, the State's argument is anathema to the First Amendment and the purpose of libraries. Governments would be empowered to impose "ideological conformity"

5

and proceed "in [the] narrowly partisan or political manner" that a majority of Supreme Court justices agreed decades ago, in *Bd. of Educ. v. Pico*, 457 U.S. 853 (1982), would be unconstitutional.

"A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." James Madison, *Letter from James Madison to W.T. Barry*, Library Of Congress (Aug. 4, 1822). If Appellants' argument is adopted, the "Farce" and "Tragedy" Madison feared is upon us and, as Jefferson warned, liberty is not "safe." The District Court should be affirmed.

## IV. ARGUMENT

### A. Libraries are crucial to American democracy.

Public libraries predate our country's establishment, with Benjamin Franklin credited with founding the first American subscription library in 1731. Jared Gibbs, *"For Tomorrow Will Worry About Itself"*, 34 W. NEW ENG. L. REV. 381, 394 (2012). Colonial libraries developed as early as 1770. Richard J. Peltz, *Pieces of Pico*, 2005 BYU Educ. & L.J. 103, 112 (2005). "After the British burned Washington's congressional library during the War of 1812, Thomas Jefferson sold his personal collection…to start what is now the Library of Congress." *Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*, 684 F. Supp. 3d 879, 889 (W.D. Ark. 2023). "He famously said, 'I have often thought that nothing would do more extensive good at

small expense than the establishment of a small circulating library in every county….'" *Id.*

## B. School libraries are critical to our democracy.

The emergence of public libraries coincided with the rise of public education and, with it, school libraries. Melvil Dewey, inventor of the library cataloging system, asserted that:

> [a] collection of books in every schoolroom for everyday use is coming to be considered an essential part of a school building's furniture. These books introduce children to the best literature of the world; they interest them in other phases of any subject they may be studying than those set forth in their text-books…. [T]hey familiarize the children with books and their use; and, in any subject, they permit the beginning of that laboratory method which is now considered so essential in all educational work.

Peltz, *supra*, at 114. Since the early 1950s, more than 30,000 school libraries have been established. *See* U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL LIBRARIES: 1953-2000 1 (2005).

## C. Robust school libraries result in better student outcomes.

School libraries' positive impact on students is well-documented. "Research studies" show "student success when schools had libraries, librarians, and resources." BLANCHE WOOLLS, ENCYCLOPEDIA OF LIBRARY AND INFORMATION SCIENCES, SCHOOL LIBRARIES 4004 (4th ed. 2017). Quality of, and access to, books at a school library is a powerful predictor of academic achievement. *See, e.g.*, Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with*

7

*gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012); Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012); Briana Hovendick Francis, et al., *School Librarians Continue to Help Students Achieve Standards: The Third Colorado Study*, LIBRARY RESEARCH SERVICE (2010); Douglas L. Achterman, *Haves, Halves, and Have-Nots: School Libraries and Student Achievement in California*, U. N. Tex. (2008); Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993).

Research consistently confirms that strong library programs increase student achievement. Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (2018); *see also, e.g.*, Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001).

**D. Librarians rely upon set standards to curate school libraries.**

The American Library Association ("ALA") is the sole accrediting body for U.S. library and information science schools. *Fayetteville*, 684 F. Supp. 3d at 890. "Professional librarians hold advanced degrees from ALA-accredited institutions,

8

and…are taught to adhere to the ALA's Code of Ethics and Library Bill of Rights in their professional lives." *Id.*

The ALA's Code of Ethics "guide[s] the work of librarians," focusing on "the values of intellectual freedom that define the profession of librarianship." *Code of Ethics*, AM. LIBR. ASS'N (2021). Chief among librarians' obligations is the duty ***not*** to limit access to information based on viewpoint:

> 1. We provide the highest level of service to all library users through appropriate and usefully organized resources; equitable service policies; equitable access; and accurate, unbiased, and courteous responses to all requests.
>
> 2. We uphold the principles of intellectual freedom ***and resist all efforts to censor library resources***.
>
> ***
>
> 6. We do not advance private interests at the expense of library users, colleagues, or our employing institutions.
>
> 7. We distinguish between our personal convictions and professional duties ***and do not allow our personal beliefs to interfere*** with…the provision of access to their information resources.

*Id.* (emphasis added).

The ALA's Library Bill of Rights sets forth the "basic policies [that] should guide [library] services," *Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble), and is unequivocal in its condemnation of censorship and attempts to limit information based on viewpoint:

9

> Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval.
>
> Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.

*Id.* §§ II, III. "'[A]ll people' and 'all points of view' should be included in library materials and information," with "no limiting qualifiers for viewpoint, origin, or politics." *Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N (2017).

These policies apply to school libraries. *Access to Resources and Services in the School Library: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2025). The school library serves to, *inter alia*, "foster intellectual growth and personal development" and "meet learners' recreational reading needs." *Id.* School librarians should make curation decisions "without letting personal beliefs or biases get in the way" so that students and educators "can access a wide range of ideas." *Id.*

The National School Library Standards emphasize the importance of the school library as an essential part of the learning community, preparing students for college, careers, and life. *See generally AASL Standards Framework for Learners*, AM. ASS'N OF SCH. LIBRARIANS (2017). School librarians are trained to curate collections in an inclusive, not exclusive, process. *See generally Diverse and Inclusive Collections: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2025). School librarians do not exclude materials because they are

10

controversial or represent viewpoints with which they disagree, but include books that reflect a diversity of thought. *See id.* School librarians curate the library collection, and provide resources and learning tools for an entire school.

When following these principles, librarians are guided by the understanding that there is no "one size fits all" approach to what books are appropriate for a particular school and community:

> Children's libraries should provide a variety of developmentally appropriate materials…to meet the needs of all age groups. There are no universal standards for the size and content of children's library collections…. A wide range of opinions, values and views should be reflected in the library stock and online accessible materials.

*IFLA Guidelines for Library Services to Children aged 0-18*, INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018). A librarian engaging in viewpoint discrimination when making curation decisions acts contrary to their training; the Library Bill of Rights and Code of Ethics; and the First Amendment.

### E. Appellants restricted books notwithstanding their educational merit.

Appellants' actions are contrary to curation principles and the First Amendment. Appellants removed from school libraries books that are award-winners, best-sellers, or have well-recognized merit—the types of books a trained librarian would be expected to select for the school library collection.

11

**1.    Appellants removed from libraries books with significant merit.**

The District Court found that the books removed by Appellants included *The Handmaid's Tale* by Margaret Atwood; *The Giver* by Lois Lowry; and *1984* by George Orwell.  *See* JA18.  These books are award winners widely recognized to have literary and educational merit.

*The Handmaid's Tale* is a dystopian novel about a future United States where, among other things, the Constitution has been suspended.  Published in 1985 to critical acclaim, a reviewer from the Houston Chronicle newspaper presciently wrote that it is "[a]n excellent novel about the directions our lives are taking…. ***Read it while it's still allowed***."  *The Handmaid's Tale,* HARPERCOLLINS.COM (emphasis added).  Among other honors, the novel was one of 70 books selected in 2022 for The Big Jubilee Read, honoring the reign of Queen Elizabeth II of the United Kingdom.  *See A literary celebration of Queen Elizabeth II's record-breaking reign, BBC (Apr. 17, 2022)*.

*The Giver* is another dystopian novel about a community in which individual freedom is suppressed; it won the Newbery Medal for children's literature in 1994. *The Giver,* HARPERCOLLINS.COM.  One reviewer wrote that "*The Giver* has things to say that cannot be said too often, and I hope there will be many, many young people who will be willing to listen." *Id.*

12

*1984* is perhaps the most famous dystopian novel ever published, about a totalitarian regime that restricts information and freedom. *See 100 Best Novels*, THE MODERN LIBRARY. Many concepts from the book, including the ubiquitous "Big Brother," are widely known and used in popular culture. *See id.* One reviewer called it "the definitive novel of the 20th century," noting that it has sold millions of copies and has been translated into more than 65 languages. Robert McCrum, *The Masterpiece That Killed George Orwell*, THE GUARDIAN (May 9, 2009).

The irony of banning these books is readily apparent. By restricting these award-winning, classic novels because of disagreement with their viewpoint and without taking into account their literary and educational merit, Appellants violated the First Amendment.

### 2. Appellants violated the First Amendment by restricting books regardless of their merit.

Governments cannot remove books from libraries merely because they find them to be "divisive," as Appellants contended. *See* JA45 (internal quotation marks omitted). "Our founding fathers understood that 'novel and unconventional ideas might disturb the complacent'; yet in authoring the First Amendment, they sought "to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Fayetteville*, 684 F. Supp. 3d at 891-92 (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)). With respect to schools, "[o]ur Nation is deeply committed to safeguarding academic freedom,

13

which is of transcendent value to all of us…. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

"First Amendment rights[] [are] not 'shed…at the schoolhouse gate.'" *Mahmoud*, 145 S.Ct. at 2350 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07 (1969)). There "can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any…sect or dogma." *Epperson v. State of Ark.*, 393 U.S. 97, 106 (1968).

"[T]o justify prohibition of a particular expression of opinion, [the government] must…show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Otherwise, the government could restrict viewpoints from any part of the political, religious, or social spectrum. *See, e.g., Roberts v. Madigan*, 702 F. Supp. 1505, 1512-13 (D. Colo. 1989) (rejecting attempts to remove the Bible from a school library).

"[T]he First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Pico*, 457 U.S. at 866. "[A]ccess prepares students for active and effective participation in the

14

pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868. "[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (plurality) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Because the First Amendment "does not permit the official suppression of *ideas*," a majority of the Supreme Court agreed that the removal of books from school library shelves "in a narrowly partisan or political manner" is unconstitutional. *Id.* at 870-71 (plurality); *id.* at 907 (Rehnquist, J., dissenting) ("cheerfully" conceding this point).

Appellants' conduct violated the First Amendment because, among other things, they ignored the educational merit of the affected books. *See, e.g., Miller v. California*, 413 U.S. 15, 22-23 (1973) ("in the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression"); *Ginsberg v. New York*, 390 U.S. 629, 632 (1968) (law prohibiting speech "utterly without redeeming social importance for minors" constitutional).

Where "every book identified by Plaintiffs has either received accolades or been on best seller lists," a school cannot "establish they are harmful to minors pursuant to the *Miller* test." *Parents v. Rockford Public School District*, 2023 Mich.

Cir. LEXIS 928, at \*10-11 (Kent Cty. Cir. Ct. Oct. 25, 2023); *see also Sheck v. Baileyville School Committee*, 530 F. Supp. 679, 687 (D. Me. 1982) (in school libraries, "the state may not impede individual expression even on obscenity grounds except…[upon] a showing that the challenged expression, taken as a whole, lacks 'serious literary, artistic, political, or scientific value' and 'appeal(s) to the prurient interest in sex,'" citing *Miller* and *Ginsberg*).

Library bookshelves have limited space and cannot include every book published. Certified, trained librarians make decisions about which books should be included based upon the needs of the students and communities they serve. Appellants overrode those decisions and restricted books without giving any weight to their merit, violating the First Amendment.

### F. Library curation is not school-sponsored or government speech.

Appellants argue that the First Amendment imposes no restrictions on school library curation, and that they have an unfettered right to engage in viewpoint discrimination on library shelves. Def. Br. 37-44. Appellants appear to argue that because school libraries are part of "the school's pedagogical mission," they are akin to the school curriculum and their contents should therefore be based upon the same "policy judgments" used to shape the curriculum. *See id.* 39-40. Appellants' primary argument, however, is that selecting what books go on or off library shelves

16

is "government speech," akin to selecting a public monument or issuing a license plate for a vehicle.  *See id.* 39-42.  These arguments are meritless.

### 1. School libraries are not equivalent to the school curriculum.

To the extent that Appellants argue that they have unrestrained power over school library shelves because those shelves are akin to the school curriculum, that argument fails.  "No doubt a State possesses legitimate power to protect children from harm," but "that does not include a free-floating power to restrict the ideas to which children may be exposed."  *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 794-95 (2011) (Scalia, J.).

Even in connection with the curriculum, "[g]overnment schools…may not place unconstitutional burdens on" First Amendment rights.  *Mahmoud*, 145 S.Ct. at 2350.  Schools cannot use the curriculum to "exert upon children a psychological 'pressure to conform' to…specific viewpoints."  *Id.* at 2355; *see also id.* at 2378 (Thomas, J., concurring) (school cannot use curriculum to "pursue…ideological conformity").  But the government's power over curriculum is not relevant in the context of the book removals because school libraries are ***extracurricular***.

Library books are not required reading, but are available for students to explore with the guidance of trained librarians.  *See Pico*, 457 U.S. at 862 (Brennan, J.) ("the only books at issue…are *library* books that by their nature are optional rather than required reading"); *Walls v. Sanders*, 144 F.4th 995, 1004 (8th Cir. 2025)

("distinguish[ing] the school library from the classroom"; although plaintiffs conceded that curriculum decisions at-issue were government speech, "books in a library" are different than "in-classroom instruction and materials"); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875-76 (D. Kan. 1995) (school officials do not have "absolute discretion beyond the compulsory environment of the classroom into the school library," where "the regime of voluntary inquiry…hold[s] sway" (internal quotation marks omitted)); *Sheck*, 530 F. Supp. at 689 (discussing "the extracurricular environment of the school library"; "information and ideas in books placed in a school library by proper authority are protected speech and the first amendment right of students to receive that information and those ideas is entitled to constitutional protection").

As another court explained:

> The student who discovers the magic of the library is on the way to a life-long experience of self-education and enrichment…. [A] library is a place to ***test or expand upon ideas*** presented to him, ***in or out of the classroom***. The most effective antidote to the poison of mindless orthodoxy is ready access to a broad sweep of ideas and philosophies. There is no danger in such exposure. The danger is in mind control.

*Right to Read Def. Comm. v. Sch. Comm.*, 454 F. Supp. 703, 715 (D. Mass. 1978) (emphasis added). Although school librarians support the entire school community and are instrumental beyond the library, school library collections are not part of the curriculum.

18

*Amici* agree (*see* Def. Br. 42-44) that *Hazelwood Sch. Dist. v. Kuhlmeier* is inapposite because it involved articles in a school-created, school-sponsored newspaper, integrated into "the educational curriculum" and controlled by the school's journalism teacher.  484 U.S. 260, 268 (1988).  The Eighth Circuit has held, similar to Appellants' argument in this Court, that *Hazelwood* applies to the "regulation of *student* speech in school-sponsored settings."  *Walls*, 144 F.4th at 1005 (italics in original).[3]  The District Court recognized this as well: it noted that *Hazelwood* is likely inapplicable, but discussed the outcome of this case under the *Hazelwood* framework out of an abundance of caution.  *See* JA47-48.  The books on school library shelves were not printed or edited by the government, and they are not "student speech" or part of the curriculum.

As the District Court noted, however, *Hazelwood* would not help Appellants; it requires that the government's actions be "reasonably related to legitimate pedagogical concerns."  484 U.S. at 273; *see also* JA47-49.  As set forth above, Appellants did not consider the educational merit of the books that they removed

---

[3] The Eighth Circuit recently issued a decision that applied *Hazelwood* to school library curation, creating a conflict with its prior holding in *Walls*. *See Penguin Random House, LLC v. Robbins*, 172 F.4th 581 (8th Cir. 2026).  Respectfully, the Eighth Circuit panel in *Robbins* erred by ignoring its prior precedent in *Walls* and by applying *Hazelwood*, which, as Appellants correctly note, does not apply to the school library.

from school library shelves, but instead blatantly removed the books based solely on their disagreement with the viewpoints expressed in those books.

Appellants' actions were a forbidden attempt to exercise a "free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95. The District Court should be affirmed.

### 2. The government does not speak through the contents of library shelves.

Appellants' attempt to equate library curation to government speech fails. *See* Def. Br. 37-44. The Eighth Circuit has rejected this argument. *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667-68 (8th Cir. 2024) ("placement and removal of books in public school libraries" not government speech). In fact, no majority of any court has ever adopted this view. *See PEN Am. Ctr., Inc. v. Escambia Cty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fl. 2024) ("The Court is not persuaded that decisions regarding the content of school libraries is 'government speech' that is not subject to any constitutional constraints"); *Crookshanks v. Elizabeth School District*, 775 F. Supp. 3d 1160, 1174-75 (D. Colo. 2025) ("Caselaw does not support the District's position" that "curation decisions are government speech immune from First Amendment scrutiny"); *Fayetteville*, 684 F. Supp. 3d at 909 (discussing lack of "legal precedent to suggest that the state may censor non-obscene materials in a public library because such censorship is a form of

20

government speech"). This Court should follow the Eighth Circuit and these other courts.[4]

"[T]he real question in government-speech cases [is] whether the government is *speaking* instead of regulating private expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 262 (2022) (Alito, J., concurring). Justice Alito warned that "it can be difficult to tell whether the government is using the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint,'" cautioning that "the government-speech doctrine becomes 'susceptible to dangerous misuse.'" *Id.* at 262-63; *see also Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints").

The Supreme Court articulated three factors to determine whether an action is government speech: "[1] the history of the expression at issue; [2] the public's likely perception as to who (the government or a private person) is speaking; and [3] the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 244.

---

[4] As discussed in n.3, *supra*, the Eighth Circuit recently applied the *Hazelwood* standard to school libraries in *Robbins*, rather than the government speech doctrine. Although *amici* respectfully submit that the *Robbins* court erred in applying *Hazelwood* to school libraries, that decision underscores the fact that no majority of any Circuit Court has ever adopted Appellants' government speech argument.

In *Matal*, the Supreme Court held that the government's registration of trademarks is not government speech. 582 U.S. at 235-39. The Court reasoned that "[t]he Federal Government does not dream up these marks, and it does not edit marks submitted for registration." *Id.* at 235. If the marks were government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things." *Id.* at 236; *see also GLBT Youth*, 114 F.4th at 668. Moreover, "[t]rademarks have not traditionally been used to convey a Government message…[a]nd there is no evidence that the public associates the contents of trademarks with the Federal Government." *Matal*, 582 U.S. at 238; *see also, e.g., Shurtleff*, 596 U.S. at 254-56 (city did not control messages on flags on government property and public would not believe city endorsed those messages).

The State did not "dream up" or "edit" the books in the school library. *See Matal*, 582 U.S. at 235. If putting books on a shelf is government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things." *See id.* Libraries are not sending any cognizable message by, *e.g.*, including on their shelves both *Mein Kampf* and books celebrating Jewish faith, as is the case at the Lejune High School library operated by Appellants.[5]

---

[5] *See Mein Kampf*, Lejune High School, https://lejeunehs-dodea.mackinvision.com:443/library/OpacLogin?corporation=LejeuneHS&url=%2Fhome%2Fresources%2Fdetails%2F05419b840a000e633a49af5803a0b46f; *Essential Judaism*, Lejune High School, https://lejeunehs-

22

The government has not traditionally conveyed messages to the public through library shelves. *See id.* at 238. Rather, as set forth above at pgs. 6-11, *supra*, Appellants' actions are antithetical to school libraries' history and mission. Nor would the public reasonably perceive that the government speaks by placing particular books on library shelves. Unlike a private actor who curates newspaper articles, television programs, or social media posts expressing certain viewpoints or content, one of a library's major objectives is to make available a wide array of books, regardless of viewpoint. *See* pgs. 6-11, *supra*. Selecting books for libraries is a situation where the government "expends funds to encourage a diversity of views from private speakers." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 833-34 (1995) (cited in Def. Br. 12, 17, 21). That conduct is ***not*** government speech. *Id.* at 833-86.

Appellants themselves seem unsure about whether curation is "expressive activity" or "speech" by the government. *See* Def. Br. 39 ("[t]o the extent that there is any expressive activity involved…."); *id.* 43 ("to the extent that the selection of such books sends a message…."). For good reason: as set forth above, library curation does not send any cognizable message. No reasonable person would view the presence or absence of certain books as communicating a particular message. A

---

dodea.mackinvision.com:443/library/OpacLogin?corporation=LejeuneHS&url=%2Fhome%2Fresources%2Fdetails%2F0544a9be0a000e630f75d74b03a1c4c4.

patron visiting an Alabama school library and finding books about Alabama history, but not Ohio history, would not perceive a government message that Ohio history is not worth reading. Nor would anyone seeing *Mein Kampf* on the shelves at Lejune High School think Appellants are asserting that it is an "appropriate" book everyone should read. Library curation does not send any comprehensible message to the public. It is not government speech.[6]

### G. The purported availability of the books from other sources does not prevent a constitutional violation.

Appellants' argument that there is no First Amendment violation because students can obtain the barred books from other sources (Def. Br. 38) also fails. Although Appellants pay lip service to the First Amendment right to receive information without viewpoint discrimination (*see id.* 37), their argument ignores that fundamental right.

Consistent with the views of Jefferson and Madison, *supra*, the "right to receive information and ideas" is protected by the Constitution as an "inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." *Pico*, 457 U.S. at 867. The Supreme Court recognized this right

---

[6] A minority (7 of 17 judges) of the *en banc* Fifth Circuit argued otherwise. *See Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (cited in Def. Br. 40-42). That minority opinion is not binding anywhere, including the Fifth Circuit, and was *dicta* because the majority dismissed plaintiffs' claims on other grounds. *See id.* at 850-51. The *Llano* minority's analysis was also flawed for the reasons set forth above.

24

before and after *Pico*: "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak ***and listen***…." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (emphasis added); *see also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (recognizing "the right to receive information and ideas"); *Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences").

Accordingly, once the government opens a library, patrons have rights that the government cannot take away without complying with the Constitution. *See, e.g., Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983) ("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum"); *Rosenberger*, 515 U.S. at 829 ("Once it has opened a limited forum…the State must [not]…discriminate against speech on the basis of its viewpoint").[7]  Where "the government, acting as censor, undertakes selectively to

---

[7] School libraries should be considered "designated" or "limited" public forums the government has designated for access to a broad range of extracurricular information. *See, e.g., Perry*, 460 U.S. at 45-46 (where government opens forum "for use by the public…content-based prohibition[s] must be narrowly drawn to effectuate a compelling state interest").  Even if content-based restrictions in the school library only needed to be "reasonable," Appellants actions are still unconstitutional because it is unreasonable to exclude works of significant merit, given the role of the school library to make available a broad array of content of use and interest to students. *See pgs. 6-11, supra.*

25

shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power." *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975).

This right applies to minors in schools. *See, e.g., Fayetteville*, 684 F. Supp. 3d at 909-10 ("it is well established that 'minors are entitled to a significant measure of First Amendment protection' and the government may restrict these rights 'only in relatively narrow and well-defined circumstances'"); *see also Mahmoud*, 145 S.Ct. at 2350 (reaffirming *Tinker*); *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187 (2021) ("Minors are entitled to a significant measure of First Amendment protection" (internal quotation and brackets omitted)); *Walls*, 144 F.4th at 1002 (recognizing "reciprocal right to receive…information," which "do[es] not disappear inside public schools"); *Sheck*, 530 F. Supp. at 689 ("the first amendment right of students to receive that information and those ideas is entitled to constitutional protection"). The fact that students "cannot simply go in the library, take the books off the shelf and thumb through them…is a restriction on [their] access" and an "impermissible infringement[] of First Amendment rights." *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003).

The right to receive information does not mean that Appellants are required to provide a particular book merely because an individual demanded it. The point is that once the government chooses to open a library, the government must comply

26

with the First Amendment when making curation decisions, including by avoiding viewpoint discrimination and complying with the *Miller-Ginsberg* test. Otherwise, if Appellants' argument is adopted, legislatures in "blue" states could enact blanket bans on all Republican books, and legislatures in "red" states could ban all Democratic books. That cannot be the law and is a far cry from what the Founders intended.

As a practical matter, Appellants also ignore the fact that some children cannot visit public libraries or purchase books. "[G]etting to the public library may be difficult for children and for those who live in homes without Internet access, the school library may be their only access to the digital world." WOOLLS, *supra*, at 4004. "Because many families cannot afford to purchase children's books, it becomes all the more important to make community resources…easily and readily available…." Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89, 527-37 (1997).

School libraries and librarians are critical resources for children. For many, the school library is their primary or only means of accessing books. The fact that restricted books ***might*** be available elsewhere is not a substitute for students' access in the school library.

## V. CONCLUSION

It is no mere rhetorical flourish to say that school libraries are citadels of

27

American democracy.  Appellants' actions undermined those citadels, in violation of the First Amendment.  The District Court should be affirmed.

Respectfully submitted,

**FREEDOM TO READ FOUNDATION, AND AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS**

By their attorneys,

*/s/ Owen R. Wolfe*

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Tel:  (212) 218-3389
Fax:  (917) 344-1394

*Attorneys for Amici Curiae*
*Freedom to Read Foundation and American*
*Association of School Librarians*

Dated:  June 2, 2026

28

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS AND VIRUS-FREE CERTIFICATION**

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) and FED. R. APP. P. 32(a)(7) because the brief contains 5,864 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface; footnotes appear in 14-point Times New Roman typeface.

*/s/ Owen R. Wolfe*
Owen R. Wolfe

Dated: June 2, 2026

29

**CERTIFICATE OF SERVICE**

I certify that on June 2, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Owen R. Wolfe*
Owen R. Wolfe