NO. 25-2497

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

E.K., by and through parent
and next friend Lindsey Keeley, *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*

v.

Department of Defense Educational Activity, *et al.*,
*Defendants-Appellants/Cross-Appellees*

Appeal from the United States District Court for the Eastern District of Virginia

**BRIEF OF AMICI CURIAE NATIONAL EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, AND EDUCATION LAW CENTER IN SUPPORT OF APPELLEES/CROSS-APPELLANTS AND URGING PARTIAL AFFIRMANCE AND PARTIAL REVERSAL**

Alice O'Brien
Jason Walta
Navin Pant
Caitlin Rooney
National Education Association
1201 16th St NW
Washington, DC 20036
(202) 215-1746
npant@nea.org

Dariely Rodriguez
Shaheena Simons
Michael Pillera
Lawyers' Committee for
Civil Rights Under Law
1500 K St NW, Suite 900
Washington, DC 20036
(202) 662-8600
drodriguez@lawyerscommittee.org
ssimons@lawyerscommittee.org
mpillera@lawyerscommittee.org

Richard Tarr
Executive Director
Federal Education Association
1201 16th Street NW
Suite 117
Washington, DC 20036
(202) 822-7855
RTarr@nea.org

Robert Kim
Katrina Reichert
Education Law Center
60 Park Place,
Suite 300
Newark, NJ 07102
(973) 624-1815
rkim@edlawcenter.org
kreichert@edlawcenter.org

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25 2497</u>        Caption: <u>E.K. et al v. Department of Defense Educational Activity et al</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>National Education Association</u>
(name of party/amicus)


who is <u>Amicus Curiae</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Navin Pant         Date: 06/02/2026

Counsel for: Amicus Curiae

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _25 2497_    Caption: _E.K. et al. v. Department of Defense Educational Activity et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Federal Education Association_
(name of party/amicus)

who is ___Amicus Curiae___, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

12/01/2019 SCC                                         - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)      ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?       ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Richard Tarr                              Date: _____06/02/26_____

Counsel for: Federal Education Association

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___25 2497___     Caption: ___E.K. et al v. Department of Defense Educational Acitivity et al___

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Lawyers' Committee for Civil Rights Under Law (LCCRUL)___
(name of party/amicus)

_____

 who is _____Amicus Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
     If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Michael J. Pillera           Date:     June 3, 2026

Counsel for: Amicus Curiae, Lawyers' Committee

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  25-2497          Caption:  E.K. et al. v. Department of Defense Educational Activity et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Education Law Center
(name of party/amicus)


 who is _____ Amicus Curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:


12/01/2019 SCC                                - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Anna Katrina Reichert       Date: June 1, 2026

Counsel for: Amicus Curiae

- 2 -

Print to PDF for Filing

## TABLE OF CONTENTS

**STATEMENT OF INTEREST OF AMICI CURIAE** ...........................................1

**INTRODUCTION AND SUMMARY OF THE ARGUMENT** ..........................4

**ARGUMENT** ....................................................................................................8

I.     The government's ideological censorship fails First Amendment scrutiny because it is not reasonably related to a legitimate pedagogical interest and harms students, staff, and schools ..........................8

      A.     The government's ideological censorship harms DoDEA students ...10

      B.     The government's ideological censorship harms DoDEA staff .........18

      C.     The government's ideological censorship puts DoDEA schools' academic success at risk ................................................................20

II.     The government speech doctrine does not shield DoDEA's library and curriculum censorship from First Amendment scrutiny ........................21

      A.     Library book removals are not "government speech" ........................22

      B.     Curriculum is not "government speech" ...........................................28

**CONCLUSION** ...............................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ..................................................................8, 9, 32

*Board of Education v. Pico*,
  457 U.S. 853 (1982) ...........................................................................8, 9, 23, 24

*Boring v. Buncombe Cnty. Bd. of Educ.*,
  136 F.3d 364 (4th Cir. 1998) ........................................................................30

*Chiras v. Miller*,
  432 F.3d 606 (5th Cir. 2005) ........................................................................31

*Crookshanks v. Elizabeth Sch. Dist.*,
  775 F. Supp. 3d 1160 (D. Colo. 2025) .........................................................23

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*,
  114 F.4th 660 (8th Cir. 2024)..................................................................23, 26

*Griswold v. Driscoll*,
  616 F.3d 53 (1st Cir. 2010) ..........................................................................31

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) .......................................................................................8

*Johanns v. Livestock Mktg. Ass'n*,
  544 U.S. 550 (2005) .....................................................................................30

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967) ................................................................................24, 32

*Leake v. Drinkard*,
  14 F.4th 1242 (11th Cir. 2021)......................................................................29

*Little v. Llano Cnty.*,
  138 F.4th 834 (5th Cir. 2025)........................................................................23

*Mahanoy Area Sch. Dist. v. B. L.*,
  594 U.S. 180 (2021) .....................................................................................28

ii

*Mahmoud v. Taylor*,
    606 U.S. 522 (2025) ............................................................................10

*Matal v. Tam*,
    582 U.S. 218 (2017) ........................................................22, 26, 27, 32

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
    711 F. Supp. 3d 1325 (N.D. Fla. 2024) ............................................23

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022) ............................................32

*Polk v. Montgomery Cnty. Pub. Schs.*,
    166 F.4th 400 (4th Cir. 2026) ....................................................30, 31

*Reno v. Am. C.L. Union*,
    521 U.S. 844 (1997) ............................................................................10

*Shurtleff v. Boston*,
    596 U.S. 243 (2022) ....................................................................22, 29

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ............................................................................32

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ............................................................................28

*Virgil v. Sch. Bd. of Columbia Cnty.*,
    862 F.2d 1517 (11th Cir. 1989) ....................................................9, 32

*Vista-Graphics, Inc. v. Virginia Dep't of Transp.*,
    682 F. App'x 231 (4th Cir. 2017) ......................................................29

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ....................................................................29, 30

*Walls v. Sanders*,
    144 F.4th 995 (8th Cir. 2025) ............................................................31

**Other Authorities**

"Trevor Project Research Brief: Bullying and Suicide Risk Among LGBTQ
    Youth" (2021) ......................................................................................17

Allan Wigfield et al., *Beyond Cognition: Reading Motivation and Reading Comprehension*, 10 CHILD DEV. PERSPECTIVE 190 (May 2016) ........................12

Am. Inst. for Research, *Concerns Based Adoption Model* (2016) ..........................21

Am. Library Ass'n, *Standard Library Organization and Equipment for Secondary Schools of Different Sizes* (1920) ......................................................24

Am. Psych. Ass'n, *School-Based Risk and Protective Factors for Gender Diverse and Sexual Minority Children and Youth* (2015)...................................17

American Association of School Librarians, NATIONAL SCHOOL LIBRARY STANDARDS FOR LEARNERS, SCHOOL LIBRARIANS AND SCHOOL LIBRARIES (1st ed. 2017) ...............................................................................26, 27

American Association of School Librarians, ROLE OF THE SCHOOL LIBRARY (2019) .............................................................................................25

Angie O. Hernandez & Dan Lamothe, *Students at Military Bases Around World Resist Trump's DEI Crackdown*, WASH. POST (Mar. 17, 2025) ............10

Anna Merod, *Survey: 37% of Teachers will Likely Quit if K-12 Censorship Laws Reach Them*, K-12 DIVE (Jan. 24, 2022) .................................................19

Ashley Woo et al., *Walking on Eggshells—Teachers' Responses to Classroom Limitations on Race- or Gender-Related Topics*, RAND CORP. (Jan. 25, 2023) .................................................................11, 18, 19

Benjamin S. Bloom et al., TAXONOMY OF EDUCATION OBJECTIVES (1956) ...........14

Blessing Ngozi Iweuno et al., *Impact of Racial Representation in Curriculum Content on Student Identity and Performance*, 23 WORLD J. ADVANCED RSCH. REVS. 2913 (2024) .....................................................................................16

Charlot Cassar, *Why Teachers Address Unplanned Controversial Issues in the Classroom*, 51 THEORY & RSCH. IN SOC. EDUC. 233 (2023) ..........................13

Christy M. Byrd, *Does Culturally Relevant Teaching Work? An Examination from Student Perspectives*, 6 SAGE OPEN (July–Sept. 2016) ..........................17

Dan Kaufman, *'The Biggest Act of Union-Busting in U.S. History': Trump's War on Federal Workers*, NEW YORK TIMES (Jan. 27, 2026) ..............6

iv

David Choi, *DODEA Students Worldwide Push Back on DEI Cuts with Walkout Demonstrations*, STARS & STRIPES (Apr. 10, 2025) ..........................10

David E. Campbell, *Introduction*, MAKING CIVICS COUNT: CITIZENSHIP. EDUCATION FOR A NEW GENERATION (David E. Campbell et al., eds. 2012) ..........................................................15

Desiree Carver-Thomas & Linda Darling-Hammond, *Teacher Turnover: Why It Matters and What We Can Do About It*, LEARNING POL'Y INST. (Aug. 2017).............................................................................................20

DoDEA, *DoD Schools Ranked Best in the United States Again on Nation's Report Card* (Jan. 29, 2025) ...........................................................20

Douglas Fisher & Nancy Frey, *Teacher Credibility in Literacy Learning*, 63 J. OF ADOLESCENT & ADULT LITERACY 356 (2019) ...................................13

Dustin Hornbeck & Joel R. Malin, *Demobilizing Knowledge in American Schools: Censoring Critical Perspectives*, 10 HUMANITIES & SOC. SCI. COMMC'NS No. 642 (2023)...................................15

Valerie A. Earnshaw et al., *Bullying Among Lesbian, Gay, Bisexual, and Transgender Youth*, 63 PEDIATR CLIN NORTH AM. 2016 (Mar. 23, 2022)........17

James L. Rodriguez et al., *Promoting Academic Achievement and Identity Development among Diverse High School Students*, 87(3) High Sch. J. 44 (Feb. 2004)..........................................................................16

Joan S. Michie and Barbara A. Holton, FIFTY YEARS OF SUPPORTING CHILDREN'S LEARNING: A HISTORY OF PUBLIC SCHOOL LIBRARIES AND FEDERAL LEGISLATION FROM 1953 TO 2000, U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics (2005).......................................................24, 25

Kathy Bickmore & Christina Parker, *Constructive Conflict Talk in Classrooms: Divergent Approaches to Addressing Divergent Perspectives*, 42 THEORY & RSCH. IN SOC. EDUC. 291 (2014)...............................................14

Kenneth Wong, *Public School Systems Can Learn a lot from the Department of Defense Education Activity*, BROOKINGS INST. (July 15, 2024)..............20, 21

Law Firm Anti-Racism All. & Nat'l Educ. Ass'n, *The Very Foundation of Good Citizenship: The Legal and Pedagogical Case for Culturally Responsive*

*and Racially Inclusive Public Education for All Students*
(Sept. 29, 2022) ........................................................................16

Enoch Leung et al., *Social Support in Schools and Related Outcomes for
LGBTQ Youth: A Scoping Review*, DISCOV. EDUC. art. 18 (2022) ...................18

Madline Roberts, *New CDC Data Shows LGBTQ Youth are More Likely
to be Bullied Than Straight Cisgender Youth*, HRC (Aug. 26, 2020)...............17

Matthew A. Kraft & Melissa Arnold Lyon, *The Rise and Fall of the Teaching
Profession: Prestige, Interest, Preparation, and Satisfaction Over
the Last Half Century*, 61 AM. EDUC. RSCH. J. 1192 (2024)...............................19

Michael Sainato, *Trump's Attack on Federal Unions a 'Test Case' for
Broader Assault, Warn Lawyers*, THE GUARDIAN (May 1, 2025) .....................6,

Paula McAvoy & Diana Hess, *Classroom Deliberation in an Era of
Political Polarization*, 43 CURRICULUM INQUIRY 14 (2013)..............................14

Sabine E. French et al., *The Development of Ethnic Identity During
Adolescence*, 42 DEVELOPMENTAL PSYCHOL. 1 (2006)......................................16

Saul K. Padover, THE COMPLETE JEFFERSON 1048 (1943).....................................28

Terese C. Aceves & Michael J. Orosco, *Culturally Responsive Teaching*,
Univ. of Fla., CEEDAR Ctr. Doc. No. IC-2 (July 2014)...................................16

Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance:
Evidence from an Ethnic Studies Curriculum*, Ctr. Educ. Pol'y Analysis
Working Paper No. 16-01 (Jan. 2016) ............................................................16

Wenxia Lv, *Unveiling the Power of Teacher Credibility and Care in Learners'
Motivation Through the Lens of Rhetorical/Relational and Broaden-and-Build
Theory*, 86 LEARNING & MOTIVATION No. 101988 (May 2024) ......................13

Zoretta Hammond, Culturally Responsive Teaching and The Brain:
Promoting Authentic Engagement and Rigor Among Culturally
and Linguistically Diverse Students (Corwin Press 2015)................................16

vi

**STATEMENT OF INTEREST OF AMICI CURIAE**

This amici curiae brief is submitted by the National Education Association ("NEA"), Federal Education Association ("FEA"), the Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee"), and Education Law Center ("ELC").[1]

NEA is the nation's largest professional association and labor organization, representing approximately three million members, the vast majority of whom serve as educators, counselors, and education support professionals in our nation's public schools. NEA is committed to fulfilling the promise of public education to prepare every student to succeed in a diverse and interdependent world. Since its founding over a century-and-a-half ago, NEA has worked to build and strengthen the quality of public education available to all students nationwide.

FEA is the federal-sector affiliate of NEA. It is a labor organization with more than 5,400 members who work as educators and education support professionals in public schools operated by the Department of Defense Educational Activity ("DoDEA"), a subdivision of the Department of Defense. DoDEA serves more than 64,000 PreK-12 dependents of military and civilian personnel stationed in bases in the United States, in United States territories, and abroad. FEA's members include

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no party's counsel or other person (other than the amici) contributed money intended to fund preparing or submitting the brief.

1

DoDEA classroom teachers, instructional assistants, librarians, counselors, nurses, and classified employees who work to ensure that their students have access to the high-quality education that has long characterized DoDEA schools.

NEA and FEA have a profound interest in their members' ability to go to work every day with confidence that they can do their jobs with integrity and professionalism, and without fear of discipline or termination because of vague and overbroad ideological censorship mandates from the government. Educators are uniquely positioned to explain to this Court the harm caused by censorship mandates because they are on the front lines in schools and must interpret and apply these directives daily in their libraries and classrooms. NEA interviewed members who have worked in different DoDEA roles before and after DoDEA's censorship directives.[2] Their experiences are reflected throughout the brief.

The Lawyers' Committee is a nonpartisan, nonprofit civil rights organization founded in 1963 by the nation's leading lawyers at the request of President John F. Kennedy to secure equal justice for all through the rule of law by targeting the inequities confronting Black communities and other communities of color. The Lawyers' Committee uses legal advocacy to achieve racial justice and ensure that Black people and other people of color have the voice, opportunity, and power to

---

[2] These members are part of both NEA and FEA. For ease of reference, this brief will refer to them as "NEA members."

make the promises of our democracy real. The Educational Opportunities Project at the Lawyers' Committee has been a national leader in protecting and defending inclusive education and diversity efforts in PK-12 schools and on college and university campuses for many years. The Lawyers' Committee represented intervenor and amici students and presented oral argument before the Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023). The Lawyers' Committee also serves as co-counsel representing students and teachers in *Black Emergency Response Team, et al. v. Drummond et al.*, No. 5:21-CV-1022-G (W.D. Okla. Nov. 9, 2021), and *Walls, et al. v. Sanders, et al.*, No. 4:24-cv-00270 (E.D. Ark Mar. 25, 2024). Both litigations challenge state laws that censor certain materials from K-12 classrooms.

Education Law Center is a non-profit organization that pursues justice and equity for public school students by enforcing their right to a high-quality education in safe, equitable, non-discriminatory, integrated, and well-funded learning environments. ELC seeks to support and improve public schools as the center of communities and the foundation of a multicultural and multiracial democratic society. To achieve these goals, ELC engages in federal and state litigation nationwide and frequently serves as *amicus curiae* in cases challenging laws and policies that deny students access to a high-quality public education and place

3

vulnerable populations at risk, such as those that censor curricular and instructional materials.

### INTRODUCTION AND SUMMARY OF THE ARGUMENT

This appeal arises from student-plaintiffs' First Amendment challenge to DoDEA's removal of over 500 library books and broad censorship of curricula and school activities in public schools serving military families around the world. In January 2025, President Trump issued various Executive Orders targeting so-called "divisive concepts" and "gender ideology and discriminatory equity ideology topics" across federal agencies, the military, and public schools nationwide. *See* JA 86-95.

Immediately after issuing the Executive Orders, and without making any effort to evaluate their pedagogical impact, DoDEA administrators moved to begin removing student access to books, learning, and activities that were even "*potentially related to* gender ideology or discriminatory equity ideology topics." *See* JA 101 (emphasis added). The censorship directives cast an immediate chill across DoDEA, one of the most demographically diverse school systems in the country.[3]

---

[3] For the 2024-25 school year, DoDEA reported the student population was 41% white, 26% Hispanic/Latino, 14% multiracial, 10% Black/African American, and 6% Asian. *See Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction*, filed May 7, 2025, at 2.

Given the breadth of the term "potentially related to," it is no surprise DoDEA staff charged with carrying out the directive engaged in a vast amount of censorship. This included: removing informative non-fiction and classic works of literature, including texts like *To Kill a Mockingbird*; eliminating aspects of the school curriculum, such as an AP Psychology unit on gender and lessons on the Civil War, immigration, and Black History Month; cancelling school events and activities "related to" observances like Black History Month and Women's History Month; and restricting student clubs and extracurricular activities. *See* JA 18-19, 69.

The district court correctly held that plaintiffs demonstrated a likelihood of success on their claims that both the removal of library books and the curricular changes were unconstitutional under the First Amendment. *See* JA 49, 52. With respect to those five schools attended by plaintiffs at the time, the court enjoined DoDEA from "further removals of educational books and curricular content in implementation of Executive Order Nos. 14168, 14185, and 14190 and any related memoranda, directives, and guidance" and ordered that DoDEA "immediately restore the library books and curricular materials that have been removed since January 19, 2025 in implementation of the EOs." JA 57-58. The district court declined to issue a broader injunction covering all DoDEA schools. JA 55-56. Amici curiae submit this brief in support of plaintiffs to amplify themes that support the

5

district court's conclusion that plaintiffs are likely to succeed on the merits of their claims, and that warrant reversing the limited scope of the injunction.

First, as educator experience and research confirm, the government's ideological censorship lacks any legitimate justification, harms students, educators, and schools, and fails any standard of constitutional scrutiny. NEA members report that the censorship directives have prompted confusion, fear, the needless elimination of important texts from school shelves, and chilling of discussion in classrooms. Educators are hard-pressed to understand the proper scope of DoDEA's directives or how they comport with their other professional obligations. They operate in perpetual fear of potentially failing to comply with the mandate to purge books and ideas from schools—a fear that is well founded given the Trump Administration's ongoing attacks on nearly all sectors of the federal workforce.[4] As a result, over a year into DoDEA's directives, NEA members report they have stopped teaching classical works such as *Animal Farm*, cut content on slavery and the Civil Rights Movement from history lessons, canceled plans for Black History Month, and curbed classroom discussions on topics such as race and immigration.

---

[4] Michael Sainato, *Trump's Attack on Federal Unions a 'Test Case' for Broader Assault, Warn Lawyers*, THE GUARDIAN (May 1, 2025), https://www.theguardian.com/us-news/2025/may/01/trump-federal-unions-labor-bargaining-rights; Dan Kaufman, *'The Biggest Act of Union-Busting in U.S. History': Trump's War on Federal Workers*, NEW YORK TIMES (Jan. 27, 2026), https://www.nytimes.com/2026/01/27/magazine/trump-federal-workers-labor-unions.html.

That is no way to prepare young people to flourish in our diverse nation and interconnected world. Educators set up students for the future by planting the seeds for lifelong curiosity and learning and by nurturing their skills of discernment and reasoning. A deep well of educational research confirms that those goals will not be achieved by telling students what they can and cannot read and by shielding them from ideas the government disfavors. Research confirms also that accurate and inclusive education addressing race, culture, and complex histories benefits all students—but is especially critical for supporting the academic and social success of students of color and LGBTQ students. Ultimately, DoDEA's sweeping censorship harms its diverse students and staff and threatens the strong academic achievements of DoDEA schools.

Second, this Court should reject the government's efforts to evade First Amendment constraints by invoking the narrow "government speech" doctrine. As reflected in amicus NEA's own work with librarians to develop public school library standards over 100 years ago, library shelves have not been historically used to broadcast government messages, and the array of materials and viewpoints represented there do not convey a governmental message. Likewise, curriculum in public schools is not a vehicle to deliver the government's own particular message directly to students; rather, curriculum serves to expose students to a range of

7

perspectives so that they may formulate their own, and become informed participants in our multicultural democracy.

These grounds all support this Court affirming the district court's grant of injunctive relief. At all schools, not just those attended by plaintiffs, educators must be able to provide students with books, materials, and the richness of discussion and intellectual engagement that learners deserve, free from a constant cloud of censorship. Thus, this Court should reverse the district court's limited scope of the injunction to protect the First Amendment rights of students at all DoDEA schools.

## ARGUMENT

**I.    The government's ideological censorship fails First Amendment scrutiny because it is not reasonably related to a legitimate pedagogical interest and harms students, staff, and schools.**

In assessing DoDEA's purge of curricular content and library books, the district court correctly applied standards under *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) (curriculum) and *Board of Education v. Pico*, 457 U.S. 853 (1982) (library materials).

Under *Hazelwood*, the government may not remove curricular materials for ideological reasons without a legitimate pedagogical basis. *See id.* at 271, 273 (holding that schools may restrict "activities [that] may fairly be characterized as part of the school curriculum" "so long as their actions are reasonably related to legitimate pedagogical concerns"). *See also Arce v. Douglas*, 793 F.3d 968, 983 (9th

8

Cir. 2015); *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1518 (11th Cir. 1989). The government has failed to provide any pedagogical support for the removal of curricular materials that would satisfy *Hazelwood*.

As to library book removals, the district court correctly applied the standard in *Pico*, 457 U.S. 853 (1982), in which eight of nine justices recognized First Amendment limits on school-library book removals. Under *Pico*, schools "may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." *Id.* at 879-80 (Blackmun, J., concurring) (emphasis in original); *see also id.* at 872 (plurality opinion) (holding that "school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books"); *id*. at 907 (Rehnquist, J., dissenting) (conceding that a school's discretion to control the content of its library "may not be exercised in a narrowly partisan or political manner" or to "permit the official suppression of ideas"). Here, the government offers no legitimate, viewpoint-neutral justification for its book removals, and the "highly irregular and ad hoc" procedures to implement the Executive Orders are the "antithesis" of what "might tend to allay suspicions regarding [illegitimate] motivations." *Id.* at 875 (plurality opinion).

Although the district court also examined DoDEA's book removals under the *Hazelwood* standard, this Court should recognize *Pico* as the most apt standard for

9

book removals given that the case dealt directly with school libraries. But the removals also fail First Amendment scrutiny under *Hazelwood*. In fact, the government has put forward *no* pedagogical basis—let alone a *legitimate* one—for its viewpoint-based censorship of either books or curricula. Nor could it, given the recognized harms that heavy-handed ideological censorship inflict on students, staff, and schools, as explained below.

**A. The government's ideological censorship harms DoDEA students.**

**1. DoDEA educators are curtailing their teaching under pressure from the censorship directives.**

DoDEA students recognized the harms of the government's censorship when they protested DoDEA's implementation of Executive Orders through a series of protests and walkouts last year.[5] Some of these educational harms are obvious: students are deprived access to books and ideas once available to them.[6] They are

---

[5] *See*, *e.g.*, Angie Orellana Hernandez & Dan Lamothe, *Students at Military Bases Around World Resist Trump's DEI Crackdown*, WASH. POST (Mar. 17, 2025), https://www.washingtonpost.com/national-security/2025/03/17/military-schools-protest-trumporders/; David Choi, *DODEA Students Worldwide Push Back on DEI Cuts with Walkout Demonstrations*, STARS & STRIPES (Apr. 10, 2025), https://www.stripes.com/theaters/asia_pacific/2025-04-10/dodea-dei-student-protests-walkouts-17428249.html.

[6] Contrary to the defendants' assertion, the availability of DoDEA-removed books outside school would not obviate a First Amendment violation. *See Mahmoud v. Taylor*, 606 U.S. 522, 561 (2025); *Reno v. Am. C.L. Union*, 521 U.S. 844, 880 (1997). Even so, many DoDEA students live in non-English speaking countries and simply will not have the opportunity to obtain DoDEA-removed books from local libraries or bookstores as the government suggests.

10

also deprived of formal educational opportunities, including the removal of a unit on gender from AP Psychology that will leave them unprepared for an exam that could otherwise provide them with college credit. *See* JA 24-25, 195-96.

But other harms are more subtle, insidious, and far-reaching. DoDEA has imposed curricular restrictions that frontline educators must obey with only vague or minimal guidance. The predictable result is that educators are uncertain about what topics can be addressed and therefore curb their teaching to avoid any materials or classroom discussions that could touch on issues that could be deemed controversial.[7]

Not surprisingly, then, NEA members report changing what and how they teach out of fear of violating DoDEA's censorship mandate. One teacher said she avoided classroom discussions on race and controversial current topics, such as immigration. She also shared that she "avoided altogether" lessons on slavery, the Civil Rights Movement, and the contributions of people of color in American history (including General Colin Powell), fearing they would be considered "divisive." For the first time in her 20-year career, she feels like she is "walking on eggshells" and is "afraid to tell students what they need to know about American history."

---

[7] *See* Ashley Woo et al., *Walking on Eggshells—Teachers' Responses to Classroom Limitations on Race- or Gender-Related Topics* at 16, RAND CORP. (Jan. 25, 2023), https://www.rand.org/content/dam/rand/pubs/research_reports/RRA100/RRA134-16/RAND_RRA134-16.pdf.

11

Other NEA members report scrapping carefully planned lessons for Black History Month. One member saw an administrator tearfully remove a book about Ruby Bridges from a classroom because she felt she had to or would be fired. And a DoDEA librarian noted that he stopped recommending certain books to students because of the censorship directives. As he put it, "Every librarian wonders: Will this decision get me in trouble? Is this the thing that brings the wrath of DoDEA on me?"

### 2. Pedagogical research establishes that censorship undermines student learning, while inclusive education enhances it.

Research on pedagogy—i.e., practices through which teachers help students learn—establishes that censorship undermines students' engagement, motivation, and ability to learn. For example, fostering students' reading motivation—particularly by giving them autonomy and access to reading materials they find relevant to their lives—promotes learning and comprehension.[8] In contrast, overt restrictions on students' choice of reading topics or materials can diminish their intrinsic motivation to read and leave them less engaged in learning.[9]

Similarly, pressure to limit instruction and classroom discussion to comply with censorship directives—as NEA members have experienced—deprives

---

[8] *See* Allan Wigfield et al., *Beyond Cognition: Reading Motivation and Reading Comprehension*, 10 CHILD DEV. PERSPECTIVE 190, 190-95 (May 2016).
[9] *Id.*

educators of one of their most valuable assets: their credibility. Maintaining credibility "is critical for educators as it directly influences the effectiveness of their teaching and the outcomes achieved by their students."[10] Students exhibit higher levels of enthusiasm for learning when taught by credible instructors compared to those perceived as less credible.[11] Where students are aware of overt efforts to censor books and ideas, educators will strain to maintain credibility. For example, student questions about controversial topics often "arise sporadically, unexpectedly, and authentically in the relative sanctity of the classroom."[12] Addressing those questions head-on would normally offer an opportunity to engage and motivate students. But a teacher who feels compelled to bow to school censorship edicts by dismissing or avoiding genuine questions could easily squander that opportunity and undermine student motivation.[13]

---

[10] Wenxia Lv, *Unveiling the Power of Teacher Credibility and Care in Learners' Motivation Through the Lens of Rhetorical/Relational and Broaden-and-Build Theory*, 86 LEARNING & MOTIVATION No. 101988 (May 2024).

[11] *Id.*

[12] Charlot Cassar, *Why Teachers Address Unplanned Controversial Issues in the Classroom*, 51 THEORY & RSCH. IN SOC. EDUC. 233, 234 (2023).

[13] *See* Douglas Fisher & Nancy Frey, *Teacher Credibility in Literacy Learning*, 63 J. OF ADOLESCENT & ADULT LITERACY 356, 356-59 (2019) (explaining that a "teacher who does not demonstrate that he or she has students' best interests at heart will not be trusted," and one "who cannot adequately convey competence and trustworthiness undermines the learning environment and negatively impacts learning").

Restrictions that limit access to material and chill classroom instruction and discussion also affect students' ability to engage in genuine learning. According to "Bloom's Taxonomy"—a theoretical framework used since the 1950's to express general goals for the educational process—effective education requires using different modalities of learning, with the goal of producing students who have a deep understanding of the learning material and the ability to think critically and apply knowledge in a variety of contexts.[14] Robust classroom discussion, in particular, improves students' development of academic skills, critical thinking, and disciplinary knowledge.[15] But the kind of classroom discussion that allows for genuinely valuable exchanges—namely, discussion characterized by argumentation, critique, inclusion, relevance, and understanding—requires that educators "let students talk."[16] And teachers who fear losing control of the direction of the discussion are less likely to engage students in this way.[17]

Restrictions that limit genuine engagement, discussion, and learning also have long-term effects that leave students less prepared to assume the responsibilities of

---

[14] *See generally* Benjamin S. Bloom et al., TAXONOMY OF EDUCATION OBJECTIVES (1956).

[15] *See* Paula McAvoy & Diana Hess, *Classroom Deliberation in an Era of Political Polarization*, 43 CURRICULUM INQUIRY 14, 14–47 (2013).

[16] *See Id.* at 20.

[17] *See* Kathy Bickmore & Christina Parker, *Constructive Conflict Talk in Classrooms: Divergent Approaches to Addressing Divergent Perspectives*, 42 THEORY & RSCH. IN SOC. EDUC. 291, 294 (2014).

citizenship. Research shows that classroom discussion is an appropriate and effective way of increasing students' awareness of current affairs, helping them form their own reasoned political opinions, and strengthening their commitment to democratic values—including respect for differing viewpoints.[18]

When an educational system betrays these ideals, it is entirely predictable that the students who suffer most are those associated with the beliefs or characteristics singled out for censorship in the first place. "Leaving out critical perspectives in school curriculum can be dangerous because it can lead to a lack of understanding and knowledge about certain groups of people, their histories, and their experiences," which can in turn "result in a lack of empathy and understanding" and "contribute to harmful stereotypes and biases."[19] And by erasing representation of Black people and other people of color, LGBQTI+ people, and other targeted groups from classroom materials and libraries, schools run the risk of alienating these students, making them feel less valued than their peers, and giving them the

---

[18] *See* David E. Campbell, *Introduction*, MAKING CIVICS COUNT: CITIZENSHIP. EDUCATION FOR A NEW GENERATION at 1–14 (David E. Campbell et al., eds. 2012).

[19] Dustin Hornbeck & Joel R. Malin, *Demobilizing Knowledge in American Schools: Censoring Critical Perspectives*, 10 HUMANITIES & SOC. SCI. COMMC'NS No. 642 at 11 (2023).

impression that education is not relevant to their lives.[20] DoDEA's censorship is thus all the more troubling given the diversity of its student population.

By contrast, inclusive education that promotes discussion of race, culture, and complex histories yields demonstrated benefits for students. These benefits include facilitating brain processing,[21] motivating and engaging students,[22] cultivating critical thinking and problem-solving skills,[23] and promoting a sense of safety and belonging.[24] Educational benefits from inclusive learning accrue not just to students from minority or marginalized communities, but to all students.[25]

Inclusive education can also help support a learning environment that is effective, safe and welcoming for all. For students of color, for example, exposure

---

[20] *See* Blessing Ngozi Iweuno et al., *Impact of Racial Representation in Curriculum Content on Student Identity and Performance*, 23 WORLD J. ADVANCED RSCH. REVS. 2913, 2914 (2024); Sabine E. French et al., *The Development of Ethnic Identity During Adolescence*, 42 DEV. PSYCHOL. 1, 2–4 (2006).

[21] *See* Zoretta Hammond, Culturally Responsive Teaching and The Brain: Promoting Authentic Engagement and Rigor Among Culturally and Linguistically Diverse Students (Corwin Press 2015).

[22] *See* Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, Ctr. Educ. Pol'y Analysis Working Paper No. 16-01 (Jan. 2016).

[23] *See* Terese C. Aceves & Michael J. Orosco, "Culturally Responsive Teaching" Univ. of Fla., CEEDAR Ctr. Doc. No. IC-2 (July 2014).

[24] *See* James L. Rodriguez et al., *Promoting Academic Achievement and Identity Development among Diverse High School Students*, 87(3) High Sch. J. 44-53 (Feb. 2004).

[25] *See* Law Firm Anti-Racism All. & Nat'l Educ. Ass'n, *The Very Foundation of Good Citizenship: The Legal and Pedagogical Case for Culturally Responsive and Racially Inclusive Public Education for All Students* at 14–15 (Sept. 29, 2022) (citing studies), https://www.nea.org/sites/default/files/2022-09/lfaa-nea-white-paper.pdf.

to inclusive and culturally responsive curricula can be a key lever in increasing their critical literacy, reading comprehension, academic engagement and achievement at all grade levels, grade point averages, and graduation rates.[26] Indeed, culturally inclusive teaching methods have been shown to be associated with positive student perceptions of racial socialization, feelings of belonging, and exploration of ethnic identity in school.[27] And for students who face higher risks of bullying at school, such as LGBTQ youth,[28] inclusive education can foster a sense of safety and well-being. There are thus particular benefits to affirmatively creating a welcoming and accepting learning environment for LGBTQ students by, for example, including books and stories in the school curriculum that reflect the lives and experiences of LGBTQ people.[29]

---

[26] *Id.* at 9-11 (detailing various studies).

[27] *See* Christy M. Byrd, *Does Culturally Relevant Teaching Work? An Examination from Student Perspectives*, 6 SAGE OPEN (July–Sept. 2016).

[28] Valerie A. Earnshaw et al., *Bullying Among Lesbian, Gay, Bisexual, and Transgender Youth*, PEDIATR CLIN NORTH AM. 2016, 63(6), 999-1010 (Mar. 23, 2022); "Trevor Project Research Brief: Bullying and Suicide Risk Among LGBTQ Youth" (2021), https://www.thetrevorproject.org/wp-content/uploads/2021/10/The-Trevor-Project-Bullying-Research-Brief-October-2021.pdf (last accessed March 13, 2026); Madline Roberts, *New CDC Data Shows LGBTQ Youth are More Likely to be Bullied Than Straight Cisgender Youth*, HRC (Aug. 26, 2020), available at https://www.hrc.org/news/new-cdc-data-shows-lgbtq-youth-are-more-likely-to-be-bullied-than-straight-cisgender-youth/ (last accessed Mar. 13, 2026).

[29] *See* Am. Psych. Ass'n, *School-Based Risk and Protective Factors for Gender Diverse and Sexual Minority Children and Youth* at 26 (2015), https://www.apa.org/pi/lgbt/programs/safe-supportive/lgbt/risk-factors.pdf; Enoch Leung et al., *Social Support in Schools and Related Outcomes for LGBTQ Youth: A Scoping Review*, DISCOV. EDUC. 2022 art 18 (2022), doi: 10.1007/s44217-022-

**B. The government's ideological censorship harms DoDEA staff.**

The government's ideological censorship has likewise negatively affected DoDEA staff, particularly librarians and teachers. In recent years, educators across the country have faced a wave of teaching and curricular restrictions that target material related to race and gender. The mounting evidence shows that navigating these restrictions "has made carrying out their jobs more difficult."[30] Many educators described how these restrictions create more work and place more responsibility on them, particularly as "options for instructional materials [are] taken away."[31] They also described how—given the potential for backlash from school administrators and others—simply teaching matters "touching on historical events has become more stressful, fear inducing, and difficult."[32] As one DoDEA educator put it, "[i]t's not teaching. [It's a] shell of what it used to be."

These kinds of restrictions also influence educators' sense of mission and satisfaction in their jobs. Educators describe how compliance with such restrictions limits their instructional autonomy.[33] They also describe how limiting their ability to teach and select course materials related to race, gender, and other complex or

---

00016-9, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9662773/pdf/44217_2022_Article_16.pdf.

[30] Woo et al., *Walking on Eggshells*, *supra* note 7, at 16.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 14.

challenging topics could harm their students—both by making students from targeted backgrounds feel marginalized and by preventing all students from developing critical-thinking skills.[34]

The burdens these restrictions place on educators exacerbate and compound the stressors that already plague the profession. Across multiple indicators, "the overall wellbeing of the teaching profession today is at or near historically low levels."[35] Perceptions of teacher prestige, educators' job satisfaction, and young people's interest in joining the teaching profession are all at their lowest recorded levels over the last half century.[36] It is therefore no wonder that restrictions like those implemented by DoDEA could push experienced educators over the edge and out of the workforce. In a recent poll, 37% of the respondent educators reported that they "are more likely to leave the profession at the end of this school year if a push for laws that 'prevent honest teaching and conversations' reaches their classrooms."[37] One DoDEA educator shared that the government's censorship had led some of his

---

[34] Woo et al., *Walking on Eggshells*, *supra* note 7, at 17–18.

[35] Matthew A. Kraft & Melissa Arnold Lyon, *The Rise and Fall of the Teaching Profession: Prestige, Interest, Preparation, and Satisfaction Over the Last Half Century*, 61 AM. EDUC. RSCH. J. 1192, 1195 (2024).

[36] *Id*.

[37] Anna Merod, *Survey: 37% of Teachers Will Likely Quit if K-12 Censorship Laws Reach Them*, K-12 DIVE (Jan. 24, 2022), https://www.k12dive.com/news/survey-37-of-teachers-willlikely-quit-if-k-12-censorship-laws-reach-them/617581/.

fellow DoDEA educators to "throw in the towel," with some already resigning or planning to resign or retire.

The consequences of such losses would be drastic. "Research is clear that both teacher inexperience and rates of turnover negatively impact student learning, which means that students in schools with high turnover and few experienced teachers are at a decided educational disadvantage."[38]

### C. The government's ideological censorship puts DoDEA schools' academic success at risk.

Since 2020, DoDEA schools have consistently outperformed the national average in reading and mathematics on the benchmark National Assessment of Educational Progress.[39] This success is due, in no small part, to DoDEA's historical "[c]ommitment to instructional quality and implementation consistency[.]"[40] In particular, "to build and sustain a collective ownership on its priorities," DoDEA's curriculum development process has been based on "a comprehensive, annual

---

[38] Desiree Carver-Thomas & Linda Darling-Hammond, *Teacher Turnover: Why It Matters and What We Can Do About It*, LEARNING POL'Y INST. at 1 (Aug. 2017), https://learningpolicyinstitute.org/sites/default/files/productfiles/Teacher_Turnover_REPORT.pdf.

[39] *See* DoDEA, *DoD Schools Ranked Best in the United States Again on Nation's Report Card* (Jan. 29, 2025), https://www.dodea.edu/news/press-releases/dod-schools-ranked-bestunited-states-again-nations-report-card.

[40] Kenneth Wong, *Public School Systems Can Learn a lot from the Department of Defense Education Activity*, BROOKINGS INST. (July 15, 2024), https://www.brookings.edu/articles/publicschool-systems-can-learn-a-lot-from-the-department-of-defense-education-activity/.

planning cycle that offers plenty of opportunity for reflection, analysis, and feedback." *Id.* This "steady, long-term focus" has consistently yielded "strong learning results."[41]

By succumbing to hastily enacted, overtly ideological curricular censorship, DoDEA schools endanger the strong academic results that have been fostered over many years by the agency's previous, deliberate, and consensus-minded approach. Not only did DoDEA not involve subject-matter experts before implementing curricular changes, it mandated the changes in a chaotic, piecemeal fashion. That approach deprives educators of the ability to feel confident in the delivery and purpose of the changes and to ensure accurate implementation.[42] Such an approach creates the very kind of "policy churn"—or ineffectual fragmentary "reforms" that ultimately distract educators and administrators from sustained academic success— that DoDEA had previously managed to avoid.[43]

## II. The government speech doctrine does not shield DoDEA's library and curriculum censorship from First Amendment scrutiny.

The district court correctly rejected the government's contention that DoDEA's library collections and classroom curricula are "government speech"

---

[41] *Id.*

[42] *See* Am. Inst. for Research, *Concerns Based Adoption Model* (2016), https://sedl.org/cbam/concerns-based_adoption_model.pdf.

[43] *See* Wong, *Public School Systems can Learn a lot from the Department of Defense Education Activity*, *supra* note 40.

immune from First Amendment constraints. The narrow government speech doctrine does not shield the government's harmful and heavy-handed censorship from First Amendment scrutiny. In fact, the Supreme Court has warned that the government speech doctrine is "susceptible to dangerous misuse," warranting the exercise of "great caution" before extending its reach. *Matal v. Tam*, 582 U.S. 218, 234-35 (2017).

To decide whether a message that emanates from the government is "communicat[ing] governmental messages," *Shurtleff v. Boston,* 596 U.S. 243, 248, 252 (2022), the Supreme Court has prescribed a "holistic inquiry […] driven by a case's context rather than the rote application of rigid factors." *Id.* at 252. The Court set out three non-dispositive "indicia" to determine whether the government is speaking for itself in conveying a message: (1) "the history of the expression at issue"; (2) the public's likely perception as to who (the government or a private person) is speaking"; and (3) "the extent to which the government has actively shaped or controlled the expression." *Id.* at 244. Applying the *Shurtleff* factors, neither DoDEA's school library collections nor its curriculum should be deemed government speech.

### A. Library book removals are not "government speech."

The removal of books from DoDEA libraries falls outside the narrow government-speech exception under the *Shurtleff* inquiry. The government seems to

concede as much, limiting their argument on this point to one sentence. *See* Govn. Br. at 39. This Court should affirm the district court's decision that DoDEA school libraries lack the quintessential elements of government speech and follow the lead of other courts in soundly rejecting the government's argument. *See, e.g., GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) (rejecting argument that public school libraries constitute government speech); *Crookshanks v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1175 (D. Colo. 2025) ("Courts generally hold that the placement and removal of books in public school libraries is *not* government speech"); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("[T]the fact that the traditional purpose of a library is to provide information on a broad range of subjects and viewpoints, the Court simply fails to see how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves.").[44]

Under the first *Shurtleff* factor, school libraries have historically served the purpose of offering a wide range of resources for their students—not conveying the government's *own* singular viewpoint or position. As the Supreme Court recognized in *Pico*, public school libraries have traditionally been places where students are

---

[44] *But see Little v. Llano Cnty.*, 138 F.4th 834, 865 (5th Cir. 2025) (minority of en banc 5th Circuit joining plurality opinion concluding that library collection decisions are government speech).

23

"free to inquire, to study and to evaluate, to gain new maturity and understanding."

*Pico*, 457 U.S. at 868 (plurality opinion) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

This core purpose is evident in both historical and contemporary standards guiding schools and librarians. The first standards appeared in a 1920 report, *Standard Library Organization and Equipment for Secondary Schools of Different Sizes*, prepared by the NEA in collaboration with librarians across the country and approved by the American Library Association.[45] Nothing in the report, which served as a guide to states in preparing their own standards,[46] suggests that libraries were vessels for government speech, or perceived by the public as such.

Far from it, the report recognized the fundamental purpose of libraries as places of student inquiry: "freedom of access to the library must imply, not only freedom to consult books for reference and for supplementary and collateral study, but also freedom to read books for recreation and pleasure. The pupils should have direct access to the bookshelves."[47] With that goal in mind, the report emphasized

---

[45] Am. Library Ass'n, *Standard Library Organization and Equipment for Secondary Schools of Different Sizes* (1920), https://babel.hathitrust.org/cgi/pt?id=mdp.39015033889935&seq=11.

[46] Joan S. Michie and Barbara A. Holton, FIFTY YEARS OF SUPPORTING CHILDREN'S LEARNING: A HISTORY OF PUBLIC SCHOOL LIBRARIES AND FEDERAL LEGISLATION FROM 1953 TO 2000, U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics (2005), https://nces.ed.gov/pubs2005/2005311.pdf.

[47] Am. Library Ass'n, *supra* note 45, at 11-12.

24

the role of the librarian in "widening the interests of the students and in cultivating a taste for good reading…[by] posting interesting material on bulletin boards and compiling lists of interesting reading in books and magazines, [through] reading clubs and personal guidance of the reading of individual students."[48]

This understanding of public-school libraries as a cornerstone of student inquiry has endured beyond the 1920 report. In 1988, the former president of the American Association of School Librarians ("AASL") testified before Congress that "[t]he school library is the information base of the school" and "serves as a point of voluntary access to information and ideas and equally as a learning laboratory for students as they acquire critical thinking and problem solving skills needed in a pluralistic society."[49] AASL echoed that point more recently, stating in a 2019 report that school libraries provide "access to a wide array of resources" and are places where students "are encouraged to explore questions of personal and academic relevance."[50] To help achieve these objectives, AASL's *National School Library Standards for Learners, School Librarians and School Libraries* provides a

---

[48] *Id.* at 20.

[49] Michie and Holton, *supra* note 46, at 1.

[50] American Association of School Librarians, ROLE OF THE SCHOOL LIBRARY (2019), https://www.ala.org/sites/default/files/aasl/content/advocacy/statements/docs/AASL_Role_of_the_School_Library.pdf.

comprehensive current framework of standards for school librarians to help prepare their students to thrive within and beyond the school building.[51]

As to *Shurtleff*'s second factor, the public does not consider a school library's catalogue to be an expression of the government's views. *See GLBT Youth*, 114 F.4th at 668 (school library collections have never been "closely identified in the public mind with the government"). Indeed, some books may contradict one another, and no one would understand the various messages to be the government speaking. *Id.; Matal*, 582 U.S. at 236 (if trademarks were understood to be the government speaking, then it would be "babbling prodigiously and incoherently").

As to the third factor, DoDEA's unprecedented removal here of over 500 books based on ideological edicts from on high stands in stark contrast to the history and traditional purpose of public-school libraries. Here again, the 1920 report on library standards is instructive. The report described standard practice as requiring the librarian to select books with the approval of the principal and based on recommendations by department heads and teachers.[52] The report emphasized that libraries should include a wide array of material, including "literature that has a natural human appeal to young people," as well as "novels, short stories, books of

---

[51] American Association of School Librarians, NATIONAL SCHOOL LIBRARY STANDARDS FOR LEARNERS, SCHOOL LIBRARIANS AND SCHOOL LIBRARIES (1st ed. 2017).

[52] Am. Library Ass'n, *supra* note 45, at 21.

travel, biography, modern drama, [and] modern poetry."[53] Nowhere does the report suggest that the government's own ideological viewpoints should dictate book selection or removal. That approach would be antithetical to the historical purpose and perception of public-school libraries.

As one DoDEA librarian observed, before the Executive Orders, librarians used their training, experience, and professional standards when recommending books for purchase and assessing book removal requests. Librarians considered criteria such as age-appropriateness, book reviews, and teacher recommendations. But now DoDEA librarians must seek approval not only of a school principal but also a higher-level DoDEA regional specialist to ensure compliance with DoDEA's censorship directives. DoDEA librarians "never had the kind of oversight we do now."

Because the "viewpoint expressed by" a book "ha[d] not played a role in the decision whether to place it on" the library shelves until the Executive Orders, school library collections "have not traditionally been used to convey a Government message." *Matal*, 582 U.S. at 238. Thus, under all three *Shurtleff* factors, this Court should uphold the district court's conclusion that library curation is not government speech.

---

[53] *Id.*

### B. Curriculum is not "government speech."

Similarly, the government speech doctrine does not insulate DoDEA's classroom instruction from First Amendment scrutiny. As to *Shurtleff*'s first factor, schools have not historically served as mouthpieces for the government to convey a singular opinion or message. On the contrary, the importance of providing a learning environment rooted in the exposure to diverse ideas is a tradition that dates back to the very founding of the nation.[54] Indeed, the Supreme Court has long recognized that exposing students to different viewpoints in school is foundational to our democracy. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 190 (2021) (public schools are "nurseries of democracies" and "[o]ur representative democracy only works if we protect the 'marketplace of ideas.'"); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'").

As to *Shurtleff*'s second factor, the public does not perceive curricular materials or classroom instruction to be the government's conduit for its own message. Students and families understand that school curriculum will encompass a variety of concepts and materials expressing different viewpoints. The public also

---

[54] Saul K. Padover, THE COMPLETE JEFFERSON 1048 (1943).

28

understands the substantial role of teachers in conveying concepts and materials to students.

In this way, curriculum is categorically different from platforms where the public understands the government is overtly articulating one message that it wants the public to adopt, such as tourist-related materials promoting state attractions at state-administered "welcome centers," *Vista-Graphics, Inc. v. Virginia Dep't of Transp.*, 682 F. App'x 231, 236 (4th Cir. 2017), a military parade advertised and promoted by the city, which identified itself as a host and identified the goal of the parade as a celebration of veterans from the area, *Leake v. Drinkard*, 14 F.4th 1242, 1249 (11th Cir. 2021), or design of government-issued specialty license plates, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).

With respect to the third *Shurtleff* factor, the federal government does play a role in determining the curriculum for DoDEA schools. But it does not unilaterally or "actively shape[] or control[]" the ideas and materials included in a curriculum. *Shurtleff*, 596 U.S. at 244. The government generally selects from existing materials the specific resources it believes will best support students in achieving the goals and standards adopted in the curriculum. But even then, the way ideas and materials are taught is strongly shaped by teachers applying their professional training, experience, and judgment. By using pedagogical best practices and organically

29

leading classroom discussions, teachers transform curriculum into meaningful learning experiences for their students.

This selection of pre-existing materials, along with the judgment and discretion exercised by educators in the classroom, makes the government's role in curriculum different from instances of government speech where the government plays a singular role in creating materials. *See, e.g.*, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005) (holding government-designed advertisements were government speech); *Walker*, 576 U.S. at 213 (holding specialty license plates were government speech where the government had "sole control" over their design and other characteristics.) The idea that the government has traditionally exerted extensive control over the specific messages conveyed in each classroom—spanning the expression and activity occurring in thousands of classrooms, each day, for nine months of the year—strains credulity.

The government relies on a host of inapt cases to argue that it is bound by no Free Speech constraints whatsoever in K-12 curriculum and instruction. To the extent those cases even decided the question of government speech, none applied *Shurtleff*. For example, one Fourth Circuit case the government cites, *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364 (4th Cir. 1998), involved a *teacher's* First Amendment right to select and produce a single school play. The only other cited Fourth Circuit case, *Polk v. Montgomery Cnty. Pub. Schs.*, 166 F.4th 400, 420

(4th Cir. 2026), also involved a teacher. There, the teacher challenged on free speech and free exercise of religion grounds a school district's policy requiring staff to refer to students by their preferred pronouns. *Id.* Similarly, in *Chiras v. Miller*, 432 F.3d 606, 614-17 (5th Cir. 2005), the Fifth Circuit rejected an *author's* First Amendment claim to include his textbook in the school curriculum but went out of its way to clarify that its conclusion did not necessarily preclude the student-plaintiff from asserting a First Amendment right to receive information claim. *Id.* at 620 (suggesting student's claim would have survived had he been able to show the curricular decision was "narrowly partisan or political"). Thus, none of those cases involved student First Amendment claims or speech restrictions resembling DoDEA's censorship.

In *Walls v. Sanders*, 144 F.4th 995, 1002 (8th Cir. 2025), which did involve students' First Amendment rights, the Eighth Circuit did not apply the *Shurtleff* factors to substantively analyze whether the government speech doctrine applies to public school instruction. And in *Griswold v. Driscoll*, 616 F.3d 53, 56-59 (1st Cir. 2010), which pre-dated *Shurtleff* and concerned the removal of a single curriculum guide, the court did not analyze any factors close to those resembling the factors that the Supreme Court has since held control the question of government speech.

Just as the cases that the government relies on do not address *Shurtleff*, the government itself makes no effort to argue that the *Shurtleff* factors favor finding

31

government speech. And for good reason. As explained above, under those factors, curriculum does not fall within the narrow parameters of government speech. This Court should follow the lead of other courts in recognizing that students have a First Amendment right to receive information in the curricular context. *See Arce*, 793 F.3d at 983; *Virgil*, 862 F.2d at 1518; *cf. Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1244, 1291 (N.D. Fla. 2022), stay pending appeal denied, *Pernell v. Fla. Bd. of Governors of State Univ.*, No. 22-13992-J, 2023 WL 2543659, at *1 (11th Cir. Mar. 16, 2023). To do otherwise would disregard the Supreme Court's warning in *Matal*, 582 U.S. at 235, and leave the door wide open to unchecked silencing of disfavored viewpoints in schools.

## CONCLUSION

The government's censorship in DoDEA schools is incompatible with the First Amendment's "special concern" with government actions that not "cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. As the Supreme Court has long recognized, the stakes in such matters could not be higher: "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

For the reasons above—and for the reasons set forth in Appellees/Cross-Appellants' brief—Amici NEA, FEA, the Lawyers' Committee, and ELC

32

respectfully request that this Court affirm the district court's order granting

Appellees/Cross-Appellants a preliminary injunction and reverse the court's

limitation of the order to just those schools attended by plaintiffs.

Dated: 06/03/2026

                                           Respectfully submitted,

                                           /s/Navin Pant

Dariely Rodriguez                                 Alice O'Brien
Shaheena Simons                               Jason Walta
Michael Pillera                                   Navin Pant
Lawyers' Committee for                    Caitlin Rooney
Civil Rights Under Law                   National Education Association
1500 K St NW, Suite 900                 1201 16th St NW
Washington, DC 20036                  Washington, DC 20036
(202) 662-8600                                 (202) 215-1746
drodriguez@lawyerscommittee.org   npant@nea.org
ssimons@lawyerscommittee.org
mpillera@lawyerscommittee.org

Richard Tarr                                   Robert Kim
Executive Director                          Katrina Reichert
Federal Education Association        Education Law Center
1201 16th Street NW, Suite 117     60 Park Place, Suite 300
Washington, DC 20036                  Newark, NJ 07102
(202) 822-7855                               (973) 624-1815
RTarr@nea.org                                rkim@edlawcenter.org
                                         kreichert@edlawcenter.org

*Counsel for Amici Curiae*

33

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B), and Local Rules 28.1(e)(2)(B) and 29(a)(5) because it contains 7,311 words, excluding the parts of the brief exempted by Federal rule of Appellate Procedure 32(f). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman 14-point font.

/s/ Navin Pant

June 3, 2026

34