Nos. 25-2497(L); 26-1002

In The United States Court of Appeals
for the Fourth Circuit

E.K., *by and through parent and next friend Lindsey Keeley, et al.*,

> *Plaintiffs-Appellees/*
> *Cross-Appellants*

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*,

> *Defendants-Appellants/*
> *Cross-Appellees*

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:25-cv-637 (PTG/IDD)

## BRIEF OF *AMICI CURIAE* THE AUTHORS GUILD, MACMILLAN PUBLISHING GROUP, LLC AND PENGUIN RANDOM HOUSE LLC IN SUPPORT OF PLAINTIFFS-APPELLEES

Marc A. Fuller
Maggie I. Burreson
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000
mfuller@jw.com
mburreson@jw.com

*COUNSEL FOR AMICI CURIAE*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, *Amici* provide the following certificate of interested persons, in addition to those listed in the previously filed briefs:

*Amicus* The Authors Guild is not a publicly held corporation, has no parent corporation, and no publicly traded corporation owns 10% or more of its stock;

*Amicus* Macmillan Publishing Group, LLC's direct parent company is Macmillan Holdings, LLC, and no publicly held company owns 10% or more of the stock of either legal entity;

*Amicus* Penguin Random House LLC is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KgaA, a privately held company;

Marc A. Fuller (counsel for *Amici*); and

Maggie I. Burreson (counsel for *Amici*).

Dated: June 3, 2026

/s/ *Marc A. Fuller*
Marc A. Fuller
*Counsel for Amici Curiae*

2

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... 4

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................... 6

SUMMARY OF THE ARGUMENT ........................................................ 10

ARGUMENT .......................................................................................... 12

I.    DoDEA's removal of books from school libraries based on its disapproval of the ideas in them is not "government speech." ...... 12

    A.    DoDEA's government-speech argument finds no support in Supreme Court precedent. ................................... 15

    B.    The *Shurtleff* factors confirm that library-book removals censor private speech and thus implicate the First Amendment. ..................................................................... 21

    C.    The Fifth Circuit's plurality opinion in *Little* is wrong ........ 24

II.   The "history-and-tradition" test proposed by *Amicus* Alliance Defending Freedom cannot save DoDEA's partisan book ban ...... 29

III.  *Amicus* Defending Education's invocation of "parental rights" cannot justify DoDEA's book ban ................................................. 33

CONCLUSION ...................................................................................... 36

CERTIFICATE OF COMPLIANCE ...................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
457 U.S. 853 (1982)...................................................... 10, 11, 12, 35

*Crookshanks v. Elizabeth Sch. Dist.,*
775 F. Supp. 3d 1160 (D. Colo. 2025) ................................................27

*E.K. by and through Keeley v. Department of Defense Education Activity,*
807 F. Supp. 3d 517 (E.D. Va. 2025) ...................................... 10, 12, 25

*GLBT Youth in Iowa Schs. v. Reynolds,*
114 F.4th 660 (8th Cir. 2024) ......................................................23, 24

*Hazelwood Sch. Dist. v. Kuhlmeier,*
484 U.S. 260 (1988).........................................................................12

*Little v. Llano County,*
138 F.4th 834 (5th Cir. 2025) (en banc) ..........15, 24, 25, 26, 27, 28, 29

*Mahmoud v. Taylor,*
606 U.S. 522 (2025)............................................................... 33, 34, 35

*Matal v. Tam,*
582 U.S. 218 (2017)..................................................... 14, 16, 18, 20, 23

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024)..........................................................................25

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009)...................................15, 16, 17, 19, 20, 25, 26, 27

*Shurtleff v. City of Boston, Mass.,*
596 U.S. 243 (2022)...................................13, 16, 19, 20, 21, 23, 24, 29

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)..........................................13, 16, 17, 18, 19, 20, 23

**REGULATIONS**

Exec. Order No. 14,185, 90 Fed. Reg. 8763 ........................................... 10

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ..................................................................... *passim*

**OTHER**

Andrew R. Chow, Lucy Feldman, Annabel Gutterman, &
    Lucas Wittmann, *The 10 Best Nonfiction Books of 2020*,
    TIME (Nov. 21, 2020) ........................................................................ 32

Evelyn Geller, *Forbidden Books in American Public
    Libraries*, 1876-1939: A Study in Cultural Change xv
    (1984)............................................................................................... 22

Helen Norton & Danielle Keats Citron, *Government Speech
    2.0*, 87 Denv. U. L. Rev. 899, 915 (2010) ........................................... 17

Marc J. Blitz, *Constitutional Safeguards for Silent
    Experiments in Living: Libraries, the Right to Read, and A
    First Amendment Theory for an Unaccompanied Right to
    Receive Information*, 74 UMKC L. Rev. 799, 829 (2006) ................... 22

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

**The Authors Guild (the "Guild")** was founded in 1912 and is a national non-profit association of more than 16,000 professional, published writers of all genres. The Guild counts historians, biographers, academicians, journalists, and other writers of nonfiction and fiction as members. The Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and taxation. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The ability to write on topics of their choosing and to have their work available through bookstores and libraries is vital to their ability to make a living in their chosen profession.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *Amici* certify that counsel for *Amici* authored this brief in whole; that no counsel for a party authored this brief in any respect; and that no person or entity, other than *Amici* and their counsel, contributed monetarily to this brief's preparation or submission.

**Macmillan Publishing Group, LLC ("Macmillan")** is a New York-based group of U.S. publishers that includes Celadon Books, Farrar, Straus and Giroux, Flatiron Books, Henry Holt & Company, Macmillan Audio, Macmillan Children's Publishing Group, St. Martin's Publishing Group, and Tor Publishing Group. The U.S. publishing group is part of Macmillan Publishers, a global trade book publishing company with prominent imprints around the world. Macmillan publishes a broad range of award-winning books for children and adults in all categories and formats. Macmillan strongly advocates for the right to read, uniting a broad community of authors, educators, librarians, and readers. Macmillan strives to ensure access to diverse literary works, highlighting the critical role of literacy in democracy, championing the transformative power of books in fostering understanding, and working to build an inclusive future.

**Penguin Random House LLC ("PRH")** is the U.S. arm of Penguin Random House, the world's largest trade publisher, which comprises more than 300 editorially and creatively independent publishing imprints globally. PRH's mission is to ignite a universal passion for reading by creating books for everyone and creating a world

where independent thinking, free expression, and creativity flourish. PRH aims to publish books that provide children with a gateway to the whole world, promoting literacy, fostering empathy, and inspiring free and open debate. Continued inclusion of its books in public and school libraries is critical to PRH's mission.

Books written and published by *Amici* and their members have been targeted for removal from school libraries throughout the country as a result of growing censorship efforts. The consequences of such book bans are devastating. Publishers decide which books to publish based in part on the expectation that those books will be available through institutional channels—including school libraries—that provide broad access to readers. Authors write books about difficult, controversial, and important subjects because they believe those books will find their audience. If government officials can remove books from libraries with impunity, the calculus changes. Publishers will be less willing to invest in books that address subjects disfavored by those in power. Authors will self-censor, avoiding topics that might lead to their work being banished from library shelves. Thus, *Amici* have defended their First Amendment

8

right to communicate through their books to readers in public and school libraries in litigation across the country.

All parties have consented to the filing of this brief.

## SUMMARY OF THE ARGUMENT

This case involves the removal of hundreds of books from the libraries of schools operated by the Department of Defense Education Activity ("DoDEA"). The books were not found to be lacking in quality or educational value, and there was no individualized review process to determine age appropriateness. Rather, they were targeted because the Executive Branch of the federal government announced in January 2025 that there are now officially approved—and disapproved—positions on issues of race and gender. Books that do not toe the government's official line are considered "un-American, divisive, discriminatory, radical, extremist, and irrational[,]" and are subject to being banned.[2]

The district court held that DoDEA's targeted book removals violated the First Amendment. *See E.K. by and through Keeley v. Department of Defense Education Activity*, 807 F. Supp. 3d 517, 539-45 (E.D. Va. 2025). Its decision rests on longstanding Supreme Court precedent. In *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), a majority of the justices

---

[2] Exec. Order No. 14,185, 90 Fed. Reg. 8763, Restoring America's Fighting Force (Jan. 27, 2025).

recognized that the First Amendment limits the government's power to remove books from school libraries. The *Pico* plurality held that school officials may not remove books from library shelves "simply because they dislike the ideas contained in those books." *Id.* at 872.

DoDEA argues that *Pico* has been superseded by recent cases involving "government speech." (Dkt. 25 at 42). According to DoDEA, the only speech interests at issue in this case are the government's and "no one else's." (*Id.*) But the government-speech doctrine has no application here. It was developed to address situations where the government itself is the speaker—erecting monuments, issuing license plates, or funding public advertising. It does not apply to the curation of library collections, which are repositories of private speech.

*Amici* write because they and their members are the *real* speakers, and the books at issue are their speech. These books and the subjects they explore have been frequently targeted in the culture wars of recent years. To protect students' right to engage with a diversity of ideas across the ideological and experiential spectrum, the Court should reject DoDEA's government-speech argument and affirm that its book ban violates the First Amendment.

## ARGUMENT

The district court held that DoDEA's book ban failed to pass muster under *Pico* or *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). *See E.K.*, 807 F. Supp. 3d at 539-45. On appeal, DoDEA does not even attempt to argue otherwise. Instead, it argues that *Hazelwood* "does not come into play" because it only applies to school regulation of student speech. (Dkt. 25 at 43). As to *Pico*, DoDEA argues that it, too, is inapplicable because "*Pico* does not account for more recent cases that explicate the government-speech doctrine[.]" (*Id.*) But DoDEA's reliance on the government-speech doctrine is misplaced, and its *amici*'s attempts to offer alternative legal and policy grounds to support DoDEA's actions also fail.

## I. DoDEA's removal of books from school libraries based on its disapproval of the ideas in them is not "government speech."

DoDEA relies primarily on a radical argument that would eviscerate the First Amendment rights of students and the public. DoDEA contends that the removal of books from school libraries is "government speech" that "does not implicate the First Amendment." (Dkt. 25 at 8). Under this argument, the government's "curation of its

own libraries" is the "government's own speech," and the "government may permissibly engage in viewpoint discrimination when it adds and removes books from library shelves." (*Id.* at 13).

This argument is as wrong as it is dangerous. The government-speech doctrine is of relatively recent vintage, but extremely limited application. At its core, the doctrine recognizes precisely what its name suggests: the government sometimes speaks. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). When it does, it is not confined to content or viewpoint neutrality. The government may promote its favored policy over other competing alternatives. It may take positions on controversial public issues, supporting one side of the debate and attacking the other. *Id.* at 207-08. Such "speech" by the government does not trigger First Amendment scrutiny.

But the Supreme Court has warned that the doctrine applies only when the government is actually "*speaking* instead of regulating private expression." *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 262 (2022) (Alito, J., concurring). When the doctrine is mistakenly applied to government regulation of others' speech, it becomes "susceptible to dangerous misuse. If private speech could be passed off as government

13

speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Thus, the Supreme Court has moved with "great caution" in this area, carefully examining the context of government action before extending the cloak of government-speech immunity. *Id.*

DoDEA's attempt to invoke the government-speech doctrine eschews the caution that Supreme Court precedent dictates. DoDEA offers only a cursory analysis of this precedent, and only in the context of its curricular decisions. (Dkt. 25 at 22-24). As to its removal of books from libraries, DoDEA merely incorporates its argument that *curriculum* decisions are government speech, without addressing the obvious differences between designing curriculum and curating a library collection. (*Id.* at 42).

Indeed, none of the limited circumstances in which the Supreme Court has applied the government-speech doctrine are similar to the removal of books from a school library. And no other court has held that book removals are government speech. This Court should not be the first. Notably, a plurality of the Fifth Circuit recently endorsed a government-

14

speech argument in a public library case, *Little v. Llano County*, 138 F.4th 834, 851-865 (5th Cir. 2025) (en banc), but that opinion failed to gain majority support—and for good reason, as its analytical flaws are glaring. In sum, no binding or persuasive authority supports DoDEA's government-speech argument.

## A.    DoDEA's government-speech argument finds no support in Supreme Court precedent.

Government-speech cases generally turn on categorization. If the government is deemed to be regulating private speech, the challenged action is generally held unconstitutional. But if the government is deemed to be the one speaking, the action is constitutionally unproblematic. This categorization is not always easy. Government-speech cases often involve some interplay between public and private actors, but the mere involvement by the government is insufficient to transform private speech into government speech.

A review of the Supreme Court's government-speech precedent reveals the deliberate caution—and deep concern—with which the Court has applied the doctrine. Although that doctrine traces its roots to earlier cases, the Supreme Court generally cites *Pleasant Grove City v.*

15

*Summum*, 555 U.S. 460 (2009), as the paradigmatic example of government speech. *See, e.g.*, *Shurtleff*, 596 U.S. at 251; *Matal*, 582 U.S. at 234; *Walker*, 576 U.S. at 207. *Summum* involved a display of approximately 15 monuments in a small city park. 555 U.S. at 464. Noting the expressive function of monuments throughout history and the government's role in selecting which monuments to allow on public property, the Court's unanimous opinion also relied heavily on practical considerations. *Id.* at 478–79. Writing for the Court, Justice Alito observed that a public park "can accommodate only a limited number of permanent monuments" and it would be absurd to force the government to display monuments from all perspectives on a range of issues. *Id.* As the Court explained, the government's display of a Statue of Liberty should not obligate it to display a Statue of Autocracy. *Id.* at 479.

The Supreme Court clearly viewed *Summum* as an easy decision—or at least an easy result, even if the majority's reasoning proved less convincing to some justices. *See, e.g.*, 555 U.S. at 481 (Stevens, J., concurring) (stating that the doctrinal underpinnings of the government speech doctrine were "of doubtful merit"); *see also id.* at 486 (Souter, J., concurring) (warning that, because the doctrine is "'recently minted,' it

16

would do well for us to go slow in setting its bounds, which will affect existing doctrine in ways not yet explored"). Commentators have similarly observed that "[p]erhaps *Summum* was unanimous because the objectionable consequences of a contrary ruling were so clear as a pragmatic matter." Helen Norton & Danielle Keats Citron, *Government Speech 2.0*, 87 Denv. U. L. Rev. 899, 915 (2010).

The unanimity did not last. In *Walker*, the Supreme Court considered whether Texas's program of specialty license plates involved government speech. The Court split 5-4, holding that it did. 576 U.S. at 212–20. Essential to the majority's analysis was its observation that "license plate designs 'are often closely identified in the public mind with the [State]'....Each Texas license plate is a government article serving the government purpose of vehicle registration and identification." *Id.* at 212. The Court noted that the State's name was prominently displayed on each plate, and vehicle owners were required by law to display the plates. *Id.* In this way, "license plates are, essentially, government IDs." *Id.*

That analysis drew a vigorous dissent by Justice Alito, joined by Chief Justice Roberts, Justice Scalia, and Justice Kennedy. *Id.* at 221 (Alito, J., dissenting). The dissent argued that the majority's "capacious

17

understanding of government speech takes a large and painful bite out of the First Amendment." *Id.* at 222. Noting the wide array of designs that had been approved under the Texas program, Justice Alito argued that a reasonable observer would not understand any specific design to be a State-sponsored message. *Id.* at 222–23. Rather, the public would likely view specialty license plates as "little mobile billboards" bearing messages of private expression. *Id.* at 223.

In retrospect, *Walker* appears to have been the high-water mark of the government speech doctrine. *See, e.g.*, *Matal*, 582 U.S. at 238 (*Walker* "likely marks the outer bounds of the government speech doctrine"). Just two years later, the Supreme Court unanimously rejected an argument that the U.S. Patent and Trademark Office's approval of trademarks transformed the content of those marks into government speech. *Id.* at 235. Noting the diversity of approved marks, the Court quipped that, "[i]f the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently." *Id.* at 236. And it warned that, if registration transforms trademarks into government speech, so would copyright registration

18

transform books into government speech—a result the Supreme Court found to be "most worrisome." *Id.* at 239.

Unanimity prevailed again in *Shurtleff*, where the Supreme Court rejected the argument that a small collection of flags outside Boston City Hall represented government speech. 596 U.S. at 251–60. The Court recognized that, under other circumstances, flags outside a government building could represent government speech. *Id.* at 255. But the City of Boston had "allowed its flag to be lowered and other flags to be raised with some regularity." *Id.* The Supreme Court held that, as to these other flags, a reasonable observer would associate their messages with the private actors who raised them. *Id.* at 255–56. Thus, even though the flags were located on government property, flown on government flagpoles, raised with government equipment, and remained under government control, they were not government speech. *Id.* at 256.

The differences between library-book removals and the two instances in which the Supreme Court applied the government-speech doctrine are clear. As to *Summum*, the overriding pragmatic concern that drove its result is absent here. *Summum* appreciated the impossibility of forcing the government to display monuments with competing

19

viewpoints, especially in a collection that numbered barely more than a dozen large monuments in a small public park. 555 U.S. at 479. But a library is not similarly constrained. School libraries shelve hundreds, if not thousands, of books. And, the fact that this case involves the *removal* of books that were previously available on library shelves confirms that the physical space constraints that drove the result in *Summum* do not apply here.

*Walker* is also of no help to DoDEA, which has made no showing that its process for deciding which books to remove bears any resemblance to the State of Texas's review process for specialty license plates. Instead, the curation of a library collection tracks more closely with the trademark program in *Matal* and the flagpoles in *Shurtleff*. In both of those cases, the government's final approval over private speech was insufficient to invoke the government-speech doctrine. *Matal*, 582 U.S. at 235–36; *Shurtleff*, 596 U.S. at 257–58. As *Shurtleff* illustrates, the mere fact that such action takes place on government property or is enabled by government infrastructure does not transform it into the government's own speech.

**B.     The *Shurtleff* factors confirm that library-book removals censor private speech and thus implicate the First Amendment.**

DoDEA's invocation of the government-speech doctrine fares no better when considering the three factors that the Supreme Court has identified to guide the government-speech analysis. *See Shurtleff*, 596 U.S. at 252. These factors include: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* DoDEA cites *Shurtleff*, but it makes no effort to discuss any of the *Shurtleff* factors. (Dkt. 25 at 17). It is perhaps a strategic omission. All three factors confirm that the removal of books from school libraries is government regulation of private expression, not government speech.

As to the first factor, only *Amicus* Alliance Defending Freedom ("ADF") addresses the historical record. (Dkt. 28-1 at 11-14). But its discussion focuses primarily on the mid-1800's, failing to account for how library-curation standards changed in later decades. Indeed, as one scholar has explained, "[e]ven near the beginning of public library history in America, … one finds evidence of the individualism and respect for

reader autonomy that would later become a hallmark of the profession." Marc J. Blitz, *Constitutional Safeguards for Silent Experiments in Living: Libraries, the Right to Read, and A First Amendment Theory for an Unaccompanied Right to Receive Information*, 74 UMKC L. Rev. 799, 829 (2006). Early on, that individualism competed with the paternalism of those who "'endorsed the librarian as moral censor'" for the masses. *Id.* at 836 (quoting Evelyn Geller, *Forbidden Books in American Public Libraries*, 1876-1939: A Study in Cultural Change xv (1984)).

As the 20th century progressed, however, respect for individual liberty prevailed over paternalism. In 1939, the American Library Association "'adopted its first Library Bill of Rights' defining librarians as 'guardian[s] of the freedom to read.'" *Id.* at 838–39 (quoting Geller at xv). Today's Library Bill of Rights continues this commitment, stating that "[l]ibraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval." American Library Association, Library Bill of Rights (2026), https://www.ala.org/advocacy/intfreedom/librarybill. It is this modern view that provides the correct frame of reference for the Court, given the

government-speech doctrine's focus on the perspective of a present-day observer. *See, e.g.*, 576 U.S. at 229-30 (Alito, J., dissenting) (focusing on post-1990s changes in Texas's license-plate program, not the early 20th century origin of the program); *cf. Shurtleff*, 596 U.S. at 255 (focusing on City's recent practice of allowing private actors to raise their own flags).

As to the second factor, there is no reasonable basis for concluding that the public views the government as the relevant speaker when it comes to library collections. As the Eighth Circuit observed, a well-appointed school library "could include copies of Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes's *Leviathan*, Karl Marx and Friedrich Engels's *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's *Democracy in America*." *GLBT Youth in Iowa Schs. v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024). If including these books on the shelves of a publicly funded library constitutes government speech, the State "'is babbling prodigiously and incoherently.'" *Id.* (quoting *Matal*, 582 U.S. at 236).

Nor could DoDEA rely on the message expressed by the government's decision to remove the books—essentially, that the books contain ideas on race and gender that are currently disfavored by

23

government officials. As Justice Alito has noted, such an argument illustrates the primary danger and core fallacy of an overbroad conception of government speech, which mistakes the expressive nature of viewpoint discrimination as "speech." *Shurtleff*, 596 U.S. at 269 (Alito, J., concurring).

Finally, as to the third factor—the extent to which the government has actively shaped or controlled the expression—the government clearly has no role in the expression contained in the books themselves. And the curation by professional school librarians of the thousands of books on various topics and diverse perspectives reflects a level of control that more resembles the approach of the City of Boston to flags or the PTO to trademark registration. Thus, none of the *Shurtleff* factors supports the State's government speech argument.

### C.    The Fifth Circuit's plurality opinion in *Little* is wrong.

No court has held that library-book removals are government speech. Like the district court, the Eighth Circuit expressly rejected that argument. *Reynolds*, 114 F.4th at 668. Notably, DoDEA and *Amicus* ADF cite the Fifth Circuit's plurality decision in *Little*, but neither relies heavily on it. There is good reason for their hesitance. *Little*'s

24

government-speech analysis is so riddled with errors that it ends up demonstrating why library-book removals cannot be considered government speech.

First, the *Little* plurality stated that it found "most instructive," cases that involve *private* speech, not government speech. 138 F.4th at 852. Among these cases was the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). DoDEA similarly relied on *Moody* in the district court, but the district court correctly rejected DoDEA's argument. *E.K.*, 807 F. Supp. 3d at 538-39. As it pointed out, private curation is fundamentally different under the First Amendment than government curation. *Id.* at 539. Indeed, as *Moody* recognized, "it is no job for government to decide what counts as the right balance of private expression." *Id.* It speaks volumes that, on appeal, neither DoDEA nor its *amici* cite *Moody* at all.

Second, the *Little* plurality asserted that *Summum* "maps neatly" onto cases involving library book removals, but it ignored the practical considerations that drove the result in *Summum*. The *Little* plurality said nothing of the physical constraints associated with displaying large monuments in a small public park, and it ignored the differences between

25

the government's review of monuments for potential display in a small public park and a public library's receipt and display of thousands of books on a range of topics and expressing a range of viewpoints.

The *Little* plurality also mischaracterized *Summum*'s reasoning. In support of its forced analogy between monuments and library books, the *Little* plurality asserted that the "relevant expression" in *Summum* was not the monuments themselves, but the city's curation and collection of monuments. *Id.* at 853. According to the *Little* plurality, the Supreme Court in *Summum* did not view the government as endorsing the message of the monuments displayed on public property. *Id.*

That is simply not a faithful reading of *Summum*, which clearly *did* view the government as endorsing the message of the monuments on display. *Summum* expressly states that "[j]ust as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land." 555 U.S. at 470-71. This is because the public understands that it "is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not

26

wish to be associated." *Id.* at 471. Indeed, *Summum* explained that the mere presence of a monument on public land so unmistakably communicates government endorsement that a formal proclamation officially endorsing that message would be redundant. *Id.* at 474 ("The City's actions provided a more dramatic form of adoption than the sort of formal endorsement that respondent would demand, unmistakably signifying to all Park visitors that the City intends the monument to speak on its behalf.").[3]

Libraries are different in this way. Even school libraries stock all kinds of books with ideas that the school does not endorse. *See, e.g.*, *Crookshanks v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1175 (D. Colo. 2025) ("No one would seriously argue that placing *Mein Kampf* in a school library constitutes government speech."). Even *Little* rejects the view that a school is viewed as endorsing the ideas in every single library book

---

[3] The *Little* plurality also erroneously relied on public forum doctrine to support its government speech analysis. *See* 138 F.4th at 858 ("Another way of looking at the government speech issue is to ask whether a library, by selecting books, creates a public forum….[T]he government speech and public forum doctrines are often two sides of the same coin."). But *Summum* rejects equating forum analysis with government speech. 555 U.S. at 478 ("public forum principles ... are out of place in the context of this case.").

it displays. 138 F.4th at 864 ("No one even claims that."). Thus, *Summum* does not "map neatly" onto *Little*. To the contrary, it relies on a theory of government endorsement that *Little* disclaims.

Third, the *Little* plurality argued unconvincingly that the message the government was expressing through its library curation was that the books on the shelves were "worth reading" and that the removed books were not. *Id.* at 854. In this way, the plurality analogized a library's book collection to an art museum's collection of paintings, noting that a librarian's job is to ensure that books are of a "suitable and worthwhile material." *Id.* But the plurality ignored that, as in this case, the books at issue in *Little* had already been on library shelves, and their removal had violated the professional standards that guide a librarian's weeding of genuinely unsuitable books from a collection. *Id.* at 853. The removed books at issue in *Little* included award-winning works of history and culture, so no reasonable observer would have interpreted their removals as being based on a lack of quality. *Id.* at 873 (Higginson, J., dissenting) (noting district court finding that removed books included "well-regarded, prize-winning" works). Instead, the only reasonable message that the government's removal of these books would have expressed to

28

the public is that the ideas in them were disfavored. That is censorship, and "plainly that kind of action cannot fall beyond the reach of the First Amendment." *Shurtleff*, 596 U.S. at 269 (Alito, J., concurring).

In sum, the Fifth Circuit plurality's opinion in *Little* is legally and factually unsound. Embracing its analysis would open the door for even the most naked viewpoint discrimination—in school libraries and public libraries alike—against authors who express messages that the government does not approve. *Little*'s analysis would even allow the government to do what *Amicus* ADF concedes is impermissible—removing books based on "[b]are hostility to a political party." (Dkt. 28-1 at 16). In short, *Little* is no model for this Court.

## II. The "history-and-tradition" test proposed by *Amicus* Alliance Defending Freedom cannot save DoDEA's partisan book ban.

*Amicus* ADF declines to embrace DoDEA's government-speech argument. (Dkt. 28-1 at 2). Instead, it proposes an alternative, "history-and-tradition" test. (*Id.* at 10). The historical context in which ADF finds guidance is mostly rooted in the mid-nineteenth century, when public and school libraries were first introduced. (*Id.* at 11-12).

Even if the premise of this argument—that practices from the mid-1800s inform the scope of First Amendment protection against library-book bans—is correct, it provides no support for DoDEA's position. After all, DoDEA argues that the First Amendment imposes no limit whatsoever on the government's removal of library books. (Dkt. 25 at 8). According to DoDEA, the First Amendment is simply not implicated by such actions. (*Id.*)

That's wrong, says ADF. Under its history-and-tradition test, the government's curation of library books "is still subject to limited judicial review." (Dkt. 28-1 at 15). The government may engage in certain types of content and viewpoint discrimination, but it can do so only "to further an educational goal." (*Id.*). When challenged, the government "must justify its choices as reasonably advancing a 'traditional [educational] mission.'" (*Id.*) And, importantly, it cannot remove books based on considerations such as "bare hostility to a political party" or "religious hostility." (*Id.* at 16).

ADF offers no guidance on how to determine whether a campaign of targeted book removals furthers an educational mission or is motivated by ideological hostility. But no such guidance is necessary here because

30

DoDEA's book removals are so obviously motivated by the latter. The record in this case shows that DoDEA's removals were clearly not motivated by concerns of educational merit.

Consider the titles mentioned in the district court's opinion. *Nineteen Eighty-Four*, George Orwell's masterpiece about totalitarian government thought control, has been a staple of English literature curricula for generations. *The Handmaid's Tale* by Margaret Atwood, a Booker Prize-winning author, is one of the most widely taught works of modern fiction. *The Giver* by Lois Lowry won the Newbery Medal and is among the most frequently assigned novels in American middle schools. *Ground Zero* by Alan Gratz is a critically acclaimed children's novel about the September 11 attacks. These are not fringe works of dubious quality.

The full list of removed books is similarly populated by award-winning and critically lauded works of fiction and nonfiction. The list includes, for example, Ta-Nehisi Coates's *Between the World and Me*, which won the National Book Award for Nonfiction and was a Pulitzer Prize finalist. It also includes Isabel Wilkerson's *Caste*, which was named

by *Time* as the No. 1 nonfiction book of 2020.[4] As Appellees note, the remainder of the list of more than 500 books "speaks for itself, heavily featuring women, non-White, and LGBTQ+ authors and characters." (Dkt. 37 at 21). DoDEA cannot, with a straight face, assert that its removal of these books was intended to "promote the marketplace of ideas" or "to spark 'critical thinking,'" as ADF's test requires. (Dkt. 28 at 18-19). To the contrary, DoDEA's removals are the product of ideological hostility—an effort to stifle debate and critical thinking on issues of race and gender by dictating which ideas are acceptable and which voices may be heard.

In sum, *Amicus* ADF's argument ends up supporting Appellees more than DoDEA. ADF confirms that limited First Amendment review of library-book removals is fully consistent with history and tradition. (Dk. 28 at 11-15). And it further concedes that such review is administrable, leaving library officials free to weed books based on legitimate content and viewpoint considerations. (*Id.* at 19). But in

---

[4] Andrew R. Chow, Lucy Feldman, Annabel Gutterman, & Lucas Wittmann, *The 10 Best Nonfiction Books of 2020*, TIME (Nov. 21, 2020), https://time.com/5913865/best-nonfiction-books-2020/.

32

offering a less radical First Amendment argument, ADF ends up proposing a test that DoDEA cannot pass.

### III. *Amicus* Defending Education's invocation of "parental rights" cannot justify DoDEA's book ban.

Unlike ADF, *Amicus* Defending Education does not propose or endorse any First Amendment standard. Rather, it argues that "[w]hatever limits" may apply, DoDEA's library-book removals pass muster because DoDEA "acted to protect parental rights." (Dkt. 29 at 5). But Defending Education does not cite any authority to support its assertion that the mere availability of library books—even controversial ones—threatens parental rights. Defending Education relies heavily on the Supreme Court's recent decision in *Mahmoud v. Taylor*, 606 U.S. 522 (2025), but that case involved fundamentally different "parental rights" claims and rejected some of the very arguments that Defending Education now makes.

First, *Mahmoud* was not about the mere availability of books in public school libraries, but the teaching of texts in curricula designed for early elementary students. *Id.* at 529-30. Nothing in *Mahmoud* requires the targeted removal of books from a school library merely because some

33

parents find the ideas in them morally or politically objectionable. Indeed, the plaintiffs in *Mahmoud* "conceded that they ha[d] no objection 'to the books being on the shelf or available in the library.'" *Id.* at 621 (Sotomayor, J., dissenting) (quoting oral argument transcript).

Defending Education then argues that the First Amendment harm resulting from DoDEA's actions is alleviated because "DoDEA has not forced any children to attend its schools." (Dkt. 29 at 5). But the same argument was made by the school district in *Mahmoud*, and the Supreme Court rejected it, holding that the availability of other educational options (such as private school or home school) was "no answer" to the plaintiffs' First Amendment objections. 606 U.S. at 560-61. That logic applies even more forcefully here, where many of the affected students attend on-base schools, sometimes in foreign countries. Defending Education then argues that there is no First Amendment harm because DoDEA "has not forbidden parents to teach their children gender theory or critical race theory outside its schools." (Dkt. 29 at 5). But, again, *Mahmoud* rejected precisely this argument. 606 U.S. at 563.

Indeed, the entire thrust of *Mahmoud*'s analysis is that "opt outs" are the appropriate way to accommodate parental rights when it comes

34

to morally sensitive topics. Censorship is not. In this way, "opt outs" function as a pressure relief valve in today's highly charged educational environment. Where parents have sincere, constitutionally protected religious or moral objections to certain types of instruction, "opt outs" may be necessary. *Id.* at 569-70. And, importantly, an "opt out" program can protect parental rights without comprising educators' commitment to foster critical thinking and protect the marketplace of ideas.

School libraries are essential to this ideal of intellectual independence. *See Pico*, 457 U.S. at 869 (noting the "regime of voluntary inquiry that … holds sway" in a library). DoDEA's attempt to subvert this independence to a regime of enforced ideological conformity on hot-button issues is a shortsighted and dangerous game, at odds with the best of our democratic traditions and constitutional values, and antithetical to an informed citizenry. Too many of our cherished institutions have been seized by the take-no-prisoners grip of political partisanship.

In this fraught moment, the Court should protect the role of the school library as a repository of diverse ideas. In doing so, it should protect the ability of school librarians to do their jobs according to the accepted standards of their profession—not the whims of whomever wins

control of the Executive Branch. Lastly, it should affirm that while books are for everyone, not every book is for every person, and therefore school libraries must be allowed to let students and their parents choose the right books for them.

## CONCLUSION

*Amici* respectfully urge the Court to affirm the district court's preliminary injunction against DoDEA's targeted removals of school-library books.

DATED:  June 3, 2026

Respectfully submitted,


/s/ *Marc A. Fuller*

Marc A. Fuller
Maggie I. Burreson
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000
mfuller@jw.com
mburreson@jw.com

**COUNSEL FOR *AMICI CURIAE***

37

## CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because it contains 5,707 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook.

*/s/ Marc A. Fuller*
Marc A. Fuller