**No. 25-2497(L), 26-1002**

# In the United States Court of Appeals for the Fourth Circuit

E.K., BY AND THROUGH PARENT AND NEXT FRIEND LINDSEY KEELEY, et al.,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, et al.,

*Defendants-Appellants/Cross-Appellees*.

On Appeal from the U.S. District Court for the Eastern District of Virginia,
Hon. Patricia Tolliver Giles, U.S. District Court Judge

**BRIEF OF SECURE FAMILIES INITIATIVE
AND PFLAG, INC. AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**

Avatara A. Smith-Carrington
Charles McLaurin
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
(202) 682-1300

Nephetari Smith
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall St., 19th Floor
New York, NY 10005
(212) 809-8585

Tara L. Borelli
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Suite 105
Decatur, GA 30030
(470) 225-5341

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-2497__     Caption: __E.K. v. Department of Defense Education Activity__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Secure Families Initiative__
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Avatara A. Smith-Carrington          Date:          6/3/26

Counsel for: Secure Families Initiative

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-2497__     Caption: __E.K., et al. v. Department of Defense Activity, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__PFLAG, Inc.__
(name of party/amicus)

_____

 who is _____Amicus Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Avatara A. Smith-Carrington          Date:    June 3, 2026

Counsel for: Amicus Curiae

- 2 -

**Print to PDF for Filing**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................. ii

INTEREST OF AMICI CURIAE ........................................................................1

SUMMARY OF THE ARGUMENT ...................................................................2

FACTUAL BACKGROUND .............................................................................5

    I.   Issuance of Executive Orders 14190, 14168, and 14185. .............................5

    II.  Defendants' Implementation of the Executive Orders and the Resultant Harms to Students.......................................................................................7

    III.  The Executive Orders' Hostility to Racial Equity and Transgender Rights and Absence of Pedagogical Concerns............................................................12

ARGUMENT .....................................................................................................17

    I.   A Student's Right to Receive Information is Foundational to a Functioning Democracy. ..................................................................................................17

    II.  The District Court Correctly Held that Plaintiffs Have a Substantial Likelihood of Succeeding on the Merits of their First Amendment Challenge. ..22

CONCLUSION ...................................................................................................29

CERTIFICATE OF COMPLIANCE ...................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) (plurality opinion) ................................................................................ *passim*

*Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136 (W.D. Okla. 2024), appeal docketed Nos. 24-6139, 24-6140, 24-6141 (10th Cir. July 16, 2024) .............................................................................................................6

*Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954), supplemented sub nom. *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955)..................................................................................................................2

*Cline v. Fox*, 319 F. Supp. 2d 685 (N.D.W. Va. 2004)..............................................18

*E.K. v. Dep't of Def. Educ. Activity*, 807 F. Supp. 3d 517 (E.D. Va. 2025) .............28

*Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-512 (JEB), 2026 WL 1257289 (D.D.C. May 7, 2026)...................................................................................16

*Epperson v. Arkansas.*, 393 U.S. 97 (1968) .................................................. 3, 19, 21

*Griswold v. Connecticut*, 381 U.S. 479 (1965)......................................................18

*Hazelwood Sch. District v. Kuhlmeier*, 484 U.S. 260 (1988) ..................... 20, 23, 24

*Honeyfund.com. v. DeSantis*, 622 F. Supp. 3d 1159 (N.D. Fla. 2022), *aff'd sub. nom. Honeyfund.com Inc. v. Governor*, State of Florida, 94 F.4th 1272 (11th Cir. 2024) ..............................................................................................................6

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965)..................................................21

*Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025) (*en banc*), *cert. denied sub nom. Little v. Llano Cty., TX*, No. 25-284, 2025 WL 3507000 (S. Ct. Dec. 8, 2025) .....20

*Loc. 8027 v. Edelblut*, 651 F. Supp. 3d 444 (D.N.H. 2023), appeal docketed No. 24-1690 (1st Cir. July 26, 2024) .................................................................6

*Mainstream Loudoun v. Board of Trustees of the Loudoun County Library, et al.*, 2 F. Supp. 2d 783 (E.D. Va. 1998)......................................................................18

*Martin v. City of Struthers*, 319 U.S. 141 (1943).....................................................19

*Matal v. Tam*, 582 U.S. 218 (2017) ...........................................................................18

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .................................................................21

*O.R. v. Greenville Cnty., South Carolina*, No. 6:25-cv-02599-DCC, 2026 WL 815913 (D.S.C. Mar. 19, 2026) ...........................................................................18

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), appeal docketed Nos. 13992 & 13994 (11th Cir. Nov. 30, 2022)........6

*Plyler v. Doe*, 457 U.S. 202 (1982).............................................................................2

*Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367 (1969)................................................19

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020).............................................................................................................................5

*Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974) ...............................................19

*Stanley v. Georgia*, 394 U.S. 557 (1969) .................................................................19

*Sweezy v. State of N.H. by Wyman*, 354 U.S. 234 (1957) ..........................................3

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)........................3

*Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025)......................................................20

*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). ......................24

iii

**Other Authorities**

AJ Plus (@ajplus), X (Jul 26, 2017, at 7:12PM),
   https://x.com/ajplus/status/890349059310997504 ................................................16

Johanna Alonso, *A Historical View of Trump's Anti-DEI Crusade* (Mar. 25, 2025)
   ..........................................................................................................................27

Christy M. Byrd, *Does Culturally Relevant Teaching Work? An Examination from
   Student Perspectives* 6 SAGE Open 1 (July-Sept. 2016),
   https://journals.sagepub.com/doi/pdf/10.1177/2158244016660744 ....................26

Nolan L. Cabrera et al., *Missing the (Student Achievement) Forest for All the
   (Political) Trees: Empiricism and the Mexican American Studies Controversy in
   Tucson*, https://www.jstor.org/stable/24546712 .................................................26

Tara Copp and Lolita C. Baldor, *Trump fires chairman of the Joint Chiefs of Staff
   and two other military officers*, Associated Press (Feb. 21, 2025),
   https://apnews.com/article/trump-brown-joint-chiefs-of-staff-firing-
   fa428cc1508a583b3bf5e7a5a58f6acf.....................................................................13

Caroline Mala Corbin, *The Government Speech Doctrine Ate My Class: First
   Amendment Capture and Curriculum Bans*, 76 Stan. L. Rev. 1473 (2024).........22

Daniel Dale, *Almost eight years later, Trump confirms he used the phrase 'shithole
   countries'*, CNN (Dec. 10, 2025),
   https://www.cnn.com/2025/12/10/politics/donald-trump-shithole-countries-
   phrase...................................................................................................................15

Thomas S. Dee & Emily K. Penner, *The Causal Effects of Cultural Relevance:
   Evidence from an Ethnic Studies Curriculum* Nat'l Bureau of Econ. Rsch. (Jan.
   2016), https://www.nber.org/papers/w21865 .....................................................26

DOW Rapid Response (@DOWResponse), X (Sep 30, 2025, at 8:59 AM ET),
   https://x.com/DOWResponse/status/1973009706181390434?s=20....................16

Educators for Excellence, *Voices from the Classroom : a Survey of America's
   Educators* 16, https://e4e.org/wp-content/uploads/2025/05/Voices-from-the-
   Classroom-2025-Report-Digital-FINAL.pdf .......................................................17

iv

Ellen Mitchell, *Hegseth's ousting of female leaders may have 'chilling effect' at Pentagon*, The Hill (July 26, 2025), https://thehill.com/policy/defense/5421346-pentagon-reassigns-women-leadership/ ..................................................................14

Executive Order on Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)......................................................... 3, 4, 5, 6, 7

Executive Order on Ending Radical Indoctrination in K-12 Schooling, Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025)............................................. *passim*

Executive Order on Restoring America's Fighting Force, Exec. Order No. 14185, 90 Fed. Reg. 8763 (Jan. 27, 2025)................................................................ *passim*

Andrew Feinberg, *Trump 'OK' with DC Statue Honoring Civil War Leader who Fought for Slavery: 'Lot of People in This Room' Agree*, Independent (Oct. 16, 2025), https://www.independent.co.uk/news/world/americas/us-politics/trumpballroom-dinner-roberte-lee-statue-b2846627.html ......................16

Pete Hegseth, *The War on Warriors: Behind the Betrayal of the Men Who Keep Us Free* (2024) (ebook)......................................................................................14

Tyrone Howard & Clarence L. Terry, *Culturally Responsive Pedagogy for African American Students: Promising Programs and Practices for Enhanced Academic Performance*, 22 Teaching Educ. 345 (2011).......................................................26

Mary E. Kite and Patricia Clark, *The benefits of diversity education: An inclusive curriculum offers important positive outcomes*, Am Psychological. (Sept. 8, 2022), https://www.apa.org/ed/precollege/psychology-teacher-network/introductory-psychology/benefits-of-diversity ......................................28

Gordon Lubold and Courtney Kube, *Hegseth has intervened in military promotions for more than a dozen senior officers*, NBC News (Apr. 2, 2026), https://www.nbcnews.com/politics/national-security/hegseth-intervened-military-promotions-dozen-senior-officers-rcna266062 ................................................14

Morris J. MacGregor, Jr., *Integration of the Armed Forces: 1940-1965* (1981), https://history.army.mil/portals/143/Images/Publications/catalog/50-1-1.pdf?utm_ ..............................................................................................9

Ryan Mancini, *Trump Administration to Display Statue of Slave Owner Removed in Delaware*, The Hill (Mar. 19, 2026), https://thehill.com/homenews/administration/5791797-trump-administrationcaesar-rodney-statue-america-250/ ...............................................16

J. David McSwane, *Dismissed by DEI: Trump's Purge Made Black Women With Stable Federal Jobs an "Easy Target"*, ProPublica (Jun. 4, 2025), https://www.propublica.org/article/trump-dei-black-women-minorities-careers-jobs-dismissed ..........................................................................................13

Nat'l Educ. Assoc. & Law Firm Antiracism All., The Very Foundation of Good Citizenship: The Legal and Pedagogical Case for Culturally Responsive and Racially Inclusive Public Education for All Students (2022), https://www.nea.org/sites/default/files/2022-09/lfaa-nea-white-paper.pdf..........26

Bianca Quilantan and David Cohen, *Trump tells Dem congresswomen: Go back where you came from*, Politico (Jul. 14, 2019), https://www.politico.com/story/2019/07/14/trump-congress-go-back-where-they-came-from-1415692 .......................................................................................15

John Rogers, et al., *Teaching and Learning in the Age of Trump: Increasing Stress and Hostility in America's High Schools*. UCLA Inst. for Democracy, Educ., and Access (Oct. 2017), https://www.fcis.org/uploaded/Data_Reports/Teaching_-_Learning_in_the_Age_of_Trump.pdf................................................................17

Philip Rucker and Robert Costa, *Trump: Rescind Obama's transgender directives, but 'protect everybody'*, Washington Post (May 16, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/05/16/trump-rescind-obamas-transgender-directives-but-protect-everybody/..........................16

Adam Serwer, *The Great Resegregation*, The Atlantic (Feb. 22, 2025), https://www.theatlantic.com/politics/archive/2025/02/trump-attacks-dei/681772/ ....................................................................................................................13

Yi-Huang Shih, *An Analysis on the Benefits of Incorporating Cultural Relevance In Curriculum Development*Yi-Huang Shih, https://www.researchgate.net/publication/383869696_An_Analysis_on_the_Benefits_of_Incorporating_Cultural_Relevance_in_Curriculum_Development.......25

Paige Shoemaker DeMio and Weade James, *Public Education Under Threat: 4 Trump Administration Actions To Watch in the 2025-26 School Year*, Ctr. for Am. Progress (Aug. 27, 2025), https://www.americanprogress.org/article/public-education-under-threat-4-trump-administration-actions-to-watch-in-the-2025-26-school-year/ ...................................................................... 15, 25

Veronia Stracqualursi and Sarah Westwood, *Trump thanked 'great people' shown in Twitter video in which a man chants 'white power'*, CNN (Jun. 29. 2020), https://www.cnn.com/2020/06/28/politics/trump-tweet-supporters-man-chants-white-power/index.html...................................................................15

Jennifer H. Svan, *DoDEA adds lessons to 'do not use' list sent to schools worldwide*, Stars and Stripes (Feb. 7, 2025), https://www.stripes.com/theaters/europe/2025-02-07/dodea-removes-book-pending-review-16753412.html ...................................................................8

Jon Valant et al., *Brown Center scholars reflect on education after 1 year of the Trump administration*, Brookings (Jan. 20, 2026), https://www.brookings.edu/articles/brown-center-scholars-reflect-on-education-after-1-year-of-the-trump-administration/ ...................................................... 14, 25

Angelo Villagomez and Sam Zeno, *The Trump Administration Is Erasing American History Told by Public Lands and Waters*, CAP (Oct. 23, 2025), https://www.americanprogress.org/article/the-trump-administration-is-erasingamerican-history-told-by-public-lands-and-waters/ .................................15

The White House, *Immediate Assessment of Aviation Safety* (Jan. 30, 2025) https://www.whitehouse.gov/presidential-actions/2025/01/immediate-assessment-of-aviation-safety/ .......................................................................13

**Documents Filed in this Case**

Pls.' Mot. for Prelim. Inj., Ex. 19, Dkt. 10-21 .......................................................10

ADF Amicus Br., Dkt. 28 ..........................................................................................21

## INTEREST OF AMICI CURIAE[1]

### Secure Families Initiative

Secure Families Initiative ("SFI") is a non-partisan, 501(c)(4) non-profit organization comprising military spouses and family members. SFI's mission is to mobilize diverse military partners, parents, kids, and veterans to vote and advocate for their communities, especially on issues of foreign policy and national security. SFI fights for foreign and domestic policies that prioritize peace and diplomacy and advance civil rights. To achieve SFI's policy goals, SFI builds the power of a diverse and representative base of military partners and family members to educate policy makers, motivate our community, and vote in every election.

### PFLAG, Inc.

PFLAG, Inc., founded in 1973, is the nation's largest organization dedicated to supporting, educating, and advocating for LGBTQ+ people and those who love them. PFLAG members include transgender and non-binary young people and their families across the country, and PFLAG is committed to supporting those families through PFLAG National's *PFLAG Connects: Communities* program, which provides a safe virtual meeting space—*PFLAG Connects: Military Community*—for military-affiliated parents and caregivers of LGBTQ+ children of any age, as well

---

[1] The parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money to fund its preparation or submission; and no person other than *amici curiae*, their members, or their counsel made monetary contributions to its preparation or submission.

as parents of LGBTQ+ service members and veterans. PFLAG National trained nearly 2,000 liaisons within the DoDEA system on issues relating to LGBTQ+ youth in January 2025. PFLAG National also has authored a publication called "At Ease: Support for Military Families with LGBTQ+ Children and Teens," to help military families and their LGBTQ+ loved ones navigate unique challenges they may face in the military.

## SUMMARY OF THE ARGUMENT

In *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, Chief Justice Warren, writing for a unanimous court, observed that "education is perhaps the most important function of state and local governments." 347 U.S. 483, 493 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955). Indeed, education "is the very foundation of good citizenship" and "is a principal instrument in awakening the child to cultural values, in preparing [them] for later professional training, and in helping [them] to adjust normally to [their] environment." *Id*.

In the decades following *Brown*, the Supreme Court has repeatedly expressed the importance of public education as a tool that prepares young people to meaningfully participate in our democratic system of government. *See generally*, *Plyler v. Doe*, 457 U.S. 202, 221 (1982) ("[E]ducation has a fundamental role in maintaining the fabric of our society."). A student's right to receive information and

ideas is foundational to their ability to gain the skills and information necessary to participate in our representative democracy because it "is a necessary predicate to [a student's] meaningful exercise of [their] own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion).

While the Court has long recognized that "public education in our Nation is committed to the control of state and local authorities," *Epperson v. Arkansas.*, 393 U.S. 97, 104 (1968), it has also repeatedly affirmed the availability of First Amendment protections to students in a public school setting. *See*, *e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("It can hardly be argued that … students … shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). Accordingly, "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate[, and school] officials cannot suppress expressions of feeling with which they do not wish to contend." *Pico*, 457 U.S. at 868 (cleaned up). Indeed, "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; *otherwise our civilization will stagnate and die*." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957) (emphasis added).

Defendants violated the "transcendent imperatives of the First Amendment," *Pico*, 457 U.S. at 864, when they implemented Executive Orders 14168, 14185, and

3

14190 to ban various viewpoints—inaccurately characterized as "divisive concepts," "discriminatory equity ideology," and "gender ideology"—within public schools operated by the Department of Defense Education Activity ("DoDEA").[2] In so doing, Defendants infringe on the First Amendment right of students to receive information. The injuries from this First Amendment deprivation are widespread and severe: Defendants have canceled Black History month and other cultural awareness months, removing related information from classrooms and hallways; censored material relating to immigration and its impact on the formation of the United States; and excised information about sexuality and gender from curriculum materials necessary for an Advanced Placement psychology course.

The District Court correctly held that Plaintiffs are likely to succeed on the merits of their First Amendment challenge to Defendants' censorship and curricular changes. This Court should affirm.[3]

---

[2] Executive Order on Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); Executive Order on Restoring America's Fighting Force, Exec. Order No. 14185, 90 Fed. Reg. 8763 (Jan. 27, 2025); Executive Order on Ending Radical Indoctrination in K-12 Schooling, Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025).

[3] Amici only discuss Defendants' unconstitutional curricular restrictions, not book removals, but also ask that this Court affirm the lower court's finding that Plaintiffs demonstrated a likelihood of success that Defendants' book removal actions are unconstitutional under the First Amendment.

## FACTUAL BACKGROUND

### I.    Issuance of Executive Orders 14190, 14168, and 14185.

On January 29, 2025, President Trump issued Executive Order 14190 ("EO 14190"), entitled "Ending Radical Indoctrination in K-12 Schooling."[4] EO 14190 purports to address what it characterizes as indoctrination of "anti-American, subversive, harmful, and false ideologies on our Nation's children"[5] by directing federal agencies to end "Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology."[6]

EO 14190 defines "discriminatory equity ideology" as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations"[7] and includes a list of several prohibited concepts that originated in President Trump's Executive Order 13950.[8] Examples of the prohibited concepts in EO 14190 include

---

[4] Exec. Order No. 14190, *supra* n.2.

[5] *Id*. at Sec. 1.

[6] Directing Federal agencies to "prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used by an ESA, SEA, LEA, elementary school, or secondary school to directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology." *Id*. at Sec. 3(a)(i).

[7] *Id*. at Sec. 2(b).

[8] During President Trump's first term, he issued Executive Order 13950, which a federal judge partially enjoined on constitutional grounds. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) (holding that

restricting "instruction, advancement, or promotion" of the concept that "the United States is fundamentally racist, sexist, or otherwise discriminatory"[9] and that "[v]irtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin."[10]

EO 14190 also incorporates, by reference, the definitions in Executive Order 14168 ("Anti-Transgender EO"), entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[11] The Anti-Transgender EO repudiates the very existence of transgender people, defining "gender ideology" as replacing "the biological category of sex with an ever-

---

Executive Order 13950 violated plaintiffs' First Amendment rights because it required them to censor training and speech that was unrelated to government funding, and that Executive Order 13950 was unconstitutionally vague because the plaintiffs had no way of knowing if teaching about unconscious bias, for example, would be a violation). Laws incorporating lists with similar "divisive concepts" language have been successfully challenged. *See generally, Honeyfund.com. v. DeSantis*, 622 F. Supp. 3d 1159, 1168–69, 1185 (N.D. Fla. 2022), *aff'd sub. nom. Honeyfund.com Inc. v. Governor*, State of Fla., 94 F.4th 1272 (11th Cir. 2024); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1231, 1291 (N.D. Fla. 2022), appeal docketed Nos. 13992 & 13994 (11th Cir. Nov. 30, 2022); *Loc. 8027 v. Edelblut*, 651 F. Supp. 3d 444, 457–58 (D.N.H. 2023), appeal docketed No. 24-1690 (1st Cir. July 26, 2024); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1143, 1157 (W.D. Okla. 2024), appeal docketed Nos. 24-6139, 24-6140, 24-6141 (10th Cir. July 16, 2024).

[9] Exec. Order No. 14190, *supra* n.2, at Sec. 2(b)(viii).

[10] *Id.* at Sec. 2(b)(vii).

[11] *Id.* at Sec. 2(a).

shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."[12]

A couple of days before President Trump's issuance of EO 14190, he issued Executive Order 14185 ("EO 14185"), entitled "Restoring America's Fighting Force."[13] EO 14185 purports to eliminate race- and sex-based discrimination in the Armed Forces by excising diversity, equity, and inclusion programs. EO 14185 incorporates, by reference, the term "divisive concepts" from Executive Order 13950 and "gender ideology" from the Anti-Transgender EO. EO 14185 also prohibits the Department of Defense ("DoD"), including any educational institution operated or controlled by the DoD, "from promoting, advancing, or otherwise inculcating the following un-American, divisive, discriminatory, radical, extremist, and irrational theories"—including "divisive concepts," "gender ideology," and "that America's founding documents are racist or sexist."[14]

## II.   Defendants' Implementation of the Executive Orders and the Resultant Harms to Students.

In response to EO 14190, EO 14185, and the Anti-Transgender EO, DoDEA issued a directive that listed materials banned from its classrooms, including

---

[12] Exec. Order No. 14168, *supra* n.2.
[13] Exec. Order No. 14185, *supra* n.2.
[14] *Id*. at Sec. 6(a).

"elementary school reading assignments on immigration to America, Black History Month social studies material and chapters on sexuality and gender for high schoolers."[15] Amicus Secure Families Initiative includes members who have children attending DoDEA schools and have experienced, first hand, how the abrupt implementation of EO 14190, EO 14185, and the Anti-Transgender EO create an educational environment steeped in hostility, fear, and erasure.  Figure A:



Figure A depicts a DoDEA school's bulletin board celebrating the contributions of Black people in honor of Black History Month, which was stripped bare within 48 hours of the school's efforts to implement the Executive Orders.

---

[15] Jennifer H. Svan, *DoDEA adds lessons to 'do not use' list sent to schools worldwide*, Stars and Stripes (Feb. 7, 2025), https://www.stripes.com/theaters/europe/2025-02-07/dodea-removes-book-pending-review-16753412.html.

Defendants' banning of cultural heritage celebrations, including Black History Month, resulted in "[k]ids being told 'we're not allowed to talk about that' when they mention Black history month." A member of Amicus SFI in Germany shared,

> Our children were recently involved in a Black History Month project, excited to research and celebrate the contributions of Black and brown individuals throughout history. They worked hard, collaborated with their peers, and took pride in sharing what they learned. Unfortunately, their efforts were silenced when they were told they could not post or share their project. This decision has left them feeling unheard, abandoned, and deeply disappointed.

The banning of Black History Month and concomitant erasure of the important contributions of Black historical figures are particularly painful when juxtaposed with the history of DoDEA schools as some of the first American public schools to racially integrate in the nation and abroad, including the desegregation of some military schools before the Supreme Court decided *Brown*.[16] Despite this storied history, DoDEA schools now send the message to students that there is something so shameful about the celebration of diversity and cultural heritage, including celebrations of Black history and culture, that it must be erased from all school activities and classrooms.

In addition, Defendants have removed library books from DoDEA schools to comply with EO 14190, EO 14185, and the Anti-Transgender EO, including a

---

[16] *See* Morris J. MacGregor, Jr., *Integration of the Armed Forces: 1940-1965*, 489-492 (1981), https://history.army.mil/portals/143/Images/Publications/catalog/50-1-1.pdf?utm_

9

biography of Supreme Court Justice Ruth Bader Ginsburg. Figure B is a social media post by U.S. Representative Jamie Raskin, after receiving a copy of implementation guidance provided to teachers at a DoDEA school.

Figure B:



Rep. Jamie Raskin ✓
February 7, 2025 · 🌐

Received this Memo from constituents abroad on a US military base who are parents in the DOD school system. They're outraged that censorship like this is happening against military families. One asked a school official why they removed photos on the walls of Susan B. Anthony and Dr. King but not Leonardo DaVinci and was told: "He was a real historical figure."

In other words, Defendants view Leonardo Da Vinci, a white, European man, as a "real historical figure"—but not women and Black people. As one member of Amicus SFI, based in Japan, commented, "There's a heaviness at least with my daughters. They're like, 'why are they just coming after girls and women?'"

Defendants' implementation of EO 14190, EO 14185, and the Anti-Transgender EO has also created an atmosphere of fear and repression for transgender students. EO 14190 forbids recognition of a transgender student's gender identity, including the name or pronouns used by the student, and bans the student from restroom use consistent with their gender identity.[17] In accordance with EO 14190, Defendants pulled a chapter on sexuality and gender from course materials for Advanced Placement psychology classes.[18]  As one parent shared with

---

[17] Exec. Order 14190, *supra* n.2, at Sec. 2(e), 3(b)(iii).
[18] Pls.' Mot. for Prelim. Inj., Ex. 19, Dkt. 10-21.

Amicus SFI, "I had a panic attack last night for the first time in my life. I am the mother of a transgender son and I am paralyzed with fear, watching his rights be slowly stripped away. I'm afraid we will see suicide rates soar among the trans community."

EO 14190, EO 14185, and the Anti-Transgender EO injure not only Black students, students of color, and LGBTQ students; but instead, all DoDEA students and their families, by depriving them of vital cultural experiences, certain race-specific information about historical events and cultural traditions, literature relevant to standardized exams, and exposure to ideas. One member of Amicus SFI explained:

> My 6th grade student in DoDEA school is really disappointed by the loss of the cultural heritage months. The dances that were performed in the assembly they held for Latin American heritage month were one of her favorite parts of what is her first year in this school. She is sad to know her friends from diverse backgrounds won't get to celebrate this at school anymore. She liked seeing her friends enjoying those events and feel proud of who they are. My daughter is white, and she is missing something wonderful in her education by no longer having access to these experiences. It's not true at all that these events aren't inclusive of or good for white students too.

Although EO 14190, EO 14185, and the Anti-Transgender EO are exceptionally sweeping, they cast a pall of orthodoxy with a chilling effect extending far beyond their requirements. One kindergartener in Germany "discovered their rainbow artwork ha[d] been removed from the classroom but receive[d] no explanation from the teacher." In the same school, "[a] poster with a child in a

11

wheelchair was removed from the classroom, and kindness bulletin boards were dismantled." In Japan, a school librarian informed an elementary school parent that "she ha[d] been directed to remove books on social justice as they contribute to 'radicalized education.'"

Military families have limited remedies to navigate Defendants' censorship and the erosion of their children's education within DoDEA schools. At a school advisory council meeting in Spain, "parents asked if they could do events on school grounds that would supplement these subjects now lacking in our children's education—the answer was no, and that if we live on-base, we cannot get together [in our own homes] to celebrate cultures as it is government property." Another member of Amicus SFI in Spain shared that some parents considered pulling their children from DoDEA schools, but the local schools are taught in Spanish, are prohibitively expensive, and would create another change for children who already deal with constant disruptions in their lives.

## III. The Executive Orders' Hostility to Racial Equity and Transgender Rights and Absence of Pedagogical Concerns.

EO 14190, EO 14185, and the Anti-Transgender EO cannot be divorced from the context in which they were created, issued, and implemented. Since re-taking office, President Donald Trump targeted for elimination principles of diversity, equity, and inclusion within the federal government. He "rescinded decades-old

orders ensuring equal opportunity in government contracts;"[19] purportedly purged diversity, equity, and inclusion from the federal government—firing hundreds of federal employees, the majority of whom are Black women;[20] and turned diversity, equity, and inclusion into a scapegoat—blaming a tragic mid-air collision on "'dangerous' 'diversity equity and inclusion' tactics, and specifically recruiting individuals with 'severe intellectual' disabilities in the" Federal Aviation Administration.[21]

As part of the Administration's campaign to "rid" the military of leaders who support diversity and equity, led in part by Secretary of Defense Pete Hegseth, President Trump fired General Charles Q. Brown, Jr., the second Black general to serve as Chairman of the Joint Chiefs of Staff—replacing him with a white Air Force general who failed to meet key prerequisites for the job.[22] Secretary Hegseth denounced "so-called 'leaders' like C.Q. Brown," making unsupported assertions

---

[19] Adam Serwer, *The Great Resegregation*, The Atlantic (Feb. 22, 2025), https://www.theatlantic.com/politics/archive/2025/02/trump-attacks-dei/681772/.

[20] J. David McSwane, *Dismissed by DEI: Trump's Purge Made Black Women With Stable Federal Jobs an "Easy Target"*, ProPublica (Jun. 4, 2025), https://www.propublica.org/article/trump-dei-black-women-minorities-careers-jobs-dismissed.

[21] The White House, *Immediate Assessment of Aviation Safety* (Jan. 30, 2025) https://www.whitehouse.gov/presidential-actions/2025/01/immediate-assessment-of-aviation-safety/.

[22] Tara Copp and Lolita C. Baldor, *Trump fires chairman of the Joint Chiefs of Staff and two other military officers*, Associated Press (Feb. 21, 2025), https://apnews.com/article/trump-brown-joint-chiefs-of-staff-firing-fa428cc1508a583b3bf5e7a5a58f6acf.

"that 17 percent of all Black officers in the Air Force are promoted simply because of how they look—and not because of how they lead."[23] The DoD canceled or delayed officer promotions for candidates who have expressed a commitment to diversity and equity or because they are perceived as hires to meet "diversity quotas,"[24] and banned transgender service members.[25]

The Trump Administration has also taken steps to weaken public education, including by taking "unprecedented effort[s] to repurpose federal anti-discrimination law to reverse longstanding efforts to promote equality in public life," including education;[26] attempting to dismantle the United States Department of Education by "slash[ing the Department's] staff, us[ing] interagency agreements … to shift

---

[23] Pete Hegseth, *The War on Warriors: Behind the Betrayal of the Men Who Keep Us Free* 181 (2024) (ebook).

[24] Ellen Mitchell, *Hegseth's ousting of female leaders may have 'chilling effect' at Pentagon*, The Hill (July 26, 2025), https://thehill.com/policy/defense/5421346-pentagon-reassigns-women-leadership/ ("At his nomination hearing, Hegseth said that he wasn't against women in combat jobs, but he seemed to suggest that standards for such roles have been lowered to meet diversity quotas — a claim that past Defense officials say there's no evidence of."); *see also* Gordon Lubold and Courtney Kube, *Hegseth has intervened in military promotions for more than a dozen senior officers*, NBC News (Apr. 2, 2026), https://www.nbcnews.com/politics/national-security/hegseth-intervened-military-promotions-dozen-senior-officers-rcna266062

[25] Executive Order on Prioritizing Military Excellence and Readiness, Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025).

[26] Jon Valant et al., *Brown Center scholars reflect on education after 1 year of the Trump administration*, Brookings (Jan. 20, 2026), https://www.brookings.edu/articles/brown-center-scholars-reflect-on-education-after-1-year-of-the-trump-administration/.

responsibilities to other agencies, and neglect[ing] to perform some basic functions like investigating complaints of illegal racial discrimination;[27] and "threatening districts in an attempt to control local instruction."[28] Additionally, the Administration's racially-biased, anti-transgender, and otherwise divisive rhetoric undergird the purpose of EO 14190, EO 14185, and the Anti-Transgender EO;[29]

---

[27] *Id.*

[28] Paige Shoemaker DeMio and Weade James, *Public Education Under Threat: 4 Trump Administration Actions To Watch in the 2025-26 School Year*, Ctr. for Am. Progress (Aug. 27, 2025), https://www.americanprogress.org/article/public-education-under-threat-4-trump-administration-actions-to-watch-in-the-2025-26-school-year/.

[29] For the last several years, President Trump has stoked the flames of division and hate on issues related to race and racism. He has referred to African nations as "shithole countries;" tweeted that four Members of Congress—Representatives Alexandria Ocasio-Cortez (D-N.Y.), Ilhan Omar (D-Minn.), Rashida Tlaib (D-Mich.), and Ayanna Pressley (D-Mass.)—should "go back" to the "totally broken and crime infested places from which they came;" and retweeted video footage of his supporters yelling, among other things, "white power." *See* Daniel Dale, *Almost eight years later, Trump confirms he used the phrase 'shithole countries'*, CNN (Dec. 10, 2025), https://www.cnn.com/2025/12/10/politics/donald-trump-shithole-countries-phrase; Bianca Quilantan and David Cohen, *Trump tells Dem congresswomen: Go back where you came from*, Politico (Jul. 14, 2019), https://www.politico.com/story/2019/07/14/trump-congress-go-back-where-they-came-from-1415692; Veronia Stracqualursi and Sarah Westwood, *Trump thanked 'great people' shown in Twitter video in which a man chants 'white power'*, CNN (Jun. 29. 2020), https://www.cnn.com/2020/06/28/politics/trump-tweet-supporters-man-chants-white-power/index.html. And over the last several years, including during Trump's second presidency, he has expressed disdain for accurate accounts of this Nation's history of racialized violence, including the role of slavery at its founding—while celebrating enslavers and secessionist proponents of slavery. *See* Angelo Villagomez and Sam Zeno, *The Trump Administration Is Erasing American History Told by Public Lands and Waters*, CAP (Oct. 23, 2025), https://www.americanprogress.org/article/the-trump-administration-is-erasingamerican-history-told-by-public-lands-and-waters/          ("Through          a

15

detrimentally impacting educational spaces. In a 2017 report examining whether the substance and tone of national political discourse during the first Trump administration affected public high school students in the United States, "many teachers reported that, in addition to political polarization, they witnessed heightened levels of hostility directed toward immigrants, racial and religious minorities,

---

multipronged strategy that includes pushing for changes in school curricula and censoring museum exhibits, the Trump administration is attempting to erase nonwhite history."); Ryan Mancini, *Trump Administration to Display Statue of Slave Owner Removed in Delaware*, The Hill (Mar. 19, 2026); Andrew Feinberg, *Trump 'OK' with DC Statue Honoring Civil War Leader who Fought for Slavery: 'Lot of People in This Room' Agree*, Independent (Oct. 16, 2025), https://www.independent.co.uk/news/world/americas/us-politics/trumpballroom-dinner-roberte-lee-statue-b2846627.html. President Trump and his Administration have also attacked LGBTQ people; and more specifically, transgender people. While campaigning in 2016, he vowed to rescind federal directives that protect transgender people in schools and healthcare. Philip Rucker and Robert Costa, *Trump: Rescind Obama's transgender directives, but 'protect everybody'*, Washington Post (May 16, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/05/16/trump-rescind-obamas-transgender-directives-but-protect-everybody/?postshare=4331463435010310. A year later, the White House distributed an email and published a tweet that recommended an article pathologizing transgender people. AJ Plus (@ajplus), X (Jul 26, 2017, at 7:12PM), https://x.com/ajplus/status/890349059310997504. Over the last decade, President Trump and his Administration have been equally plain-spoken in their anti-transgender bias, calling transgender women "dudes in dresses" and members of "freak squads" that turned the military into a "cartoonish circus." DOW Rapid Response (@DOWResponse), X (Sep 30, 2025, at 8:59 AM ET), https://x.com/DOWResponse/status/1973009706181390434?s=20; Hegseth, *supra* n.23, at 23. These are only a few examples of the "breadth and vigor" of the anti-transgender "animus" displayed by the Trump Administration. *Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-512 (JEB), 2026 WL 1257289, at *11 (D.D.C. May 7, 2026).

LGBTQ youth, and young women"[30] and the researchers found it "noteworthy that numerous teachers said that the level of animus they witnessed was 'unprecedented' in their careers."[31] And in a 2025 report discussing the results of a national survey of teachers, the authors shared that "[t]eachers are nearly unanimously reporting that they want their students to strengthen our democracy by simply engaging in it, from whatever perspective they see fit;" however, executive orders from the Trump Administration—including EO 14190—"stand directly in the way of teachers' aims to guide their students in engaging in political or historical discourse without imposing their own political beliefs on others."[32]

## ARGUMENT

### I. A Student's Right to Receive Information is Foundational to a Functioning Democracy.

A student's "right to receive ideas is a necessary predicate to the [student's] meaningful exercise of [their] own rights of speech, press, and political freedom." *Pico*, 457 U.S. at 867. Similarly, at issue here is the ability of DoDEA students to receive information and ideas that, in turn, enable them to fully develop their own

---

[30] John Rogers, et al., *Teaching and Learning in the Age of Trump: Increasing Stress and Hostility in America's High Schools*, UCLA Inst. for Democracy, Educ., and Access (Oct. 2017), https://www.fcis.org/uploaded/Data_Reports/Teaching_-_Learning_in_the_Age_of_Trump.pdf.

[31] *Id*.

[32] Educators for Excellence, *Voices from the Classroom : a Survey of America's Educators* 16, https://e4e.org/wp-content/uploads/2025/05/Voices-from-the-Classroom-2025-Report-Digital-FINAL.pdf.

rights of speech, press, and political freedom. Defendants' argument that school curricula decisions are "core government speech," beyond the purview of First Amendment protections, is inconsistent with the *Pico* plurality's reasoning that school officials may not interfere with students' right to receive information when motivated by partisan reasons, racial animus, or "dislike" for the ideas the information contains. *Pico*, 457 U.S. at 870-71 (in the context of removing books from school library).[33] Importantly, Defendants' articulation of government speech dangerously expands the doctrine beyond recognition, undermining the essential role of public education within a functioning democracy. *See Matal v. Tam*, 582 U.S. 218, 235 (2017) ("But while the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse.").

The freedom of speech and press secured by the First Amendment must include, as an inherent corollary, the right to receive ideas and information. *See generally, Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (noting that "[t]he

---

[33] The Fourth Circuit has never distanced itself from the *Pico* plurality's central reasoning, and in fact numerous courts in this circuit have relied on it to hold that censorship of materials in schools or libraries to suppress disfavored ideas or information can violate the right to receive information under the First Amendment. *See, e.g., O.R. v. Greenville Cnty., South Carolina*, No. 6:25-cv-02599-DCC, 2026 WL 815913, at *9 (D.S.C. Mar. 19, 2026) (holding that *Pico* provides guidance on the scope of the right to receive information, and that other district courts within this circuit also have relied repeatedly on *Pico* for guidance; citing *Cline v. Fox*, 319 F. Supp. 2d 685, 690–91 (N.D.W. Va. 2004); *Mainstream Loudoun v. Bd. of Trustees of the Loudoun Cnty. Library, et al.*, 2 F. Supp. 2d 783, 794–95 (E.D. Va. 1998)).

right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read … and freedom of inquiry, freedom of thought, and freedom to teach"). The ability to participate in the free exchange of views and receive unfettered information "preserve[s] an uninhibited marketplace of ideas in which truth will ultimately prevail." *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969); *see also Saxbe v. Washington Post Co.*, 417 U.S. 843, 862-863 (1974) (Powell, J., dissenting) ("[P]ublic debate must not only be unfettered; it must also be informed."); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("[N]ovel and unconventional ideas might disturb the complacent, but [the First Amendment authors] chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance."). For that reason, the First Amendment encompasses an individual's right to receive information and ideas as well as the right of free expression. *See Stanley v. Georgia*, 394 U.S. 557, 564, 565 (1969) (collecting authorities).

The vigilant protection of the right to receive information and ideas "is nowhere more vital than in the community of American schools." *Epperson*, 393 U.S. at 104. Public schools serve a unique role as a space to cultivate democratic ideals in our multi-racial democracy because they "convey[] to our young the information and tools required not merely to survive in, but to contribute to, civilized

19

society." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 278 (1988) (Brennan, J., dissenting).

Plaintiffs have a First Amendment right to receive curricular materials, and the government speech doctrine must not shield Defendants from constitutional liability. Defendants and Amicus Alliance Defending Freedom reliance on non-binding, out-of-circuit case law that is distinguishable and unpersuasive. In *Little v. Llano County*, a case that involved neither school curriculum nor school libraries, a plurality of the court reasoned that a public library's collection decisions are government speech. 138 F.4th 834, 835 (5th Cir. 2025) (*en banc*) (plurality opinion), *cert. denied sub nom. Little v. Llano Cnty., TX*, No. 25-284, 2025 WL 3507000 (S. Ct. Dec. 8, 2025). The Fifth Circuit's en banc court, however, declined to adopt that position, with only seven of the seventeen Fifth Circuit judges joining that portion of the decision. *Id.* at 835. Further, *Llano* is distinguishable because a county library does not implicate the unique First Amendment concerns at play in a public school setting. *See Pico*, 457 U.S. at 868–69 (observing that a school library is "the principal locus" of students' "free[dom] to inquire, to study[,] and to evaluate"). And in *Walls v. Sanders*, plaintiffs *conceded* that "the classroom materials and instruction they seek to receive constitute government speech," which the Eighth Circuit panel deemed "fatal" to their right to receive claim. 144 F.4th 995, 1000 (8th Cir. 2025). That is not the case here.

20

Additionally, Amicus Alliance Defending Freedom's standing argument, ADF Amicus Br., Dkt. 28 at 21, asks this Court to predicate students' ability to vindicate their First Amendment right to receive information "upon the First Amendment rights of the senders. To succeed, the [students] would then have to establish their standing to vindicate the senders' constitutional rights … as well as First Amendment protection [for the speech]." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307–08 (1965) (Brennan, J., concurring) (recognizing addressees' First Amendment right to receive publications through mail). This argument, however, fundamentally misconstrues the First Amendment right to receive claim because it focuses exclusively on the speaker and fully ignores the separate and distinct First Amendment rights of students to receive information, which the Supreme Court recognized as "constitutional limits upon the power of the State to control even the curriculum and classroom." *Pico*, 457 U.S. at 861 (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923) (declaring unconstitutional Nebraska's ban on teaching school age-children foreign languages in schools)); *Epperson*, 393 U.S. at 97 (invalidating Arkansas' ban on teaching human evolution in public schools).

Defendants' implementation of EO 14190, EO 14185, and the Anti-Transgender EO does not simply limit curricular speech but, instead, constitutes curricular decisions that severely censor and restrict a full spectrum of information and ideas on specific topics that would otherwise be available to DoDEA students,

but for Defendants' imposition of their preferred, political viewpoints. Thus, EO 14190, EO 14185, and the Anti-Transgender EO directly threaten what the First Amendment right to receive aims to protect: "a comprehensive and dynamic marketplace of ideas, especially of opinions and information necessary to become an informed citizen"[34] in our multiracial democracy.

## II. The District Court Correctly Held that Plaintiffs Have a Substantial Likelihood of Succeeding on the Merits of their First Amendment Challenge.

Writing for a plurality in *Pico*, Justice Brennan opined that the First Amendment right to receive information bars school boards from removing certain materials from school libraries because they disagree with the materials' ideas or want to impose a particular "political orthodoxy" upon students. 457 U.S. at 875. The plurality cautioned that school officials cannot exercise their discretion in a manner that is "narrowly partisan or political," "motivated by racial animus," or at risk of "carry[ing] the danger of an official suppression of ideas." *Id*. at 871. In his concurrence, Justice Blackmun expressed "that state-operated schools may not be enclaves of totalitarianism." *Id*. at 876–77 (Blackmun, J., concurring) (cleaned up). More importantly, Justice Blackmun elucidated that "the State may not suppress

---

[34] Caroline Mala Corbin, *The Government Speech Doctrine Ate My Class: First Amendment Capture and Curriculum Bans*, 76 Stan. L. Rev. 1473, 1501 (2024).

exposure to ideas—for the sole purpose of suppressing exposure to those ideas—absent sufficiently compelling reasons." *Id*. at 876 (Blackmun, J., concurring).

In *Hazelwood School District v. Kuhlmeier*, the Supreme Court further articulated the bounds of school officials' exercise of control in the context of a local school district's decision-making with respect to student-speech that the Court characterized as part of the school curriculum. 484 U.S. at 270–71 (1988). The Supreme Court held that public officials "do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities *so long as their actions are reasonably related to legitimate pedagogical concerns*." *Id*. at 273 (emphasis added). Read together, *Pico* and *Hazelwood* provide clear and practical parameters for courts to assess whether the actions of state and local officials are violative of the First Amendment in the public school setting.

Devoid of any legitimate pedagogical justifications, EO 14190, EO 14185, and the Anti-Transgender EO excise information and ideas from curriculum regarding race, racism, gender, and sexual orientation—simply because they are disfavored by the Trump Administration. EO 14190, EO 14185, and the Anti-Transgender EO "carry the danger of an official suppression of ideas," *Pico*, 457 U.S. at 871, because they bowdlerize information about race, gender, and sexuality—particularly, information about Black people, people of color, and

23

LGBTQ people. Neither Defendants nor the text of the Executive Orders attempt to provide a legitimate pedagogical reason to justify these restrictions, failing to meet even the First Amendment parameters articulated by the *Hazelwood* Court. *Hazelwood*, 484 U.S. at 273. Further, even the deference due to local officials regarding curricular decisions ends when decisions are based on "narrow[] partisan or political" considerations, "motivated by racial animus," "an official suppression of ideas," or a desire to impose upon students a political orthodoxy. *Pico*, 457 U.S. at 871, 875.

Simply put, Defendants seek to suppress ideas and information because they are disfavored by officials in the Trump Administration. This censorship restricts students' ability to receive information within the marketplace of ideas that, in turn, helps them formulate and express their own ideas and meaningfully engage in discussions about the role that race and gender play in this country. To permit such censorship would defeat the very purpose of education because "[c]ompulsory unification of opinion achieves only the unanimity of the graveyard." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).

Contrary to the inaccurate characterizations in EO 14190, EO 14185, and the Anti-Transgender EO, diversity, equity, and inclusion programs and initiatives are meant to expand opportunity, understanding, and belonging in classrooms for the

24

benefit of all students, and especially those who have historically faced unfair barriers and disadvantages:

> [Diversity, equity, inclusion, and accessibility programs] benefit all students, not just some, by ensuring that people of all identities, abilities, and perspectives are welcomed. DEIA practices remove accessibility barriers for students with disabilities; open doors for girls to participate in science, technology, engineering and math (STEM) programs; ensure students of different religions and ethnicities are educated without harassment or discrimination; and offer a moral compass to help districts intentionally identify and address inequities in their school system, such as the consistent lack of Advanced Placement (AP) courses available in low-income and rural schools.[35]

Indeed, "[s]tudents who feel included and respected at schools are more likely to be engaged with their learning—a relationship observed across racial and gender categories."[36]

Inclusive curricula promotes self-esteem, engagement, motivation in learning, and critical thinking and perspective taking, and create a meaningful connection between students' experiences and their education.[37] As research demonstrates,

---

[35] Paige Shoemaker DeMio and Weade James, *Public Education Under Threat: 4 Trump Administration Actions To Watch in the 2025-26 School Year*, Ctr. for Am. Progress (Aug. 27, 2025), https://www.americanprogress.org/article/public-education-under-threat-4-trump-administration-actions-to-watch-in-the-2025-26-school-year/.

[36] Valant, *supra* n.26.

[37] Yi-Huang Shih, *An Analysis on the Benefits of Incorporating Cultural Relevance In Curriculum Development*, 7 Int'l J. Latest Rsch. Humanities and Soc. Sci. 4 (2024),
https://www.researchgate.net/publication/383869696_An_Analysis_on_the_Benefits_of_Incorporating_Cultural_Relevance_in_Curriculum_Development.

racially inclusive curriculum improves academic outcomes for students of all races and especially students—including Black students—who did not previously see themselves represented in their schools' curriculum.[38] Students who receive a racially inclusive curricula have greater classroom engagement and higher graduation rates.[39] And curricular instruction on race, as well as student awareness of racism, reduce the likelihood that students will engage in racial harassment and that students of color will experience school-based discrimination.[40] As Martin Luther King Jr. acknowledged, the "educational realm" has a "critically important

---

[38] *See, e.g.*, Thomas S. Dee & Emily K. Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum* Nat'l Bureau of Econ. Rsch. (Jan. 2016), https://www.nber.org/papers/w21865 (finding students enrolled in multiple culturally-responsive ethnic studies courses showed improved test scores in math, reading, and writing and are more likely to attend class and attain credits, and Black students, Latinx students, and male students especially are less likely to drop out of high school and are more likely to graduate and attend college); *see also* Tabbye M. Chavous et al., *Racial Identity and Academic Attainment Among African American Adolescents*, 74 Child Dev. 1076 (2003), https://pubmed.ncbi.nlm.nih.gov/12938705/; Nolan L. Cabrera et al., *Missing the (Student Achievement) Forest for All the (Political) Trees: Empiricism and the Mexican American Studies Controversy in Tucson*, 51 Am. Educ. Rsch. J. 1084, 1102 (2014), https://www.jstor.org/stable/24546712; Tyrone Howard & Clarence L. Terry, *Culturally Responsive Pedagogy for African American Students: Promising Programs and Practices for Enhanced Academic Performance*, 22 Teaching Educ. 345 (2011).

[39] Nat'l Educ. Assoc. & Law Firm Antiracism All., The Very Foundation of Good Citizenship: The Legal and Pedagogical Case for Culturally Responsive and Racially Inclusive Public Education for All Students 12–14 (2022), https://www.nea.org/sites/default/files/2022-09/lfaa-nea-white-paper.pdf.

[40] Christy M. Byrd, *Does Culturally Relevant Teaching Work? An Examination from Student Perspectives* 6 SAGE Open 1, 7 (July-Sept. 2016), https://journals.sagepub.com/doi/pdf/10.1177/2158244016660744.

job ... : destroying the myths and half-truths that have constantly been disseminated about Negroes all over the country and which lead to many of these racist attitudes"—in other words, "getting rid once and for all of the notion of white supremacy."[41] Additionally, curriculum inclusive of LGBTQ perspectives and experiences likewise yields positive benefits for students. In a 2022 study on social support in schools and related outcomes for LGBTQ youth, researchers found that "LGBTQ-inclusive curriculum led to decreased victimization and negative socioemotional outcomes and increased sense of safety" and "can result in improvements in [students'] learning, wellbeing, identity exploration, and foster a supportive school and classroom climate."[42]

Defendants' efforts to censor and erase this crucial component of a student's education effectively prevents the formative role that education can play in bridging differences, promoting equality, and dismantling the racial hierarchies of white supremacy—to the detriment of all students, but most acutely Black students, students of color, and LGBTQ students. "In contrast to the view that addressing topics such as privilege and systemic inequity is harmful, research shows that

---

[41] Johanna Alonso, *A Historical View of Trump's Anti-DEI Crusade*, Inside Higher Ed (Mar. 25, 2025), https://www.insidehighered.com/news/diversity/race-ethnicity/2025/03/25/historian-discusses-dei-bans-through-historical-lens (internal quotation marks omitted).

[42] Leung, Enoch et al. *Social support in schools and related outcomes for LGBTQ youth: a scoping review*. 1 Discover Educ. 1 (2022), https://pubmed.ncbi.nlm.nih.gov/36407890/.

experience with these issues lead to positive changes in students' attitudes and values," and "[a]n inclusive classroom also provides global academic benefits, such as improved critical thinking and higher overall achievement levels for both majority and minority group [43]

The District Court correctly found that Defendants curricular censorship lacks pedagogical interest, emphasizing that it could not "contemplate the pedagogical basis for banning the 'Gender and Sex' module from Advanced Placement Psychology; lessons on immigration in elementary school; chapters on 'Human Reproductive System, Menstrual Cycle, and Fetal Development,' 'Abuse and Neglect,' and 'Adolescence and Puberty' from health education textbooks; and celebrations related to 'identity months,' including Black History and Women's History Months." *E.K. v. Dep't of Def. Educ. Activity*, 807 F. Supp. 3d 517, 546 (E.D. Va. 2025). The District Court's ruling was correct because there is simply no pedagogical basis for Defendants' censorship.

* * *

---

[43] Mary E. Kite and Patricia Clark, *The benefits of diversity education: An inclusive curriculum offers important positive outcomes*, Am. Psych. Assoc. (Sept. 8, 2022), https://www.apa.org/ed/precollege/psychology-teacher-network/introductory-psychology/benefits-of-diversity.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in submissions from Plaintiffs, this Court should affirm the District Court's ruling below.

Dated this 3rd day of June 2026.        Respectfully submitted,

/s/ Avatara A. Smith-Carrington

Nephetari Smith                    Avatara A. Smith-Carrington
LAMBDA LEGAL DEFENSE AND           Charles McLaurin
EDUCATION FUND, INC.               NAACP LEGAL DEFENSE &
120 Wall St., 19th Floor           EDUCATIONAL FUND, INC.
New York, NY 10005                 700 14th Street NW, Ste. 600
(212) 809-8585                     Washington, DC 20005
                                   (202) 682-1300

Tara L. Borelli
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Suite 105
Decatur, GA 30030
(470) 225-5341

*Counsel for Amici Curiae*

29

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing filing complies with the relevant typeface requirements of the Federal Rules of Appellate Procedure and the Court's Local Rules.

This petition also complies with the type-volume requirements set forth in Fed. R. App. P. 28.1(e) and Fed. R. App. P. 29(a)(5), because, excluding the exempted portions of the petition, as provided in Fed. R. App. P. 32(f), the petition contains 6,640 words.

This petition complies with the typeface and type style requirements because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: June 3, 2026

/s/ Avatara A. Smith-Carrington
Avatara A. Smith Carrington
Attorney for *Amici Curiae*