**Nos. 25-2497(L), 26-1002**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

E.K., *by and through parent and next friend Lindsey Keeley*, *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*

*v.*

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*,
*Defendants-Appellants/Cross-Appellees.*

On Appeal from the U.S. District Court for the Eastern District of Virginia,
No. 1:25-cv-637-PTG-IDD (Hon. Patricia Tolliver Giles)

## BRIEF OF AMICUS CURIAE PEN AMERICAN CENTER
## IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

Mara Gassmann
*Counsel of Record*
PEN AMERICAN CENTER, INC.
1100 13th Street NW, Ste. 800
Washington, D.C. 20005
(202) 669-7487
mgassmann@pen.org

Diane Elizabeth Brinkley
PEN AMERICAN CENTER, INC.
120 Broadway, 26th Floor N.
New York, NY 10271
(646) 779-4823
ebrinkley@pen.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus Curiae* PEN American Center, Inc. certifies that it is a tax-exempt 501(c)(3) nonprofit organization. It has no parent corporation and issues no stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF IDENTITY, INTEREST, AND SOURCE OF
AUTHORITY TO FILE ...................................................................................1

FED. R. APP. P. 29(a)(4)(E) STATEMENT...........................................................2

SUMMARY OF ARGUMENT .........................................................................3

ARGUMENT ...................................................................................................5

    I.    The freedom to read and learn is central to
        democracy, and the First Amendment protects
        against government imposition of ideological orthodoxy. ..................5

    II.    DoDEA's curricular restrictions and book
        quarantines constitute viewpoint-based
        discrimination that cannot survive constitutional
        scrutiny. . ..............................................................................................8

        A.    The actions are part of a troubling push for educational
            censorship targeting disfavored viewpoints................................8

        B.    The First Amendment does not permit
            DoDEA to impose the ideological orthodoxy
            it attempts here. .......................................................................15

CONCLUSION...............................................................................................22

CERTIFICATION OF COMPLIANCE .............................................................23

CERTIFICATE OF SERVICE .......................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Arce v. Douglas*,
        793 F.3d 968 (9th Cir. 2015) ..................................................... 18, 20

*Ambach v. Norwick*,
        441 U.S. 68 (1979) ........................................................................ 6, 7

*Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*,
        457 U.S. 853 (1982) ..................................................... 7, 16, 17, 19, 20

*Bartels v. Iowa*,
        262 U.S. 404 (1923).......................................................................... 22

*Brown v. Bd. of Educ. of Topeka*,
        347 U.S. 483 (1954).......................................................................... 5, 6

*Brown v. La.*,
        383 U.S. 131 (1966) .......................................................................... 20

*Citizens United v. Fed. Election Comm'n*,
        558 U.S. 310 (2010) ...................................................................... 17, 20

*Epperson v. Arkansas*,
        393 U.S. 97 (1968) ........................................................................ 18, 22

*First Nat'l Bank of Boston v. Bellotti*,
        435 U.S. 765 (1978) .......................................................................... 16

*Hazelwood Sch. District v. Kuhlmeier*,
        484 U.S. 260 (1988) .......................................................................... 16

*Kennedy v. Bremerton Sch. Dist.*,
        597 U.S. 507 (2022) ............................................................................ 6

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
        385 U.S. 589 (1967) ...................................................................... 19, 21

*Kleindienst v. Mandel*,
        408 U.S. 753 (1972) .......................................................................... 17

*Kreimer v. Bureau of Police*,
        958 F.2d 1242 (3d Cir. 1992) ............................................................ 18

*Mahanoy Sch. Dist. v. B.L. ex. rel. Levy*,
        594 U.S. 180 (2021) .......................................................................... 20

*Meyer v. Nebraska*,
        262 U.S. 390 (1923) ...................................................................... 21, 22

iii

*Minarcini v. Strongsville City Sch. Dist.*,
    541 F.2d 577 (6th Cir. 1976) ...................................................... 18, 20
*Monteiro v. Tempe Union High Sch. Dist.*,
    158 F.3d 1022 (9th Cir. 1998) ........................................................ 18
*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*,
    670 F.2d 771 (8th Cir. 1982) .......................................................... 18
*Right to Read Defense Comm. v. Sch. Comm.*,
    454 F. Supp. 703 (Mass.1978) ........................................................ 20
*Shelton v. Tucker*,
    364 U.S. 479 (1960) ........................................................................ 6
*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022)....................................................................... 15
*Stanley v. Georgia*,
    394 U.S. 557 (1969)....................................................................... 16
*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)....................................................................... 19
*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)............................................................. 5, 6, 7, 16
*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)................................................................. 16, 17
*Wieman v. Updegraff*,
    344 U.S. 183 (1952)..................................................................... 7, 21
*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)............................................................. 5, 6, 7, 17

**Regulatory Materials**
Exec. Order No. 13950,
    85 Fed. Reg. 60683 (Sept. 22, 2020) ................................ 9, 10, 11, 15
Exec. Order No. 14190,
    90 Fed. Reg. 8853 (Jan. 29, 2025) ............................................... 4, 15
Exec. Order No. 14185,
    90 Fed. Reg. 8615 (Feb. 3, 2025) ..................................................... 4
Exec. Order No. 14168,
    90 Fed. Reg. 8763 (Feb. 3, 2025) ..................................................... 4

**Other Authorities**

Sabrina Baêta, *Spineless Shelves: Two Years of Book Banning*,
    PEN America (Dec. 14, 2023),
    https://pen.org/report/spineless-shelves. ....................................12-13

Sabrina Baêta, et. al., *The Normalization of Book Banning: Banned
    in the USA, 2024-2025*, PEN America (Oct. 1, 2025),
    https://pen.org/report/the-normalization-of-book-banning ............. 8, 9

Rudine Sims Bishop, *Mirrors, Windows, and Sliding Glass Doors*,
    *Perspectives: Choosing and Using Books for the Classroom*
    vol. 6, no. 3, ix–xi (Summer 1990). ....................................... 8

Jonathan Friedman & Nadine Farid Johnson, *Banned in the USA:
    Rising Book Bans Threaten Free Expression and Students'
    First Amendment* Rights, PEN America (April 11, 2022),
    https://pen.org/report/banned-in-the-usa-rising-bans-
    threaten-1a/ ........................................................... 12

Jonathan Friedman & James Tager, *Educational Gag Orders*, PEN
    America (Nov. 8, 2021), https://pen.org/report/educational-
    gag-orders/ ........................................................... 10, 11

Trip Gabriel, *He Fuels the Right's Cultural Fires (and Spreads
    Them to Florida)*, The New York Times (Apr. 24, 2022),
    https://www.nytimes.com/2022/04/24/us/politics/christopher
    -rufo-crt-lgbtq-florida.html ........................................ 12

Sam LaFrance & Jonathan Friedman,  *Educational Intimidation:
    How "Parents' Rights" Legislation Undermines the
    Freedom to Learn*, PEN America (Aug. 23, 2023),
    https://pen.org/report/educational-intimidation/ .......................... 11, 12

Tasslyn Magnusson, et. al., *Facts & Fiction: Stories Stripped
    Away by Book Bans*, PEN America (May 7, 2026),
    https://pen.org/report/facts-fiction/ ......................................... 7, 13, 14

Madison Markham & Laura Benitez, *The Bills Igniting Book Bans:
    Evolving State Legislative Efforts to Censor Public School
    Libraries*, PEN America (Dec. 18, 2025),
    https://pen.org/report/the-bills-igniting-book-bans ........................... 12

Madison Markham & Tasslyn Magnusson, *Cover to Cover: An Analysis of Titles Banned in the 23-24 School Year*, PEN America (Feb. 27, 2025), https://pen.org/report/cover-to-cover .................................................................. 7

PEN America, *Index of Educational Gag Orders* (Accessed Jun. 2, 2026), https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tblZ40w5HLBuTK9vs/viw5lFPxKHGkamF0k ...................... 9, 11

Jeffrey Adam Sachs, et. al., *Expanding the Web of Control: America's Censored Classrooms 2025*, PEN America (Jan. 15, 2026), https://pen.org/report/americas-censored-campuses-25-web-of-control/ ................................................................. 4, 14

Jeffrey Adam Sachs & Jeremy C. Young, *America's Censored Classrooms 2024*, PEN America (Oct. 8, 2024) https://pen.org/report/americas-censored-classrooms-2024/ ............. 14

James Tager, *Project 2025 and Its Threat to Free Expression*, PEN America (Sept. 12, 2024), https://pen.org/report/project-2025/ ................................................................. 14

Benjamin Wallace-Wells, *How a Conservative Activist Invented the Conflict Over Critical Race Theory*, The New Yorker (Jun. 18, 2021), https://www.newyorker.com/news/annals-of-inquiry/how-a-conservative-activist-invented-the-conflict-over-critical-race-theory ........................................ 10

## STATEMENT OF IDENTITY, INTEREST, AND SOURCE OF AUTHORITY TO FILE

PEN American Center, Inc. ("PEN America" or "*Amicus*") is a nonpartisan, nonprofit membership organization working at the intersection of literature and human rights. Founded in 1922, and the largest of the more than 100 centers worldwide that make up the PEN International network, PEN America advocates for free expression and the interests of writers and readers in the United States and abroad. Through advocacy on issues ranging from campus free speech to book removals affecting public libraries, and from online abuse to educational censorship, it works to protect not only the freedom to create literature, but also the freedoms to convey information and ideas and to access the views, ideas, and literature of others. As part of its work, PEN America collects data and publishes reports on book bans and curricular restrictions in American public schools.  It has filed *amicus curiae* briefs in federal and state courts across the country in cases involving the right to read and learn. *See, e.g.* Br. of Amicus Curiae PEN Am. in Support of Petition for Writ of Certiorari*, Little v. Llano Cty.*, No. 25-284 (U.S. October 15, 2025); Br. of Amicus Curiae PEN Am., *Mahmoud v. Taylor*, No. 24-297 (U.S. April 9, 2025); Br. of Amicus Curiae PEN Am., *Penguin Random House, LLC. v. Gibson*, No-25-13181 (11th Cir. Feb. 17, 2026).

PEN America and its members around the country have an interest in the application of First Amendment principles to the government's activity here.  PEN

1

America submits this brief to place the book quarantines and curricular restrictions at these public, federally run schools within the broader context of classroom censorship nationwide and, as such, provide further support for the District Court's well-reasoned finding that the educational censorship here is unconstitutional.

Appellants/Cross-Appellees and Appellees/Cross-Appellants consent to the filing of this brief, and it is thus filed pursuant to Federal Rule of Appellate Procedure 29(a)(2).

### FED. R. APP. P. 29(a)(4)(E) STATEMENT

*Amicus* certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief; and no person—other than *Amicus*, its members, or its counsel—contributed money that was intended to fund the preparation or submission of the brief.

**SUMMARY OF ARGUMENT**

The Department of Defense Education Activity ("DoDEA") does not dispute that it changed school curricula and quarantined over 500 books in response to the three executive orders issued by the Administration. Nor does it dispute that it engaged in viewpoint discrimination in doing so. Instead, it argues that the Constitution permits it to impose viewpoint-based control in this manner. But as the District Court correctly held, this is incorrect as a matter of law, and to permit DoDEA's ideologically-motivated effort at control here would have far-ranging consequences for education—irrespective of whether one agrees or disagrees with the ideology of those who currently control the levers of federal power.

DoDEA's actions directly interfere with the right to learn, read, and receive information. These First Amendment rights are vital to ensuring classrooms educate and prepare students to develop critical thinking skills and participate in democratic society. Courts have long affirmed the importance of these principles in public education and resisted partisan, viewpoint-based restrictions on teaching and learning in American public schools. The civilian children of military families are no less entitled to the education and preparation that their peers in public schools in states around the country receive.

As *Amicus* has documented in published reports, a small but mobilized minority has engineered efforts to suppress disfavored viewpoints in schools across

the country, wielding government power to exert ideological control over educational institutions by imposing government dictates on teaching and learning. Jeffrey Adam Sachs, et. al., *Expanding the Web of Control: America's Censored Classrooms 2025*, PEN America (Jan. 15, 2026), https://pen.org/report/americas-censored-campuses-25-web-of-control/. The executive orders ("EOs") issued by this Administration that led to the curricular restrictions and book removals in this case are a part of this wave of educational censorship.

The EOs in this case bar the Department of Defense and its educational institutions from teaching what it terms "divisive concepts" about race, sex, and gender. Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025); Exec. Order 14185, 90 Fed. Reg. 8763 (Feb. 3, 2025); and Exec. Order 14190, 90 Fed. Reg. 8853 (Feb. 3, 2025). The aims of these EOs are squarely in line with, and arise out of, those of the movement to censor disfavored ideas in education at the state level. DoDEA does not in its papers deny that it seeks to impose its ideological view on its schools and control the viewpoints introduced through library books and curricula.

The effort to suppress disfavored viewpoints in education seeks to foreclose the exploration, discussion and debate central to the education process, instead politicizing genuine disagreement and distorting reasonable discussions of what should be taught. That is antithetical to the core American values enshrined in the

First Amendment and critical to the education of the next generation of Americans.

For these reasons, the District Court's preliminary injunction should be affirmed.

## ARGUMENT

I.    **The freedom to read and learn is central to democracy, and the First Amendment protects against government imposition of ideological orthodoxy.**

The freedom to read and learn, and the right to access information, ideas, and knowledge, are fundamental building blocks of a democratic society. Education is "the very foundation of good citizenship…[i]t is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954). Students must be "free to inquire, to study and to evaluate," and schools play a special role in allowing for such personal and civic development. *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). To ensure the government cannot "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes," there must be "scrupulous protection of Constitutional freedoms of the individual" in schools. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943); *see also Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (J. Frankfurter, concurring) ("Public opinion is the ultimate reliance of our society only if it be disciplined and responsible. It can be disciplined and responsible only if habits of open-mindedness and of critical

5

inquiry are acquired in the formative years of our citizens."); *Bd. Of Educ., Island Trees Sch. Dist. v. Pico*, 457 U.S. 853, 864 (1982) ("[P]ublic schools are vitally important 'in the preparation of individuals for participation as citizens."); *Ambach v. Norwick*, 441 U.S. 68, 76-77 (1979) (schools "inculcat[e] fundamental values necessary to the maintenance of a democratic political system").

The First Amendment freedoms to read, speak, listen, and discuss—and the opportunity to read, analyze, consider, critique, and grow in schools—provides the foundation for people's lives. School libraries serve the educational process by making knowledge and ideas available and ensuring a range of books remain available. *See, e.g.,* Madison Markham & Tasslyn Magnusson, *Cover to Cover: An Analysis of Titles Banned in the 23-24 School Year*, PEN America (Feb. 27, 2025), https://pen.org/report/cover-to-cover/; Tasslyn Magnusson, et. al., *Facts & Fiction: Stories Stripped Away by Book Bans*, PEN America (May 7, 2026), https://pen.org/report/facts-fiction/. Similarly, curricula are developed to prepare students to encounter new ideas and different perspectives, think critically, and engage in discussion and debate—skills that will serve them throughout their lives. Rudine Sims Bishop, *Mirrors, Windows, and Sliding Glass Doors*, *Perspectives: Choosing and Using Books for the Classroom* vol. 6, no. 3, ix–xi (Summer 1990).

Consistent with these aims, courts have taken care to shield education from partisan or ideological control. As Justice Jackson wrote for the Court in *West Virginia Board of Education v. Barnette*, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion…." 319 U.S. at 642. He cautioned against misguided efforts "to impose [] ideological discipline" and "coerce uniformity of sentiment," in public education, urging instead that government be "faithful to the ideal" of "political neutrality." *Id.* at 637, 41. And while First Amendment rights must be "applied in light of the special characteristics of the school environment," it has long "been the unmistakable holding of [the Supreme] Court" that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *accord Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527-28 (2022). Indeed, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v.* Tucker, 364 U.S. 479, 487 (1960).

Censorship rooted in ideological control that inhibits students' ability to explore and understand the world around them and to see themselves and others reflected undermines the very values underpinning our government and the qualities necessary for its continuation. The right to read and learn is paramount,

7

and courts should remain vigilant in safeguarding these rights—regardless of the prevailing orthodoxy of whichever political party holds power at the moment.

**II.   DoDEA's curricular restrictions and book quarantines constitute viewpoint-based discrimination that cannot survive constitutional scrutiny.**

### A. The actions are part of a troubling push for educational censorship targeting disfavored viewpoints.

The efforts over the past year and a half of the executive branch to exert control over public education mirror the rhetoric and tactics that have been playing out at the state level over the past five years. Since 2021, *Amicus* has tracked nearly 23,000 book bans and over 400 legislative efforts to restrict teaching about certain disfavored topics and narratives in K-12 education. Sabrina Baêta, et. al., *The Normalization of Book Banning: Banned in the USA, 2024-2025*, PEN America (Oct. 1, 2025), https://pen.org/report/the-normalization-of-book-banning; PEN America, *Index of Educational Gag Orders* (accessed June 2, 2026), https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tblZ40w5HLBuT K9vs/viw5lFPxKHGkamF0k. These restrictions have overwhelmingly targeted instruction on race, gender, and sexuality. These book bans and curricular restrictions are distinct but related phenomena stemming from the same effort to curtail disfavored viewpoints; DoDEA's interpretation of the executive orders as requiring both curricular changes and book removals speaks to this relationship.

This wave of educational censorship can be traced back to a common origin point. In 2020, Trump issued an executive order banning the use of certain "divisive concepts" in trainings in federal agencies. Exec. Order No. 13950, *Combatting Race and Sex Stereotyping*, 85 Fed. Reg. 60683 (Sept. 22, 2020) ("2020 EO"). The 2020 EO purported merely to encourage actions that would combat stereotyping on the basis of race or sex. But it also sought to prohibit workplace trainings that address the ways racism has impacted the history of the United States, claiming those discussions "perpetuat[ed] racial stereotypes" that were "contrary to the fundamental premises underpinning our Republic." *Id.* § 1.

This executive order was a response to a period of racial upheaval in the country and amidst response to efforts to advance racial understanding in 2020. In September 2020, activist Christopher Rufo appeared on Fox News, arguing that certain discussions of race and American history that were emerging were destructive and calling on President Trump "to immediately issue [an executive order] to stamp out this destructive, divisive, pseudoscientific ideology." Benjamin Wallace-Wells, *How a Conservative Activist Invented the Conflict Over Critical Race Theory*, The New Yorker (Jun. 18, 2021),

https://www.newyorker.com/news/annals-of-inquiry/how-a-conservative-activist-invented-the-conflict-over-critical-race-theory.[1]

The morning after his appearance, White House Chief of Staff Mark Meadows approached Rufo directly to assist in drafting an executive order ("EO") banning the use of certain "divisive concepts" in trainings in federal agencies. *Id.*

This executive order was the direct result of a political effort to "stamp out" a disfavored ideology. Wallace-Wells, *How a Conservative Activist Invented the Conflict Over Critical Race Theory*. It became a blueprint for the widespread state-level legislative restrictions on discussions of race, racism, and American history, many of which mirror the language of the executive order. Jonathan Friedman & James Tager, *Educational Gag Orders*, PEN America (Nov. 8, 2021), https://pen.org/report/educational-gag-orders/. Beginning in January 2021, various state legislators took up the charge initiated by the Trump Administration. In 2021 alone, at least 35 bills were introduced in state legislatures that were directly modeled on the executive order. PEN America, *Index of Educational Gag Orders*.

---

[1]    Rufo introduced a distorted definition of CRT, a term that has traditionally referred to a legal theory that has been part of legal academia for half a century, into the cultural lexicon to paint certain discussions of race and American history as destructive. Rufo explicitly "acknowledges that he intentionally uses the label to rally political support, saying that CRT is 'the perfect villain' and a useful 'brand category' to build opposition." Jonathan Friedman & James Tager, *Educational Gag Orders*, PEN America (Nov. 8, 2021), https://pen.org/report/educational-gag-orders/.

In a 2021 report, *Amicus* argued that these measures "amount to a sweeping crusade for content- and viewpoint-based state censorship." Friedman & Tager, *Educational Gag Orders*. Since then, more than half of the 485 viewpoint-based curricular restrictions that *Amicus* has tracked draw directly from the language of that EO. PEN America, *Index of Educational Gag Orders*.

While its origin lies in an effort to combat so-called "divisive concepts" about race and racism, these efforts at educational censorship have morphed into a broader, multi-pronged attack against any discussions, history, and understandings of race, gender, sexual orientation or other difference.[2] *See, e.g.,* Sam LaFrance & Jonathan Friedman, *Educational Intimidation: How "Parents' Rights" Legislation Undermines the Freedom to Learn*, PEN America (Aug. 23, 2023), https://pen.org/report/educational-intimidation/. Book banning became another critical tool in this attempt to exert ideological conformity across public education.

---

[2]    This shift was also in part the work of Rufo, who had become a senior fellow at the Manhattan Institute, where he also drafted model legislation that aimed to suppress many of the same ideas and narratives under the guise of curbing "diversity, equity, and inclusion" ("DEI") programs. Using the same strategy, Rufo, the Manhattan Institute, and other conservative groups also began attacking discussions of LGBTQ+ identity in classrooms. Trip Gabriel, *He Fuels the Right's Cultural Fires (and Spreads Them to Florida)*, The New York Times (Apr. 24, 2022), https://www.nytimes.com/2022/04/24/us/politics/christopher-rufo-crt-lgbtq-florida.html.

In the 2021-2022 school year, *Amicus* tracked 1,145 instances of book bans in public school libraries. Jonathan Friedman & Nadine Farid Johnson, *Banned in the USA: Rising Book Bans Threaten Free Expression and Students' First Amendment* Rights, PEN America (April 11, 2022), https://pen.org/report/banned-in-the-usa-rising-bans-threaten-1a/. 41% of those instances were tied directly to directives from state officials and elected lawmakers to investigate and remove books.

Many of the educational censorship bills discussed *supra* created mechanisms to facilitate book bans in school districts, and over the next few years, book banning legislation spread across the country. Madison Markham & Laura Benitez, *The Bills Igniting Book Bans: Evolving State Legislative Efforts to Censor Public School Libraries*, PEN America (Dec. 18, 2025), https://pen.org/report/the-bills-igniting-book-bans. Alongside these state-level efforts to censor school libraries came a parallel movement to challenge and remove books at the local level. Sabrina Baêta, *Spineless Shelves: Two Years of Book Banning*, PEN America (Dec. 14, 2023), https://pen.org/report/spineless-shelves/. Since 2021, *Amicus* has found nearly 23,000 book bans in American public school libraries. Baêta, et. al., *The Normalization of Book Banning*.

*Amicus*'s most recent report on the state of book bans in the United States demonstrates that book bans have become normalized and pervasive, and that now school districts face so much pressure to exclude books with certain viewpoints that

they are not only removing books, but also preemptively excluding such materials from their collections. *Id. Amicus*'s analysis of the 6,870 instances of book bans in the 2024-2025 year also revealed a surge in the banning of nonfiction titles, with bans on over 1,100 unique educational or informational books for young people. *Id. and* Tasslyn Magnusson, et. al., *Facts & Fiction: Stories Stripped Away by Book Bans*, PEN America (May 7, 2026), https://pen.org/report/facts-fiction/. The increase in educational and informational titles within a larger erasure of nonfiction titles underscores the rising influence of anti-intellectualism in the public sphere. The removal of these titles highlights the growing censorship of information, facts, and accounting of history and events available in public K–12 education across America. Magnusson, et. al., *Facts & Fiction: Stories Stripped Away by Book Bans*.

When Trump returned to office in 2025, he brought to the federal level the state-level censorship that had been brewing since he left office. *Amicus* has found that the growing federal efforts to restrict education use rhetoric and language from state and local efforts to ban books, Baêta, et. al., *The Normalization of Book Banning*; federal restrictions and attacks on higher education are also working in tandem with these state-level efforts to undermine colleges and universities. As *Amicus* stated in its most recent report on legislative restrictions in higher education, "Numbers and taxonomy alone cannot capture the scale of what is taking place. The vast assemblage of legislation, policies, investigations, and threats, from state and

federal governments, as well as various elected officials, has cast a web of control over campuses. Taken as a whole, they constitute a widening playbook for censorship that adds up to something more than the sum of its parts." Sachs, et. al., *Expanding the Web of Control*.

Many of the Trump administration's priorities, as demonstrated by executive orders issued in the early days of his second term, reflect strategies for censoring public education articulated in the Heritage Foundation's policy blueprint, Project 2025. James Tager, *Project 2025 and Its Threat to Free Expression*, PEN America (Sept. 12, 2024), https://pen.org/report/project-2025/.

The executive orders at issue in this case fit into that project precisely. Executive Order No. 14190, "Ending Radical Indoctrination in K-12 Schooling," requires the Department of Defense to plan to eliminate "support for" and "indoctrination in" "gender ideology and discriminatory equity ideology." The definition of "discriminatory equity ideology" in EO 14190 is nearly identical to the definition of "divisive concepts" originated in Trump's 2020 executive order and mirrors the language of the state level prohibitions that followed.

The history of the coordinated campaign of educational censorship demonstrates that these EOs and the DoDEA's actions are part of a deliberate attempt to silence specific disfavored viewpoints.

**B. The First Amendment does not permit DoDEA to impose the ideological orthodoxy it attempts here.**

The attempts to exert ideological control over public schools discussed *supra* are unconstitutional.[3] The government has the authority to make decisions consistent with reasonable pedagogical interests, but here, the actions of DoDEA go beyond the discretion afforded to the government and rest on an improper motivation—censorship of disfavored views in our schools. *See Pico*, 457 U.S. at 864 *and Hazelwood Sch. District v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

---

[3]    In its well-reasoned discussion, the District Court explained why DoDEA's actions were not immune from First Amendment scrutiny. Appellees in their briefing address the argument, and *Amicus* will not repeat it here. *Amicus* adds only that in *Shurtleff v. City of Boston*, the Supreme Court laid out three "indicia" that courts must consider in the context of a "holistic inquiry" in determining whether something constitutes government speech (and thus immune from First Amendment scrutiny). 596 U.S. 243 (2022). These include "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled expression." *Id.* at 244. As Appellees correctly note, "Taking each *Shurtleff* factor in turn, it is clear that K-12 instruction is not government speech." Appellees' Br. at 34. In particular, when considering the history of caselaw discussed *supra* § IA and *infra* § IIB, it is clear that the imposition of specific ideology and the suppression of disfavored ideas in public education are inimical to fundamental First Amendment values. *See also, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 ("In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.") Appellants' application of the government speech doctrine to educational decisions would immunize these decisions from First Amendment scrutiny and would permit the government to engage in such ideological control and suppression of disfavored ideas. The precedents discussed in this brief rely on fundamental First Amendment principles that would not tolerate such a result.

15

Students have a First Amendment right to receive the information and ideas that DoDEA has censored through its curricular changes and book removals. This Court has repeatedly recognized that the First Amendment protects not only the right of the speaker but also the right of the listener, especially when the speech restriction is motivated by disapproval of the ideas reflected. *See, e.g., Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas."); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) (recognizing the First Amendment's "role in affording the public access to discussion, debate, and the dissemination of information and ideas"); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976) ("freedom of speech 'necessarily protects the right to receive'") (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972)); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (holding that the First Amendment protects "[t]he right of citizens" not only "to speak" but also "to inquire" and "to hear"); *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 866-67 (1982).

The Supreme Court addressed students' First Amendment rights to receive information with respect to school library materials in *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853 (1982). *Pico* concerned the removal of books from a school district's libraries on the basis that school board members found

16

them "anti-American, anti-Christian, [anti-Semitic], and just plain filthy." *Id.* at 857. Justice Brennan's plurality opinion there, joined by Justices Marshall and Stevens, and in part by Justice Blackmun,[4] set forth the standard that local school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books." *Id.* at 872. In drafting the plurality opinion, Justice Brennan reasoned that students' right to receive information is an "inherent corollary" of their right to free speech, *Id.* at 867, and that school boards may not remove books to "prescribe what shall be orthodox in politics, nationalism, religion, and other matters of opinion." *Id.* at 871 (quoting *Barnette*, 319 U.S. at 642).

While *Pico* is a plurality opinion, it is worth noting that seven out of nine justices in the *Pico* court agreed that books could not be removed in a "narrowly partisan or political manner," a fact Chief Justice Rehnquist "cheerfully concede[d]" in his dissent. 457 U.S. at 907 (Rehnquist, C.J., dissenting).[5] Several circuits around

---

[4]     Justice Blackmun accepted the standard set forth by the plurality but wrote separately. In his view, the ban was improper not due to a right to receive information, but rather because the "State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons." *Pico*, 457 U.S. at 878-89.

[5]     Furthermore, Justice White's concurrence in the judgment agreed that the case should be remanded to evaluate the "reasons underlying the school board's removal of the books." Justice White's opinion relies on the fundamental premise that the removal of school library books is subject to First Amendment scrutiny. That means that eight of nine justices in *Pico* agreed that the government is constrained to some extent by the First Amendment in such decisions, a premise that is completely at odds with the application of the government speech doctrine Appellants put forward, discussed *supra* fn. 3.

the country have adopted *Pico*'s standard, and the decision provides useful guidance in establishing a standard by which to evaluate school library book removals.[6]*Pico* draws explicitly from the lineage of caselaw on free speech in public schools, which consistently affirms the rights of students to certain free speech protections and access to information, while recognizing the discretion of local school boards concerning curriculum and instruction. *Pico*, 457 U.S. at 868-72.[7]

As Justice Brennan's opinion in *Pico* states, removing books in "a narrowly partisan or political manner" "stand[s] inescapably condemned by our precedents." 457 U.S. at 870. This principle is also the logical conclusion of decades of case law on the First Amendment and public education.

While *Pico* deals with book removals, these principles and the associated lineage of cases are no less important in the classroom than they are in independent reading and study. As discussed *supra* § I, First Amendment caselaw on public education consistently emphasizes the role of public schools to prepare students for

---

[6]     *Arce v. Douglas*, 793 F.3d 968, 981-82 (9th Cir. 2015) (applying *Pico*); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) (same); *and Kreimer v. Bureau of Police*, 958 F.2d 1242 (3d Cir. 1992) (same). *See also Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) *and Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982) (applying similar standards prior to the Supreme Court's decision in *Pico*).
[7]     *See also Epperson v. Arkansas*, 393 U.S. 97,  104 (1968) ("Our courts…have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief").

18

citizenship and participation in public life. In *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, Justice Brennan famously wrote that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom" and that "[t]he Nation's future depends on leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues (rather) than through any kind of authoritative selection." 385 U.S. 589 (1967) at 603 (internal citations omitted). *See also Pico*, 457 U.S. at 868 ("[A]ccess to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner … [and] prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members.") *and Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (discussing the same principle as applied to higher education) ("To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation."). These cases entail that the Constitution safeguards students' right to receive information and protects against the dangers of state intervention to "strangle the free mind at its source." *Id. See, e.g., Arce*, 793 F.3d at 981-84 (9th Cir. 2015); *see also cf. Mahanoy Sch. Dist. v. B.L. ex. rel. Levy*, 594 U.S. 180, 190 (2021) (holding that schools have "an interest in protecting a student's unpopular

19

expression").[8] These cases and the foundational First Amendment principles they reflect underscore that students have a right to receive information.

While students do not have unbounded freedom to read or learn whatever they want at school, they do have a First Amendment interest in receiving "information from diverse sources" and "determin[ing] for [themselves] what speech and speakers are worthy of consideration." *Citizens United*, 558 U.S. at 341. "[A]ccess to ideas . . . prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico*, 457 U.S. at 868. The restrictions on curriculum go far beyond the necessary discretion given to the government regarding educational decisions and violate the First Amendment.

Likewise, although teachers do not have unbounded freedom of speech in the classroom, it is the job of teachers, including elementary school teachers, to

---

[8] Courts have also recognized the unique quality of libraries in providing patrons and students with sites of individual and extracurricular exploration. *See, e.g., Pico*, 457 U.S. at 869 ("Libraries afford [students] an opportunity at self-education and individual enrichment that is wholly optional"); *Right to Read Defense Comm. v. Sch. Comm.*, 454 F.Supp. 703, 715 (Mass.1978) ("[A] student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum.... Th[e] student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom."); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (holding that libraries are widely understood as a public good and a "mighty resource in the free marketplace of ideas"); *and Brown v. La.*, 383 U.S. 131 (1966) (recognizing the significance of the library as "a place dedicated to quiet, to knowledge, and to beauty).

present students with unfamiliar ideas and invite them to debate and grapple with those ideas. As Justice Frankfurter put it:

> To regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is . . . not to indulge in hyperbole. It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion.

*Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring). *See also Keyishian*, 385 U.S. at 603 (1967) (*supra* 19). Teachers—who "must be exemplars of open-mindedness and free inquiry"—"cannot carry out their noble task" of developing responsible citizens "if the conditions for the practice of a responsible and critical mind are denied to them." *Wieman*, 344 U.S. at 196 (Frankfurter, J., concurring). Because of this critical role that teachers play in the project of educating and preparing young minds for participation in public life, barring them from teaching particular topics or narratives contravenes the First Amendment's protections of the freedom to teach and learn in the classroom.

*See Meyer v. Nebraska*, 262 U.S. 390, 400-01 (1923) (holding that the statute prohibiting the teaching of any language other than English "interfere[d] with the calling of modern language teachers" and that the teacher's "right thus to teach" was protected under the Constitution. 262 U.S. 390, 400-01 (1923); *Bartels v. Iowa*, 262 U.S. 404 (1923) (overturning convictions of teachers on the same grounds); *Epperson v. Arkansas*, 393 U.S. 97, 109 (1968) (holding that a law

prohibiting teachers from teacher Darwinian evolution was unconstitutional). *See also id.* at 115 (J. Stewart, concurring in the result) (arguing that the state could not constitutionally "punish a teacher for letting his students know that other languages are also spoken in the world" or for "mention[ing] the very existence of an entire system of respected human thought.") As these cases suggest, teachers have constitutionally-protected interests in employing diverse teaching methods and invoking topics of public concern in the classroom.

This caselaw affirming the special interest of the First Amendment in safeguarding education from undue partisan and ideological influence, as well as protecting students' and teachers' rights to teach and learn, yields the inescapable conclusion that the kind of official suppression of disfavored ideas at issue in this case is unconstitutional.

## CONCLUSION

For the foregoing reasons, *Amicus* respectfully urges this Court to affirm the preliminary injunction against the challenged book quarantines and curriculum removals in DoDEA schools.

Dated: June 3, 2026

Respectfully submitted,

*/s/Mara Gassmann*
Mara Gassmann
*Counsel of Record*
PEN AMERICAN CENTER, INC.

22

1100 13th Street NW, Ste. 800
Washington, D.C. 20005
(202) 669-7487
mgassmann@pen.org

Diane Elizabeth Brinkley
PEN AMERICAN CENTER, INC.
120 Broadway, 26th Floor N.
New York, NY 10271
(646) 779-4823
ebrinkley@pen.org

*Counsel for Amicus Curiae*

23

## CERTIFICATION OF COMPLIANCE

I hereby certify that the foregoing brief of amicus curiae complies with:

1) the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,272 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-processing system used to prepare the brief; and

2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

*/s/ Mara Gassmann*
Mara Gassmann
    *Counsel of Record*
PEN AMERICAN CENTER, INC.

24

**CERTIFICATE OF SERVICE**

I hereby certify that I have filed the foregoing brief of proposed amicus curiae electronically with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system on June 3, 2026.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Mara Gassmann*
Mara Gassmann
    *Counsel of Record*
PEN AMERICAN CENTER, INC.

25