**Nos. 25-2497(L), 26-1002**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

E.K., *by and through parent and next friend Lindsey Keeley, et al.*,

Plaintiffs-Appellees/
Cross-Appellants,

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, *et al.*,

Defendants-Appellants/
Cross-Appellees.

On Appeal from the United States District Court
for the Eastern District of Virginia

## RESPONSE/REPLY BRIEF FOR
## APPELLANTS/CROSS-APPELLEES

*Of Counsel:*

EARL G. MATTHEWS
*General Counsel*

SARAH N. SMERLING
*Attorney*

*Department of War*

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION AND SUMMARY OF ARGUMENT .............................. 1

ARGUMENT ................................................................................................. 3

I.      The injunction against removing material from school curricula
        should be vacated........................................................................... 3

        A.      The government speaks through curriculum. ...............................3

        B.      *Hazelwood* does not apply to curriculum changes, but the
                government would still prevail under that test. ..........................13

II.     The injunction against removing books from school libraries
        should be vacated..........................................................................16

        A.      Plaintiffs lack standing to obtain injunctive relief. .......................17

        B.      The *Pico* plurality does not bind this Court, and plaintiffs
                offer no defense of the plurality's reasoning................................22

III.    An injunction may be no broader than necessary to redress
        injuries to plaintiffs who have established standing for that form
        of relief. .......................................................................................31

        A.      Plaintiffs are not entitled to a broader injunction.........................31

        B.      At minimum, the injunction should be narrowed.........................35

CONCLUSION.............................................................................................37

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                **Page(s)**

*A.T. Massey Coal Co. v. Massanari,*
305 F.3d 226 (4th Cir. 2002) ............................................................ 23

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
557 F.3d 1177 (11th Cir. 2009) ................................................... 21, 25

*Allen v. Wright,*
468 U.S. 737 (1984) ............................................................................17

*Ambach v. Norwick,*
441 U.S. 68 (1979) ..................................................... 9, 16, 30

*Arce v. Douglas,*
793 F.3d 968 (9th Cir. 2015) ........................................... 11, 12

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ........................................... 35

*Ashwander v. Tennessee Valley Auth.,*
297 U.S. 288 (1936) ...................................................... 27

*Board of Educ. v. Pico,*
457 U.S. 853 (1982) ....................................... 2, 5, 23, 24, 25, 27, 28

*Board of Regents of the Univ. of Wis. Sys. v. Southworth,*
529 U.S. 217 (2000) ...................................................... 15

*Boring v. Buncombe Cnty. Bd. of Educ.,*
136 F.3d 364 (4th Cir. 1998) ............................... 1, 4, 7, 13, 16, 30

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ........................................................ 32

*Carney v. Adams,*
592 U.S. 53 (2020) ................................................... 21, 22

*Center for Biological Diversity v. EPA,*
937 F.3d 533 (5th Cir. 2019) .......................................... 17

ii

*Chiras v. Miller,*
432 F.3d 606 (5th Cir. 2005) ..................................................... 11, 13

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ..................................................................... 22

*Davison v. Randall,*
912 F.3d 666 (4th Cir. 2019) .......................................................... 26

*Elam v. Early,*
138 F.4th 804 (4th Cir. 2025) ......................................................... 32

*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ..................................................................... 17

*Griggs v. Provident Consumer Disc. Co.,*
459 U.S. 56 (1982) ...................................................................... 33

*Griswold v. Driscoll,*
616 F.3d 53 (1st Cir. 2010) ............................................................ 11

*Hazelwood Sch. Dist. v. Kuhlmeier,*
484 U.S. 260 (1988) ..................................................................... 13

*Kennedy v. Silas Mason Co.,*
334 U.S. 249 (1948) .....................................................................24

*King v. Palmer,*
950 F.2d 771 (D.C. Cir. 1991) ........................................................ 23

*Lewis v. Tobacco Workers' Int'l Union,*
577 F.2d 1135 (4th Cir. 1978) .................................................... 33–34

*Little v. Llano County,*
138 F.4th 834 (5th Cir. 2025) .................................................... 25, 30

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .................................................................. 20, 21

*Mahmoud v. McKnight,*
102 F.4th 191 (4th Cir. 2024), *rev'd,*
606 U.S. 522, (2025) .................................................................... 26

iii

*Mahmoud v. Taylor,*
   606 U.S. 522 (2025) ............................................................... 7, 9

*Marks v. United States,*
   430 U.S. 188 (1977) ................................................................. 22

*Maryland v. USDA,*
   151 F.4th 197 (4th Cir. 2025) ................................................. 18

*Matal v. Tam,*
   582 U.S. 218 (2017) ................................................................. 10

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) ................................................................. 18

*Penguin Random House, LLC v. Robbins,*
   172 F.4th 581 (8th Cir. 2026) ................................................. 31

*Pleasant Grove City v. Summum,*
   555 U.S. 460 (2009) ................................................................... 6

*Plyler v. Doe,*
   457 U.S. 202 (1982) ................................................................... 9

*Polk v. Montgomery Cnty. Pub. Schs.,*
   166 F.4th 400 (4th Cir. 2026) ................................................... 4

*Riley's Am. Heritage Farms v. Elsasser,*
   32 F.4th 707 (9th Cir. 2022) ................................................... 12

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
   515 U.S. 819 (1995) ................................................................... 5

*Rossignol v. Voorhaar,*
   316 F.3d 516 (4th Cir. 2003) ................................................... 25

*RXD Media, LLC v. IP Application Dev. LLC,*
   986 F.3d 361 (4th Cir. 2021) ................................................... 31

*Satellite Broad. & Commc'ns Ass'n v. FCC,*
   275 F.3d 337 (4th Cir. 2001) .............................................. 25–26

*Shurtleff v. City of Boston,*
   596 U.S. 243 (2022) ................................................................... 6

*South Carolina Educ. Ass'n v. Campbell,*
883 F.2d 1251 (4th Cir. 1989) ................................................................ 26

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ........................................................................... 19–20

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) ............................................................................... 13

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .......................................................................... 19, 35

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) .......................................................................... 32, 35

*Virgil v. School Bd. of Columbia Cnty.,*
862 F.2d 1517 (11th Cir. 1989) ......................................................... 11, 16

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
576 U.S. 200 (2015) ................................................................................. 6

*Walls v. Sanders,*
144 F.4th 995 (8th Cir. 2025) ........................................ 4-5, 11, 12, 13, 15, 25

*Woolard v. Thurmond,*
170 F.4th 701 (9th Cir. 2026) ................................................................ 12

## Statutes:

10 U.S.C. § 2164(d) .................................................................................... 8

Act of Mar. 4, 1826, ch. 170, § 2,
1826 Mass. Acts 299, 300 ...........................................................................7

Act of June 20, 1826, ch. 10,
1826 Mass. Acts 345, 345 ...........................................................................7

## Regulation:

32 C.F.R. pt. 69 ......................................................................................... 8

**Regulatory Materials:**

90 Fed. Reg. 8615 (Jan. 30, 2025) ........................................................ 15

90 Fed. Reg. 8853 (Feb. 3, 2025) ......................................................... 15

**Rules:**

Fed. R. App. P. 12.1 ............................................................................ 33

Fed. R. Civ. P. 62.1(a) ........................................................................ 33

**Other Authorities:**

Bernard Bailyn, *The Ideological Origins of the
American Revolution* (1967) ...........................................................8

DoDEA, *DoWEA Europe: SY 2025-2026 Regional
Calendar*, https://perma.cc/L8LU-DYA7 ....................................18

David C. Frederick, *Justice White and the Virtues of
Modesty*, 55 Stan. L. Rev. 21 (2002) ......................................... 27

Bryan A. Garner et al., *The Law of Judicial Precedent*
(2016) ..............................................................................................23

Gary B. Nash, *The Unknown American Revolution:
The Unruly Birth of Democracy and the Struggle to
Create America* (2006) .....................................................................8

Antonin Scalia, *The Doctrine of Standing as an
Essential Element of the Separation of Powers*,
17 Suffolk U. L. Rev. 881 (1983) ...................................................17

Michael Wineripe, *L.I. School Board Ends Its Fight
to Ban Books*, N.Y. Times, Jan. 31, 1983,
https://nyti.ms/4ejThMH ..............................................................27

## INTRODUCTION AND SUMMARY OF ARGUMENT

Courts are ill-positioned to become arbiters of syllabi or library catalogs. The federal judiciary has thus long eschewed treating "education as a federal judicial enterprise." *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 371 (4th Cir. 1998) (en banc) (Wilkinson, C.J., concurring). Courts give broad deference to schools' curricular choices; they do not scrutinize the shelves of school libraries. Plaintiffs seek to upend that tradition of judicial restraint and instead to impose strict constitutional constraints on routine educational decisions. This Court should decline that invitation.

The Department of Defense Education Activity (DoDEA) operates schools for the dependents of servicemembers, and its selection of curricula for those schools does not violate the First Amendment. Plaintiffs try to suggest otherwise without even identifying whose speech is restricted, pointing instead to a supposed right to receive information that has no footing in First Amendment law in the absence of a willing speaker. The fundamental point is that to run any school, administrators must be able to select curricular materials. Doing so does not violate the First Amendment even if, as is inevitable, some students would prefer a different curriculum.

And even under plaintiffs' preferred framework, courts defer to the government's decision to deem materials unsuitable and to remove them from the curriculum, as DoDEA did here.

DoDEA similarly acted within its authority in removing certain library books for further review. Plaintiffs have not established standing to challenge that policy, but even if they had, the First Amendment does not compel the government to provide the books plaintiffs prefer in a school library. The only speech that is actually at issue here is the government's own speech, in the form of curating its own libraries.

Despite their novel and broad theories, plaintiffs' brief is remarkable for its limited scope. Plaintiffs bring a pair of claims rooted in the right to receive information, but they never explain how such a right can be implicated without a willing speaker. They insist that school curriculum is speech—though not government speech—but never identify who speaks through curriculum if not the government. They stake their entire argument for the unlawfulness of the book-review policy on treating as controlling law the plurality opinion in *Board of Education v. Pico*, 457 U.S. 853 (1982), but never defend the plurality's rationale. And they assert a broad theory of standing to challenge book removals without identifying an Article III injury.

These threadbare arguments cannot justify the sweeping theories plaintiffs ask this Court to adopt. The preliminary injunction should be vacated.

## ARGUMENT

### I.    The injunction against removing material from school curricula should be vacated.

#### A.    The government speaks through curriculum.

1. This case presents an unusual First Amendment claim because there is no restriction of private speech, and plaintiffs do not contend otherwise. Plaintiffs challenge the government's decisions about curriculum in schools run by DoDEA. Although plaintiffs attend the schools, this case is not about anyone telling plaintiffs what they can say while they are at school. Nor is any teacher a plaintiff here. Thus, there is no party before the court asserting that the government is curtailing its right to express any message. The only issue is whether plaintiffs are entitled to assert control over the government's curricular decisions through the guise of the First Amendment. They plainly cannot.

This Court's cases confirm that plaintiffs do not have a First Amendment right to dictate school curriculum. In *Boring v. Buncombe County Board of Education*, this Court held that a teacher had no "First Amendment right to participate in the makeup of the school curriculum

through the selection and production of a play." 136 F.3d 364, 366 (4th Cir. 1998) (en banc). In *Polk v. Montgomery County Public Schools*, this Court held that a teacher had no First Amendment right to refuse to identify students by their preferred pronouns. *See* 166 F.4th 400, 419 (4th Cir. 2026); *see also id.* at 427 (Wilkinson, J., dissenting) (disagreeing with the majority that the use of pronouns may be restricted on the ground that it was not part of the curriculum but reaffirming that "state control of curricular matters is necessary").

Plaintiffs seek to brush these cases away on the ground that they "concerned teachers' First Amendment claims, not students' right to receive information." Br. 32. But that distinction makes plaintiffs' case weaker, not stronger. In those cases, at least the government restricted the challengers' speech, and the question was whether the restriction was justified based on the government's authority to control its own employees. Here, there is no restriction on plaintiffs' speech at all. Surely there is no First Amendment right to receive information that is stronger than the would-be speaker's right to convey it.

In fact, a willing speaker is an indispensable element of a claim rooted in the right to receive information. *See Walls v. Sanders*, 144 F.4th 995, 1003

4

(8th Cir. 2025). Plaintiffs do not posit the existence of a willing speaker. Nor do they explain how their claim could possibly be viable in the absence of a willing speaker. *See Board of Educ. v. Pico*, 457 U.S. 853, 887–90 (1982) (Burger, C.J., dissenting). That should be the end of the case.

2. The absence of any restriction on speech resolves this case at the threshold. Another way to look at the issue is that the only speech at issue is government speech, which the government has a right to control. "When the [government] determines the content of the education it provides, it is the [government] speaking, and [the Supreme Court] ha[s] permitted the government to regulate the content of what is or is not expressed when it is the speaker …." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). Plaintiffs do not dispute the point, conceding that the government is entitled to restrict the curricular speech of its teachers. But they elsewhere seem to mistakenly suggest that curricular restrictions do not reflect determinations about government speech.

When evaluating "whether the government intends to speak for itself or to regulate private expression" courts consider "the history of the expression at issue; the public's likely perception as to who … is speaking; and the extent to which the government has actively shaped or controlled the

expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). When it comes to selecting school curricula, all factors indicate that the government is speaking.

*First*, as plaintiffs concede, DoDEA "is responsible for creating and delivering education materials." Br. 36–37. The government thus "maintains direct control over the messages conveyed" in its classrooms and it "actively exercise[s] this authority." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015).

*Second*, the public considers the government to be speaking through its school curriculum. Public schools are "closely identified in the public mind with the government unit that" operates them. *Pleasant Grove City v. Summum*, 555 U.S. 460, 472 (2009). Indeed, a public school is often the form of government that ordinary members of the public interact with most. And plaintiffs offer no real theory of whose message would be promoted through curriculum if not the government's. Plaintiffs gesture (Br. 35–36) towards teachers as the speakers, but they admit elsewhere (Br. 32–33) that classroom instruction does not represent the teachers' speech. Instead, teachers speak in classrooms as agents of the government delivering the government's message. The public, thus, naturally understands the message

to be the government's own. *See Mahmoud v. Taylor*, 606 U.S. 522, 554–55 (2025) (explaining that teachers' role as authority figures gives imprimatur of state authority to "classroom instruction").

*Third*, the government has chosen the curriculum for public schools for longer than compulsory public schools have existed. *See, e.g.*, Act of Mar. 4, 1826, ch. 170, § 2, 1826 Mass. Acts 299, 300 ("[T]he school committee of each town shall direct and determine the class books to be used in the respective classes, in the public district and town schools of the town …."); Act of June 20, 1826, ch. 10, 1826 Mass. Acts 345, 345 (giving school committees "the general charge and superintendence of all the public schools in said town"); *see also Boring*, 136 F.3d at 370 ("[T]he school[ ] … has the right to fix the curriculum.").

3. Plaintiffs do not respond to these points and instead advance a scattershot of reasons to ignore the absence of any restriction on speech and the clear indications that the only speech involved is the government's. Plaintiffs quibble about who within the government is controlling the speech, *see* Br. 35–37, but if anything the involvement of senior officials confirms that it is the government, rather than someone else, that is speaking. The intervention of individuals like the President and a Cabinet officer, who are

7

politically accountable, hurts rather than helps plaintiffs' case.[1] And while plaintiffs note (Br. 33) independent constitutional constraints on curricular decisions such as the Establishment Clause and the Equal Protection Clause, they do not raise any such claims here.

Plaintiffs fare no better in suggesting (Br. 36) that a student debate or other robust academic discussion somehow renders curriculum other than government speech. The government can speak by explicating the diversity of views or complexity of an issue. A teacher could, for example, follow a government-prescribed curriculum and instruct students that while some historians believe that the American Revolution had primarily ideological causes, others historians give primacy to social and economic factors as a motivating force.[2] The government does not embrace an incoherent view by teaching conflicting ideas; it endorses the idea that some questions are contested and open to multiple explanations. And plaintiffs' discussion of a

---

[1] DoDEA has school advisory committees, formerly known as school boards, for its schools but these bodies possess no executive authority. *See* 10 U.S.C. § 2164(d); 32 C.F.R. pt. 69.

[2] *Compare, e.g.*, Bernard Bailyn, *The Ideological Origins of the American Revolution* (1967), *with* Gary B. Nash, *The Unknown American Revolution: The Unruly Birth of Democracy and the Struggle to Create America* (2006).

student debate merely muddles the issue, because this case has nothing to do with whether students are permitted to express their own views.

Plaintiffs are also incorrect to suggest that a curriculum somehow stops being government speech when it advances particular values. As the Supreme Court has recognized, some material taught in school is "unmistakably normative. [It is] clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Mahmoud*, 606 U.S. at 550. Plaintiffs cannot undermine that longstanding tradition by characterizing curricular judgments with which they disagree as "partisan propagandizing and political micromanagement." Br. 34. This case does not involve any required partisan messaging. And the possibility that some values may be controversial is not a reason for courts to micromanage curricula at the behest of individual plaintiffs. Rather, it reaffirms the wisdom of democratic accountability. Public schools "inculcat[e] fundamental values necessary to the maintenance of a democratic political system." *Ambach v. Norwick*, 441 U.S. 68, 77 (1979). They function as "the primary vehicle for transmitting the values on which our society rests." *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (quotation marks omitted). In any event, government-speech analysis does

9

not depend on the particular views being expressed, much less examine whether the government has embraced a particular viewpoint before, as plaintiffs would seem to demand.

Plaintiffs' only other response (Br. 23–24) is to note that the Supreme Court has cautioned against too broad a reading of the government speech doctrine. *See Matal v. Tam*, 582 U.S. 218, 235 (2017). Plaintiffs, however, shear crucial context from this admonition. *Tam* involved whether trademarks registered by the Patent and Trademark Office constitute government speech. *Id.* at 233–34. The Court held that trademarks are private speech. *Id.* at 239. In so doing, it cautioned that "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, we must exercise great caution before extending our government-speech precedents." *Id.* at 235. Here, however, plaintiffs point to no private speech and no private speakers. Without a private speaker, this case represents a core application of the government speech doctrine, not an extension of it. The cautionary note from *Tam* simply does not apply.

10

4. Plaintiffs find themselves on the short side of a circuit split. *Compare Griswold v. Driscoll*, 616 F.3d 53, 60 (1st Cir. 2010) (holding that cirricular changes do not implicate the First Amendment), *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005) (same), *and Walls*, 144 F.4th at 1003 (same), *with Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015) (sustaining First Amendment challenge to circular change), *and Virgil v. School Bd. of Columbia Cnty.*, 862 F.2d 1517, 1523 (11th Cir. 1989) (applying First Amendment to reject challenge to curricular change). Instead of addressing these decisions on the merits, plaintiffs brush away published opinions in three circuits as "a few out-of-circuit cases." Br. 31.

The First, Fifth, and Eight Circuits have resolved this question correctly. Revisions to curricular material, "even if made in response to political pressure, d[o] not implicate the First Amendment." *Griswold*, 616 F.3d at 60. The Eighth Circuit in *Walls* carefully explained why a right-to-receive-speech claim "cannot constrain the government's ability to decide what to say and what not to say," 144 F.4th at 1003, and why *Virgil* is not compatible with modern government speech doctrine, *id.* at 1004. Plaintiffs have no response to this analysis, except to argue that the Eighth Circuit

11

"misread[ ] *Pico*." Br. 25. Plaintiffs, however, are the ones who misunderstand *Pico*'s precedential value. *See infra* pp. 22–30.

Plaintiffs' reliance (Br. 29–30) on *Virgil* and *Arce* is misplaced. *Virgil* "predates the numerous Supreme Court decisions holding that the government is permitted to engage in viewpoint discrimination when it speaks." *Walls*, 144 F.4th at 1004. *Virgil* also offers plaintiffs limited help because it upheld the government's decision to remove materials from the curriculum under an exceedingly deferential standard, one easily satisfied here. *See* Gov't Br. 29–30. *Arce*, for its part, did not explain why a decision about what to include in the curriculum represents student speech rather than the school's speech. *See* 793 F.3d at 982 (distinguishing cases brought by textbook author and teacher). Moreover, the Ninth Circuit has since cast *Arce* into doubt, explaining that "information and speech presented to school children may be deemed to be part of the school's curriculum and thus [s]chool [d]istrict speech" and that "[g]overnment speech is not subject to scrutiny under the Free Speech Clause." *Woolard v. Thurmond*, 170 F.4th 701, 710 (9th Cir. 2026) (cleaned up); *see also Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 728 (9th Cir. 2022). In these circumstances, *Virgil* and *Arce* possess little power to persuade.

12

**B.**     *Hazelwood* **does not apply to curriculum changes, but the government would still prevail under that test.**

1. Plaintiffs continue to insist (Br. 29) that *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), provides the proper framework for evaluating changes to school curricula. They fail, however, to explain how *Hazelwood*, which applies to "school-sponsored" student speech, is implicated in this context. *Id.* at 271. "School-sponsored" speech, after all, is *student speech* which "might reasonably [be] perceive[d] to bear the imprimatur of the school." *Id. Hazelwood* concerns the circumstances where the government may exercise "editorial control" over such speech because its interests outweigh those of the students. *Id.* at 273. But without student speech, *Hazelwood*'s balancing test does not apply.[3] *See Boring*, 136 F.3d at 373 (Luttig, J., concurring) ("*Hazelwood* was concerned only with student speech …."); *Walls*, 144 F.4th at 1005; *Chiras*, 432 F.3d at 616–17. And

---

[3] *Hazelwood* does, however, answer plaintiffs' hypothetical about a school "ban[ning] mention … of any disfavored idea." Br. 38. A direct restriction on student speech as part of the curriculum would be governed by *Hazelwood*; other restrictions on student speech that occur on school grounds would be governed by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). But neither situation is present here.

plaintiffs do not contend that the government's choice of curriculum implicates student speech.

Instead of explaining why *Hazelwood* should apply, plaintiffs repeat the same error the district court made. They inaccurately assert (Br. 29) that the parties agreed that *Hazelwood* applies to curricular changes. *See* Memorandum Opinion, JA50. As the government has already explained, it argued in district court that the only speech at issue here was government speech to which *Hazelwood* does not apply. Gov't Br. 26 n.4; *see* Opposition to Motion for Preliminary Injunction, Dkt. 29, at 9–15. The government also argued in the alternative that "[e]ven assuming" the First Amendment applies, "DoDEA's curriculum review still satisfies *Hazelwood*'s 'legitimate pedagogical concerns' test." Opposition to Motion for Preliminary Injunction, Dkt. 29, at 14. But that alternative argument is hardly a concession that *Hazelwood* provides the governing test; indeed, it underscores that the government's frontline argument was that *Hazelwood* performs no work in this context. Plaintiffs fail to respond to this point.

Plaintiffs also have no response to the democratic-accountability problems *Hazelwood* may impose on schools seeking to change their curricula. *See* Gov't Br. 24–26. The First Amendment does not require the

14

government to put forward pedagogical reasons sufficient to satisfy a district court every time it wants to change a textbook. If the school district makes a value-based judgment that a book should not be used, that rationale suffices. *See Walls*, 144 F.4th at 1006. The limiting principle in this context is political, not judicial. *See Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). Plaintiffs fail to justify the aggressive judicial intervention they seek.

2. Even if *Hazelwood* were to apply, however, the government would prevail. The President explained the pedagogical basis for the curricular changes. *See* Gov't Br. 30–31. One executive order explained that, in the President's view, "gender ideology" promotes a "false claim" and is "internally inconsistent." 90 Fed. Reg. 8615, 8615–16 (Jan. 30, 2025), JA87–88. Another executive order rejected the teaching that "[m]embers of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin" or that "[m]embers of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin." 90 Fed. Reg. 8853, 8853–54 (Feb. 3, 2025), JA96–97. Plaintiffs do not dispute that schools have legitimate pedagogical goals in teaching students to eschew

15

racist and sexist thinking and ensuring that available learning materials are age appropriate. *See Ambach*, 441 U.S. at 76–77; *see also* Br. 30. Instead, they try to pretend (Br. 30–31) that these pedagogical explanations for the curriculum changes do not exist.

The "legitimate pedagogical concern" standard does not "remove from students, teachers, parents, and school boards the right to direct their educational curricula through democratic means." *Boring*, 136 F.3d at 371 (Wilkinson, C.J., concurring). Instead, this capacious standard requires courts give significant deference to the government's decisions. *Cf. Virgil*, 862 F.2d at 1525. When the responsible officials decide that curricular materials are inaccurate or promote hateful ideas, they are entitled to remove them. DoDEA acted for legitimate reasons in reshaping its curriculum, and the district court erred in failing to defer to the agency's judgment.

## II.    The injunction against removing books from school libraries should be vacated.

Plaintiffs challenge to the removal of library books fails twice over. First, any claim relating to the removal of library books is now moot because the only plaintiff held to have standing no longer attends a DoDEA school.

16

Second, DoDEA's book-removal decisions are not subject to scrutiny under the Free Speech Clause.

## A. Plaintiffs lack standing to obtain injunctive relief.

1. Establishing Article III standing is not a box-ticking requirement. Rather, standing is a "bedrock constitutional requirement." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quotation marks omitted). Because federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business[,]' … Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *Id.* at 379 (citations omitted) (first quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984); and then quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). Plaintiffs' answer to that question is only that DoDEA's removal of books from school libraries offends them.

Plaintiffs do not meaningfully dispute that L.K. 3 cannot maintain standing to challenge the removal of library books. *Cf.* Br. 15. They have thus forfeited any claim to standing based on her asserted injuries. *See, e.g.*, *Center for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019)

17

(collecting cases) (arguments in favor of subject-matter jurisdiction may be forfeited).

Plaintiffs instead rely on efforts made by two other plaintiffs to check out library books. But their attempt to backfill standing by filing additional declarations fails because they do not grapple with another core Article III principle: "'Past exposure to illegal conduct does not in itself show a present case or controversy' for purposes of equitable relief." *Maryland v. USDA*, 151 F.4th 197, 209 (4th Cir. 2025) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)). Thus, while plaintiffs can point (Br. 19) to three books checked out by M.T. at her school library, JA274, they have not shown that M.T. intends to read any other library books in the future. Indeed, M.T. was in the twelfth grade during the 2025–26 school year, JA274, and presumably graduated in June 2026.[4] She thus has no prospect of being injured by DoDEA library policies. Because "[p]rospective relief must … be justified by prospective injury," *Maryland*, 151 F.4th at 209, M.T. lacks standing to obtain injunctive relief.

---

[4] *See* DoDEA, *DoWEA Europe: SY 2025-2026 Regional Calendar*, https://perma.cc/L8LU-DYA7 (academic year for DoDEA schools in Europe ended June 9, 2026).

Similarly, plaintiffs point (Br. 19–20) to O.H.'s inability to check out books at her school because it is not subject to the district court's injunction. But if O.H. would not benefit from the injunction actually entered by the district court, she obviously lacks standing to obtain that particular injunction. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (plaintiff must show standing for every form of relief sought). And whether she might be able to support standing for some other injunction—for example one providing her access to the three named titles she sought in her school library—is not at issue in this appeal because that was not the relief the district court granted. Nor do plaintiffs ask for that relief in their cross-appeal, instead demanding a system-wide injunction. *See* Br. 41 (objecting to "student-based injunction").

2. Failing to surmount their obligation to establish standing, plaintiffs instead try to lower the bar. They assert that a student should have standing if she "express[es] interest in accessing the removed materials and take[s] some concrete action to gain access." Br. 18. But that theory absolves plaintiffs of their obligation to show a "concrete" and "particularized" injury—that is, an injury that is "real and not abstract" and that "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*,

578 U.S. 330, 339–40 (2016) (quotation marks omitted). If a plaintiff wants to check out an identified library book and is unable to because the book has been removed, that plaintiff can allege a particularized and concrete harm from the absence of the book. But a plaintiff can allege no such harm if she cannot identify a book that she cannot access. Instead, she simply objects in a generalized way to the removal of books writ large. Plaintiffs stand in similar position as a person who expresses some interest in visiting wildlife; without more, those "'some day' intentions" are not enough. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). Indeed, plaintiffs' theory requires even less than the assertion of standing the Supreme Court rejected in *Lujan*. The *Lujan* plaintiffs at least identified specific animals in specific habitats: Nile crocodiles in Egypt and leopards and Asian elephants in Sri Lanka. *Id.* at 563. Plaintiffs are more akin to environmentalists who assert that they could find some species they might want to visit in a habitat if only they had access to an appropriate wildlife guide.

Plaintiffs fail to articulate the injury underlying their theory of standing. Presumably, the injury is that the student was prevented from accessing materials in which she was interested, with interest defined at any level of generality. Plaintiffs appear to believe that having a theoretical

interest in accessing a book on the list of books under review is sufficient even if they are not aware of the titles of any of those books. *See* Br. 17. But a generalized grievance about the content of a library does not support standing. *See Lujan*, 504 U.S. at 575–76. A "few words of general intent" cannot establish a particularized injury. *Carney v. Adams*, 592 U.S. 53, 64 (2020). If plaintiffs cannot show that they have "concrete plans" to read specific books removed from a DoDEA library to which they have access, their abstract desire to read some of these unnamed books does not suffice. *Lujan*, 504 U.S. at 564.

Plaintiffs give away the game when they complain that DoDEA "made it nearly impossible for [p]laintiffs to name a 'particular book' that had been removed" because DoDEA initially declined to disclose the list of removed books. Br. 17; *see also* Memorandum Opinion, JA33–34 (articulating same objection). A litigant does not need a road map to plead a real injury. *See, e.g.*, *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) (the plaintiff has standing to challenge the "removal of *Vamos a Cuba* from the school district libraries"). Such a road map is only necessary when plaintiffs ask courts to step in to superintend curation decisions in school libraries independent of any actual interest they may have

21

in reading a particular book that may be removed. Nor does plaintiffs' gripe have any doctrinal merit: The Supreme Court has recognized that a litigant's lack of awareness about whether a government policy affects it does not entitle it to standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 n.4 (2013) (noting that plaintiffs have burden of establishing standing even if there are facts known only to the government).

Plaintiffs have "show[n] a desire to vindicate [their] view of the law." *Carney*, 592 U.S. at 64. They have not shown the sort of concrete and particularized plans necessary to invoke federal jurisdiction.

**B.    The *Pico* plurality does not bind this Court, and plaintiffs offer no defense of the plurality's reasoning.**

1. Plaintiffs hang the entirety of their defense of the book-removal element of the injunction on the mistaken proposition that the plurality opinion in *Pico* is binding precedent on this Court. They offer no defense of the plurality's opinion on the merits—perhaps because it is indefensible— and thus concede that if *Pico* is only persuasive authority, it lacks power to persuade.

"It is well established, under *Marks v. United States*, 430 U.S. 188 (1977), that when a decision of the Court lacks a majority opinion, the opinion of the Justices concurring in the judgment on the 'narrowest grounds' is to

22

be regarded as the Court's holding." *A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002). "The narrowest grounds may be thought of as a common denominator standard." Bryan A. Garner et al., *The Law of Judicial Precedent* 200–01 (2016). To satisfy *Marks*, "the narrowest opinion … must embody a position implicitly approved by at least five Justices who support the judgment." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). Where, however, there is no "common denominator" underlying the reasons offered by at least five justices, then the fractured opinion is precedential for litigants only in a "substantially identical position" as those before the Supreme Court. *A.T. Massey Coal*, 305 F.3d at 236–37.

*Pico* produced seven opinions. Five justices voted to affirm the decision of the Second Circuit, which was favorable to the students. Justice Brennan wrote for himself and Justices Marshall and Stevens, articulating plaintiffs' preferred theory of the First Amendment. *Pico*, 457 U.S. at 855–75 (plurality opinion). Justice Blackmun concurred in part and concurred in the judgment articulating "a somewhat different perspective on the nature of the First Amendment right involved" than the plurality's. *Id.* at 876 (Blackmun, J., concurring in part and concurring in the judgment); *see id.* at 875–82. Chief Justice Burger, Justice Powell, Justice Rehnquist, and Justice

23

O'Connor dissented. *See id.* at 885–93 (Burger, C.J., dissenting); *id.* at 893–97 (Powell, J., dissenting); *id.* at 904–20 (Rehnquist, J., dissenting); *id.* at 921 (O'Connor, J., dissenting).

Justice White concurred only in the judgment. *Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment). He expressly explained that he saw "no necessity" to weigh in on "the extent to which the First Amendment limits the discretion of the school board to remove books from the school library." *Id.* at 883. He declined to "decide constitutional questions until it is necessary to do so, or at least until there is better reason to address them than are evident here." *Id.* at 884. Instead, Justice White stated that he was "not inclined to disagree with the Court of Appeals" on whether a material issue of fact precluded summary judgment in favor of the school board. *Id.* at 883. Justice White thus voted to send the case back to the district court "[w]ithout intimating any conclusion on the merits," *id.* at 884 (quoting *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257 (1948)), to allow for further proceedings. The thrust of his opinion was that the constitutional question may never need to be decided so the Court should not weigh in on it.

Justice White's opinion controls under *Marks*. Reversing the district court for granting summary judgment despite a material factual dispute was

24

the narrowest way to resolve the case. And the plurality opinion and Justice Blackmun agreed with Justice White that there was a material dispute of fact. *See Pico*, 457 U.S. at 875 (plurality opinion) ("[I]t simply cannot be said that there is no genuine issue as to any material fact."); *id.* at 882 (Blackmun, J., concurring in part and concurring in the judgment) (joining that part of the plurality opinion). *Pico* thus supplies precedent on that summary-judgment issue. But because no First Amendment holding commanded the support of five justices, *Pico* does not supply any First Amendment precedent. *See Little v. Llano County*, 138 F.4th 834, 844 (5th Cir. 2025) (en banc) (majority opinion); *ACLU of Fla.*, 557 F.3d at 1200; *Walls*, 144 F.4th at 1003–04.

Plaintiffs offer only fatuous arguments for why the *Pico* plurality binds this Court. They note (Br. 26–28) that this Court has sometimes cited or even quoted from the *Pico* plurality opinion in other contexts. But citing an opinion for a proposition of law is not the same thing as adopting the opinion wholesale as binding precedent. And context indicates that this Court has not treated the plurality's First Amendment analysis as controlling. True, this Court has cited the *Pico* plurality several times for the proposition that the Free Speech Clause protects the rights of a listener as well as a speaker. *See Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003); *Satellite Broad. &*

25

*Commc'ns Ass'n v. FCC*, 275 F.3d 337, 353 (4th Cir. 2001). That proposition of law is not controverted; the problem for plaintiffs is that there is no willing speaker here. *See* Gov't Br. 37–38. This Court has also cited the *Pico* plurality for other basic principles of First Amendment law. *See South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1259 n.8 (4th Cir. 1989) (legislative motive may be relevant to free speech cases); *Mahmoud v. McKnight*, 102 F.4th 191, 217–18 (4th Cir. 2024) (Quattlebaum, J., dissenting) (the First Amendment applies to school board decisions), *rev'd*, 606 U.S. 522, (2025). That leaves plaintiffs with a "*cf.*" citation to the *Pico* plurality, illustrating, by way of example, the point that public-forum analysis applies both to public and to private property. *See Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019) (suggesting that same viewpoint discrimination rules would apply to public library on government owned land or in leased building). These scattered citations hardly represent embrace of the rationale of the *Pico* plurality as law of the circuit.

Plaintiffs also try, without avail, to count to five. Plaintiffs argue that Justice White would have had no reason to send the case back to the district court "if no facts could have established a First Amendment violation." Br. 26. Justice White did not explain why he saw fit to send the case back to

district court but did make clear that he did not mean to "intimat[e] *any conclusion* on the merits." 457 U.S. at 884 (White, J., concurring in the judgment) (emphasis added; quotation marks omitted). Instead, he explained that the Court "should not decide constitutional questions until it is necessary to do so, or at least until there is better reason to address them than are evident here." *Id.* Justice White had a very good reason to send the case back for fact-finding without weighing in on the merits: Further proceedings might have obviated the need for the Court to reach the constitutional question.[5] *See id.* at 883. As he explained, "[i]f, for example, the District Court concludes after a trial that the books were removed for their vulgarity, there may be no appeal" because the removal would satisfy the plaintiffs' standard. *Id.* That sort of outcome is not "pointless." Br. 26. Rather, it reflects a prudent exercise of judicial restraint. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *see also* David C. Frederick, *Justice White and the Virtues of Modesty*, 55 Stan. L. Rev. 21, 26 (2002) (describing Justice White's commitment to

---

[5] Indeed, the *Pico* litigation never resulted in a final judgment on the merits because it was settled. Michael Wineripe, *L.I. School Board Ends Its Fight to Ban Books*, N.Y. Times, Jan. 31, 1983, at B7, https://nyti.ms/4ejThMH.

judicial restraint). His opinion cannot plausibly be read to establish a principle of First Amendment law.

Even more tenuously, plaintiffs try to count Justice Rehnquist's dissent in their favor because, in a throwaway line, he "cheerfully concede[d]" that "[o]ur Constitution does not permit the official suppression of ideas." Br. 26 (alterations in original) (quoting *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting)). But Justice Rehnquist also explained that suppressing ideas was "hardly an apt description" of the defendants' removal of books from the school library. *Pico*, 457 U.S. at 919 (Rehnquist, J., dissenting). So Justice Rehnquist can hardly be said to have "agreed that removing materials from school libraries implicates students' First Amendment rights." Br. 25. And while Justice Rehnquist acknowledged that removing library books "motivated by racial animus" could raise a constitutional issue, *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting) (quotation marks omitted), those were not the facts of *Pico*, and they are not the facts of this case either. The "harder cases," Justice Rehnquist explained, he "would leave to another day." *Id.* at 920.

2. In the absence of binding law, a court must look to persuasive authorities and first principles. Plaintiffs, however, offer no defense of the

28

*Pico* plurality on the merits. They have no answer for why the Free Speech Clause would protect the right to receive information in the absence of a willing speaker. *See* Gov't Br. 37–38, 42. They have no answer for why the removal of library books violates the First Amendment when they can obtain these books from other sources. *See* Gov't Br. 38–39. They have no answer for why the government's curation of library books is not government speech.[6] *See* Gov't Br. 38–39. They have no answer for how a school library can function without engaging in viewpoint discrimination. *See* Gov't Br. 40. Plaintiffs give this court no reason to embrace the flawed framework of the *Pico* plurality.

Amicis' efforts to revitalize the *Pico* plurality are unavailing. Amici too are unwilling to offer a robust defense of *Pico* from first principles. Two amici point to the importance of schools as incubators of critical thinking and democratic ideals. *See* PEN Amicus Br. 18–22; Freedom to Read Amicus Br. 13–15. Those arguments, however, cut the other way. Support for pluralism and liberal democracy is a viewpoint. Our public schools have long embraced

---

[6] Bizarrely, plaintiffs characterize this argument as "abandoned," Br. 23, though the government expressly argues that the only speech involved at all is "the government's own speech in determining how to curate its library," Gov't Br. 39.

29

and promoted these values precisely because they are able to engage in viewpoint discrimination. *See Little*, 138 F.4th at 850; *see also Ambach*, 441 U.S. at 76–80 (describing vital role of schools in inculcating civic values). Thus, school libraries can stock books promoting democracy and tolerance without also stocking books promoting authoritarianism and intolerance. *See* Gov't Br. 40–41. Imposing viewpoint-neutrality requirements on public schools would inhibit the promotion of democratic ideals. Moreover, amicis' arguments invite courts to become arbiters of what books promote democracy and what books inhibit it. Those notoriously contested choices are no better "consign[ed] … to the mercies of the federal courts" than other curricular decisions. *Boring*, 136 F.3d at 371 (Wilkinson, C.J., concurring). "[T]he fact that such choices arouse deep feelings argues strongly for democratic means of reaching them." *Id*. at 372.

3. It is unclear whether plaintiffs believe that *Hazelwood* applies to library curation decisions. *See* Br. 22, 28. Regardless, *Hazelwood* applies to student speech bearing the imprimatur of the school, *see supra* pp. 13–15,

30

and plaintiffs point to no student speech implicated by library curation decisions.[7]

### III.   An injunction may be no broader than necessary to redress injuries to plaintiffs who have established standing for that form of relief.

Plaintiffs make no effort to defend the injunction issued by the district court, and their requests for a broader injunction fail. The district court issued an injunction that pertained to each school attended by a plaintiff. But as the government pointed out, some of the plaintiffs lack standing, or their claims have become moot, such that no injunction is warranted as to their schools. Plaintiffs offer no response, instead contending that any limited injunction is inappropriate and they are entitled to a systemwide injunction. The limited arguments they make are erroneous.

### A.   Plaintiffs are not entitled to a broader injunction.

To prevail on their cross-appeal, plaintiffs must show that the district court abused its "wide discretion" in determining the scope of relief. *RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 375 (4th Cir. 2021).

---

[7] In *Penguin Random House, LLC v. Robbins*, the Eighth Circuit applied broad deference under *Hazelwood* to reject book publishers' challenge to a state law requiring many books to be removed from public school libraries. 172 F.4th 581, 587–88 (8th Cir. 2026). That decision has no application here in the absence of a claim by publishers.

Plaintiffs seek to satisfy that standard not by pointing to legal error but rather by noting the possibility that they may transfer schools. Their argument fails thrice over.

First, plaintiffs' argument rests on their misunderstanding that the district court was required to provide them with "complete relief." Br. 40 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025)). That argument misstates fundamental principles of equity. The principle that an injunction may be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), provides a ceiling, not a floor, on the district court's discretion in fashioning relief. "Complete relief is not a guarantee—it is the maximum a court can provide." *CASA*, 606 U.S. at 854. While plaintiffs assert (Br. 40–41) that the district court could have granted broader relief, they do not develop an argument that the narrower injunction rises to the level of an abuse of discretion. *See CASA*, 606 U.S. at 853–54 ("[T]o say that a court *can* award complete relief is not to say that it *should* do so."). That failure alone forecloses their cross-appeal. *See Elam v. Early*, 138 F.4th 804, 817 (4th Cir. 2025) (argument not developed in opening brief is forfeited). And there is every reason, even if the argument were entertained, to reject it: Requiring

32

systemwide changes to curricula and other practices at the behest of a handful of plaintiffs would implicate the same concerns once prompted by universal injunctions.

Second, plaintiffs take issue (Br. 41) with an injunction that the district court has not yet entered—one tied to each plaintiff as opposed to the schools attended by the plaintiffs when relief was granted. Plaintiffs assert that a student-focused injunction would not be an adequate alternative to the systemwide relief they seek. But plaintiffs must establish that the injunction that was actually entered, and not some hypothetical other injunction, was an abuse of discretion. And in any event, plaintiffs cannot argue that an injunction tied to each student as opposed to each school is unworkable because they took the opposite position before the district court. After the notices of appeal were filed, plaintiffs moved the district court to modify the injunction so that it would apply "to any DoDEA school where Plaintiffs relocate while the preliminary injunction is in effect." Motion to Modify the Preliminary Injunction, Dkt. 69, at 3. *But see Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam); *Lewis v. Tobacco Workers' Int'l*

33

*Union*, 577 F.2d 1135, 1139 (4th Cir. 1978).[8] In support of that motion, plaintiffs asserted that such an injunction "would suffice to remedy the ongoing First Amendment harms to [plaintiffs] E.G. and O.H."[9] Memorandum in Support of Renewed Motion for Preliminary Injunction, Dkt. 70, at 12. Having sought relief on the basis that a student-focused injunction would be adequate, plaintiffs cannot now assert that this narrower form of relief is inadequate in service of their all-or-nothing argument that the district court abused its discretion in failing to issue a systemwide injunction.

Third, plaintiffs' complaints about the scope of a tailored injunction fail to justify broader relief. Plaintiffs say that systemwide relief is required—despite the possibility of a narrower injunction satisfying their demand for complete relief—because any less burdensome injunction would be

---

[8] The government consented to modification of the injunction by indicative ruling and limited remand. Opposition to Motion to Modify the Injunction, Dkt. 80, at 2; *see* Fed. R. Civ. P. 62.1(a); Fed. R. App. P. 12.1. Plaintiffs refused to agree to use these procedures. Opposition to Motion to Modify the Injunction, Dkt. 80, at 2; Reply in Support of Renewed Motion for Preliminary Injunction, Dkt. 85.

[9] Plaintiffs also noted that they prefer a "DoDEA-wide injunction" and that they "intend to pursue a more expansive injunction on appeal or through other procedural mechanisms." Memorandum in Support of Renewed Motion for Preliminary Injunction, Dkt. 70, at 12.

"unnecessarily onerous" on DoDEA. Br. 41. But courts lack the power to require more relief than necessary to remedy the plaintiff's injury simply because doing so may be more efficient for the defendant. *See CASA*, 606 U.S. at 852; *see also id.* at 865 (Thomas, J., concurring). It is up to the government, not the district court, to determine whether complying with a properly limited injunction is sufficiently unworkable that it should choose to extend broader relief to facilitate compliance. *See Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring).

## B.    At minimum, the injunction should be narrowed.

1. Plaintiffs never grapple with their obligation to establish standing for each plaintiff who will benefit from the injunction. *See TransUnion*, 594 U.S. at 431 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff." (quotation marks omitted)); Gov't Br. 44–46. With regard to the portion of the injunction relating to library books, even accepting all of plaintiffs' arguments, only O.H.: (1) requested library books that DoDEA removed and (2) intends to enroll in a DoDEA school in Fall 2026. *See* Br. 19; JA279. And O.H. does not attend a school covered by the injunction. Plaintiffs have made no effort to justify the broader relief the district court granted with respect to the removal of library books. At

35

minimum, therefore, the injunction should be limited to protecting only O.H. She is the only plaintiff with even a colorable argument for establishing a future injury.

2. Similarly, as to both portions of the injunction, plaintiffs make no argument against narrowing the injunction so that it excludes Crossroads Elementary School, Sollars Elementary School, and Edgren Middle High School, which no plaintiffs attend. *See* Gov't Br. 47. Indeed, plaintiffs have seemingly soured on school-based injunctions. *See* Br. 40–41 (describing "school-based" injunctions as "unworkable"). Because plaintiffs have not defended the district court's injunction as it applies to those three schools, it should be vacated in that respect.

36

**CONCLUSION**

For the foregoing reasons and the reasons stated in the government's principal brief, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

*Of Counsel:*

EARL G. MATTHEWS
*General Counsel*

DANIEL TENNY

SARAH N. SMERLING
*Attorney*

*Department of War*

 /s/ *Maxwell A. Baldi*
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*
*maxwell.baldi@usdoj.gov*

JUNE 2026

37

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A) because it contains 7,637 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

/s/ *Maxwell A. Baldi*
MAXWELL A. BALDI